# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13

Christopher D. Beatty (SBN 266466)
chris.beatty@katten.com
Ashley T. Brines (SBN 322988)
ashley.brines@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: 310.788.4400
Facsimile: 310.788.4471

Richard L. Farley (*pro hac vice* forthcoming)
Richard.farley@katten.com
Lindsey L. Smith (*pro hac vice* forthcoming)
lindsey.smith@katten.com
Kelsey R. Panizzolo (*pro hac vice* forthcoming)
Kelsey.panizzolo@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
500 S. Tryon Street, Suite 2900
Charlotte, NC 28202-4213
Telephone: 704.344.3178

Attorneys for Plaintiff
The BrandR Group, LLC

14
15

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN MATEO

16
17
18
19
20
21
22
23
24
25
26
27
28

| | | |
|---|---|---|
| THE BRANDR GROUP, LLC | ) | Case No. |
| Plaintiff, | ) | **VERIFIED COMPLAINT** for: |
| vs. | ) | 1. **Tortious Interference with Contract** |
| ELECTRONIC ARTS, INC., and DOES 1 through 10, inclusive, | ) | 2. **Violation of California Civil Code § 3344** |
| Defendants. | ) | 3. **Violation of Right of Publicity/Misappropriation of Likeness** |
| | ) | 4. **Violation of California Business and Professions Code § 17200, *et seq.*; and** |
| | ) | 5. **Declaratory Relief** |

VERIFIED COMPLAINT

157725142v12

Plaintiff The BrandR Group, LLC ("TBG"), by and through its attorneys Katten Muchin Rosenman LLP, for its complaint in this action against Defendant Electronic Arts, Inc. ("EA Sports" or "EA"), alleges as follows:

## NATURE OF THE CASE

1.      This dispute involves the rights of collegiate student-athletes to receive fair compensation for the commercial use of their "name, image, and likeness" ("NIL") and the protection of the contractual rights of those engaged to advocate for those rights.

2.      For more than 100 years, National Collegiate Athletic Association ("NCAA") rules limited the financial benefits student-athletes could accept for the use of their NIL.  That rule changed in the wake of the seminal Ninth Circuit rulings in *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1272 (9th Cir. 2013) and *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), and the Supreme Court's decision in *NCAA v. Alston*, 141 S. Ct. 2141 (2021), which ultimately divested the NCAA of its long-standing justification for prohibiting collegiate athletes from commercializing their NIL and prompted the NCAA to suspend its previous restrictions and allow student-athletes to profit from the use of their NIL.

3.      With the removal of previous barriers to paying student-athletes for their NIL has come a frenzy of marketing and advertising opportunities for young student-athletes arising from their participation in collegiate sports.

4.      This has proven especially true for those student-athletes participating in collegiate football and basketball programs.  Indeed, it is hard to overstate the popularity of these collegiate sports in the United States, which contributes to the vast array of opportunities that are now available to collegiate football and basketball players with the use of their NIL.

5.      One such opportunity is the return of the *EA Sports College Football* video game ("EA College Football" or the "Game").  Originally released in the 1990s, in 2013-2014, EA announced that it was discontinuing its popular football video game amid an onslaught of NIL

157725142v12

litigation in 2013-2014. The discontinuance of the Game was significant given that it reportedly generated anywhere between $80 million to $125 million per year in sales revenue.[1]

6.    EA now plans to bring back its popular Game, but this time, EA intends to use student-athletes' NIL and schools' intellectual property ("IP") to create a more realistic college football experience for users – one that includes realistic-looking avatars of the players and the actual branding, logos, and even fight songs from the players' schools. The Game presents an exciting opportunity for young college football players to participate in what has historically been a tremendously popular and successful video game; more importantly, it presents an opportunity for these young athletes to be fairly compensated for helping to make that Game so successful.

7.    Unfortunately, EA Sports is trying to avoid paying collegiate football players a fair price for their participation in the Game, continuing the pre-*O'Bannon* pattern of large corporations taking advantage of young student-athletes and capitalizing on their NIL. EA Sports is reportedly offering student-athletes a flat fee of just $500 per athlete to participate in a Game which is expected to yield EA Sports significant revenue in year over year sales. As the contractual representative for student-athletes in Group Rights Programs co-branded with schools' IP, this is what TBG is trying to prevent.

8.    TBG is a brand management, marketing, and licensing business that holds exclusive Group Rights Licensing Agreements with dozens of FCS and FBS colleges and universities and thousands of football players for these schools. Generally, under these agreements, TBG has been engaged to act as the exclusive agent for student-athletes to secure third-party sponsorships and licensing opportunities for Group Licensing Programs – defined as licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes (as

---

[1] Kristi Dosh, *How much did Schools Make from EA Sports's NCAA Football Previously?*, https://businessofcollegesports.com/name-image-likeness/how-much-did-schools-make-from-ea-sportss-ncaa-football-previously/#:~:text=Industry%20analysts%20back%20then%20told,Sports'%20total%20revenue%20per%20year . (May 17, 2023) (reporting that *EA Sports College Football* generated $125 million in annual sales revenue); *but see* Steve Berkowitz, *How EA Sports's NCAA Football video game could make a comeback*, https://www.usatoday.com/story/sports/2019/05/20/how-ea-sportss-ncaa-football-video-game-could-make-comeback/3704876002/ (May 20, 2019) (reporting that EA executive previously testified that *EA Sports College Football* generated $80 million in sales revenue on the sale of roughly 2 million units).

2

157725142v12

defined below) of three (3) or more current athletes from one sport or six (6) or more from multiple sports in combination with school trademarks, logos, and other IP.

9.      Unlike the student-athletes it represents, TBG is well-positioned to negotiate with corporate sponsors and licensees – such as EA Sports – in order to ensure that its clients receive fair market value for the use of their respective NIL.  TBG is powered by a team of individuals with decades of collective management experience for some of the world's largest brands. TBG and its principals have substantial experience in the group licensing business and have developed significant goodwill among its clients and customers.

10.     Since the announcement that EA was developing a new version of the Game, TBG has paid careful attention to media and industry reports relating to EA's use of players' NIL and schools' IP.  Representatives of TBG promptly notified EA of its exclusive Group Licensing agreements and informed EA that any attempt to secure TBG's collaborating schools' and client student athletes' participation in the Game without the consent or involvement of TBG would be a violation of those agreements.

11.     Although TBG expressly informed EA of its exclusive contractual rights at collaborating schools that are implicated by the TBG-represented student-athletes included in the Game, EA is pressuring and coercing or attempting to coerce TBG's exclusive collaborating universities to opt-in to the Game, agreeing to a structure that will reportedly pay the student-athletes a flat fee that is far below market value and does not include any payments for future royalties.

12.     Given the ever-changing landscape of collegiate NIL rights, there is no bright-line rule for what a third-party must pay for the use of a student-athlete's NIL in certain contexts.  The issue of collegiate NIL rights has dominated sports headlines and been a hotly litigated subject for several years.  Fortunately, while the legislation surrounding student-athlete NIL rights is relatively new and still evolving, the law of contracts is not.

