1   Christopher D. Beatty (SBN 266466)
    chris.beatty@katten.com
2   Ashley T. Brines (SBN 322988)
    ashley.brines@katten.com
3   **KATTEN MUCHIN ROSENMAN LLP**
    2029 Century Park East, Suite 2600
4   Los Angeles, CA 90067
    Telephone: 310.788.4400
5   Facsimile: 310.788.4471

6   Richard L. Farley (*pro hac vice* forthcoming)
    Richard.farley@katten.com
7   Lindsey L. Smith (*pro hac vice* forthcoming)
    lindsey.smith@katten.com
8   Kelsey R. Panizzolo (*pro hac vice* forthcoming)
    Kelsey.panizzolo@katten.com
9   **KATTEN MUCHIN ROSENMAN LLP**
    500 S. Tryon Street, Suite 2900
10  Charlotte, NC 28202-4213
    Telephone: 704.344.3178

11

12  Attorneys for Plaintiff
    The BrandR Group, LLC

13          **UNITED STATES DISTRICT COURT**
14          **NORTHERN DISTRICT OF CALIFORNIA**

15

16  The BrandR Group, LLC,                    Case No. 3:23-cv-02994-LB

17          Plaintiff,                        Honorable Laurel Beeler

18          v.                               **PLAINTIFF'S *EX PARTE* APPLICATION
                                             FOR TEMPORARY RESTRAINING
19  Electronic Arts, Inc., and DOES 1 through 10,  ORDER AND ORDER TO SHOW CAUSE
    inclusive,                               WHY A PRELIMINARY INJUNCTION
20                                           SHOULD NOT ISSUE; MEMORANDUM
            Defendants,                      OF POINTS AND AUTHORITIES**

21                                           [Declaration of Wesley Haynes; Declaration
22                                           of Christopher Beatty; and [Proposed] Order
                                             filed concurrently herewith]

23                                           Date: Requested as soon as possible
24                                           Time: TBD
                                             Place: TBD

25                                           State Court Action Filed: June 16, 2023
26                                           Date of Removal: June 20, 2023

27

28

---

PLAINTIFF'S EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1 310.788.4400 tel  +1 310.788.4471 fax

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to Local Rules 7-10 and 65, and Federal Rule of Civil Procedure 65(b), on a date and time to be set by the Court, in Courtroom B – 15th Floor of the above-entitled court located at San Francisco Courthouse, 450 Golden Gate Ave., San Francisco, California 94102, Plaintiff The BrandR Group ("Plaintiff" or "TBG") will and hereby does move, *ex parte*, for an Application for a Temporary Restraining Order and an order to show cause why a preliminary injunction should not issue (the "Motion") against Defendant Electronic Arts, Inc. ("Defendant" or "EA Sports").

As set forth in the accompanying Memorandum of Points and Authorities and the Declaration of Wesley Haynes and the exhibits thereto, Plaintiff will suffer great and irreparable harm unless the Court issues a TRO and preliminary injunction enjoining Defendant from (1) directly or indirectly soliciting TBG's Partner Schools and Client Athletes for their participation in the game; (2) directly or indirectly from interfering with TBG's contractual rights granted to TBG under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes; and (3) directly or indirectly using, appropriating, or incorporating the NIL of TBG's Client Athletes in the Game without the express authorization and consent of TBG, the exclusive license holder of such rights (capitalized terms defined herein below).

This Motion is made pursuant to Rule 65 of the Federal Rules of Civil Procedure on the grounds that (1) Plaintiff is likely to prevail on its causes of action, or at a minimum, Plaintiff has raised serious questions going to the merits; (2) Plaintiff will likely suffer irreparable harm or injury if relief is denied; (3) the balance of equities tips in Plaintiff's favor, or alternatively, that the balance of hardships tips sharply toward Plaintiff; and (4) the public interest supports granting the injunction.

Pursuant to Local Rule 65-1 and as described further in the Declaration of Christopher Beatty filed concurrently herewith, notice of this motion was provided to EA Sports' counsel on June 22, 2023. *See* Declaration of Christopher Beatty.

This Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the concurrently filed Declaration of Wesley Haynes and the exhibits attached thereto,

the pleadings and papers on file in this action, such other matters of which this Court must or may take judicial notice; and such evidence and argument as may be considered by the Court at any hearing on this matter.

Dated: June 22, 2023                    **KATTEN MUCHIN ROSENMAN LLP**


By: /s/ Christopher D. Beatty
　　　　　　　Christopher D. Beatty
　　　　　　　Attorneys for Plaintiff
　　　　　　　The BrandR Group, LLC

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................. 2

    A.   The BrandR Group ............................................................................... 2

    B.   TBG's Group Rights Licensing Agreements ...................................... 2

    C.   EA Sports and the Game ...................................................................... 5

    D.   Communications between TBG and EA Regarding the Game ............ 5

    E.   EA's Compensation to Student-Athletes and Schools ....................... 9

III.  LEGAL STANDARD ...................................................................................... 10

IV.   ARGUMENT ................................................................................................... 11

    A.   TBG will prevail on the merits of its claims against EA Sports. ...... 11

        1.   TBG will prevail on its tortious interference with contract claim. ....................................................................................... 11

        2.   TBG will prevail on its violation of right of publicity claim. .......... 14

        3.   TBG will prevail on its claim for violation of the UCL................... 15

    B.   The balance of hardships and equities tilts sharply in TBG's favor............ 17

    C.   TBG will suffer irreparable harm and injury if relief is denied. .................. 18

    D.   The injunction is in the public interest. ..................................................... 22

V.    CONCLUSION................................................................................................ 23

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

PLAINTIFF'S EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Alliance for the Wild Rockies v. Cottrell*,
5     632 F.3d 1127 (9th Cir. 2011) ...............................................................................10

6

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
     750 F.2d 1470 (9th Cir. 1985) ...............................................................................21
7

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,
8     28 F. Supp. 3d 1006 (C.D. Cal. 2013) ...................................................................16

9

*Committee on Children's Television, Inc. v. General Foods Corp.*,
10     35 Cal. 3d 211 (1983) ............................................................................................17

11

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
     869 F.3d 848 (9th Cir. 2017) .................................................................................11
12

*Doran v. Salem Inn, Inc.*,
13     422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) ..........................................21

14

*hiQ Labs, Inc. v. LinkedIn Corp.*,
15     31 F.4th 1180 (9th Cir. 2022) ...........................................................................13, 19

16

*Imperial Ice Co. v. Rossier*,
     18 Cal. 2d 33 (1941) ..........................................................................................13, 19
17

*Innersvingen AS v. Sports Hoop, Inc.*,
18     No. CV12-05257 R JCGX, 2012 WL 3048363 (C.D. Cal. July 26, 2012) ...........22

19

*Ixchel Pharma, LLC v. Biogen, Inc.*,
20     9 Cal. 5th 1130 (2020) ..........................................................................................12

21

*Jenni Rivera Enterprises, LLC v. Latin World Ent. Holdings, Inc.*,
     36 Cal. App. 5th 766 (2019) ..................................................................................12
22

*Knight v. Richardson Bay Regional Agency*,
23     No. 3:22-CV-06347-WHO, 2022 WL 15567657 (N.D. Cal. Oct. 27, 2022) .........11

