Christopher D. Beatty (SBN 266466)
chris.beatty@katten.com
Ashley T. Brines (SBN 322988)
ashley.brines@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: 310.788.4400
Facsimile: 310.788.4471

Richard L. Farley (*pro hac vice* forthcoming)
Richard.farley@katten.com
Lindsey L. Smith (*pro hac vice* forthcoming)
lindsey.smith@katten.com
Kelsey R. Panizzolo (*pro hac vice* forthcoming)
Kelsey.panizzolo@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
500 S. Tryon Street, Suite 2900
Charlotte, NC 28202-4213
Telephone: 704.344.3178

Attorneys for Plaintiff
The BrandR Group, LLC

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BRANDR GROUP, LLC<br><br>Plaintiff,<br><br>v.<br><br>ELECTRONIC ARTS, INC., and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No: 3:23-cv-02994-LB<br><br>Honorable Laurel Beeler<br><br>**DECLARATION OF WESLEY HAYNES IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>[Plaintiff's *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue; Memorandum of Points and Authorities; Declaration of Christopher Beatty; and [Proposed] Order filed concurrently herewith]<br><br>State Court Action Filed: June 16, 2023<br>Date of Removal: June 20, 2023 |

### DECLARATION OF WESLEY HAYNES

1.      I am over the age of eighteen (18) years and I am competent to make this declaration. I have personal knowledge of the matters and things set forth in this declaration, except for those things stated upon information and belief, which I believe to be true.

2.      I am the President and founder of the plaintiff in this action, The Brandr Group, LLC ("TBG"). TBG is a brand management, marketing, and licensing agency that partners with student-athletes, colleges and universities, licensees and collectives to manage and monetize student-athletes' name, image and likeness ("NIL").

3.      I have been engaged in sports marketing, licensing, and licensing management since 1984, having held executive positions with Russell Athletic, the PGA Tour, and IMG before founding TBG in 2014. TBG's initial principal focus was on group rights licensing for members of the MLB Players Association, NBA Players Association and NFL Players Association. "Group Rights Licensing," in the sports marketing context, is the licensing of a combined rights of multiple athletes together with their team, for example, which allows the athletes to market their own NIL while also exploiting the team's uniforms, marks and other rights.

4.      Since its founding in 2014, TBG has been acutely aware of the changing landscape of college athletics, especially the trend towards allowing student-athletes to receive compensation for their own NIL, and closely followed the related legal landscape, including the *O'Bannon* case, *NCAA v Alston,* and other developments related to student-athlete NIL. Beginning as early as 2017, TBG foresaw that college athletics was likely to undergo significant change with respect to NIL programs, to eventually allow college athletes to benefit from the marketing of their own NIL (a practice that was largely prohibited until 2021), and began planning for that eventuality. Specifically, we began developing a strategy to market TBG's professional sports group licensing experience to college athletes and college athletic departments.

5.      TBG invested significant time, effort, and money into this belief and strategy, even before the rules surrounding NIL were changed.  One step towards this strategy was successfully working with a major university to develop group licensing programs for the school's student-athlete alumni, allowing these former athletes to collaborate with the school to monetize their own

NIL in combination with the school's name, logo and other IP. This work, which TBG invested in and developed before student-athletes themselves were allowed to monetize their NIL, proved to be the foundation for TBG's subsequent student-athlete group NIL programs.

6.     Because of this investment, when the NIL rules did eventually change in 2021 to allow college athletes to capitalize on their NIL while still in school, TBG quickly became a leader in the new industry of collegiate group licensing. As of this date, TBG has entered into Collaboration Agreements with 65 colleges or universities ("Partner Schools") with NCAA Football programs, and Group Licensing Authorization and Assignment Agreements ("GLA") with 3,725 related student-athletes.

7.     The following is a list of TBG's Partner Schools, with whom it has entered into Collaboration Agreements, pursuant to which TBG is the exclusive or preferred provider for each school's Group Licensing Program:

| Current TBG-Exclusive or Preferred Schools | | |
|---|---|---|
| Appalachian State University | University of Louisville* | Oregon State University |
| Arizona State University | Marshall University | University of Pittsburgh |
| University of Arkansas | University of Maryland | Purdue University |
| Auburn University | University of Miami* | Rutgers, The State University of New Jersey (Rutgers University) |
| Baylor University | University of Michigan | Southern Methodist University |
| Boston College | Michigan State University | Syracuse University |
| Brigham Young University | Middle Tennessee State University | The University of Texas at Arlington |
| Campbell University | Mississippi State University | The University of Texas at Austin |
| University of Cincinnati | University of Missouri | Texas Christian University* |
| University of Colorado Boulder | Murray State University | The University of Texas at El Paso |
| Colorado State University | North Carolina Central University | The University of Texas Permian Basin |
| University of Connecticut | North Carolina State University | The University of Texas at San Antonio |
| University of Dayton | University of Nebraska-Lincoln | Towson University |
| University of Florida | The University of North Carolina at Chapel Hill | Troy University |
| Georgia Institute of Technology | University of North Texas | The University of Utah |

DECLARATION OF WESLEY HAYNES

| Gonzaga University | Northwestern University | University of Virginia |
| University of Hawaiʻi at Manoa | Ohio University | University of Wyoming |
| University of Houston | The Ohio State University | Villanova University |
| Kansas State University | Oklahoma State University | Wake Forest University |
| Liberty University | Old Dominion University | West Virginia University |
| Louisiana Tech University | The University of Mississippi (Ole Miss) | William Marsh Rice University (Rice University) |
| University of Louisiana at Lafayette | Oral Roberts University | |
| *Schools for whom TBG's exclusivity rights are limited to the football program. | | |

8.     Among the above-referenced Partner Schools, TBG represents almost all student-athlete members of their respective football programs, totaling 3,725 student-athletes (sometimes referred to hereafter as "Client Athletes").  TBG is willing to provide a list to the Court of each Client Athlete with whom TBG has entered into a GLA upon entry of a confidential protective order or similar order protecting the privacy of these student-athletes.  For purposes of enforcing an injunction, we will provide a list of TBG's Client Athletes to EA, subject to a confidentiality agreement.

9.     Under TBG's Collaboration Agreements, its partners engage TBG to manage the schools' Group Licensing Program, defined as "those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes [e.g., an athlete's name, image, likeness, voice, etc.] of three (3) or more current athletes from one sport or six (6) or more from multiple sports, either in combination with school trademarks and logos or separately as a group."

10.     Most of TBG's Collaboration Agreements contain a provision granting to TBG the exclusive right to develop, implement, and manage the school's Group Licensing Program with the school's students, as follows:

>     6. EXCLUSIVITY. During the Term of this Agreement, [University] recognizes TBG and [University's] exclusive agent to develop, implement and manage the Group Licensing Program among its current Athletes. During such time, [University] shall not engaged any other third party,

without the express written consent of TBG, to develop, implement or manage any similar program involving a group of any size of current or former [University] Athletes.

11.     A sample exclusive Collaboration Agreement is attached as attached as **Exhibit A**.

12.     Certain other of TBG's Collaboration Agreements include Preferred Provider provisions, which instead state that the school "shall consider TBG as its preferred provider of a Group Licensing Program for Athletes, and shall not, without TBG's written consent, contract with any other party to develop, implement or manage any substantially similar group licensing program for groups of any size of Athletes." Although this Preferred Provider language is different from the Exclusive Provider language, it still effectively grants to TBG control over the school's Group Licensing Program by requiring TBG's consent to contract with any other provider for that purpose.

13.     A sample Collaboration Agreement in which TBG is designated as the Partner School's preferred partner is attached as **Exhibit B**.