13.     This is a textbook case of tortious interference by EA of TBG's contractual rights *with thousands of student-athletes* and at schools where TBG has exclusive Collaboration Agreements.  TBG files this Complaint to prevent EA Sports from intentionally interfering with

3

VERIFIED COMPLAINT

its contractual rights, violating its right to publicity, and causing irreparable harm to TBG and the student-athletes it represents at collaborating schools.

**PARTIES, JURISDICTION AND VENUE**

14.     Plaintiff TBG is a limited liability company organized under the laws of the state of North Carolina with a principal place of business at 100 Corridor Road, Suite 200, Ponte Vedra Beach, FL 32082.

15.     Upon information and belief, Defendant EA Sports is corporation organized under the laws of the state of Delaware with its principal office located at 209 Redwood Shores Parkway, Redwood City, California 94065.

16.     TBG is informed and believes, and on that basis alleges, that Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to TBG for the wrongs alleged herein. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, are unknown to TBG at this time.  Accordingly, TBG sues Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities after they are ascertained.

17.     The Court has subject matter jurisdiction over this action, and venue is proper in San Mateo County, because Defendant EA Sports maintains its principal place of business in Redwood City, California.

18.     The Court has general personal jurisdiction over Defendant EA Sports because it maintains its principal place of business in Redwood City, California and the exercise of jurisdiction over Defendant EA Sports is consistent with the Constitutions of California and the United States of America.

VERIFIED COMPLAINT

157725142v12

## FACTUAL BACKGROUND

### TBG and NIL Licensing

19.     TBG is a leader in the collegiate group licensing space, using its industry experience and relationships to facilitate co-branding opportunities for student-athletes and their schools.

20.     Co-branding is the combining of the name, image, likeness, and other intellectual property rights owned by a particular athlete, aggregated with the branding rights from another entity, such as the school for which that athlete competes.

21.     For example, when a fan wants to purchase the jersey of their favorite college quarterback ("QB1"), the fan is purchasing an item that needs to be licensed from at least two sources: (1) QB1, for the use of his NIL; and (2) QB1's university, for the use of its logo and related IP.  TBG steps into this deal by grouping the rights and marketing them together to companies—such as jersey manufacturers—in order to create an efficient and effective way to create co-branded products, services, events and the like.

22.     It is in this industry (among others) that TBG has invested significant time, energy and money, building a sterling reputation and substantial goodwill, and in the process creating a brand for itself.

23.     Beginning as early as 2017, TBG believed that college athletics was likely to undergo significant change with respect to NIL programs across the country to allow college athletes to benefit from the marketing of their own name, image and likeness (a practice that was largely prohibited until 2021).

24.     Specifically, at that time, TBG believed the prohibition on athletes marketing their own NIL was likely going to change or be eliminated, so it began developing a strategy to market its professional sports group licensing experience to college athletic departments.

25.     TBG invested significant time, effort, and money into this belief and strategy, even before the rules surrounding NIL were changed, going so far as to develop co-branded programs with one particular university's alumni in two different sports so that the foundations for future

VERIFIED COMPLAINT
157725142v12

work with current student-athletes would be in place when the NIL restrictions were lifted by the NCAA.

26.   When the NIL rules did eventually change in 2021, college athletes were permitted to capitalize on their NIL while still in school, and TBG quickly became a leader in the new industry of collegiate group licensing.

**TBG's Agreements with Schools and Student-Athletes**

27.   To capitalize on co-branding opportunities for its student-athlete clients, TBG enters into Collaboration Agreements with colleges and universities to manage the schools' Group Licensing Programs – which it defines as "those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more Athletes from any one specific sport or six (6) or more Athletes from multiple sports in combination with University trademarks."

28.   TBG typically defines Athlete Attributes to mean "the Athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature in Collegiate Group Licensing Programs of any kind."

29.   As used herein, "Partner Schools" refers to those colleges and universities with whom TBG has entered into Collaboration Agreements to manage the schools' Group Licensing Programs.

30.   Pursuant to these Collaboration Agreements, TBG obtains the right to work with its Partner Schools' licensees and sponsors to explore and develop co-branded opportunities for student-athletes and to manage the schools' Group Licensing Programs.

31.   In connection with the Collaboration Agreements, TBG separately contracts with individual student-athletes at these Partner Schools, entering into Group Licensing Authorization and Assignment Agreements ("GLAs"), through which a participating student-athlete grants and assigns to TBG the right to use and to grant to licensees and sponsors the right to use the student-athlete's NIL for co-branded opportunities with the student-athlete's school and sports team in group licensing programs.

157725142v12

32.     Presently, 65 of TBG's Partner Schools have NCAA football programs, 54 of which are Division I schools.  TBG likewise has active GLAs with 3,725 current-roster[2] football players at these Partner Schools, including players residing in California.

33.     As used herein, "Client Athletes" refers to those 3,725 student-athlete football players with whom TBG has entered into GLAs for the right to use and market the players' NIL in connection with their respective schools' Group Licensing Programs.

34.     TBG's Collaboration Agreements and GLAs may differ slightly between parties, but the material provisions relevant to this action are substantially the same across all of those contract.

35.     Each GLA provides for the assignment of the Client Athlete's NIL rights in connection with their school's Group Licensing Program, stating as follows:

> The undersigned, **an Athlete at [Partner School], hereby grants and assigns to TBG** and its licensing affiliates during the term only of this Agreement, **the worldwide right to use <u>and to grant to licensees and sponsors</u> the right to use all or any combination of [Client Athlete's] name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature (collectively known as "Athlete Attributes")** in Collegiate Group Licensing Programs that also include the use of [Partner School's] intellectual property. "Collegiate Group Licensing Programs" are defined as those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more current [Partner School] Athletes from one sport or six (6) or more from multiple sports, either in combination with University trademarks and logos or separately as a group.

(emphasis added).

36.     Attached as **<u>Exhibit 1</u>** is a true and correct copy of TBG's GLA template that TBG uses with its Client Athletes.[3]  The template GLA of Exhibit 1 is substantially similar to all of TBG's executed GLAs in all material aspects.

---

[2] This number does not include incoming 2023 freshmen, a number of whom TBG has entered into GLAs with or with whom TBG is in final discussions.

[3] TBG will provide a list of all Client Athletes with whom TBG has entered into GLAs upon request and once a confidential protective order is entered.

37.    TBG's GLAs further clarify that, "[t]he focus of the Collegiate Group Licensing Programs will be <u>co-branded licensing opportunities involving groups of Athletes' NIL along with [the Partner School's] IP</u>."

38.    In combination, TBG's Collaboration Agreements with the Partner Schools and GLAs with the schools' student-athletes allow TBG to pursue group NIL opportunities for Client Athletes, knowing that they can use the schools' logos and other IP to do so; in other words, while TBG must collaborate with its Partner Schools to use their IP while pursuing opportunities for the student-athletes, TBG's clients in doing so are the student-athletes—not the schools.