24

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
25     752 F.3d 755 (9th Cir. 2014) .................................................................................11

26

*Loc. TV, LLC v. Superior Ct.*,
     3 Cal. App. 5th 1 (2016) ...................................................................................14, 15
27

*Notorious B.I.G. LLC v. Yes. Snowboards*,
28     No. LACV1901946JAKKSX, 2022 WL 2784808 (C.D. Cal. June 3, 2022) .........21

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1 310.788.4400 tel  +1 310.788.4471 fax

*Pyro Spectaculars N., Inc. v. Souza*,
    861 F. Supp. 2d 1079 (E.D. Cal. 2012)........................................................22

*Robbins v. Super. Ct.*,
    38 Cal. 3d 199 (1985) ...............................................................................19

*Santa Cruz Lesbian & Gay Community Ctr. v. Trump*,
    508 F. Supp. 3d 521 (N.D. Cal. 2020) .......................................................10

*Saunders v. Superior Court*,
    27 Cal. App. 4th 832 (1994) ......................................................................16

*Smith v. State Farm Mut. Auto. Ins. Co.*,
    93 Cal. App. 4th 700 (2001), *as modified* (Nov. 20, 2001) .......................17

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) .................................................................21, 22

*Upper Deck Company v. Panini America, Inc.*,
    469 F. Supp. 3d 963 (2020) ............................................................13, 14, 15

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).................................................................................10, 11

**Statutes**

Cal. Bus. & Prof. Code § 17200 ......................................................................15

Cal. Bus. & Prof. Code § 17203 ......................................................................17

Cal. Civ. Proc. Code § 3344 ...........................................................................15

Cal. Educ. Code § 67456 ...........................................................................17, 22

California Unfair Competition Law (UCL) ...........................................11, 16, 17

**Other Authorities**

Michael McCann, *What's Next After California Signs Game Changer Fair Pay to
    Play Act into Law?*, https://www.si.com/college/2019/09/30/fair-pay-to-play-
    act-law-ncaa-california-pac-12 (September 30, 2019) .................................22

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1 310.788.4400 tel  +1 310.788.4471 fax

iii

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Plaintiff The BrandR Group ("TBG") is a leader in the collegiate group licensing industry. TBG contracts with student-athletes and schools to facilitate co-branding opportunities for the use of student-athletes' "name, image, and likeness" ("NIL") in combination with their respective schools' logos, brand, and other intellectual property ("IP").  By virtue of thousands of contracts TBG has with schools and their athletes, TBG owns exclusive group licensing rights with respect to a number of National Collegiate Athletic Association ("NCAA") football programs and players.

Defendant Electronic Arts, Inc. ("EA Sports" or sometimes simply, "EA") seeks to feature these schools and players in its upcoming *EA Sports College Football* video game (the "Game"). Its use of these players and schools in this manner directly implicates TBG's exclusive group license rights.  Yet EA has brazenly violated TBG's rights by negotiating directly with TBG's contractual partners, encouraging these partners to violate their contractual obligations to TBG, and giving them a deadline of June 30, 2023 to sign with EA and threatening that they will be excluded from the highly anticipated game if they do not comply.  In doing so, EA seeks to secure TBG's represented student-athletes' participation in the game for far less than market value and in violation of TBG's contractual rights.

This conduct by EA constitutes tortious interference with thousands of TBG's contracts, violates the statutory and common law right of publicity, and is unfair competition in violation of California law.  As the Ninth Circuit held last year, in applying longstanding California Supreme Court case law to enter a preliminary injunction to stop ongoing contractual interference, courts appropriately impose injunctions "restraining continued interference" of a contract where "unjustifiable interference with contractual relations has occurred."  That is exactly what EA is doing here.  The harm TBG is sustaining and will continue to sustain as EA seeks to destroy its contractual rights and business model more than satisfies the irreparable harm standard.

With this Application, TBG seeks temporary and preliminary injunctive relief restraining and enjoining EA Sports from: (1) directly or indirectly soliciting TBG's Partner Schools and Client Athletes (as defined herein) for their participation in the game; (2) directly or indirectly from

interfering with TBG's contractual rights granted to TBG under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes; and (3) directly or indirectly using, appropriating, or incorporating the NIL of TBG's Client Athletes in the Game without the express authorization and consent of TBG.

For these reasons and those discussed more fully below, the Court should grant this Application.

## II.    FACTUAL BACKGROUND

### A.    The BrandR Group

Plaintiff TBG is a brand management, marketing, and licensing agency based in Ponte Vedra Beach, Florida. Compl. ¶ 14; Declaration of Wesley Haynes ("Haynes Decl.") ¶ 2. TBG is a leader in the collegiate group licensing space, using its industry experience and relationships to facilitate co-branding[1] opportunities for student-athletes and their schools. Haynes Decl. ¶ 2. Since its founding in 2014, TBG has been acutely aware of the changing landscape of college athletics, especially the trend toward allowing student-athletes to receive compensation for their own NIL. Haynes Decl. ¶ 2. Beginning as early as 2017, TBG foresaw that college athletics was likely to undergo significant change with respect to NIL programs, to eventually allow college athletes to benefit from the marketing of their own NIL (a practice that was largely prohibited until 2021), and began planning for that eventuality. *Id.* ¶ 4. Specifically, it began developing a strategy to market TBG's professional sports group licensing experience to college athletes and college athletic departments. *Id.* ¶ 4. TBG invested significant time, effort, and money into this belief and strategy, even before the rules surrounding NIL were changed.  Haynes Decl. ¶ 5.

### B.    TBG's Group Rights Licensing Agreements

Because of this investment, when the NIL rules did eventually change in 2021 to allow college athletes to capitalize on their NIL while still in school, TBG quickly became a leader in the new industry of collegiate group licensing. Haynes Decl. ¶ 6. TBG has exclusive Group Rights

---

[1] As used herein, co-branding is the combining of the name, image, likeness, and other intellectual property rights owned by a particular athlete, aggregated with the branding rights from another entity, such as the school for which that athlete competes.

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1310.788.4400 tel  +1310.788.4471 fax

**Katten**

PLAINTIFF'S EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

1   Licensing Agreements with dozens of FCS and FBS colleges and universities and thousands of

2   football players for these schools. Haynes Decl. ¶ 6.

3          Specifically, as of this date, TBG has entered into Collaboration Agreements with 65

4   colleges or universities ("Partner Schools") having NCAA football programs, and Group Licensing

5   Authorization and Assignment Agreements ("GLA") with 3,725 related student-athletes ("Client

6   Athletes"). *Id.* ¶ 6. Under TBG's Collaboration Agreements, TBG contracts with Partner Schools

7   to manage the schools' Group Licensing Programs. Haynes Decl. ¶ 7. Pursuant to those agreements,

8   Group Licensing Programs are defined as "those licensing or sponsorship programs in which a

9   collegiate licensee or collegiate sponsor uses the Athlete Attributes [e.g., an athlete's name, image,

10  likeness, voice, etc.] of three (3) or more current athletes from one sport or six (6) or more from

11  multiple sports, either in combination with school trademarks and logos or separately as a group."

12  *Id.* ¶ 9.