14.     In conjunction with the Collaboration Agreement entered into between TBG and the school, TBG also enters into a GLA with each student-athlete who wishes to participate in the school's Group Licensing Program. In each GLA, the Client Athlete grants to TBG the exclusive right to use and grant the right to use the athlete's NIL in Group Licensing Programs, as follows:

> The undersigned, an Athlete at [Partner School], hereby grants and assigns to TBG and its licensing affiliates during the term only of this Agreement, the worldwide right to use and to grant to licenses and sponsors the right to use all or any combination of [Sponsored Athlete's] name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature (collectively known as "Athlete Attributes") in Collegiate Group Licensing Programs that also include the use of [Partner School's] intellectual property. "Collegiate Group Licensing Programs" are defined as those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more current [Partner School] Athletes from one sport or six (6) or more from multiple sports, either in combination with University trademarks and logos or separately as a group.

15.     In combination, TBG's Collaboration Agreements with the schools and GLAs with the school's student-athletes allow TBG to pursue group NIL opportunities for its student-athlete clients, knowing that they can use the school's logos and other IP to do so. In other words, while

4

TBG must collaborate with its Partner Schools to use their IP while pursuing opportunities for its student-athletes, TBG's clients in doing so are the student-athletes, not the schools. In fact, TBG receives no compensation or royalties from the schools.

16.     While the Collaboration Agreements and GLAs do not set forth an exhaustive list of what constitutes a Group Licensing Program, most of these agreements do specifically identify video games as such a program.  For instance, most of TBG's GLAs provide that Client Athletes "shall receive 70% of royalties from "third-party licensees in the video game, trading card and Fanatics  categories" and 80% of royalties "from all other third-party licensees and sponsors for use of the group NIL or Athlete Attributes in connection with this Collegiate Group Licensing Program."  TBG typically retains 30% and 20%, respectively, of royalties from these programs. TBG's Collaboration Agreements similarly identify video games as an example of a Group Licensing Program.

17.     TBG is powered by a team of individuals with more than 380 years of collective sports business and licensing experience, including 12 former college athletes. Unlike the student-athletes and schools it represents, TBG is well-positioned to negotiate with corporate sponsors and licensees – such as EA Sports – in order to ensure that its student-athlete clients receive top value for the use of their NIL, while the Partner Schools are also compensated for the of their IP.

18.     Beginning in the late 1990s and continuing until 2013, the defendant in this case, Electronic Arts, Inc. (also sometimes referred to as "EA Sports" or simply "EA") produced and sold video games featuring certain NCAA football and basketball teams, respectively *NCAA Football* and *NCAA Basketball* (formerly known as *NCAA March Madness*). Earlier versions of these games featured the marks and IP of the schools portrayed, but did not feature the players' actual names and images, instead using player avatars featuring only the player's number and position, and no compensation was paid by EA Sports to any student-athletes.  In particular, EA's NCAA Football (the "Game") was wildly popular, but EA discontinued the Game in 2013 amid ongoing litigation over its use of the player avatars and NIL.

19.     On February 2, 2021, EA Sports announced that it was bringing back the Game, to be relaunched as *EA SPORTS College Football*. Since the announcement that EA was developing

DECLARATION OF WESLEY HAYNES

a new version of the Game, TBG has paid careful attention to media and industry reports relating to EA's use of players' NIL and school's IP.

20.     Also on February 2, 2021, EA Sports announced that it had reached a deal with Collegiate Licensing Company that includes licenses for nearly 120 Football Bowl Subdivision ("FBS") schools' intellectual property – such as logos, stadiums, mascots, and fight songs.

21.     To my knowledge, as of February 2021, EA Sports had not yet announced any plans to include college athletes' NIL in the Game.

22.     Following EA's formal announcement of the return of the Game, in numerous communications with EA, TBG reminded EA of TBG's exclusive rights, and EA acknowledged those rights. I specifically discussed this with Paul Cairns, EA's Executive Vice-President, Product Development in a telephone conversation discussing possible collaboration with EA on April 15, 2022, and followed up by providing him samples of our Collaboration Agreements by email. A copy of my April 15, 2022 email to him is attached as **EXHIBIT C**. In a subsequent call with me on May 12, 2022, Mr. Cairns assured me that TBG's Partner Schools and student-athlete clients would be included in the new Game, and that EA would honor TBG's rights under TBG's Collaboration Agreements and GLAs.  In particular, on this May 12, 2022 call, I discussed TBG's exclusive agreements and asked Mr. Cairns whether EA planned to include TBG's Partner Schools in the Game.  Mr. Cairns informed me that "rest assured," EA would put all of TBG's Partner Schools and Sponsored-Players in the Game and would enter into direct agreements with TBG at all schools where TBG has rights.  Mr. Cairns also stated that EA "100% plans to work with [TBG]."

23.     On May 17, 2023, notwithstanding EA's knowledge of TBG's Exclusive Collaboration Agreements, Preferred Collaboration Agreements and Player GLAs, Sean O'Brien, an Executive Vice President of EA, emailed me and others at TBG, reporting that EA had contracted with OneTeam Partners ("OTP"), a competitor of TBG, to "facilitate the opportunity for college athletes to opt in and be included in our CFB video game[.]"

24.     The same day, EA Sports publically announced it had contracted with OTP to "facilitate collegiate athletes' names and likenesses" into its Game. EA Sports' announcement

noted that its partnership with OTP would include the "chance for all eligible FBS players to opt in to have their likenesses in EA Sports College Football" and that that the participating players "will receive compensation for being placed in the game."

25.     Upon hearing of EA's announcement, by letter dated May 18, 2023, TBG, through counsel, immediately reminded EA of TBG's exclusive rights and requested EA's cooperation to ensure that TBG's rights were honored and that compensation being paid by EA, especially that being paid to the student-athletes, represented the fair value of those student-athletes' rights. A copy of TBG counsel's May 18, 2023 letter is attached as **EXHIBIT D**.

26.     Thereafter, on May 24, 2023, I learned that EA was communicating directly with a representative from a Partner School and a member of the Big 10 Conference.  That day, the Partner School representative emailed EA employees, Deanne Mollema and Josh Gregory, asking whether opting-in to the Game would create a conflict with the school's corporate sponsors.  In that email, the school representative informed EA that "We are currently a BrandR exclusive school." Mr. Gregory responded to the Partner School, advising that each student-athlete would individually contract with EA, and thus group rights would not be implicated.  A copy of the May 24, 2023 email correspondence between EA and TBG's Partner School (redacted) is attached as **EXHIBIT E**.

27.     By email to TBG's attorney Lindsey Smith on May 30, 2023, EA, through its internal counsel Betsy Contro, responded to the May 18 letter. Despite its knowledge of TBG's Collaboration Agreements, GLAs and definition of "Group Licensing Program," EA claimed that its program involved "individual" licenses unrelated to any other rights licensed by EA, and "nothing to do with the group rights BrandR [sic] claims to have." A copy of Ms. Contro's May 31 email is attached as **EXHIBIT F**.

28.     Ms. Contro is wrong. A video game featuring actual student-athlete names and images combined with the logos, marks and other IP of the college for who he plays is, necessarily, a "licensing … programs in which a collegiate licensee [e.g., EA Sports] or collegiate sponsor uses the Athlete Attributes [e.g., an athlete's name, image, likeness, voice, etc.] of three (3) or more current [football] athletes … in combination with school trademarks and logos…."

29.     Furthermore, although the specific language may vary, TBG's agreements with universities and with athletes generally contemplate royalties from a "video game."  For example, the sample exclusive Collaboration Agreement attached as **Exhibit A**, states that "TBG will pay the Athletes Seventy Percent (70%) of the athletes' royalty revenue received in the video game, trading card and Fanatics[1] categories and eighty Percent (80%) of the athletes' royalty revenue received in all other categories."