39.    In fact, TBG receives no compensation or royalties from the Partner Schools. Pursuant to its agreements, Client Athletes assign to TBG the right to use and to grant to others the right to use the Client Athletes' NIL in Group Licensing deals, and TBG contracts directly with sponsors and licensees for the use of its Partner Schools' and Client Athletes' NIL.  TBG then distributes the royalty revenues received from the sponsor or licensee to the participating Client Athletes.  Typically, TBG retains a percentage commission of the Client Athlete's share of royalty revenue received, including royalties from video game, trading card, merchandise, and apparel sponsorships, and distributes the balance to the participating Client Athletes.

40.    All of TBG's Collaboration Agreements contain provisions designating TBG as either the exclusive or preferred contractor for the Partner Schools' Group Licensing Programs.

41.    The following is a representative exclusivity provision from TBG's Collaboration Agreement with one Partner School in the Big Ten Conference:

> 6. EXCLUSIVITY. During the Term of this Agreement, [University] recognizes TBG and [University's] exclusive agent to develop, implement and manage the Group Licensing Program among its current Athletes. During such time, [University] shall not engaged any other third party, without the express written consent of TBG, to develop, implement or manage any similar program involving a group of any size of current or former [University] Athletes.

42.    Attached as **Exhibit 2** is a true and correct copy of a Collaboration Agreement entered into between TBG and a Partner School, pursuant to which TBG is the exclusive manager

157725142v12

of the Group Licensing Program.  The Collaboration Agreement attached as Exhibit 2 is substantially the same as TBG's other Collaboration Agreements which grant TBG exclusivity.

43.     Certain other of TBG's Collaboration Agreements include Preferred Provider provisions, which state that the Partner School "shall consider TBG as its preferred provider of a Group Licensing Program for Athletes, and shall not, without TBG's written consent, contract with any other party to develop, implement or manage any substantially similar group licensing program for groups of any size of Athletes."

44.     Attached as **Exhibit 3** is a true and correct copy of a Collaboration Agreement entered into between TBG and a Partner School, pursuant to which TBG is the preferred provider for the Group Licensing Program.  The Collaboration Agreement attached as Exhibit 3 is substantially the same as TBG's other preferred provider agreements.

45.     Pursuant to TBG's Collaboration Agreements, a third-party cannot use the Partner School's trademarks, logos or other IP in combination with the NIL or other Athlete Attributes of three or more of a Partner Schools' student-athletes from any one specific sport or six or more student-athletes from multiple sports (i.e. Group Licensing) without TBG's authorization or consent.

46.     Note that while the Collaboration Agreements establish TBG as the exclusive or preferred agent for Group Licensing Programs, neither the Collaboration Agreements nor the GLAs prohibit or prevent the Partner Schools' student-athletes from individually marketing or licensing their NIL, so long as such NIL use does not implicate the Group Licensing Program.

47.     As an example, consistent with the Collaboration Agreement and the GLA, a student-athlete from a Partner School could individually contract with an athletic apparel company for the use of the athlete's NIL in an advertising campaign depicting only that individual (e.g. Michael Jordan's "Air Jordan" campaign with Nike).  In this example involving an individual athlete, Group Licensing Rights are not implicated.

48.     Conversely, Group Licensing Rights *would* be implicated if three or more members of a Partner School's basketball team contracted with an athletic apparel company for the use of

their NIL in an advertising campaign depicting the teammates with their school uniform and branding.

49.     In fact, the GLAs include express language making clear that TBG's representation applies only to Group Licensing Rights.  Each GLA includes the following:

> Please note that this Agreement does NOT limit an Athlete's right to grant the use of his/her individual Athlete Attributes or individual NIL for publicity, advertising, or other commercial purposes, except that such individual grants will not preclude the undersigned also from being covered by the Collegiate Group Licensing Programs granted by TBG. This Agreement also does not limit the Athlete's right to join with other Athletes to grant the group use of their NIL for publicity, advertising or other commercial purposes IF any such other group NIL grant does not involve any use or co-branding of any kind of [Partner School's] own IP or property (such as trademarks, logos, jerseys, names, nicknames, etc.)

50.     As evidenced by this language, TBG's mission is not to limit the commercial opportunities for its Client Athletes, but rather to expand those opportunities and leverage TBG's expansive experience in Group Licensing, such that its Client Athletes receive fair compensation for the use of their NIL in connection with the co-branding of their school.

51.     Based on the reported compensation offered to student-athletes by EA for their participation in the Game, EA's strategy is contrary to TBG's mission and certainly contrary to the interests of TBG's Client Athletes; EA's strategy is, in fact, contrary to the interests of college football student–athletes, generally.

## History of EA Sports Game

52.     Before NCAA rules allowed student-athletes to profit off of NIL, beginning in 1998, EA Sports produced and sold its NCAA-branded video game featuring various college football teams that allowed users to control digital avatars of college football players in simulated matches.[4]

---

[4] Gia Silahian, *EA Sports: It's in the Federal Legislation*, 45 Hastings COMM. & ENT. L.J. 75 (2023).

VERIFIED COMPLAINT

157725142v12

53.    EA Sports first released the game in 1998, under the title "*NCAA Football 98*," and thereafter released a new version of *NCAA Football* each year until 2013 (the 1998-2013 version of the game is collectively referred to herein as "*NCAA Football*").

54.    *NCAA Football* included a unique digital avatar for each college football player represented in the game.  The digital avatars did not identify the players by name, but they did possess the same identifying attributes, including their playing position and uniform number.[5]

55.    Consistent with NCAA rules at the time, EA Sports did not compensate the players for use of their NIL in *NCAA Football*.[6]

56.    The *NCAA Football* franchise was a consistent top-seller for EA Sports, generating tens of millions in unit sales between 2005-2014.[7]

57.    Despite its massive popularity, following a number of legal challenges regarding compensation for student-athletes, EA Sports stopped producing NCAA Football in 2013.

58.    After its discontinuation and in recent years, a college football video game was one of the most-requested games by fans to EA Sports.[8]

**EA's Announced Return of *EA Sports College Football***

59.    On February 2, 2021, EA Sports announced that it was bringing back the Game, to be relaunched as *EA Sports College Football*.

60.    In its February 2, 2021 press release, EA Sports Executive Vice President and General Manager, Cam Weber, touted that "[w]e've heard from the millions of passionate fans requesting the return of college football video games," and we are "beyond thrilled to say we are back in development."

61.    EA Sports also announced that it would be partnering with Collegiate Licensing Committee ("CLC"), a collegiate trademark licensing company, to develop the Game.  In its

---

[5] *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1271 (9th Cir. 2013).

[6] *See id.*

[7][7] EA Sports Press Release, *Electronic Arts & CLC to Bring Back College Football Video Games*, https://ir.ea.com/press-releases/press-release-details/2021/Electronic-Arts--CLC-to-Bring-Back-College-Football-Video-Games/default.aspx (February 2, 2021).

[8] *Id.*

VERIFIED COMPLAINT

157725142v12

February 2, 2021 announcement, EA revealed that it had reached a deal with CLC that includes licenses for nearly 100 Football Bowl Subdivision ("FBS")[9] schools' intellectual property – such as logos, stadiums, mascots, and fight songs.[10]

62.     CLC's Chief Executive Officer, Cory Moss, shared in EA Sports' excitement, stating that he was excited to bring back "one of the most popular collegiate licensed products in our history."