13         The specific language in TBG's Collaboration Agreements may vary slightly between

14  schools, but each of TBG's Collaboration Agreements includes a provision requiring that at a

15  minimum, no third party can implement or use a Group Licensing Program without TBG's written

16  consent. *Id.* ¶ 10; *see e.g.*, Ex. B at __. Most of TBG's Collaboration Agreements provide that the

17  Partner School grants to TBG the "exclusive" right to develop, implement, and manage the school's

18  Group Licensing Program with the school's students, as follows[2]:

19             6. EXCLUSIVITY. During the Term of this Agreement, [University]
               recognizes TBG and [University's] exclusive agent to develop, implement
20             and manage the Group Licensing Program among its current Athletes.
               During such time, [University] shall not engaged any other third party,
21             without the express written consent of TBG, to develop, implement or
               manage any similar program involving a group of any size of current or
22             former [University] Athletes. *Id.* ¶ 10; *see e.g.*, Ex. A.

23  Certain other of TBG's Collaboration Agreements include Preferred Provider provisions, which

24  instead state that the school "shall consider TBG as its preferred provider of a Group Licensing

25  Program for Athletes, and shall not, <u>without TBG's written consent</u>, contract with any other party

26

27  ───────────────────

28  [2]  A list of TBG's Partner Schools is set forth in ¶ 7 of Haynes Decl.; and a sample exclusive Collaboration
    Agreement is attached as Exhibit A-1 to the same

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1 310.788.4400 tel   +1 310.788.4471 fax

**Katten**

3

1    to develop, implement or manage any substantially similar group licensing program for groups of

2    any size of Athletes." [3] (emphasis added). Whether designated as the exclusive or preferred provider

3    for a respective Partner School, under every Collaboration Agreement, no third-party can use a

4    Partner School's IP in connection with Group Licensing without TBG's written consent.

5        In conjunction with the Collaboration Agreements entered into between TBG and its Partner

6    Schools, TBG separately enters into a GLA with each student-athlete who wishes to participate in

7    their school's Group Licensing Program. Haynes Decl. ¶ 14; *see e.g.*, Ex. B. In each GLA, the

8    student-athlete (referred to herein as "Client Athletes") grants and assigns to TBG the exclusive

9    right to use and grant the right to use the athlete's NIL in Group Licensing Programs, as follows:

> The undersigned, an Athlete at [Partner School], hereby grants and assigns
> to TBG and its licensing affiliates during the term only of this Agreement,
> the worldwide right to use and to grant to licenses and sponsors the right to
> use all or any combination of [Sponsored Athlete's] name, nickname,
> initials, autograph/signature, facsimile, voice, caricature, photograph,
> portrait, picture, image, likeness, voice, jersey number, statistics, data, biographical
> information or any other identifiable feature (collectively known as "Athlete
> Attributes") in Collegiate Group Licensing Programs that also include the
> use of [Partner School's] intellectual property. "Collegiate Group Licensing
> Programs" are defined as those licensing or sponsorship programs in which
> a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three
> (3) or more current [Partner School] Athletes from one sport or six (6) or
> more from multiple sports, either in combination with University trademarks
> and logos or separately as a group. *Id.* ¶ 14.

18       Together, TBG's Collaboration Agreements and GLAs allow TBG to pursue group NIL

19    opportunities for its Client Athletes, knowing that they can use their respective school's logos and

20    other IP to do so. Haynes Decl. ¶ 15. Unlike many of its Client Athletes, TBG is well-positioned to

21    negotiate with corporate sponsors and licensees – such as EA Sports – in order to ensure that Client

22    Athletes receive fair value for the use of their NIL.

23       While the Collaboration Agreements and GLAs do not set forth an exhaustive list of what

24    constitutes a Group Licensing Program, most of these agreements do specifically identify video

25    games as such a program. For instance, most of TBG's GLAs provide that Client Athletes "shall

---

[3] A sample exclusive Collaboration Agreement is attached as Exhibit B to the Haynes Decl.

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

receive 70% of royalties from "third-party licensees in the video game, trading card and Fanatics[4] categories" and 80% of royalties "from all other third-party licensees and sponsors for use of the group NIL or Athlete Attributes in connection with this Collegiate Group Licensing Program." Haynes Decl. ¶ 16, Ex. B. TBG typically retains 30% and 20%, respectively, of royalties from these programs. TBG's Collaboration Agreements similarly identify video games as an example of a Group Licensing Program. Haynes Decl. ¶ 16, Ex. B. Note that while the Partner Schools are also compensated for the use of their IP in Group Licensing Programs, TBG's clients are its Client Athletes—not the Partner Schools.

### C.      EA Sports and the Game

As the collegiate NIL landscape began to change and TBG worked to implement its strategy to market collegiate Group Licensing Programs, TBG anticipated specific opportunities for the use of student-athletes' NIL in connection with their schools' IP. In particular, TBG anticipated the use of collegiate Group Licensing in video games, due in part to the popular NCAA-branded video games produced by EA Sports. Beginning in the late 1990s, EA Sports produced and sold video games featuring certain NCAA football and basketball teams, respectively *NCAA Football* and *NCAA Basketball* (formerly known as *NCAA March Madness*). Haynes Decl. ¶ 18. Earlier versions of these games featured the marks and IP of the schools portrayed, but did not feature the players' actual names and images, instead using player avatars featuring only the player's number and position, and no compensation was paid by EA Sports to any student-athletes. *Id.* ¶ 18. In particular, EA's *NCAA Football* (the "Game") was wildly popular, but EA discontinued the Game in 2013 amid ongoing litigation over its use of the player avatars and NIL. *Id.* ¶ 18.

### D.      Communications between TBG and EA Regarding the Game

On February 2, 2021, EA Sports announced that it was bringing back the Game, to be relaunched as *EA SPORTS College Football*. Haynes Decl. ¶ 19. EA Sports' February 2021 announcement came amid uncertainty regarding NCAA rules relating to student-athlete NIL rights, and at the time, EA Sports reported that the Game would not include student-athlete NIL but noted

---

[4] As used in the agreements, "Fanatics" refers to an online retailer of official sports apparel.

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1 310.788.4400 tel   +1 310.788.4471 fax

Katten

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

1    that EA Sports was watching developments with NIL closely. Aware of the publicity surrounding

2    EA Sports' announcement about the Game, and its related statements regarding the use of student-

3    athletes' NIL within the same, TBG reached out to EA Sports early-on to ensure it was aware of

4    and honored TBG's rights with respect to group licensing management for its Partner Schools.

5    Haynes Decl. ¶ 22.

6          Over the next year, TBG communicated with EA about its re-release of the Game, the

7    possible use of student-athlete NIL in the Game, and specifically about TBG's exclusive rights with

8    respect to its Partner Schools' Group Licensing Programs. *Id.* ¶ 22. On April 15, 2022, Wesley

9    Haynes, President and Founder of TBG, emailed Paul Cairns, Chief Business Officer for EA to

10   follow up from one of their recent conversations. *Id.* ¶ 22. In his April 15, 2022 email, Mr. Haynes

11   provided Mr. Cairns with six sample Collaboration Agreements for FBS Partner Schools to ensure

12   that EA was aware of and understood TBG's rights.  TBG is now aware that EA intends to include

13   all six of those Partner Schools in the Game. *Id.* ¶ 22. On May 12, 2022, Mr. Haynes spoke with

14   Mr. Cairns again about the continued development of the Game and TBG's rights with respect to

15   Group Licensing Programs. *Id.* ¶ 22. During the May 12, 2022 call, Mr. Haynes discussed TBG's

16   exclusive agreements and asked whether EA planned to include TBG's Partner Schools in the

17   Game.  Mr. Cairns informed Mr. Haynes that "rest assured," EA would put all of TBG's Partner

18   Schools and Sponsored-Players in the Game and would enter into direct agreements with TBG at

19   all schools where TBG has rights. *Id.* ¶ 22. Mr. Cairns also stated that EA "100% plans to work

20   with [TBG]." *Id.* ¶ 22.