30.     Based upon reports to TBG by multiple Partner Schools, EA appears to be falsely telling TBG Partner Schools that the EA's arrangements for inclusion of participating student-athletes do not conflict with the Partner's Collaborative Agreement with TBG.

31.     Further, based upon reports to TBG by multiple Partner Schools, EA is pressuring schools who have not yet opted into the Game to approve their participation in the Game by June 30, 2023. TBG learned of EA's June 30 deadline from representatives of certain of its Partner Schools who asked TBG how they should proceed.  TBG has heard from a number of Partner Schools that the schools do not want to miss out on the opportunity for their student-athletes to participate in the Game, but that they do not want to breach their contractual obligations to TBG.

32.     On June 1, 2023, TBG, through counsel, responded to Ms. Contro's May 31 email, and also addressed EA's reported June 30 deadline for schools to opt-in to EA's program (the "Second Notice"). The Second Notice clearly explained that if EA Sports intends to use the names, images, and likenesses of student-athletes in connection with the student's school name, branding, logos, or other intellectual property in the Game, and the Game involves more than three individual athletes, then the Game implicates group rights. A copy of the Second Notice is attached hereto as **EXHIBIT G**.

33.     On June 5, 2023, Ms. Contro emailed counsel for TBG and asked for a list of the student-athletes represented by TBG. Counsel for TBG responded by email on June 7, 2023, providing EA with a list of its 65 Partner Schools and informed her that TBG has entered into a GLA with almost all of the football players from these schools, authorizing TBG to act as the

---

[1] "Fanatics" refers to an online retailer of official sports apparel.

DECLARATION OF WESLEY HAYNES

student-athletes' exclusive representative with respect to their respective school's Group Licensing Program. A copy of the June 5, email is attached as **EXHIBIT H**.

34.    Based upon media and industry reports, I am informed and believe that EA intends to pay each participating player a lump sum payment of $500 for the use of that player's NIL, with no continuing royalties, for a likely total payment of only $5,000,000 for all participating players' NIL.

35.    By contrast, based upon information received from one or more of TBG's Partner Schools, I am informed and believe that EA is offering to pay participating schools some percentage of royalties from the Game, with the total compensation pool available to schools being 10% of the revenue generated from sales of the Game, with guaranteed payments ranging from $10,400 to $104,900 depending on variables such as the football program's prominence, recent national ranking, etc.

36.    In my opinion, based upon my experience in collegiate NIL group licensing arrangements, industry information concerning compensation to professional players under EA Sport's popular "Madden" NFL game series, and other factors, $500 per player for the use of his NIL is not fair compensation to the student-athlete. For example, it has been widely reported in sports press that EA's recent agreement with the NFL and the NFL Players Association (NFLPA) to renew the Madden franchise for five years included $500,000,000 for the players' NIL.[2]

37.    Indeed, this amount is far less than EA paid players in settlement of the seminal NIL case, *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1056 (9th Cir. 2015), where former University of California, Los Angeles basketball player, Ed O'Bannon, sued EA, *et al.*, after recognizing himself as a digital avatar in EA's *NCAA Basketball 2009* video game. O'Bannon joined with other former NCAA basketball and football players in a class action, which EA eventually settled for an average per player payment of $1,600.00.[3]

---

[2] *See, e.g.*, https://www.polygon.com/platform/amp/2020/5/28/21270647/madden-nfl-ea-renew-contract-license-football.

[3] *See, e.g.,* Stephen Totilo, *EA Sports reaches deal to pay college football athletes*, https://www.axios.com/2023/05/18/ea-sports-college-football-deal.

DECLARATION OF WESLEY HAYNES

38.     Moreover, based upon information received from one or more of TBG's Partner Schools, I am informed and believe that by opting in the EA's program, participating schools will also grant to EA not only exclusive rights to use participating schools' trademarks and related indicia for the Game, but for any simulation game play (such as mobile simulation games or arcade games) within college football and non-exclusive rights for non-simulation games. Thus, not only would players' compensation for the use of their NIL in the Game be capped at $500, but they would be precluded from earning additional compensation off of their NIL in other arcade and video game opportunities.

39.     EA's interference with TBG's exclusive Collaboration Agreements is causing and will continue to cause TBG irreparable harm. EA's false and deceptive assurances to TBG Partner Schools that the Partner Schools' and Client Athletes' direct contracts with EA will not violate the Collaborative Agreements with TBG, and its artificial deadline for the schools to do so by June 30, 2023 places TBG's Partner School's in the unenviable position of either breaching their contracts with TBG or potentially losing the opportunity to participate in EA's new Game.

40.     EA's conduct and misrepresentations have disrupted TBG's contractual relationships with its Partner Schools and Client Athletes.  I am aware that certain of TBG's Partner Schools have already opted-in to the Game, violating their exclusive Collaboration Agreements with TBG, while others have expressed confusion as to how they should proceed when they are interested in participating in the Game and offering that opportunity to their student-athletes, but do not want to run afoul of their contractual obligations with TBG.

41.     Similarly, EA's tactics are misleading and deceptive to TBG's Client Athletes, the vast majority of whom are not represented by attorneys or player's agents and who may unwittingly opt-in to EA's Game, not knowing that they are breaching their GLAs with TBG and that they are also likely giving up other opportunities.

42.     EA's tactics, in my opinion, will also cause harm to TBG's Client Athletes, and to every student-athlete who opts in to their scheme for unfair compensation, because they are being deprived of the opportunity to have their own representative negotiate on their behalves for fair

compensation for the use of their NIL. That is the fundamental purpose of TBG's Collaboration Agreements, and that is what is being circumvented by EA's program and its misleading tactics.

43.    Over the years, TBG has developed a strong reputation as a leader in facilitating Collegiate Group Licensing Programs and tremendous goodwill among the schools and student-athletes with whom it partners.  TBG's contractual agreements are founded on the relationships TBG has built throughout the years with collegiate athletic programs and out of TBG's mission to advocate for the interests of student-athletes in Group Licensing Programs.

44.    TBG has no desire to sour those relationships by suing its contractual partners in this instance, particularly considering that some of its Partner Schools have communicated a desire to honor their contractual obligations but also a concern that they will miss out on the opportunity for their student-athletes to participate in the Game if they do not oblige with EA's terms.

45.    On June 21, 2023, I learned of an email from another representative of one of TBG's Partner Schools, a member of the Pacific 12 Conference, asking how they should handle EA's' and OneTeam's requests for the School to opt-in to the Game.  Specifically, the representative stated that, "One Team is connecting with our Athletics administration to educate and work through student-athlete onboarding. While we want to support our agreement with TBG, EA Sports is putting us in a difficult position to tell our student-athletes we don't have an agreement."  A copy of the June 21, 2023 email correspondence, redacted in part, is attached as **EXHIBIT I**.

46.    I am concerned that if EA is not enjoined, TBG's ability to facilitate Group Licensing Programs through its Partner Schools on behalf of its Client Athletes will be severely weakened, threatening one of TBG's core business strategies.

47.    Pursuant to the GLAs and Collaboration Agreements, TBG's compensation is based on a percentage of the revenue that it is able to obtain for its Client Athletes for the use of the NIL in group licensing arrangements. I am confident, based on TBG's prior experience, that given the opportunity to represent its Client Athletes in fair negotiations with EA, in compliance with its contractual rights and its Partner Schools' and Client Athletes' contractual obligations, TBG would successfully obtain fair compensation to its Client Athletes (and ultimately to every

student-athlete that opts into EA's new Game), even after subtracting TBG's commission for this representation.

I declare under penalty of perjury under the laws of the state of the United States that the foregoing is true and correct. Executed this 22nd day of June, 2023, at Ponte Vedra, Florida.