63.     EA Sports' February 2021 announcement came amid uncertainty regarding NCAA rules relating to student-athlete NIL rights, and at the time, EA Sports reported that the Game would not include student-athlete NIL but noted that EA Sports was watching developments with NIL closely.

64.     Following the Supreme Court's decision in *Alston*, EA Sports released the following statement:

> We are watching the recent developments regarding student-athlete name, image and likeness very closely. It's still very early stages at this point, and we plan to explore the possibility of including players in EA SPORTS College Football. For now, our development team is focused on working with our partners at CLC to ensure the game authentically showcases the great sport of college football and the more than 100 institutions signed on to be featured in our game.[11]

65.     Aware of the publicity surrounding EA Sports' announcement about the Game, and its related statements regarding the use of student-athlete NILs within the same, TBG reached out to EA Sports early-on to ensure it was aware of and honored TBG's rights with respect to group licensing management for its Partner Schools.

66.     In fact, as early as 2021, TBG's representatives were in regular communication with EA about TBG's Collaboration Agreements with Partner Schools, with TBG regularly

---

[9] NCAA Division I Football Bowl Subdivision is the highest level of college football and generally consists of the largest schools in the NCAA.  Presently, there are 133 schools in the FBS.

[10] Mike Hume and Rick Maese, *EA Sports revives college football franchise as courts mull NCAA's stance on amateurism*, https://www.washingtonpost.com/video-games/2021/02/02/ea-sports-college-football/ (February 2, 2021).

[11] Gia Silahian, *EA Sports: It's in the Federal Legislation*, 45 Hastings COMM. & ENT. L.J. 75 (2023).

VERIFIED COMPLAINT
157725142v12

reporting to EA about new partnerships formed and discussing possible opportunities for Group Licensing, including participation of EA's Partner Schools and Client Athletes in the Game.

67.     Over the next year, TBG communicated with EA about its re-release of the Game, the possible use of student-athlete NIL in the Game, and specifically about TBG's exclusive rights with respect to its Partner Schools' Group Licensing Programs.

68.     On April 15, 2022, Wesley Haynes, President and Founder of TBG, emailed Paul Cairns, Chief Business Officer for EA to follow up from one of their recent conversations.  In his April 15, 2022 email, Mr. Haynes provided Mr. Cairns with six sample Collaboration Agreements for FBS Partner Schools to ensure that EA was aware of and understood TBG's rights.  TBG is now aware that EA intends to include all six of those Partner Schools in the Game.

69.     On May 12, 2022, Mr. Haynes spoke with Mr. Cairns again about the continued development of the Game and TBG's rights with respect to Group Licensing Programs.

70.     During the May 12, 2022 call, Mr. Haynes discussed TBG's exclusive agreements and asked whether EA planned to include TBG's Partner Schools in the Game.  Mr. Cairns informed Mr. Haynes that "rest assured," EA would put all of TBG's Partner Schools and Sponsored-Players in the Game and would enter into direct agreements with TBG at all schools where TBG has rights.  Mr. Cairns also stated that EA "100% plans to work with [TBG]."

71.     Between May 2022 and May 2023, representatives of TBG and EA kept in touch regarding EA's relaunch of the Game and TBG's growing list of Partner Schools for whom it is the exclusive or preferred manager of Group Licensing Programs.

72.     On May 17, 2023, Sean O'Brien, an Executive Vice President of EA, emailed Mr. Haynes, *et al.*, reporting that EA had contracted with OneTeam Partners ("OneTeam") to "facilitate the opportunity for college athletes to opt in and be included in our CFB video game[.]"

73.     That same day, EA Sports made a public announcement regarding its deal with OneTeam, which noted that the partnership will include the "chance for all eligible FBS players to opt in to have their likenesses in EA Sports College Football."[12]

**TBG'S Formal Notice to EA**

74.     Given TBG's previous communications with EA and Mr. Cairns' assurances, it came as a shock to hear that EA was partnering with OneTeam to incorporate the NIL of student-athletes into the Game.[13]

75.     TBG took prompt action to assert its rights to EA, sending correspondence, through counsel, to Mr. Cairns on May 18, 2023.  In the May 18, 2023 correspondence, counsel for TBG not only reiterated that it has exclusive Group Licensing Rights for many of the schools to be featured in the Game, but also expressed concerns about the reported compensation to be paid to student-athletes.  A true and accurate copy of TBG's May 18, 2023 correspondence is attached hereto as **Exhibit 4**.

76.     Thereafter, TBG learned that EA was communicating directly with certain of its Partner Schools and telling the schools that contracting directly with EA (or an EA affiliate) to participate in the Game would not implicate any group rights and would therefore not be a violation of TBG's rights.

77.     For example, on May 24, 2023, a representative from a Partner School, a member of the Big Ten Conference, emailed EA employees, Deanne Mollema and Josh Gregory, asking whether opting in to the Game would create a conflict with the school's corporate sponsors.  In that email, the school representative informed EA that "We are currently a BrandR exclusive school."  Mr. Gregory responded to the Partner School, advising that each student-athlete would individually contract with EA, and thus group rights would not be implicated.  A true and accurate

---

[12] *See* May 18, 2023 *EA Sports to feature players' NIL in CFB video game*, https://www.sportsbusinessjournal.com/Daily/Closing-Bell/2023/05/17/ea-sports-college-football-video-game-nil.aspx.

[13] Lorenzo Reyes, *It's in the game!  EA Sports College Football video game will allow FBS players to opt in*, https://www.usatoday.com/story/sports/ncaaf/2023/05/17/ea-sports-college-football-video-game-will-allow-fbs-players-to-opt-in/70227313007/ (May 17, 2023).

VERIFIED COMPLAINT
157725142v12

copy of the May 24, 2023 email correspondence between EA and TBG's Partner School is attached hereto as **Exhibit 5**.[14]

78.     On May 30, 2023, EA Sports, through Senior Counsel, Betsy Contro, sent correspondence to TBG's counsel, confirming that "EA plans to provide eligible college football athletes the opportunity to opt-in individually and license their likeness rights directly to EA for inclusions in the Game."  A true and accurate copy of Ms. Contro's May 30, 2023 email is attached hereto as **Exhibit 6**.

79.     Also in her May 30, 2023 email, Ms. Contro further stated that its aim is "to allow individual athletes an inclusive and equitable opportunity to decide whether or not they would like their name and likeness to be included in the Game and to license those (unencumbered) rights directly from eligible student athletes, independently and unrelated to any potential licensing by EA of other intellectual property rights (e.g., division, conference, school, group, etc.)."

80.     Despite the clear implication of TBG's Group Licensing rights, Ms. Contro dismissed TBG's contractual relationships, stating, "[t]o be clear, this has nothing to do with the group rights with student athletes that BrandR claims to have."

81.     On May 31, 2023, TBG heard from certain of its Partner Schools that EA was pressuring schools who had not yet opted in to the Game to approve their participation in the Game by June 30, 2023.

82.     TBG learned of EA's June 30 deadline from representatives of certain of its Partner Schools who asked TBG how they should proceed.  TBG has heard from a number of Partner Schools that the schools do not want to miss out on the opportunity for its student-athletes to participate in the Game, but that they do not want to breach their contractual obligations to TBG.