21         Between May 2022 and May 2023, representatives of TBG and EA kept in touch regarding

22   EA's relaunch of the Game and TBG's growing list of Partner Schools for whom it is the exclusive

23   or preferred manager of Group Licensing Programs. *Id.* ¶ 23. On May 17, 2023, Sean O'Brien, an

24   Executive Vice President of EA, emailed Mr. Haynes, *et al.*, reporting that EA had contracted with

25   OneTeam Partners ("OneTeam")—to the exclusion of TBG— to "facilitate the opportunity for

26   college athletes to opt in and be included in our CFB video game[.]" *Id.* ¶ 23. That same day, EA

27   Sports made a public announcement regarding its deal with OneTeam, which noted that the

28

partnership will include the "chance for all eligible FBS players to opt in to have their likenesses in EA Sports College Football." *Id.* ¶ 24.

Upon hearing of EA Sports' announced partnership with OneTeam, TBG immediately reached out to EA Sports. Haynes Decl. ¶ 25. By letter dated May 18, 2023, TBG, through counsel, reminded EA Sports of TBG's exclusive rights and requested EA's cooperation to ensure that TBG's rights were honored and that compensation being paid by EA Sports, especially that being paid to the student-athletes, represented the fair value of those student-athletes' rights.[5] *Id.* ¶ 25. Thereafter, TBG learned that EA was communicating directly with certain of TBG's Partner Schools and telling the schools that contracting directly with EA (or an EA affiliate) to participate in the Game would not implicate any group rights and would therefore not be a violation of TBG's rights. *Id.* ¶ 26. For example, on May 24, 2023, a representative from a Partner School, a member of the Big Ten Conference, emailed EA employees, Deanne Mollema and Josh Gregory, asking whether opting in to the Game would create a conflict with the school's corporate sponsors.  In that email, the school representative informed EA that "We are currently a BrandR exclusive school." *Id.* ¶ 26. Mr. Gregory responded to the Partner School, advising that each student-athlete would individually contract with EA, and thus group rights would not be implicated. *Id.* ¶ 26.

Thereafter, on May 30, 2023, EA Sports, through Senior Counsel Betsy Contro, sent correspondence to TBG's counsel, confirming that "EA plans to provide eligible college football athletes the opportunity to opt-in individually and license their likeness rights directly to EA for inclusions in the Game." *Id.* ¶ 27, Ex. F. Also in her May 30, 2023 email, Ms. Contro further stated that its aim is "to allow individual athletes an inclusive and equitable opportunity to decide whether or not they would like their name and likeness to be included in the Game and to license those (unencumbered) rights directly from eligible student athletes, independently and unrelated to any potential licensing by EA of other intellectual property rights (e.g., division, conference, school, group, etc.)." *Id.* ¶ 27. Despite the clear implication of TBG's Group Licensing rights, Ms. Contro dismissed TBG's contractual relationships, stating, "[t]o be clear, this has nothing to do with the group rights with student athletes that BrandR claims to have." *Id.* ¶ 27.

---

[5] A copy of TBG counsel's May 18, 2023 letter is attached as EXHIBIT D to Haynes Decl.

PLAINTIFF'S EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

On May 31, 2023, TBG heard from certain of its Partner Schools that EA was pressuring schools who had not yet opted-in to the Game to approve their participation in the Game by June 30, 2023. *Id.* ¶ 31. TBG learned of EA's June 30 deadline from representatives of certain of its Partner Schools who asked TBG how they should proceed.  TBG has heard from a number of Partner Schools that the schools do not want to miss out on the opportunity for its student-athletes to participate in the Game, but that they do not want to breach their contractual obligations to TBG.

On June 1, 2023, TBG's counsel responded and sent EA Sports a second letter, clearly explaining that if EA Sports intends to use the NIL of student-athletes in connection with Partner Schools' name, branding, logos, or other IP in the Game, and the Game involves more than three individual athletes, then the Game implicates Group Licensing rights. *Id.* ¶ 32. Also in its June 1, 2023 letter, TBG's counsel notified EA that TBG's Collaboration Agreements and GLAs required that EA recognize TBG as its clients' exclusive representative to the extent EA Sports wishes to include TBG's Partner Schools and Client Athletes in the Game. *Id.* ¶ 32.

On June 5, 2023, Ms. Contro emailed counsel for TBG and asked for a list of the student-athletes represented by TBG.  Counsel for TBG responded on June 7, 2023, providing a list of the 65 Partner Schools for whom TBG is the exclusive or preferred partner for their respective Group Licensing Programs. *Id.* ¶ 33, Ex H. Also in its June 7, 2023 response, TBG provided EA with the following explanation of how its Group Licensing rights are implicated by the use of TBG's Partner Schools and Student Athletes in the Game:

> Given the nature of the EA Sports College Football Game, we think this list is sufficient to provide EA with a general understanding of TBG's representation.  As we explained previously, we presume that the Game will require the use of NIL from three or more football players from a given school, which necessarily implicates TBG's Group Licensing Rights for its partner schools.  TBG has entered into Student-Athlete Group Licensing Authorization & Assignment Agreements with almost all of the football players from these schools, authorizing TBG to act as the student-athletes' exclusive agent with respect to their respective school's Group Licensing Program.  *Id.* ¶ 33.

To date, EA has not responded to TBG's June 7, 2023 email. Counsel for TBG followed up with Ms. Contro by email on June 12, 2023, requesting an opportunity to discuss TBG's rights and EA's plans, but EA has not responded. Compl. ¶ 88. However, notwithstanding TBG's

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

communications, EA Sports has informed (and continues to inform) TBG's Partner Schools that Partner Schools negotiating and contracting directly with EA Sports, and Client Athletes contracting directly with EA (or an EA affiliate) will not interfere with TBG's exclusivity rights. *Id.* ¶ 89. This assertion by EA is patently false. EA cannot circumvent TBG's or its Partner Schools' and Client Athletes' contractual rights by entering into individual and direct contracts for participation in the Game.  Indeed, TBG has individual and direct contracts with each of its Client Athletes. TBG's GLAs with its Client Athletes plainly assign to TBG the right to use and license its Client Athletes' NIL in licensing programs such as EA's Game, where one Client Athlete's NIL will be used in combination with two or more teammates and their school's IP.