_Wesley Haynes_
Wesley Haynes

DECLARATION OF WESLEY HAYNES

# EXHIBIT A



Michigan State University Athletics Department and The Brandr Group, LLC
Group Rights Collaboration Agreement

This is a Collaboration Agreement between the Michigan State University Athletics Department ("MSU") and The Brandr Group, LLC ("TBG") with an effective date of the _23rd_ of August 2021.

WHEREAS, on June 21, 2021, in the case of <u>National Collegiate Athletic Association ("NCAA") v. Alston, et al.,</u> the U.S. Supreme Court held, among other things, that current university student-athletes have certain rights not previously recognized by the NCAA; and

WHEREAS, the NCAA adopted a new Name, Image and Likeness ("NIL") Interim Policy effective July 1, 2021 ("Interim Policy"); and

WHEREAS, the State of Michigan on December 1, 2020 passed an NIL statute, House Bill 5217, pertaining to student-athletes at certain postsecondary educational institutions in the State; and

WHEREAS, MSU has revised its "Student-Athlete NIL Compensation Policy"; and

WHEREAS, MSU wishes to ensure that its student-athletes are able to benefit from their NIL to the fullest extent possible consistent with all applicable federal and state laws, as well as the Interim Policy, the MSU Policy and the rules of the Big Ten Conference ("Big 10"); and

WHEREAS, MSU intends to make available a Group Licensing Program for its current student-athletes in conjunction with the University's official marks, logos or other intellectual property; and

WHEREAS, TBG is experienced in managing Group Licensing Programs, including for such entities as the National Football League Players Association, the National Basketball Players Association, and the U.S. Women's National Soccer Team, among others.

NOW THEREFORE, MSU and TBG agree to work in collaboration to make available a Group Licensing Program for current MSU student-athletes ("Athletes") under the following terms and conditions:

1. DEFINITIONS
   (a) "<u>Athlete Attributes</u>" mean the Athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature in Collegiate Group Licensing Programs of any kind.

   (b) "<u>Group Licensing Program</u>" means those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more

1

Athletes from any one specific sport or six (6) or more Athletes from multiple sports in combination with University trademarks.

2. DUTIES

(a) <u>MSU</u> will support the Group Licensing Program among its Athletes, including by:
    (i)    distributing information about the Program;
    (ii)    encouraging and facilitating the voluntary execution by any interested Athletes of the attached GROUP LICENSING AUTHORIZATION & ASSIGNMENT ("GLA Agreement");
    (iii)    making Athletes' contact information available to TBG;
    (iv)    supporting the Group Licensing Program among the University's sponsors as appropriate; and
    (v)    via MSU's third-party licensing agency and University licensing staff, make MSU official marks, logos, verbiage, or designs (including identifiable aspects of MSU uniforms) available for use in the Program at market rates for co-branded products.

(b) <u>TBG</u> will create, activate and manage the Group Licensing Program on behalf of current MSU Student-Athletes, including by:
    (i)    creating Group Licensing Program educational materials to be distributed to Athletes;
    (ii)    securing sponsors and licensees to support the Group Licensing Program and its participants;
    (iii)    confirming that no sponsor or licensee in the Group Licensing Program is owned or operated under the authority of MSU;
    (iv)    coordinating with MSU rights holders to avoid any sponsorship or licensing conflicts;
    (v)    receiving funds from sponsors and licensees;
    (vi)    distributing sponsor and licensee funds to participating Athletes; and
    (vii)    reporting on the results of the Program on a quarterly basis to MSU.

3. TERM. This Agreement shall commence on the effective date and expire on July 31, 2024, unless terminated sooner or renewed. During the initial or any subsequent Term, either party may terminate this agreement for any or no reason with ninety (90) days written notice to the other party. Renewal consideration will begin no later than six (6) months prior to the expiration date. Upon expiration or termination of the Agreement, TBG will be entitled to its percentage of royalty payments on deals it consummated for a period of two (2) years. The Agreement will renew automatically for periods of three (3) additional years unless a notice of termination is provided at least sixty (60) days prior to an expiration of any Term.

4. INDEMNIFICATION. Each party shall defend, indemnify, and hold harmless the other party and/or its directors, officers, trustees, employees, agents, or other representatives from and

2

against any claims, suits, demands, hearings, actions, damages, losses, or expenses, made by a third party relating to an alleged act, error, or omission of the other party in its proceedings or in its handling of its obligations hereunder; provided, however, that an indemnifying party shall not be required to defend or indemnify the other party to the extent that the latter caused, was involved in, or contributed to such act, error or omission.  Each party shall promptly notify the other of any such actual or threatened claim, suit, demand, hearing, or proceeding.

5. ROYALTIES. It is understood that TBG will pay the Athletes Seventy Percent (70%) of the athletes' royalty revenue received in the video game, trading card and Fanatics categories and Eighty Percent (80%) of the athletes' royalty revenue received in all other categories.  MSU shall have no authority to compensate or cause compensation to be directed to a Student-Athlete or to the family of a Student-Athlete.

6. EXCLUSIVITY.  During the Term of this Agreement, MSU recognizes TBG as MSU's exclusive agent to develop, implement and manage the Group Licensing Program among its current Athletes.  During such time, MSU shall not engage any other third party, without the express written consent of TBG, to develop, implement or manage any similar program involving a group of any size of current or former MSU Athletes.

7.  MISCELLANEOUS.  This agreement shall be governed by the laws of the State of Michigan without regard to its conflict of laws principles.  In their respective performance of this Agreement, the parties agree to comply with all applicable federal and state laws and regulations, as amended, as well as all applicable rules and policies, as amended, of the NCAA, the Big 10, and MSU.


MICHIGAN STATE
ATHLETICS DEPARTMENT

_____

Bill Beekman

Director of Athletics


THE BRANDR GROUP, LLC


_____

Wesley Haynes

CEO & President


3

# EXHIBIT B



Marshall University Athletics Department and The Brandr Group, LLC
Group Rights Collaboration Agreement

This is a Collaboration Agreement between Marshall University on behalf of its Athletics Department ("MU") and The Brandr Group, LLC ("TBG") with an effective date of the 18th of August 2022.

WHEREAS, on June 21, 2021, in the case of <u>National Collegiate Athletic Association ("NCAA") v. Alston, et al.,</u> the U.S. Supreme Court held, among other things, that current university student-athletes have certain rights not previously recognized by the NCAA; and

WHEREAS, the NCAA adopted a new Name, Image and Likeness ("NIL") Interim Policy effective July 1, 2021 ("Interim Policy"); and

WHEREAS, MU has published its "Student-Athlete NIL Compensation Policy"; and

WHEREAS, MU wishes to ensure that its student-athletes are able to benefit from their NIL to the fullest extent possible consistent with all applicable federal and state laws, as well as the Interim Policy, the MU Policy, WV Uniform Athlete Agents Act "Athlete Agent Act" and the rules of the Sun Belt Conference ("SBC"); and

WHEREAS, MU intends to make available a Group Licensing Program for its current student-athletes in conjunction with the University's official marks, logos or other intellectual property; and

WHEREAS, TBG is experienced in managing Group Licensing Programs, including for such entities as the National Football League Players Association, the National Basketball Players Association, and the U.S. Women's National Soccer Team, among others.

NOW THEREFORE, MU and TBG agree to work in collaboration to make available a Group Licensing Program for current MU student-athletes ("Athletes") under the following terms and conditions:

1. DEFINITIONS
   (a) "<u>Athlete Attributes</u>" mean the Athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature in Collegiate Group Licensing Programs of any kind.
   (b) "Athlete" is a person who meets the definition of a student athlete according to NCAA regulations.

1

(c) <u>"Group Licensing Program"</u> means those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more Athletes from any one specific sport or six (6) or more Athletes from multiple sports in combination with University trademarks.