83.     On June 1, 2023, TBG's counsel responded and sent EA Sports a second letter, clearly explaining that if EA Sports intends to use the NIL of student-athletes in connection with Partner Schools' name, branding, logos, or other IP in the Game, and the Game involves more than

---

[14] To protect the confidentiality and privacy of its Partner Schools, TBG has redacted Exhibit 5.  TBG will provide an unredacted copy of the email upon request and once a confidential protective order is entered.

157725142v12

three individual athletes, then the Game implicates group rights.  A true and accurate copy of TBG's June 1, 2023 letter is attached hereto as **Exhibit 7**.

84.     Also in its June 1, 2023 letter, TBG's counsel notified EA that TBG's Collaboration Agreements and GLAs required that EA recognize TBG as its clients' exclusive representative to the extent EA Sports wishes to include TBG's Partner Schools and Client Athletes in the Game.

85.     On June 5, 2023, Ms. Contro emailed counsel for TBG and asked for a list of the student-athletes represented by TBG.  Counsel for TBG responded on June 7, 2023, identifying the following Partner Schools for whom TBG is the exclusive or preferred partner for their respective Group Licensing Programs:

| | | |
|---|---|---|
| Appalachian State University | University of Louisville* | Oregon State University |
| Arizona State University | Marshall University | University of Pittsburgh |
| University of Arkansas | University of Maryland | Purdue University |
| Auburn University | University of Miami* | Rutgers, The State University of New Jersey (Rutgers University) |
| Baylor University | University of Michigan | Southern Methodist University |
| Boston College | Michigan State University | Syracuse University |
| Brigham Young University | Middle Tennessee State University | The University of Texas at Arlington |
| Campbell University | Mississippi State University | The University of Texas at Austin |
| University of Cincinnati | University of Missouri | Texas Christian University* |
| University of Colorado Boulder | Murray State University | The University of Texas at El Paso |
| Colorado State University | North Carolina Central University | The University of Texas Permian Basin |
| University of Connecticut | North Carolina State University | The University of Texas at San Antonio |
| University of Dayton | University of Nebraska-Lincoln | Towson University |
| University of Florida | The University of North Carolina at Chapel Hill | Troy University |
| Georgia Institute of Technology | University of North Texas | The University of Utah |
| Gonzaga University | Northwestern University | University of Virginia |
| University of Hawai'i at Manoa | Ohio University | University of Wyoming |
| University of Houston | The Ohio State University | Villanova University |

VERIFIED COMPLAINT

| Kansas State University | Oklahoma State University | Wake Forest University |
|---|---|---|
| Liberty University | Old Dominion University | West Virginia University |
| Louisiana Tech University | The University of Mississippi (Ole Miss) | William Marsh Rice University (Rice University) |
| University of Louisiana at Lafayette | Oral Roberts University | |
| *Schools for whom TBG's exclusivity rights are limited to the football program. | | |

86.     Also in its June 7, 2023 response, TBG provided EA with the following explanation of how its Group Licensing rights are implicated by the use of TBG's Partner Schools and Student Athletes in the Game:

> Given the nature of the EA Sports College Football Game, we think this list is sufficient to provide EA with a general understanding of TBG's representation.  As we explained previously, we presume that the Game will require the use of NIL from three or more football players from a given school, which necessarily implicates TBG's Group Licensing Rights for its partner schools.  TBG has entered into Student-Athlete Group Licensing Authorization & Assignment Agreements with almost all of the football players from these schools, authorizing TBG to act as the student-athletes' exclusive agent with respect to their respective school's Group Licensing Program.

87.     A true and accurate copy of TBG's June 7, 2023 email is attached hereto as **Exhibit 8**.

88.     To date, EA has not responded to TBG's June 7, 2023 email. Counsel for TBG followed up with Ms. Contro by email on June 12, 2023, requesting an opportunity to discuss TBG's rights and EA's plans, but EA has not responded.

89.     However, notwithstanding TBG's communications, EA Sports has informed (and continues to inform) TBG's Partner Schools that Partner Schools negotiating and contracting directly with EA Sports, and Client Athletes contracting directly with EA (or an EA affiliate) will not interfere with TBG's exclusivity rights.

90.     This assertion *by EA* is patently false.

91.     EA cannot circumvent TBG's or its Partner Schools' and Client Athletes' contractual rights by entering into individual and direct contracts for participation in the Game.

157725142v12

Indeed, TBG has *individual* and *direct* contracts with each of its Client Athletes.  TBG's GLAs with its Client Athletes plainly assign to TBG the right to use and license its Client Athletes' NIL in licensing programs such as EA's Game, where one Client Athlete's NIL will be used in combination with two or more teammates and their school's IP.

92.    Further, EA continues to push TBG's Partner Schools to opt-in to the Game by its arbitrary June 30 deadline or else they will be ineligible from participating.

93.    Despite repeated notices that negotiating directly with Partner Schools or Client Athletes violates TBG's Collaboration Agreements, EA Sports continues to negotiate in direct, knowing, and intentional interference with TBG's contractual rights.

94.    EA's conduct and misrepresentations have disrupted TBG's contractual relationships with its Partner Schools and Client Athletes.

95.    Indeed, certain of TBG's Partner Schools have already opted-in to the Game, violating their exclusive Collaboration Agreements with TBG, while others have expressed confusion as to how they should proceed when they are interested in participating in the Game and offering that opportunity to their student-athletes, but do not want to run afoul of their contractual obligations with TBG.

**EA's Compensation to Student-Athletes and Schools**

96.    EA's announced return of the Game prompted significant media interest, particularly since EA revealed it would use student-athletes' NIL in connection with their respective teams' logos and IP and that EA would compensate student-athletes for their NIL.

97.    In the May 17, 2023 announcement, EA Sports reported that the participating players "will receive compensation for being placed in the game," and that details regarding "how much an athlete will receive and the structure of payments – are still being finalized."[15]

98.    That same day, EA reportedly told ESPN that the goal is to be "as inclusive and equitable as possible[,]" while OneTeam's website referenced that if "the influence of individual

---

[15] *Id.*

VERIFIED COMPLAINT

157725142v12

1  sales couldn't be figured out" that revenue would be divided equally among athletes included in

2  each licensing program.[16]

3      99.    Since then, numerous articles have been published regarding the reported

4  compensation EA is offering to student-athletes for their participation in the Game.  Reportedly,

5  EA plans to offer a flat, one-time payment of $500 to each player for the use of their NIL in the

6  Game, and no payment for royalties on actual sales of the Game.[17]

7      100.   TBG has also heard from its Partner Schools that EA is offering to pay participating

8  schools some percentage of income received from the Game, with the total compensation pool

9  available to schools being 10% of the Game's revenue, with guaranteed payments ranging from

10 $10,400 to $104,900 depending on variables such as the football program's prominence, recent

11 national ranking, etc.

12     101.   EA's proposed compensation to players for participation in the Game is far below

13 market value.

14     102.   Indeed this reported amount is far less than EA paid players in settlement of the

15 seminal NIL case, *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1056 (9th Cir.