Further, EA continues to push TBG's Partner Schools to opt-in to the Game by its arbitrary June 30 deadline or else they will be ineligible from participating.  Haynes Decl. ¶ 31.  Despite repeated notices that negotiating directly with Partner Schools or Client Athletes violates TBG's Collaboration Agreements, EA Sports continues to negotiate in direct, knowing, and intentional interference with TBG's contractual rights. *Id.* ¶ 45.  EA's conduct and misrepresentations have disrupted TBG's contractual relationships with its Partner Schools and Client Athletes. *Id.* ¶ 40. Certain of TBG's Partner Schools have already opted-in to the Game, violating their exclusive Collaboration Agreements with TBG, while others have expressed confusion as to how they should proceed when they are interested in participating in the Game and offering that opportunity to their student-athletes, but do not want to run afoul of their contractual obligations with TBG. *Id.* ¶ 44.

### E.    EA's Compensation to Student-Athletes and Schools

Based upon media and industry reports, it appears that EA Sports intends to pay each participating player a lump sum payment of $500 for the use of that player's NIL, with no continuing royalties, for a likely total payment of only $5,000,000 for all participating players' NIL. *Id.* ¶ 34. By contrast, EA Sports is reportedly offering to pay participating schools some percentage of royalties from the Game, with the total compensation pool available to schools being 10% of the revenue generated from sales of the Game, with guaranteed payments ranging from $10,400 to $104,900 depending on variables such as the football program's prominence, recent national ranking, etc. *Id.* ¶ 35.

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

Based on TBG's experience, industry information concerning compensation to professional players under EA Sport's popular "Madden" NFL game series, and other factors, $500 per player for the use of his NIL is not fair compensation to the student-athlete. *Id.* ¶ 36. For example, it has been widely reported in sports press that EA's recent agreement with the NFL and the NFL Players Association (NFLPA) to renew the Madden franchise for five years included $500,000,000 for the players' NIL. *Id.* ¶ 36.

Moreover, based upon information received from one or more of TBG's Partner Schools, by opting-in to EA's Game, participating schools will also grant to EA Sports not only exclusive rights to use participating schools' trademarks and related indicia for the Game, but for any simulation game play (such as mobile simulation games or arcade games) within college football and non-exclusive rights for non-simulation games. Thus, not only would players' compensation for the use of their NIL in the Game be capped at $500, but they would be precluded from earning additional compensation from their NIL in other arcade and video game opportunities.

## III.   LEGAL STANDARD

In the Ninth Circuit, a plaintiff is entitled to a temporary restraining order and/or preliminary injunction upon satisfaction of either of two tests: (1) the *Winter* factor test; or (2) the "sliding scale" test, also referred to as the "serious questions" test.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

Under the *Winter* test a preliminary injunction may be granted where a plaintiff demonstrates (1) a likelihood of success on the merits; (2) that plaintiff will likely suffer irreparable harm unless the preliminary injunction issues; (3) the balance of equities tips in plaintiff's favor; and (4) issuance of the preliminary injunction is in the public interest.  *Winter*, 555 U.S. at 20; *Santa Cruz Lesbian & Gay Community Ctr. v. Trump*, 508 F. Supp. 3d 521, 540–48 (N.D. Cal. 2020) (granting preliminary injunction where plaintiff satisfied *Winter* factors).

Under the sliding scale test, a plaintiff is entitled to a preliminary injunction if he establishes: (1) "serious questions going to the merits"; (2) "a balance of hardships that tips sharply towards the plaintiff"; (3) "a likelihood of irreparable injury"; and (4) a preliminary injunction is

in the public interest.  *Wild Rockies*, 632 F.3d at 1135.  "[T]he elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Id.*; *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (affirming grant of preliminary injunction while recognizing both the *Winter* standard and the sliding scale standard); *see also Knight v. Richardson Bay Regional Agency*, No. 3:22-CV-06347-WHO, 2022 WL 15567657, *4–5 (N.D. Cal. Oct. 27, 2022) (granting temporary restraining orders where plaintiff satisfied the sliding scale test).

## IV.    ARGUMENT

Whether applying the *Winter* test or sliding scale test, TBG is entitled to temporary and preliminary injunctive relief against EA Sports.

### A.    TBG will prevail on the merits of its claims against EA Sports.

TBG has asserted claims against EA Sports for (i) tortious interference with contract; (ii) violation of right of publicity (common law and statutory); (iii) misappropriation of likeness; (iv) violations of California Unfair Competition Law; and (v) declaratory relief. TBG need only establish a probability of prevailing on one of these claims to establish their entitlement to preliminary injunctive relief.  *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 767 (9th Cir. 2014) (remanding with instructions to enter a preliminary injunction even though plaintiffs were likely to succeed on the merits of only one claim).  TBG has a likelihood of success on all of the claims alleged, or at a minimum, that serious questions as to the merits exist.  *See Wild Rockies*, 632 F.3d at 1135.

#### 1.    TBG will prevail on its tortious interference with contract claim.

To establish a claim for tortious interference with contract, a plaintiff must establish "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship[6]; and (5) resulting damage."  *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130,

---

[6] To satisfy this element, TBG need only show disruption, not breach, which is established here. *See Jenni Rivera Enterprises, LLC v. Latin World Ent. Holdings, Inc.*, 36 Cal. App. 5th 766, 782 (2019).

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

**Katten**

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

1141 (2020). Here, TBG will prevail on its tortious interference with contract claim because EA Sports is actively soliciting and negotiating with TBG's Partner Schools and Client Athletes, without TBG's consent, for the use of TBG's Client Athletes' NIL in the Game—in direct contravention of TBG's contractual rights.

The first two elements of this claim are satisfied because the Collaboration Agreements and GLAs are valid contracts between TBG and its Partner Schools and Client Athletes. EA is undisputedly on notice of TBG's contractual agreements—having been informed by not only TBG, but also at least one of TBG's Partner Schools, who informed EA that they are "a BrandR exclusive school." *See* Haynes Decl. ¶¶ 26, 30 (TBG repeatedly informed EA Sports about the existence and contents of these contracts, provided EA Sports with samples of the contracts and lists of all of TBG's Partner Schools and Client Athletes).

The third and fourth elements are similarly satisfied. The Collaboration Agreements and GLAs state that TBG has exclusivity or preferred partner status with all of its Partner Schools and Client Athletes with respect to Group Licensing opportunities for the Client Athletes. Haynes Decl. ¶ 6, 7. Given the nature of EA's Game which features whole teams of collegiate football programs (i.e. three or more players from each team), any of TBG's Partner Schools featured in the Game would implicate TBG's Group Licensing Rights. Past iterations of EA's Game included at least 54 of TBG's Partner Schools, and thus, TBG reasonably expects most, if not all, of these Programs to be featured in the new version. Compl. ¶ 113.

Notwithstanding TBG's plain assertion of its rights, EA continues to solicit and attempt to engage TBG's Partner Schools and Client Athletes to participate in the Game. EA even used a manufactured deadline of June 30, 2023, to increase the pressure on TBG's Partner Schools to opt-in to the Game. Haynes Decl. ¶ 31. This places TBG's Partner Schools and Client Athletes in the unenviable position of either breaching their obligations to TBG or missing out on participating in a video game that is expected to sell millions of units once launched. Compl. ¶ 120. Unfortunately, TBG has heard from some of its Partner Schools that EA's threats of missing out are effectively frightening schools into participating in EA's scheme, and those schools have opted-in to the Game. Haynes Decl. ¶ 31. Undoubtedly, if not enjoined, EA will successfully coerce more and more of

TBG's Partner Schools and Client Athletes to breach their contractual obligations to TBG and contract directly with EA for the use of their respective IP and NIL in the Game. Through its actions, EA is intentionally disrupting TBG's contractual rights by circumventing TBG and negotiating directly with Partner Schools and/or Client Athletes.[7] *Upper Deck Company v. Panini America, Inc.*, 469 F. Supp. 3d 963, 982 (2020) (actual disruption can be proven by showing that interference "makes enjoyment of a contract more expensive or burdensome") (internal citations omitted).