(d) <u>"MU Marks and Indicia"</u> means MU's name, its trademarks, service marks, logos, symbols, college colors, and other licensed indicia

2. DUTIES

(a) <u>MU</u> will support the Group Licensing Program among its Athletes, including by:

    (i)    distributing information about the Program;

    (ii)    facilitating the voluntary execution by any interested Athletes of the attached GROUP LICENSING AUTHORIZATION & ASSIGNMENT ("GLA Agreement");

    (iii)    organizing educational sessions for Athletes to learn about the Program from TBG;

    (iv)    making Athletes' contact information available to TBG for purposes of facilitating signing of the GLA, provided that, this information may only be used by TBG for the purpose of contacting Athletes. This information will remain the property of MU and may not be sold or used for any other purposes not expressly stated in this Agreement;

    (v)    "connecting TBG with MU's third-party trademark licensing agency and University licensing staff, so that TBG can discuss opportunities to secure from such entity(-ies) the right to use MU Marks and Indicia in connection with the Group Licensing Program, provided that MU reserves the right to review and approve each proposed use of MU Marks and Indicia and will have sole discretion to determine involvement by the appropriate rights holder (e.g., trademark licensing agency and/or multi-media rights holder).

    (vi)    providing information regarding the Group Licensing Program among the University's sponsors as appropriate; and

    (vii)    via MU's third-party licensing agency, Multi Media Rights holder and University licensing staff, make MU official marks, logos, verbiage, or designs (including identifiable aspects of MU uniforms) available for use in the Program at market rates for co-branded products. Provided that, MU will review and approve at its sole discretion.

(b) <u>TBG</u> will create, activate and manage the Group Licensing Program on behalf of current MU Student-Athletes, including by:

    (i)    creating Group Licensing Program educational materials to be distributed to Athletes;

2

(ii)     registering as an Athlete Agent through the West Virginia Secretary of State as required by the Athletes Agent Act.

(iii)    conducting Group Licensing Program educational sessions for Athletes;

(iv)    securing sponsors and licensees to support the Group Licensing Program and its participants;

(v)     confirming that no sponsor or licensee in the Group Licensing Program is owned or operated under the authority of MU;

(vi)    coordinating with MU rights holders to avoid any sponsorship or licensing conflicts;

(vii)   ensuring that all sponsors and licensees that plan to produce products as part of the Group Licensing Program apply and become licensed as WVU licensees through the Collegiate Licensing Company;

(viii)  receiving funds from sponsors and licensees;

(ix)    distributing sponsor and licensee funds to participating Athletes; and

(x)     reporting on the results of the Program on a quarterly basis to MU.

(xi)    reporting to MU within seventy-two (72) hours after entering into a contract with a MU Student-Athlete or before the next scheduled athletic event in which the Student-Athlete may participate, whichever occurs first; and

(xii)   retaining records as required by the Athletes Agents Act.

3.  TERM.  This Agreement shall commence on the effective date and expire on July 1, 2027, unless terminated sooner or renewed. During the initial or any subsequent Term, either party may terminate this agreement for any or no reason with ninety (90) days written notice to the other party after two years have elapsed since the effective date. Renewal consideration will begin no later than six (6) months prior to the percentage of royalty payments on deals it consummated for a period of two (2) years. The Agreement may be modified or renewed upon the mutual written agreement of the parties.

4.   RESPONSIBILITY FOR OWN ACTS.  Each party shall be responsible for its own acts or omissions and for any and all claims, liabilities, injuries, suits, demands and expenses of all kinds which may result or arise out of any alleged malfeasance or neglect caused or alleged to have been caused by that party or its employees or representatives in the performance or omission of any act or responsibility of that party under this Agreement.

5. ROYALTIES. It is understood that TBG will pay the Athletes Seventy Percent (70%) of the athletes' royalty revenue received. MU shall have no authority to compensate or cause compensation to be directed to an Athlete or to the family of an Athlete. Royalties to MU shall be in accordance with the co-branded royalty rate identified by MU that apply to this program.

6. PREFERRED PROVIDER.  To the extent permitted by law, during the Term, the Department shall consider TBG as its preferred provider of a Group Licensing Program for

Athletes, and shall not, without TBG's written consent, contract with any other party to develop, implement or manage any substantially similar group licensing program for groups of any size of Athletes.

7. MISCELLANEOUS.  This agreement shall be governed by the laws of the State of West Virginia without regard to its conflict of laws principles.  In their respective performance of this Agreement, the parties agree to comply with all applicable federal and state laws and regulations, as amended, as well as all applicable rules and policies, as amended, of the NCAA, the Sun Belt Conference and MU.

8. ASSIGNMENT. This Agreement may not be assigned without the mutual consent of the parties.

9. NO PARTNERSHIP OR JOINT VENTURE. Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture.

MARSHALL UNIVERSITY
ATHLETICS DEPARTMENT

THE BRANDR GROUP, LLC

Christian Spears

Wesley Haynes

Director of Athletics

CEO & President

4

# **EXHIBIT C**

| | |
|---|---|
| **From:** | Wesley Haynes |
| **To:** | Farley, Richard L.; Smith, Lindsey L. |
| **Subject:** | Fwd: Good to Catch Up |
| **Date:** | |
| **Attachments:** | E68B8093-2797-40B4-9330-EF284620099F |
| | Michigan State - TBG Collaboration Agreement Fully Executed.pdf |
| | Maryland - TBG Agreement Fully Executed.pdf |
| | Nebraska TBG Collaboration Agreement Fully Executed.pdf |
| | NC State-BrandR Collaboration Agreement (Fully Executed) (N0038308xC1D49)[1].pdf |
| | Utah - TBG_Collaboration_Agreement Fully Executed.pdf |
| | West Virginia The Brandr Group fully executed.pdf |

Wesley Haynes
**TBG | The Brandr Group**

Begin forwarded message:

> **From:** Wesley Haynes <wesley.haynes@tbgusa.com>
> **Date:** April 15, 2022 at 2:40:29 PM EDT
> **To:** "Cairns, Paul" <pcairns@ea.com>
> **Subject: Good to Catch Up**

Paul -

Good to catch up with you today. I hope you have a great Easter weekend with your family.

Per our discussion, like you - I remain disappointed that we have not yet been able to settle our disagreement with Ahmad and OneTeam Partners on our cooperative strategies & joint plans going forward. Ahmad and I had a good working agreement dating back to July 23, 2021, but that agreement seems to be in doubt now based on some of their recent actions. Maybe we can fix this, but if not - we are certainly ready/prepared to enter into a parallel agreement with EA for our +45 TBG partner Power 5 schools & the +10K student-athletes who have opted into our GLA program. And, as I said during our discussion if warranted - I am happy to agree in writing to ***the same or similar terms as OneTeam so long as there is transparency in the process***. Our agreements require us to notify the student-athletes we represent and the various school compliance offices of the player deal terms (like the %s going to players), which we will need to get to school compliance offices once we have agreement. If anything, the recent awkward way the Fanatics program has attempted to be executed, has taught us how NOT to handle this EA program.

Lastly, I just thought I would share just a couple of our example school agreements (if OK, please keep these confidential). As you will note, most of our agreements are for 5'ish years and usually include exclusivity with player + school IP group rights programs. I hope OneTeam does not force us or the schools to protect our rights in this matter, as that seems like a huge waste of time & resources.

Talk again soon, and let me know when you can get to PVB. I would love to grab dinner while you are here...