16 2015), where former University of California, Los Angeles basketball player, Ed O'Bannon, sued

17 EA, *et al.*, after recognizing himself as a digital avatar in EA's *NCAA Basketball 2009* video game.

18 O'Bannon joined with other former NCAA basketball and football players to form the class of

19 student-athletes, with whom EA eventually settled for a total of $60 million.  Individual players

20 received varying amounts in the settlement, but reports indicate that players received on average

21 about $1,600 each after payment of expenses and legal fees.[18]

22

23

24 [16] Mike McDaniel, *EA Sports Reaches Agreement to Have FBS Players in College Football Game*,
   https://www.si.com/college/2023/05/17/ea-sports-reaches-agreement-real-fbs-players-college-football-game-nil
25 (May 17, 2023).

26 [17] James Batchelor, *College football players urged to boycott EA Sports game over low pay*,
   https://www.gamesindustry.biz/college-football-players-urged-to-boycott-ea-sports-game-over-low-pay (June 8,
   2023).

27 [18] Stephen Totilo, *EA Sports reaches deal to pay college football athletes*, https://www.axios.com/2023/05/18/ea-
28 sports-college-football-deal (May 18, 2023).

103.   As another example, EA Sports is reportedly paying some National Football League players $28,000 each to appear in EA's annual release of its *Madden* video game.[19]

104.   Not only is the reported $500 per player insufficient to compensate the Client Athletes for the use of their NIL in the Game, but TBG recently learned that the potential cost to players is even higher.  EA is reportedly seeking exclusive rights to use participating schools' trademarks and related indicia for any current or future simulation game play within college football—not just the Game—and non-exclusive rights for non-simulation games.  Thus, not only would players' compensation for the use of their NIL in the Game be capped at $500, but they would be precluded from earning additional compensation off of their NIL in other simulation games such as arcade and video game opportunities.

105.   This is exactly why it is critical that these student-athletes have the benefit of TBG's representation in negotiating with corporate giants like EA.

**The Client Athletes and TBG will be Irreparably Harmed if EA is not Enjoined**

106.   EA has made clear its intent to violate not only TBG's contractual relationships, but also the Client Athletes' right to contract for fair representation in negotiating Group Licensing sponsorships and licensing deals.

107.   TBG's Client Athletes have made clear their intent and desire to be represented by TBG in sponsorship and licensing opportunities involving Group Licensing Programs, specifically those involving video games.

108.   TBG's GLAs state that "[t]he focus of the Collegiate Group Licensing Programs will be <u>co-branded opportunities involving groups of Athletes' NIL along with [the Partner School's] IP</u>[,]" and that the Client Athletes "shall receive 70% (Seventy Percent) of the royalties from third-party licensees in the video game [category.]"

109.   Unlike professional athletes, collegiate student-athletes do not yet have an organized union to represent them in Group Licensing Programs.

---

[19] Franca Quarneti, *EA Sports' College Football Return Marred by Potential Boycott Over Poor Compensation*, https://www.benzinga.com/general/gaming/23/06/32786383/ea-sports-college-football-return-marred-by-potential-boycott-over-poor-compensation (June 8, 2023).

VERIFIED COMPLAINT

157725142v12

110.    For instance, players in the National Football League ("NFL") are represented by the NFL Players Association ("NFLPA"), and the NFLPA negotiates with EA for the licensing of players' NIL rights to be included in the annual *Madden* video game.

111.    TBG's Client Athletes do not have a union, but they are not without representation. They have TBG, whom they engaged to leverage its industry expertise and substantial market share of FBS Partner Schools and Client Athletes to negotiate fair compensation for the Client-Athletes participation in Group Licensing Programs such as EA's Game.

112.    TBG is informed and understands that EA intends to include most—if not all—of its Partner Schools and Client Athletes in the Game.  This, of course, makes sense given that TBG's Partner Schools include 35 of the 65 teams in Power Five conferences[20], six of the 14 programs appearing in the College Football Playoffs since 2014, nine teams ranked in the Associated Press Top 25 at the end of the 2022-2023 college football season, and programs accounting for seven of the 16 Bowl Championship Series ("BCS") championships during the 1998-2013 BCS era.

113.    Further, at least 54 of TBG's Partner Schools were featured in past iterations of the Game before it was discontinued.

114.    Because of these relationships, TBG is well-positioned to influence the amount of compensation to be paid by EA to not only its Client Athletes, but to all other student-athletes who may wish to participate in the Game.

115.    EA's attempt to exclude TBG from discussions regarding the use of Client Athletes' NIL in the Game amounts to anticompetitive conduct that is contrary to the public interest and public policy of California.

116.    As collegiate NIL rights have evolved over the past several years, California has particularly championed the rights of student-athletes to be fairly compensated for the use of their NIL.  California was the first state in the country to create a legal right for college athletes to be compensated for the commercial use of their NIL.  California's Fair Pay to Play Act was groundbreaking legislation in the area of student-athletes NIL rights, and importantly authorizes

---

[20] The "Power Five" conferences include the Atlantic Coast Conference, Big Ten Conference, Big 12 Conference, Pac-12 Conference, and Southeastern Conference.

VERIFIED COMPLAINT

157725142v12

college athletes to hire agents and other representatives to assist them in negotiating and securing commercial opportunities.[21]

117.   EA seeks to reverse that evolution, denying not only TBG's Client Athletes the right to their desired representation, but also denying all participating student-athletes fair compensation for the use of their NIL in the Game.

118.   Again, EA's conduct goes beyond its failure to offer fair compensation for the Client Athletes' NIL in *this* Game, as EA is reportedly seeking to obtain exclusivity rights for the use of Client Athletes' NIL in *other* simulation video games, compounding the unfairness of EA's offer.

119.   EA's interference with TBG's exclusive Collaboration Agreements has caused and will continue to cause TBG immeasurable and irreparable harm.

120.   EA's false and deceptive assurances to TBG's Partner Schools that contracting directly with EA will not violate the Collaboration Agreements with TBG, as well as EA's artificial deadline for the schools to opt-in to the Game by June 30, 2023 places TBG's Partner Schools in the unenviable position of either breaching their contracts with TBG or potentially losing the opportunity for themselves and their athletes to participate in the Game.

121.   Similarly, EA's tactics are misleading and deceptive to TBG's Client Athletes, the vast majority of who are not represented by attorneys or player's agents and who may unwittingly opt-in to EA's game, not knowing that they are breaching their GLAs with TBG and that they are also likely giving up other NIL sponsorship and licensing opportunities.

122.   EA's tactics will also cause irreparable harm to TBG's Client Athletes, and to every student-athlete who opts-in to their scheme for unfair compensation, because they are being deprived of the opportunity to have their own representative negotiate on their behalves for fair compensation for the use of their NIL.  That is the fundamental purpose of TBG's Collaboration Agreements, and that is what is being circumvented by EA's program and its misleading tactics.

---

[21] *See* Cal. Educ. Code § 67456; Michael McCann, *What's Next After California Signs Game Changer Fair Pay to Play Act into Law?*, https://www.si.com/college/2019/09/30/fair-pay-to-play-act-law-ncaa-california-pac-12 (September 30, 2019).