In tortious interference cases involving established contractual relationships—like this one—the "societal interest in 'contractual stability is generally accepted as of greater importance than competitive freedom.'" *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1194 (9th Cir. 2022) (internal citations omitted). A competitor's interference with an existing contract "is not justified simply because a competitor 'seeks to further his own economic advantage at the expense of another.'" *Id.* In *hiQ Labs*—a Ninth Circuit decision from just last year—the Ninth Circuit found that plaintiff had "raised at least serious questions going to the merits of its tortious interference with contract claim," which was "sufficient to support an injunction," and affirmed the lower court's injunction. An injunction is thus necessary—and appropriate under California law—here in order to prevent EA from further interference and solicitation of TBG's Partner Schools and Client Athletes. *See Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 38 (1941) (noting that an injunction is a proper remedy for "unjustifiable interference contractual relations").

Finally, as further discussed below, TBG and the Client Athletes it represents have suffered and will continue to suffer irreparable harm as a result of EA's disruption. By negotiating directly with TBG's Partner Schools and Client Athletes, EA is contracting for the use of Client Athletes' NIL in its Game at a flat rate that includes no payment of future royalties and is far below fair market value.   Haynes Decl. ¶ 34. Not only is the reported $500 per player insufficient to compensate the Client Athletes for the use of their NIL in the Game, but TBG recently learned that

---

[7] Not only is EA Sports interfering with TBG's contractual rights by attempting to reach licensing agreements with TBG's Partner Schools and Client Athletes, but it is also disrupting TBG's relationships with its Partner Schools by informing TBG's Partner Schools that excluding TBG from negotiations about the Game is not a violation of their Collaboration Agreements. Haynes Decl. ¶ 40.

PLAINTIFF'S EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

the potential cost to players is even higher.  Compl. ¶ 104.  EA is reportedly seeking exclusive rights to use participating schools' trademarks and related indicia for any current or future simulation of game play within college football—not just the Game—and non-exclusive rights for non-simulation games.  Thus, not only would players' compensation for the use of their NIL in the Game be capped at $500, but they would be precluded from earning additional compensation from their NIL in other simulation games such as arcade and video game opportunities.

### 2.  TBG will prevail on its violation of right of publicity claim.

Under the GLAs, TBG's Client Athletes assigned the right to use their NIL in connection with Group Licensing Programs to TBG.  Thus, EA's use of the Client Athletes' NIL in the Game without TBG's consent constitutes a violation of TBG's right of publicity and misappropriation of name or likeness.

TBG has standing to bring a right of publicity claim because it is assignable under California law. *See Upper Deck Co.*, 469 F. Supp. 3d at 984 (exclusive license holder had standing to bring right of publicity claim).

Here, TBG's Client Athletes assigned this right through the execution of the Collaboration Agreements and GLAs. See Haynes Decl. ¶¶ 14.  In particular, the universities' contracts with TBG make TBG their "exclusive agent to develop, implement and manage the Group License Program among its current Athletes." *Id.* ¶ 10; *see e.g.*, Ex. A.  And these rights to the athletes' NIL explicitly include group licensing in video games.  Haynes Decl. ¶ 16, Ex. B (referring to "video game" royalties).

To establish a claim for common law right of publicity (or misappropriation of name or likeness), a plaintiff must show "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Loc. TV, LLC v. Superior Ct.*, 3 Cal. App. 5th 1, 8 (2016). To establish a claim for statutory violation of right of publicity under California Civil Code section 3344, a plaintiff must show all elements of a common law claim plus "a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose." *Upper Deck Co.*, 469 F. Supp. 3d at 984.

Under the GLAs, TBG owns the right to use the Client Athletes' NIL in Collegiate Group Licensing Programs, and no third-party can use the Client Athletes' NIL in Group Licensing deals without TBG's authorization and consent. *Id.* ¶142. In its public reports to the media and private communications with TBG's Partner Schools, EA communicated a clear intent to use the NIL of the football players from the respective teams depicted in the Game, thousands of whom are represented by TBG under a GLA. *Id.* ¶ 143. TBG reasonably anticipates that EA has solicited or will solicit most, if not all, of its Client Athletes for the use of their NIL in the Game in knowing violation of TBG's in knowing violation of TBG's Group Licensing Rights. *Id.* ¶ 145.

Further, based on the past performance of EA's NCAA College Football game and reported projections, EA expects to sell millions of units of its Game, generating hundreds of millions of dollars in revenue from sales of the Game, featuring TBG's Partner Schools' IP and Client Athletes' NIL. *Id.* ¶ 147. In contrast, the reported compensation offered to student-athletes participating in the Game falls woefully short of what is fair and seeks to cut out TBG altogether. TBG does not and would not consent to the use of its Client Athletes' NIL in the Game for such inadequate compensation.

Further, EA seeks to deprive TBG of its right to control the commercial exploitation of its Client Athletes' NIL. TBG's Client Athletes engaged and entrusted TBG with the right to facilitate Group Licensing Programs using their NIL and to represent their interests in these programs. By circumventing TBG to directly negotiate with the Client Athletes, EA is depriving these athletes of their desired representation.

### 3.      TBG will prevail on its claim for violation of the UCL.

The UCL is broad in scope, prohibiting any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," as well as any act specifically prohibited under Business and Professions Code section 17200 *et seq*. An "unlawful" activity is any business activity that is forbidden by law. *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838–39 (1994). Specifically, "a claim under the UCL unlawful prong may be premised upon the unlawful actions that constitute tortious interference with

1   contractual relations." *Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006,

2   1017 (C.D. Cal. 2013).

3       As described herein, EA intentionally interfered (and continues to interfere) with

4   TBG's contractual rights.  EA's conduct is anticompetitive and unfair, and the resulting harm

5   threatens the very nature of TBG's business and its reputation.  TBG devoted significant

6   resources and energy into its strategy of marketing and facilitating Collegiate Group

7   Licensing Programs on behalf of its Partner Schools and Client Athletes.  Haynes Decl. ¶ 5.

8   If EA is permitted to negotiate directly with TBG's Partner Schools and Client Athletes,

9   disregarding TBG's rights in connection with future Group Licensing Programs, other third-

10  party licensees and sponsors are likely to follow suit.  Further, EA reportedly seeks to require

11  that Partner Schools participating in the Game grant EA exclusive rights for the use of its IP

12  in other simulation games, infringing on TBG's rights to secure future Group Licensing

13  Programs for its Client Athletes in the video game industry.  Haynes Decl. ¶ 38.  This conduct

14  plainly violates California's UCL.  *See e.g. Blizzard Ent. Inc.*, 28 F. Supp. 3d at 1018

15  (awarding permanent injunction where plaintiff producer of online warfare role-playing game

16  suffered irreparable injury from software developers tortiously interfering with producer's

17  contractual relations, breaching contracts prohibiting use of botting software in game, and

18  violating California Unfair Competition Law (UCL), where producer expended significant

19  resources combating use of software bots that also harmed good will and reputation of

20  producer and game.).