Thanks,


**WESLEY HAYNES**
**TBG //** The Brandr Group
**M //** 904.860.3249

# **EXHIBIT D**

# Katten

**550 S. Tryon Street**
**Suite 2900**
**Charlotte, NC  28202-4213**
**+1.704.444.2000 tel**
**katten.com**

**LINDSEY L. SMITH**
lindsey.smith@katten.com
+1.704.344.3178 direct

May 18, 2023

_Via Certified Mail and Email_
Mr. Jake Schatz
Chief Legal Officer
Electronic Arts Inc.
209 Redwood Shores Parkway
Redwood City, CA  94065
jschatz@ea.com

Re:   **LEGAL HOLD NOTICE – Retaining and Preserving All Documents and Electronically Stored Information about EA Sports College Football Game Agreement and Negotiations with OneTeam Partners**

Dear Mr. Schatz:

We represent The BrandR Group ("TBG") and are writing regarding Electronic Arts Inc. ("EA Sports") and its purported agreement with OneTeam Partners ("OTP").  We understand that EA Sports issued a May 17 statement indicating, among other things, that, "_We're excited to have an agreement in place with OneTeam Partners that will enable us to include the names and likenesses of eligible collegiate football athletes at NCAA Division 1 Football Subdivision schools who opt-in to being featured in EA Sports College Football._"

As you know, TBG is involved in ongoing litigation with OTP, wherein TBG has asserted claims based, in part, on disputes involving OTP's college-related negotiations and any contracts with EA Sports.  While we hope that EA Sports can remain a non-party to that litigation, you nevertheless are hereby notified of your obligation to identify and preserve all documents[1] that might possibly be subject to discovery as part of the ongoing lawsuit between TBG and OTP.  Such materials include but are not limited to documents relating to the agreement with OTP noted in your statement and all the negotiations leading to that agreement.

By our estimate, TBG represents the group rights of about 50-60% of the collegiate student athletes eligible to participate in the EA Sports College Football Game.  Most of those student athlete

---

[1] For purposes of this Legal Hold Notice, the term "documents" is defined to include all emails, documents, communications, information, reports, or records, whether in paper or electronic form, in your possession or control.  Further, this Legal Hold Notice relates to all documents within the possession or control of EA Sports or its employees, including documents stored on your electronic business network, computer desktops, in your business or home office space, or on individual employees' personal communication devices.

KATTEN MUCHIN ROSENMAN LLP
CENTURY CITY     CHARLOTTE     CHICAGO     DALLAS     LOS ANGELES
NEW YORK     ORANGE COUNTY     SHANGHAI     WASHINGTON, DC
A limited liability partnership including professional corporations
LONDON: KATTEN MUCHIN ROSENMAN UK LLP

**Katten**

May 18, 2023
Page 2

contracts grant TBG exclusivity with respect to such group rights.  You are, of course, aware of such exclusivity since TBG has provided EA Sports with multiple examples of such contracts in connection with its past business dealings.  Therefore, we request that you immediately provide us with the details of the compensation to be paid to the student athletes represented by TBG, as well as a copy of the "agreement in place" between EA Sports and OTP as referenced above.  From the press reports and statements we have seen so far, the proposed compensation to the student athletes appears to fall far below fair market value.  The team at TBG sincerely hopes that such early press reporting is inaccurate, as TBG intends to protect and advance the rights and interests of the student athletes under contract with TBG, as well as the group rights granted by those student athletes to TBG.

In addition, we understand that EA Sports also has been provided with samples of TBG's Collaboration Agreements with about 70-80 Division 1 universities.  In many of those agreements, the colleges granted TBG exclusivity or preferred contractor status to manage those schools' NIL programs, including the schools' IP when paired with student athletes' NIL in group rights programs.  We intend to enforce all of TBG's contractual rights in this regard as well.  We hope to receive EA Sports' full cooperation as we do so.

Finally, many of TBG's partner schools already have expressed concerns that the arrangement and compensation planned by EA Sports and OTP will primarily serve the interests of those two entities.  At least some of those colleges are also concerned that the compensation that the schools will receive will be unfair and unreasonable in light of the below market value to be paid to the student athletes.

As we continue to look into the announced agreement between EA Sports and OTP, we look forward to speaking with you about the impact to TBG's existing contractual rights and relationships.  In particular, we look forward to hearing from you as to how EA Sports intends to implement its agreement with OTP without violating TBG's exclusivity rights with respect to those student athletes and universities referenced above.  Please contact me at your earliest convenience to discuss this point.

In addition, we appreciate your cooperation in preserving the documents identified above, and we ask that you provide us with a copy of your contract with OTP, including all exhibits, addendums, and amendments thereto.  Kindly provide this to me at your earliest convenience and by no later than May 25, 2023.

We look forward to speaking with you soon.

**Katten**

May 18, 2023
Page 3


Sincerely,

Lindsey L. Smith

Cc:     Mr. Paul Cairns, pcairns@ea.com, *via email*

        Richard Farley, richard.farley@katten.com, *via email*

# __EXHIBIT E__

███████████████████████████████████████

---

**From:** Gregory, Josh <jogregory@ea.com>
**Sent:** Wednesday, May 24, 2023 1:31 PM
**To:** ████████████████████████ Mollema, Deanne <dmollema@ea.com>
**Subject:** RE: EA Sports News

Non-██ Email

---

Hi ████,


Thanks for reaching out about this! The Compass NIL App will be used, but the college football video game license is a standalone offer, is not part of OneTeam's group license, and will not be bundled with anything else.


One Team will be facilitating this offer on behalf of EA Sports through the Compass NIL App. However, the individual license agreement will be directly with EA Sports, not as a part of OneTeam's group license. By opting into the EA Sports agreement, your student-athlete individually grants NIL rights to EA Sports for our college football video game and not any other OneTeam opportunity.


Thanks,


Josh


---

**From:** ████████████████████████ >
**Sent:** Tuesday, May 23, 2023 3:02 PM
**To:** Mollema, Deanne <dmollema@ea.com>; Gregory, Josh <jogregory@ea.com>
**Subject:** FW: EA Sports News


Deanne and Josh,


It might be too early to have answers to the questions below but wanted to forward this along from my boss.

I think his concern is if our student athletes opt in to one-team, they will automatically be opted in to deals via Learfield which could conflict with our current corporate sponsors.

We are currently a BrandR exclusive school.

Let me know if you have any feedback?


Thank you,



---

**From:** 
**Sent:** Monday, May 22, 2023 10:56 AM
**To:**
**Cc:**
**Subject:** EA Sports News


,

Can you please reach out to EA Sports and ask if players will be able to opt in only for the EA Sports offer through Compass or if opting in through One Team/Compass App will opt players in for all One Team offers?  Some student athletes already have deals in certain categories, and we need to educate them on how this upcoming EA opt in with effect those agreements.

Thanks,



# **<u>EXHIBIT F</u>**

| | |
|---|---|
| **From:** | Contro, Betsy |
| **To:** | Smith, Lindsey L. |
| **Subject:** | Correspondence from EA re the BrandR Group |
| **Date:** | Tuesday, May 30, 2023 6:23:34 PM |
| **Attachments:** | image001.png |

*EXTERNAL EMAIL – EXERCISE CAUTION*

Dear Ms. Smith,

I am writing on behalf of Electronic Arts Inc. ("EA").  We received your letter to EA dated May 18, 2023, on behalf of your client, The BrandR Group ("BrandR"), regarding the EA Sports College Football game (the "Game").

As we've indicated to BrandR previously, EA is not involved in BrandR's dispute with OneTeam Partners and has no interest in getting drawn into any such dispute.  EA, however, will comply with any legal obligations it may have with respect to such proceedings.

As publicized on May 17, EA plans to provide eligible college football athletes the opportunity to opt-in individually and license their likeness rights directly to EA for inclusion in the Game.  The aim is to allow individual athletes an inclusive and equitable opportunity to decide whether or not they would like their name and likeness to be included in the Game and to license those (unencumbered) rights directly from eligible student athletes, independently and unrelated to any potential licensing by EA of other intellectual property rights (e.g., division, conference, school, group, etc.). To be clear, this has nothing to do with the group rights with student athletes that BrandR claims to have. Additionally, media contacted us about statements BrandR has made to schools regarding the Game. We ask that you advise your client to refrain from making any false statements about EA or the Game, including suggesting that EA is currently working with BrandR or has any plans to engage BrandR to negotiate on its behalf with schools or student athletes.