VERIFIED COMPLAINT

157725142v12

123.    TBG's own financial damage is also likely impossible to calculate, leading further to its irreparable harm.   Pursuant to the GLAs and Collaboration Agreements, TBG's compensation is based on a percentage of the revenue that it is able to obtain for its Client Athletes for the use of the NIL in Group Licensing arrangements.

124.    If given the opportunity to represent its Client Athletes in fair negotiations with EA and in compliance with its contractual rights and its Partner Schools' and Client Athlete;' contractual obligations, TBG is confident that it would successfully obtain fair compensation to for Client Athletes (and ultimately to every student athlete that opts in to EA's new Game), even after subtracting TBG's commission for its representation. Absent the opportunity to do so, however, it is exceedingly difficult to calculate TBG's damages—or the damages suffered by student athletes themselves by opting in to EA's unfair compensation scheme.

**FIRST CLAIM FOR RELIEF**
**(Tortious Interference with Contract)**
**(By TBG Against Defendants)**

125.    TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

126.    TBG has valid and binding Collaboration Agreements with 65 Partner Schools and GLAs with 3,725 Client Athletes.

127.    EA Sports is aware of TBG's Collaboration Agreements and GLAs, both through notices from TBG directly as well as through correspondence with some of TBG's Partner Schools.

128.    EA Sports is in possession of certain of TBG's Collaboration Agreements and is informed of every Partner School with whom TBG is the exclusive or preferred partner for the schools' Group Licensing Program.

129.    Specifically, EA Sports is aware that the use of TBG's Client Athletes' NIL in the Game implicates TBG's exclusive Group Licensing Rights with its Client Athletes and Partner Schools and that it is a violation of TBG's contractual rights for EA to facilitate the use of the Client Athletes' NIL or the Partner Schools' IP without TBG's involvement or consent.

VERIFIED COMPLAINT

157725142v12

130.   TBG does not consent to any agreement between EA (or any other third-party) and its Partner Schools and Client Athletes for the use of their respective IP and NIL in the Game.

131.   By requiring TBG's Partner Schools and Client Athletes to negotiate directly with EA or an EA affiliate for their participation in the Game, EA is preventing TBG and its Partner Schools and Client Athletes from performing their contractual obligations under the Collaboration Agreements and GLAs.

132.   Because of EA's interference and direct communications with TBG's Partner Schools, certain of the Partner Schools have already either contracted directly with EA or agreed to contract directly with EA for the use of their IP and their participation in the Game, in direct violation of their contractual obligations to TBG.

133.   EA ultimately intends to engage most—if not all—of TBG's Partner Schools and Client Athletes to participate in the Game.

134.   EA Sports intended to disrupt the performance of TBG, its Partner Schools, and Client Athletes of their contractual obligations under the respective Collaboration Agreements and GLAs.  Further, EA Sports knew the disruption of the performance by the parties of their obligations under the respective Collaboration Agreements and GLAs was substantially certain to occur.

135.   As a result of EA's interference with TBG's contractual relationships with its Partner Schools and Client Athletes, TBG has been harmed by the deprivation of its contractual right to represent its Client Athletes in negotiations with EA for fair compensation for the use of the Client Athletes' NIL in the Game.

136.   Also as a result of EA's interference with TBG's contractual relationships with its Partner Schools and Client Athletes, TBG has suffered and will continue to suffer damages resulting from lost royalties owed to TBG under the GLAs, in an amount to be determined at trial. Disgorgement is also appropriate.

137.   EA Sports' conduct was a substantial factor in causing TBG's harm.

138.   Further, preliminary and permanent injunctive relief is appropriate to restrain EA Sports from engaging in interference.

VERIFIED COMPLAINT

139.   Because EA Sports has acted with oppression, fraud or malice, punitive damages are appropriate to punish EA Sports and make an example of EA Sports.

**SECOND CLAIM FOR RELIEF**
**(Violation of Right of Publicity; CA. Civ. Code § 3344)**
**(By TBG Against Defendants)**

140.   TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

141.   Pursuant to the express terms of the GLAs between TBG and its Client Athletes, each Client Athlete assigned to TBG the right to use their NIL in Collegiate Group Licensing Programs.

142.   Accordingly, TBG owns the right to use the Client Athletes' NIL in Collegiate Group Licensing Programs, and no third-party can use the Client Athletes' NIL in Group Licensing deals without TBG's authorization and consent.

143.   In its public reports to the media and private communications with TBG's Partner Schools, EA communicated a clear intent to use the NIL of most—if not all—of TBG's Client Athletes in its Game.

144.   EA has knowingly engaged certain of TBG's Partner Schools to participate in the Game and has announced its intention to include the Partner Schools' brand, logos, and other IP in the Game.

145.   EA has likewise announced its intention to appropriate and use the Client Athletes' NIL for its own commercial gain, in knowing violation of TBG's Group Licensing Rights, without TBG's consent, and in knowing violation of Cal. Civ. Code § 3344.

146.   EA's knowing appropriation of the Client Athletes' NIL is for the purpose of soliciting sales of EA's *NCAA College Football* video game.

147.   Based on the past performance of EA's *NCAA College Football* game and reported projections, EA expects to sell millions of units of its Game, generating hundreds of millions of dollars in revenue from the sale of the Game, featuring TBG's Partner Schools' IP and Client Athletes' NIL.

VERIFIED COMPLAINT

157725142v12

148.   EA's Game will include the NIL of at least three student-athletes from the Partner Schools represented in the Game, and thus, EA's use of the Client Athletes' NIL in the Game constitutes Group Licensing, as defined by TBG's Collaboration Agreements and GLAs, for which TBG owns the exclusive rights.

149.   TBG does not consent to EA's use of its Client Athletes' NIL in the Game.

150.   As a direct and proximate result of EA's violation of TBG's right of publicity, TBG has suffered and will continue to suffer damages resulting from lost royalties owed to TBG under the GLAs, in an amount to be determined at trial.  Disgorgement is also appropriate.

151.   As a further direct and proximate result of the wrongful conduct set forth above, TBG has been injured by the loss of the right to control the commercial exploitation of its Client Athletes' NIL.

152.   Further, preliminary and permanent injunctive relief is appropriate to restrain EA Sports from engaging in interference and violating TBG's right of publicity.

153.   Because EA Sports has acted with oppression, fraud or malice, punitive damages are appropriate to punish EA Sports and make an example of EA Sports.

### THIRD CLAIM FOR RELIEF
**(Violation of Common Law Right of Publicity / Misappropriation of Likeness)**
**(By TBG Against Defendants)**

154.   TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

155.   Pursuant to the express terms of the GLAs between TBG and its Client Athletes, each Client Athlete assigned to TBG the right to use their NIL in Collegiate Group Licensing Programs.

156.   Accordingly, TBG owns the right to use the Client Athletes' NIL in Collegiate Group Licensing Programs, and no third-party can use the Client Athletes' NIL in Group Licensing deals without TBG's authorization and consent.