21      EA has likewise engaged in fraudulent conduct as defined by the UCL.  A "fraudulent"

22  activity includes any act or practice likely to deceive the public, even if no one is actually

23  deceived.  *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 211

24  (1983).  In its direct communications with at least one of TBG's Partner Schools, EA

25  misrepresented the scope and nature of TBG's Group Licensing Rights, attempting to induce

26  the Partner School to breach its agreement with TBG.  If not enjoined, EA will likely continue

27  to make similar misrepresentations to more of TBG's Partner Schools and Client Athletes.

28

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

**Katten**

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1 310.788.4400 tel  +1 310.788.4471 fax

1   EA's conduct also violates the "unfair" prong of the UCL.  Under the UCL, an "unfair"

2   practice is one that "offends an established public policy" or "when the practice is immoral,

3   unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Smith v. State*

4   *Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001), *as modified* (Nov. 20, 2001)

5   (internal citations omitted).  Here, EA Sports' endeavors to circumvent the Client Athletes'

6   contractual representation in order to underpay college athletes for the value of their NIL.

7   Such conduct is unquestionably unfair and against California's public policy in favor of

8   athletes' right to adequate compensation for their NIL. *See, e.g.*, Cal. Educ. Code § 67456

9   (California's "Fair to Play" act, which provides "[a] postsecondary educational institution

10  shall not uphold any rule [] that prevents a student of that institution participating in

11  intercollegiate athletics from earning compensation as a result of the use of the student's

12  name, image, likeness, or athletic reputation.").[8]

13  California's UCL expressly authorizes injunctive relief against any person engaged in

14  unfair competition.  *See* Cal. Bus. & Prof. Code § 17203.  For the reasons set forth herein,

15  the instant case clearly supports an award of injunctive relief to prevent further violations by

16  EA of the UCL.

17  **B.     The balance of hardships and equities tilts sharply in TBG's favor.**

18  EA's intentional interference implicates *thousands* of TBG's binding contracts with its

19  Partner Schools and Client Athletes and threatens the business model TBG worked so hard to

20  develop, as well as its goodwill and reputation built over the years.  If EA succeeds in engaging

21  directly with TBG's Partner Schools and Client Athletes, other third-party licensees and sponsors

22  may similarly seek to cut TBG out of Group Licensing Programs in order to obtain the use of IP

23  and NIL rights for less than fair market value.  Further, TBG's relationships with its Partner Schools

24  and Client Athletes are founded on the mutual desire for TBG to facilitate Group Licensing

25  Programs for these parties, understanding that there is significant value to athletes when these

26  _____

27  [8] TBG also asserts a cause of action for declaratory relief. It will prevail on this claim because the Collaboration
    Agreements and GLAs clearly grant TBG exclusive right to negotiate on behalf of student athletes and the
    exclusive right to use the athletes' NIL in Group Licensing Programs, and therefore, is entitled to a declaration

28  to that effect.

PLAINTIFF'S EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

negotiations are handled as a group.  If EA succeeds in continuing to disrupt those relationships, TBG's ability to successfully deliver Group Licensing Programs for its Partner Schools and Client Athletes is and will continue to be compromised.

In addition, although TBG has valid and binding contracts with its Partner Schools and Client Athletes, it is neither desirable nor practical for TBG to enforce those contracts by way of individualized actions.  First and foremost, TBG's contracts are founded on the relationships TBG has built throughout the years with collegiate athletic programs and out of TBG's mission to advocate for the interests of its Partner Schools and Client Athletes in Group Licensing Programs. Haynes Decl. ¶ 43.  TBG has no desire to sour those relationships by suing its contractual partners in this instance, particularly considering that some of its Partner Schools have communicated a desire to honor their contractual obligations but also a concern that they will miss out on the opportunity for their student-athletes to participate in the Game if they do not oblige with EA's terms and artificial June 30 deadline.  *See* Haynes Decl. ¶ 44.

Moreover, TBG's contractual partners include Partner Schools and Client Athletes located all over the United States.  Generally, each agreement provides that it is governed by the law of the state where the respective Partner School is located.  It is far more practical and efficient for TBG to obtain relief against EA in a single forum than for TBG to enforce its agreements against its contractual parties in separate lawsuits throughout the country.

Not only is the risk of harm to TBG great, but the burden on EA Sports is marginal.  "If the denial of an injunction would result in great harm to the plaintiff, and the defendants would suffer little harm if it were granted, then it is an abuse of discretion to fail to grant the preliminary injunction." *Robbins v. Super. Ct.*, 38 Cal. 3d 199, 205 (1985).  Here, the proposed injunction will have minimal impact on EA Sports because the Game is not set to be released until sometime in 2024, and EA Sports has ample time to negotiate appropriate license agreements with TBG if it wishes to feature TBG's Client Athlete's NIL in its Game.

**C.     TBG will suffer irreparable harm and injury if relief is denied.**

The irreparable harm element is satisfied here for several reasons:

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1 310.788.4400 tel  +1 310.788.4471 fax

*First,* per the California Supreme Court, it has long been established that courts appropriately impose injunctions "restraining continued interference" of a contract where "unjustifiable interference with contractual relations has occurred." *Imperial Ice Co*, 18 Cal. 2d at 38. Last year, the Ninth Circuit relied on the *Imperial* doctrine in *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1187 (9th Cir. 2022). There, the Ninth Circuit affirmed the granting of a preliminary injunction restraining the defendant from continuing to interfere with plaintiff's contracts with third parties, holding that there was sufficient evidence presented that the defendant was engaged in unfair competition that threatened to irreparably harm the plaintiff. *Id.*

Here, EA has embarked on a coordinated campaign to convince certain of TBG's Partner Schools to abandon their contractual obligations to TBG in order to avoid missing out on the chance for their athletes to participate in the Game. Certainly, more of these Partner Schools will follow suit in the coming days as EA's manufactured June 30 deadline to opt-in approaches. Further, as EA has already publicized and stated its intention to contract directly with student-athletes for the use of their NIL in the Game, TBG reasonably anticipates that after June 30, EA will turn its focus to signing TBG's Client Athletes. Haynes Decl. ¶ 39. EA Sports' false and deceptive assurances to TBG Partner Schools that the Partner Schools' and Client Athletes' direct contracts with EA Sports do not violate TBG's agreements, and its artificial deadline for the schools to do so by June 30, 2023, places TBG's Partner School's in the undesirable position of either breaching their contracts with TBG or potentially losing the opportunity to participate in EA's Game. *Id.* ¶ 39.