Nothing in this response is intended or be construed to constitute an express or implied waiver of any rights or remedies that EA may have in connection with this matter, and all rights are reserved.
Regards,

Betsy Contro
Senior Counsel, Litigation
Electronic Arts Inc.
Email: bcontro@ea.com



NOTICE TO RECIPIENT: THIS E-MAIL IS MEANT SOLELY FOR THE INTENDED RECIPIENT OF THE TRANSMISSION, AND MAY BE A COMMUNICATION PRIVILEGED BY LAW. IF YOU RECEIVED THIS E-MAIL IN ERROR, ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND PLEASE DELETE THIS MESSAGE FROM YOUR SYSTEM.

# **EXHIBIT G**

# Katten

**550 S. Tryon Street**
**Suite 2900**
**Charlotte, NC  28202-4213**
**+1.704.444.2000 tel**
**katten.com**

**Lindsey L. Smith**
lindsey.smith@katten.com
+1.704.344.3178 direct

June 1, 2023

*Via Certified Mail and Email*
Ms. Betsy Contro
Senior Counsel
Electronic Arts Inc.
209 Redwood Shores Parkway
Redwood City, CA  94065
bcontro@ea.com

Re:   **EA Sports College Football Game (the "Game") Agreement and Negotiations with OneTeam Partners**

Dear Ms. Contro:

We appreciate your response to our May 18, 2023 letter.  Unfortunately, your comments make clear that either EA does not understand TBG's exclusive group licensing rights, or EA plans to intentionally violate those rights.

You claim in your May 31, 2023 email that the Game "has nothing do with" TBG's exclusive group licensing agreements between it and the dozens of schools and thousands of student-athletes TBG represents.  You seem to suggest that because EA is contracting separately with the individual student-athletes and their schools, that the Game does not affect "group" rights.  To be clear, if EA plans to use the names, images, and likenesses of student-athletes in connection with the students' school name, branding, logos, or other intellectual property, and it involves more than three individual athletes, then the Game necessarily implicates group rights.  EA cannot circumvent TBG's exclusive agreements by entering into what it considers "individual" or "independent" deals with the student-athletes and schools.  We suspect you may understand this concept given your current agreements with the NFLPA and NBPA.

Under TBG's agreements, "Group Licensing Programs" are defined as "those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes[1] of three (3) or more current Athletes from any one specific sport or six (6) or more Athletes from multiple sports in combination with University trademarks."  By definition, the Game constitutes a Group Licensing Program, for which TBG's contractual agreements require that EA recognize TBG as its clients' exclusive agent.  Thus, to the extent EA seeks to include

---

[1]  "Athlete Attributes" include all or any combination of the designated athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature.

KATTEN MUCHIN ROSENMAN LLP

CENTURY CITY     CHARLOTTE     CHICAGO     DALLAS     LOS ANGELES
NEW YORK     ORANGE COUNTY     SHANGHAI     WASHINGTON, DC
A limited liability partnership including professional corporations
LONDON: KATTEN MUCHIN ROSENMAN UK LLP

**Katten**

June 1, 2023
Page 2

TBG-represented student-athletes and schools in its Game, EA must work with TBG to negotiate the student-athlete terms.

We have heard from certain of TBG's partner schools that EA does in fact intend to use TBG-sponsored student-athletes and schools in the Game, and that EA is informing TBG's partners that this will not interfere with TBG's exclusivity rights. Based on the explanation in your email, this statement is false. We also understand that EA is telling schools and universities that they must opt in to the Game by June 30, 2023, or else they will be ineligible from participating. Given the urgency EA has created with this supposed deadline, TBG is accelerating its review of next steps and available remedies. TBG will not hesitate to take appropriate action against EA to protect its contractual rights and the interests of the schools and athletes TBG represents.

Moreover, contrary to assertions made by EA and OTP, TBG has not made any public statements regarding the Game. TBG has voiced concerns to its clients about student-athletes not having a voice or representation regarding the financial compensation for joining the Game, which we understand may be well below market value based on comparable video games and arrangements with athletes from other leagues and sports. TBG's concerns are based on media reports and statements made directly by EA to TBG.

I invite you to contact me should you wish to discuss a possible resolution between our clients. In the meantime, TBG reserves all rights and continues to assess its next steps.

Sincerely,

*Lindsey L. Smith*

Lindsey L. Smith


Cc:   Mr. Jake Schatz, jschatz@ea.com, *via email*
      Mr. Paul Cairns, pcairns@ea.com, *via email*

# EXHIBIT H

| | |
|---|---|
| **From:** | Smith, Lindsey L. |
| **To:** | "Contro, Betsy" |
| **Cc:** | Schatz, Jake; Cairns, Paul; Farley, Richard L. |
| **Subject:** | RE: Correspondence from EA re the BrandR Group |
| **Date:** | Wednesday, June 7, 2023 6:45:14 PM |
| **Attachments:** | image001.png |

Ms. Contro,

In response to your request, please see below for a list of the current NCAA schools with whom TBG has contracted to act as the exclusive agent with respect to each school's Group Licensing Program.  I believe you are already in possession of certain of TBG's collaboration agreements, and that exclusivity language is representative of TBG's agreements with all of these schools.  Given the nature of the EA Sports College Football Game, we think this list is sufficient to provide EA with a general understanding of TBG's representation.  As we explained previously, we presume that the Game will require the use of NIL from three or more football players from a given school, which necessarily implicates TBG's Group Licensing Rights for its partner schools.  TBG has entered into Student-Athlete Group Licensing Authorization & Assignment Agreements with almost all of the football players from these schools, authorizing TBG to act as the student-athletes' exclusive agent with respect to their respective school's Group Licensing Program.

We hope that this invites a discussion regarding TBG's representation and the participation of its represented schools and student-athletes in the Game.  We reserve all rights and look forward to your response.

| Current TBG-Exclusive Schools | | | |
|---|---|---|---|
| Appalachian State | Kansas State | North Texas | Towson |
| Arizona State | Liberty | Northwestern | Troy |
| Arkansas | Louisiana Tech | Ohio State | UConn |
| Auburn | Louisiana- Lafayette | Ohio University | UNC |
| Baylor | Louisville* | Oklahoma State | UT Arlington |
| Boston College | Marshall | Old Dominion | Utah |
| BYU | Maryland | Ole Miss | UTEP |
| Campbell | Miami* | Oral Roberts | UTPB |
| Cincinnati | Michigan | Oregon State | UTSA |
| Colorado | Michigan State | Pittsburgh | Villanova |
| Colorado State | Middle Tennessee State | Purdue | Virginia |
| Dayton | Mississippi State | Rice | Wake Forest |
| Florida | Missouri | Rutgers | West Virginia |
| Georgia Tech | Murray State | SMU | Wyoming |
| Gonzaga | NC Central | Syracuse | |
| Hawaii | NC State | TCU* | |
| Houston | Nebraska | Texas | |
| *Schools for whom TBG's exclusivity rights are limited to the football program. | | | |

Thank you,

**Lindsey L. Smith**
Partner

**Katten**

Katten Muchin Rosenman LLP
550 S. Tryon Street, Suite 2900 | Charlotte, NC 28202-4213
direct +1.704.344.3178
lindsey.smith@katten.com | katten.com

**From:** Contro, Betsy <bcontro@ea.com>
**Sent:** Monday, June 5, 2023 7:23 PM
**To:** Smith, Lindsey L. <lindsey.smith@katten.com>
**Cc:** Schatz, Jake <JSchatz@ea.com>; Cairns, Paul <pcairns@ea.com>; Farley, Richard L. <richard.farley@katten.com>

**Subject:** RE: Correspondence from EA re the BrandR Group

*EXTERNAL EMAIL – EXERCISE CAUTION*

Dear Ms. Smith,

Your June 1 letter says that your client The BrandR Group ("TBG") is the "exclusive agent" for its clients and that "EA must work with TBG to negotiate the student-athlete terms." Please identify the student-athletes that TBG claims to represent as their exclusive agent for these purposes, and the scope of such exclusivity.

Regards,
Betsy Contro

**From:** Smith, Lindsey L. <lindsey.smith@katten.com>
**Sent:** Thursday, June 1, 2023 2:55 PM
**To:** Contro, Betsy <bcontro@ea.com>
**Cc:** Schatz, Jake <jschatz@ea.com>; Cairns, Paul <pcairns@ea.com>; Farley, Richard L. <richard.farley@katten.com>
**Subject:** RE: Correspondence from EA re the BrandR Group

Ms. Contro,
Please see the attached correspondence regarding this matter.

Thank you,

**Lindsey L. Smith**
Partner

**Katten**

Katten Muchin Rosenman LLP
550 S. Tryon Street, Suite 2900 | Charlotte, NC 28202-4213
direct +1.704.344.3178
lindsey.smith@katten.com | katten.com

**From:** Contro, Betsy <bcontro@ea.com>
**Sent:** Tuesday, May 30, 2023 6:23 PM
**To:** Smith, Lindsey L. <lindsey.smith@katten.com>
**Subject:** Correspondence from EA re the BrandR Group

*EXTERNAL EMAIL – EXERCISE CAUTION*

Dear Ms. Smith,

I am writing on behalf of Electronic Arts Inc. ("EA"). We received your letter to EA dated May 18, 2023, on behalf of your client, The BrandR Group ("BrandR"), regarding the EA Sports College Football game (the "Game").

As we've indicated to BrandR previously, EA is not involved in BrandR's dispute with OneTeam Partners and has no interest in getting drawn into any such dispute. EA, however, will comply with any legal obligations it may have with respect to such proceedings.

As publicized on May 17, EA plans to provide eligible college football athletes the opportunity to opt-in individually and license their likeness rights directly to EA for inclusion in the Game. The aim is to allow individual athletes an inclusive and equitable opportunity to decide whether or not they would like their name and likeness to be included in the Game and to license those (unencumbered) rights directly from eligible student athletes, independently and unrelated to any potential licensing by EA of other intellectual property rights (e.g., division, conference, school, group, etc.). To be clear, this has nothing to do with the group rights with student athletes that BrandR claims to have.

Additionally, media contacted us about statements BrandR has made to schools regarding the Game. We ask that you advise your client to refrain from making any false statements about EA or the Game, including suggesting that EA is currently working with BrandR or has any plans to engage BrandR to negotiate on its behalf with schools or student

athletes.

Nothing in this response is intended or be construed to constitute an express or implied waiver of any rights or remedies that EA may have in connection with this matter, and all rights are reserved.

Regards,

Betsy Contro
Senior Counsel, Litigation
Electronic Arts Inc.
Email: bcontro@ea.com



NOTICE TO RECIPIENT: THIS E-MAIL IS MEANT SOLELY FOR THE INTENDED RECIPIENT OF THE TRANSMISSION, AND MAY BE A COMMUNICATION PRIVILEGED BY LAW. IF YOU RECEIVED THIS E-MAIL IN ERROR, ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND PLEASE DELETE THIS MESSAGE FROM YOUR SYSTEM.

```
============================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive
use of the individual or entity to whom it is addressed and may contain information that is
proprietary, privileged, confidential and/or exempt from disclosure under applicable law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the original
message without making any copies.
============================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
============================================================
```

# **<u>EXHIBIT I</u>**



Wesley Haynes
**TBG | The Brandr Group**

Begin forwarded message:

> **From:** Riley Haynes <riley.haynes@tbgusa.com>
> **Date:** June 21, 2023 at 7:21:09 AM EDT
> **To:** Dave Schroeder <dave.schroeder@tbgusa.com>, Len Stachitas
> <len.stachitas@tbgusa.com>, Paul Pogge <paul.pogge@tbgusa.com>, Ryan Moss
> <ryan.moss@tbgusa.com>, Wallis Haynes <wallis.haynes@tbgusa.com>, Wesley Haynes
> <wesley.haynes@tbgusa.com>
> **Subject: Fwd: FW: EA Sports News**
>
>
> FYI.
>
> ---------- Forwarded message ---------
> From: ███████████████████████>
> Date: Tue, Jun 20, 2023 at 11:52 PM
> Subject: FW: EA Sports News
> To: Ryan Moss <ryan.moss@tbgusa.com>, Riley Haynes <riley.haynes@tbgusa.com>
> CC: ███████████████████
>
>
> Gentlemen,
>
>
> Do you have any updates on TBG's negotiations with EA Sports? One Team is connecting with
> our Athletics administration to educate and work through student-athlete onboarding. While we
> want to support our agreement with TBG, EA Sports is putting us in a difficult position to tell
> our student-athletes we don't have an agreement. Any recommendations?

Thanks,



**From:** Wesley Haynes <wesley.haynes@tbgusa.com>
**Date:** Wednesday, May 24, 2023 at 9:22 AM
**To:** Wesley Haynes <wesley.haynes@thebrandrgroup.com>
**Cc:** Rachel Maruno <rachel.maruno@tbgusa.com>, Len Stachitas <len.stachitas@tbgusa.com>,
Ryan Moss <ryan.moss@tbgusa.com>, Riley Haynes <riley.haynes@tbgusa.com>, Dan Barrett
<dan.barrett@tbgusa.com>, Paul Pogge <paul.pogge@tbgusa.com>, Rick Perko
<rick.perko@tbgusa.com>, Jim Neish <jim.neish@tbgusa.com>
**Subject:** EA Sports News

Good morning!

Like you, we received the news that confirms Electronic Arts (EA) will be compensating student-athletes who are included in the upcoming EA Sports College Football game. TBG has been in regular contact with EA throughout the last year, and we view this public confirmation as a positive step forward. Over the course of the last year, EA has mentioned an approach to us that is similar to the one now being reported in the press. We expressed concerns to EA that this proposal, on the surface, may have some issues that we would like to understand better before it moves forward.

At its core, the proposed program appears to counter the intent of NIL, which is supposed to give athletes a voice in these discussions and an opportunity for them or their representation to negotiate for fair-market-value. From what we know, we are concerned that there was no opportunity for athletes to have a voice, and this proposal may not meet the threshold of fair-market-value based on previous settlement amounts reported years ago, existing rates provided to professional athletes in similar situations, and several other factors. In fact, the terms offered may only be a fraction of fair-

market-value, which we will need to confirm in further conversations with EA on behalf of student-athletes.

Again last week, we expressed new, additional concerns to EA on this matter, as well as our desire to create transparency with the program and ensure there is representation on behalf of your student-athletes. There is still over a year before the game is launched, and we will continue working with EA to recognize and respect the rights of the athletes. Our objective will be to reopen a dialogue so we can advocate and work diligently for the thousands of athletes you have entrusted us to represent. We appreciate the opportunity to work with you and for your student-athletes. As always, we are open to discussing this and any other program with you and will be proactive in providing ongoing communication around this topic.

Best wishes for a productive and successful summer! Talk again soon.

Wesley



**WESLEY HAYNES**
**TBG //** The Brandr Group - CEO
**M //** 904.860.3249

--

**RILEY HAYNES**
**TBG //** The Brandr Group
**M //** 904.629.8275