VERIFIED COMPLAINT

157725142v12

157.    In its public reports to the media and private communications with TBG's Partner Schools, EA communicated a clear intent to use the NIL of most—if not all—of TBG's Client Athletes in its Game.

158.    EA has knowingly engaged certain of TBG's Partner Schools to participate in the Game and has announced its intention to include the Partner Schools' brand, logos, and other IP in the Game.

159.    EA has likewise announced its intention to appropriate and use the Client Athletes' NIL for its own commercial gain, in violation of TBG's Group Licensing Rights, without TBG's consent, and in knowing violation of its right of publicity.

160.    EA's knowing appropriation of the Client Athletes' NIL is for its own commercial gain and for the purpose of soliciting sales of EA's NCAA College Football video game.

161.    Based on the past performance of EA's NCAA College Football game and reported projections, EA expects to sell millions of units of its Game, generating hundreds of millions of dollars in revenue from the sale of the Game, featuring TBG's Partner Schools' IP and Client Athletes' NIL.

162.    EA's Game will include the NIL of at least three student-athletes from the Partner Schools represented in the Game, and thus, EA's use of the Client Athletes' NIL in the Game constitutes Group Licensing, as defined by TBG's Collaboration Agreements and GLAs, for which TBG owns the exclusive rights.

163.    TBG does not consent to EA's use of its Client Athletes' NIL in the Game.

164.    As a direct and proximate result of EA's violation of TBG's right of publicity, TBG has suffered and will continue to suffer damages resulting from lost royalties owed to TBG under the GLAs, in an amount to be determined at trial.  Disgorgement is also appropriate.

165.    As a further direct and proximate result of the wrongful conduct set forth above, TBG has been injured by the loss of the right to control the commercial exploitation of its Client Athletes' NIL.

166.    Further, preliminary and permanent injunctive relief is appropriate to restrain EA Sports from engaging in interference and violating TBG's right of publicity.

157725142v12

167.   Because EA Sports has acted with oppression, fraud or malice, punitive damages are appropriate to punish EA Sports and make an example of EA Sports.

### FOURTH CLAIM FOR RELIEF
#### (Violation of California Business and Professions Code § 17200, et seq.)
#### (By TBG Against Defendants)

168.   TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

169.   California Business and Professions Code § 17200, et seq. (the "Unfair Competition Law" or "UCL") prohibits unlawful, unfair and fraudulent business acts and practices.

170.   By negotiating directly with TBG's Partner Schools—in direct violation of TBG's exclusivity agreements—EA Sports is tortiously and unlawfully interfering with TBG's contractual and business relationships and violating TBG's NIL rights.  Further, EA Sports is fraudulently misrepresenting the scope and nature of TBG's rights in communications with athletes, schools, and the public.

171.   EA Sports' interference is unlawful, fraudulent, and/or unfair competition in violation of the UCL.

172.   As a direct and proximate result of EA Sports' unfair, fraudulent and illegal business practices, TBG is suffering and will continue to suffer financial losses if and when EA Sports reaches any agreements with TBG's Partner Schools, without TBG's involvement and in direct violation of EA Sports' exclusivity agreements.

173.   Pursuant to the UCL, TBG is also entitled to injunctive relief to protect athletes, schools, and the public from EA's unfair, illegal, and fraudulent practices.

### FIFTH CLAIM FOR RELIEF
#### (Declaratory Relief)
#### (By TBG against Defendants)

174.   TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

175.   TBG owns the exclusive right to negotiate under the Group Licensing Rights with its Client Athletes and Partner Schools.

VERIFIED COMPLAINT
157725142v12

176.     To the extent EA Sports wishes to include TBG's Partner Schools and Sponsored Students in the Game, TBG's Collaboration Agreements and GLAs require that EA recognize TBG as its clients' exclusive agent.

177.     By negotiating directly with TBG's Partner Schools, EA Sports is in direct violation of TBG's exclusivity agreements.

178.     As a result of the foregoing, there is an actual and present controversy between TBG and EA Sports.

179.     Accordingly, TBG desires a judicial declaration that TBG has exclusive rights to negotiate under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes and to provide EA Sports what it needs to lawfully make the Game.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff TBG prays that the Court enter Judgment as follows:

1.   That EA be preliminarily and permanently enjoined from the following:

    a.   Directly or indirectly soliciting TBG's Partner Schools or Client Athletes for their participation in the Game;

    b.   Directly or indirectly from interfering with TBG's contractual rights granted to TBG under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes; and

    c.   Directly or indirectly using, appropriating, or incorporating the NIL of TBG's Client Athletes in the Game without the express authorization and consent of TBG.

2.   That TBG is entitled to recover damages in an amount in excess of $25,000, to be determined at trial;

3.   That TBG is entitled to recover punitive damages pursuant to California Civil Code § 3294;

4.   That TBG recover costs and attorneys' fees;

5. For a judicial declaration that TBG has exclusive rights to negotiate under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes and to provide EA Sports what it needs to lawfully make the Game; and

6. For such other relief as the Court deems just and proper.

KATTEN MUCHIN ROSENMAN LLP

By: */s/ Christopher D. Beatty*

Christopher D. Beatty (SBN 266466)
chris.beatty@katten.com
Ashley T. Brines (SBN 322988)
ashley.brines@katten.com
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: 310.788.4400
Facsimile: 310.788.4471

Richard L. Farley (*pro hac vice* forthcoming)
Richard.farley@katten.com
Lindsey L. Smith (*pro hac vice* forthcoming)
lindsey.smith@katten.com
Kelsey R. Panizzolo (*pro hac vice*
forthcoming)
Kelsey.panizzolo@katten.com
500 S. Tryon Street, Suite 2900
Charlotte, NC 28202-4213
Telephone: 704.344.3178
Facsimile: 704.444.2050

ATTORNEYS FOR THE BRANDR GROUP,
LLC

VERIFIED COMPLAINT
157725142v12

1

## JURY DEMAND

2

3      Plaintiff TBG hereby demands a trial by jury.

4
                                    KATTEN MUCHIN ROSENMAN LLP
5

6
                                    By: */s/ Christopher D. Beatty*
7

8                                       Christopher D. Beatty (SBN 266466)
                                        chris.beatty@katten.com
9                                       Ashley T. Brines (SBN 322988)
                                        ashley.brines@katten.com
10                                      2029 Century Park East, Suite 2600
                                        Los Angeles, CA 90067
11                                      Telephone: 310.788.4400
                                        Facsimile: 310.788.4471
12
                                        Richard L. Farley (*pro hac vice* forthcoming)
13                                      Richard.farley@katten.com
                                        Lindsey L. Smith (*pro hac vice* forthcoming)
14                                      lindsey.smith@katten.com
                                        Kelsey R. Panizzolo (*pro hac vice*
15                                      forthcoming)
                                        Kelsey.panizzolo@katten.com
16                                      500 S. Tryon Street, Suite 2900
                                        Charlotte, NC 28202-4213
17                                      Telephone: 704.344.3178
                                        Facsimile: 704.444.2050
18

19                                      ATTORNEYS FOR THE BRANDR GROUP,
                                        LLC
20

21

22

23

24

25

26

27

28

VERIFIED COMPLAINT

157725142v12