Without injunctive relief, EA Sports will have free reign to solicit TBG's Partner Schools and Client Athletes for their participation in the Game in direct violation of TBG's Group Licensing rights—rights that once violated, cannot be walked back. EA's actions will have a far-reaching impact—not only with respect to TBG's Group Licensing rights implicated by the Game—but all future Group Licensing Programs where a third-party seeks to use TBG's Client Athletes' NIL. This is due in part to the exclusivity that EA seeks from the schools opting-in to the Game with respect to other simulation video games. Beyond that, however, is the precedent EA's conduct will set for other prospective licensees and sponsors who may follow EA's lead and similarly disregard—not only TBG's Group Licensing Rights—but any other individual or entity seeking to

represent collegiate athletes in collective bargaining agreements.  In fact, given the previous success of EA's *NCAA Basketball* video game and the excitement surrounding the announced return of EA's *NCAA Football*, it is reasonable to anticipate that EA may re-launch its NCAA-branded basketball game now that it can feature student-athletes' NIL.  If EA is able to freely violate TBG's Group Licensing rights with respect to the Game without consequence, why would EA act any differently in the future?

Finally, TBG's and its Client Athletes will be irreparably harmed by the lost opportunity to negotiate fair compensation for the use of the Client Athletes' NIL in the Game.  EA is circumventing and preventing TBG from representing its Client Athletes in negotiations for the use of these Athletes' NIL in the Game – which plainly constitutes a Group Licensing Program under TBG's Collaboration Agreements and GLAs.  Pursuant to the GLAs, TBG is entitled to a percentage of the Client Athletes' proceeds, specifically from Group Licensing Programs involving video games.  Thus, while TBG is certainly harmed if it is cut out of the Group Licensing Program involving EA and the Game, TBG's Client Athletes are also immeasurably and irreparably harmed.  Unlike professional athletes, collegiate student-athletes do not yet have an organized union to represent them in Group Licensing Programs.  Compl. ¶ 109.  For instance, players in the National Football League ("NFL") are represented by the NFL Players Association ("NFLPA"), and the NFLPA negotiates with EA for the licensing of players' NIL rights to be included in the annual Madden video game.  *Id.* ¶ 110.  TBG's Client Athletes do not have a union, but they are not without representation.  They have TBG, whom they engaged to leverage its industry expertise and substantial market share of FBS Partner Schools and Client Athletes to negotiate fair compensation for the Client-Athletes participation in Group Licensing Programs such as EA's Game.  *Id.* ¶ 111.

*Second*, because this case arises from the unauthorized use of name, image, and likeness of the athletes that provided an exclusive license to TBG, irreparable harm is established.  The Central District's recent reasoning in *Notorious B.I.G. LLC v. Yes. Snowboards*, No. LACV1901946JAKKSX, 2022 WL 2784808, at \*9 (C.D. Cal. June 3, 2022), is instructive.  There the district court imposed a preliminary injunction barring a defendant from selling merchandise with the likeness of the late Notorious B.I.G.  *Id.*  Notably, the right of publicity claims were brought

by a plaintiff that had obtained an exclusive license to control the sale of such merchandise.  *Id.* The court noted that even though damages could compensate Plaintiff and other stakeholders for much of the harm, "Plaintiff has presented sufficient evidence of its investment of substantial time and resources over many years in establishing Wallace's public persona. It has also presented material evidence regarding how its ability to benefit from these efforts will be harmed if Wallace's image and likeness is exploited by Defendant." *Id.*  In particular, the district court found persuasive evidence that the defendant's activities jeopardized and diminished the value of the exclusive license for such merchandise, "which has caused a decrease in the value of Plaintiff's property rights. *Id.*

Similarly, here, EA's conduct, if left unchecked, threatens to diminish, if not completely destroy, TBG's exclusive group license for video games for its school partners and their players. And, like in *Notorious*, TBG obtained this license through intentional and painstaking work over the course of several years, in seeking to assist college players in being paid fair value for their name image and likeness.

*Third,* "[t]he threat of being driven out of business is sufficient to establish irreparable harm" here.  *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985); *see also  Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (holding that "a substantial loss of business" constitutes irreparable harm sufficient to warrant interim relief); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (holding that "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm").  In addition, "[l]oss of goodwill, as well as damage to reputation, can support a finding of irreparable harm." Id. at *11; *see also Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.") (quotation omitted); *see also Innersvingen AS v. Sports Hoop, Inc*., No. CV12-05257 R JCGX, 2012 WL 3048363, at *2 (C.D. Cal. July 26, 2012) (granting TRO and preliminary injunction where plaintiff demonstrated that defendant's interference with exclusive license of plaintiff caused irreparable harm through

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

**Katten**

1    loss of prospective customers and goodwill that "Plaintiff had spent significant time, money, and

2    effort in cultivating.")

3         Here, EA's conduct undermines, at a minimum, TBG's licensing efforts with respect of

4    video games, and there is a threat that this misconduct will spill over into other businesses as well.

5    Haynes Decl. ¶ 43.  EA is signaling to the market that TBG's licenses and rights are of no value

6    and not to be taken seriously.

7         **D.    The injunction is in the public interest.**

8         EA seeks to exclude TBG from discussions regarding the use of Client Athletes' NIL in the

9    Game and deny the Client Athletes fair representation.  This amounts to anticompetitive conduct

10    that is contrary to the public interest and public policy of California.

11        Indeed, as collegiate NIL rights have evolved over the past several years, California has

12    championed the rights of student-athletes to be fairly compensated for the use of their NIL.

13    California was the first state in the country to create a legal right for college athletes to be

14    compensated for the commercial use of their NIL.  California's Fair Pay to Play Act was

15    groundbreaking legislation in the area of student-athletes NIL rights, and importantly authorizes

16    college athletes to hire agents and other representatives to assist them in negotiating and securing

17    commercial opportunities.[9]  EA seeks to reverse that evolution, denying not only TBG's Client

18    Athletes the right to their desired representation, but also denying all participating student-athletes

19    fair compensation for the use of their NIL in the Game.  Again, EA's conduct goes beyond its

20    failure to offer fair compensation for the Client Athletes' NIL in this Game, as EA is reportedly

21    seeking to obtain exclusivity rights for the use of Client Athletes' NIL in other simulation video

22    games, compounding the unfairness of EA's offer.  Haynes Decl. ¶ 38.

23        In sum, a preliminary injunction is warranted here; any potential (marginal) harm to EA

24    Sports is far outweighed by the irreparable harm that will be prevented by protecting the contractual

25    rights of TBG and its Partner Schools, and especially the interests of the Client Athletes who stand

26

27    [9] *See* Cal. Educ. Code § 67456; Michael McCann, *What's Next After California Signs Game Changer Fair Pay to Play Act into Law?*, https://www.si.com/college/2019/09/30/fair-pay-to-play-act-law-ncaa-california-
28    pac-12 (September 30, 2019).

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

**Katten**

to miss out on fair compensation for their participation in the Game and immeasurable financial opportunities in the future given EA's exclusivity requirements.

## V.      CONCLUSION

For the reasons set forth above, the Court should grant TBG's Motion and enter an order restraining and enjoining EA Sports from: (1) directly or indirectly soliciting TBG's Partner Schools and Client Athletes for their participation in the game; (2) directly or indirectly from interfering with TBG's contractual rights granted to TBG under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes; and (3) directly or indirectly using, appropriating, or incorporating the NIL of TBG's Client Athletes in the Game without the express authorization and consent of TBG.

DATED:  June 22, 2023                                KATTEN MUCHIN ROSENMAN LLP

By:      /s/ Christopher D. Beatty
                     Christopher D. Beatty
                     Attorneys for Plaintiff
                     The BrandR Group, LLC

PLAINTIFF'S EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION