# EXHIBIT

Christopher D. Beatty (SBN 266466)
chris.beatty@katten.com
Ashley T. Brines (SBN 322988)
ashley.brines@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: 310.788.4400
Facsimile: 310.788.4471

Richard L. Farley (*pro hac vice* forthcoming)
Richard.farley@katten.com
Lindsey L. Smith (*pro hac vice* forthcoming)
lindsey.smith@katten.com
Kelsey R. Panizzolo (*pro hac vice* forthcoming)
Kelsey.panizzolo@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
500 S. Tryon Street, Suite 2900
Charlotte, NC 28202-4213
Telephone: 704.344.3178

Attorneys for Plaintiff
The BrandR Group, LLC

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON        6/16/2023
By        /s/ Jennifer Torres
          Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN MATEO

| | |
|---|---|
| THE BRANDR GROUP, LLC | Case No. 23-CIV-02715 |
| Plaintiff, | **VERIFIED COMPLAINT** for: |
| vs. | 1. **Tortious Interference with Contract** |
| ELECTRONIC ARTS, INC., and DOES 1 through 10, inclusive, | 2. **Violation of California Civil Code § 3344** |
| Defendants. | 3. **Violation of Right of Publicity/Misappropriation of Likeness** |
| | 4. **Violation of California Business and Professions Code § 17200, *et seq.*; and** |
| | 5. **Declaratory Relief** |

157725142v12

Plaintiff The BrandR Group, LLC ("TBG"), by and through its attorneys Katten Muchin Rosenman LLP, for its complaint in this action against Defendant Electronic Arts, Inc. ("EA Sports" or "EA"), alleges as follows:

## NATURE OF THE CASE

1.     This dispute involves the rights of collegiate student-athletes to receive fair compensation for the commercial use of their "name, image, and likeness" ("NIL") and the protection of the contractual rights of those engaged to advocate for those rights.

2.     For more than 100 years, National Collegiate Athletic Association ("NCAA") rules limited the financial benefits student-athletes could accept for the use of their NIL.  That rule changed in the wake of the seminal Ninth Circuit rulings in *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1272 (9th Cir. 2013) and *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), and the Supreme Court's decision in *NCAA v. Alston*, 141 S. Ct. 2141 (2021), which ultimately divested the NCAA of its long-standing justification for prohibiting collegiate athletes from commercializing their NIL and prompted the NCAA to suspend its previous restrictions and allow student-athletes to profit from the use of their NIL.

3.     With the removal of previous barriers to paying student-athletes for their NIL has come a frenzy of marketing and advertising opportunities for young student-athletes arising from their participation in collegiate sports.

4.     This has proven especially true for those student-athletes participating in collegiate football and basketball programs.  Indeed, it is hard to overstate the popularity of these collegiate sports in the United States, which contributes to the vast array of opportunities that are now available to collegiate football and basketball players with the use of their NIL.

5.     One such opportunity is the return of the *EA Sports College Football* video game ("EA College Football" or the "Game").  Originally released in the 1990s, in 2013-2014, EA announced that it was discontinuing its popular football video game amid an onslaught of NIL

litigation in 2013-2014.  The discontinuance of the Game was significant given that it reportedly generated anywhere between $80 million to $125 million per year in sales revenue.[1]

6.      EA now plans to bring back its popular Game, but this time, EA intends to use student-athletes' NIL and schools' intellectual property ("IP") to create a more realistic college football experience for users – one that includes realistic-looking avatars of the players and the actual branding, logos, and even fight songs from the players' schools.  The Game presents an exciting opportunity for young college football players to participate in what has historically been a tremendously popular and successful video game; more importantly, it presents an opportunity for these young athletes to be fairly compensated for helping to make that Game so successful.

7.      Unfortunately, EA Sports is trying to avoid paying collegiate football players a fair price for their participation in the Game, continuing the pre-*O'Bannon* pattern of large corporations taking advantage of young student-athletes and capitalizing on their NIL.  EA Sports is reportedly offering student-athletes a flat fee of just $500 per athlete to participate in a Game which is expected to yield EA Sports significant revenue in year over year sales.  As the contractual representative for student-athletes in Group Rights Programs co-branded with schools' IP, this is what TBG is trying to prevent.

8.      TBG is a brand management, marketing, and licensing business that holds exclusive Group Rights Licensing Agreements with dozens of FCS and FBS colleges and universities and thousands of football players for these schools.  Generally, under these agreements, TBG has been engaged to act as the exclusive agent for student-athletes to secure third-party sponsorships and licensing opportunities for Group Licensing Programs – defined as licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes (as

---

[1] Kristi Dosh, *How much did Schools Make from EA Sports's NCAA Football Previously?*, https://businessofcollegesports.com/name-image-likeness/how-much-did-schools-make-from-ea-sportss-ncaa-football-previously/#:~:text=Industry%20analysts%20back%20then%20told,Sports%27%20total%20revenue%20per%20year . (May 17, 2023) (reporting that *EA Sports College Football* generated $125 million in annual sales revenue); *but see* Steve Berkowitz, *How EA Sports's NCAA Football video game could make a comeback*, https://www.usatoday.com/story/sports/2019/05/20/how-ea-sportss-ncaa-football-video-game-could-make-comeback/3704876002/ (May 20, 2019) (reporting that EA executive previously testified that *EA Sports College Football* generated $80 million in sales revenue on the sale of roughly 2 million units).

157725142v12

defined below) of three (3) or more current athletes from one sport or six (6) or more from multiple sports in combination with school trademarks, logos, and other IP.

9.    Unlike the student-athletes it represents, TBG is well-positioned to negotiate with corporate sponsors and licensees – such as EA Sports – in order to ensure that its clients receive fair market value for the use of their respective NIL.  TBG is powered by a team of individuals with decades of collective management experience for some of the world's largest brands. TBG and its principals have substantial experience in the group licensing business and have developed significant goodwill among its clients and customers.

10.    Since the announcement that EA was developing a new version of the Game, TBG has paid careful attention to media and industry reports relating to EA's use of players' NIL and schools' IP.  Representatives of TBG promptly notified EA of its exclusive Group Licensing agreements and informed EA that any attempt to secure TBG's collaborating schools' and client student athletes' participation in the Game without the consent or involvement of TBG would be a violation of those agreements.

11.    Although TBG expressly informed EA of its exclusive contractual rights at collaborating schools that are implicated by the TBG-represented student-athletes included in the Game, EA is pressuring and coercing or attempting to coerce TBG's exclusive collaborating universities to opt-in to the Game, agreeing to a structure that will reportedly pay the student-athletes a flat fee that is far below market value and does not include any payments for future royalties.

12.    Given the ever-changing landscape of collegiate NIL rights, there is no bright-line rule for what a third-party must pay for the use of a student-athlete's NIL in certain contexts.  The issue of collegiate NIL rights has dominated sports headlines and been a hotly litigated subject for several years.  Fortunately, while the legislation surrounding student-athlete NIL rights is relatively new and still evolving, the law of contracts is not.

13.    This is a textbook case of tortious interference by EA of TBG's contractual rights *with thousands of student-athletes* and at schools where TBG has exclusive Collaboration Agreements.  TBG files this Complaint to prevent EA Sports from intentionally interfering with

3

its contractual rights, violating its right to publicity, and causing irreparable harm to TBG and the student-athletes it represents at collaborating schools.

**PARTIES, JURISDICTION AND VENUE**

14. Plaintiff TBG is a limited liability company organized under the laws of the state of North Carolina with a principal place of business at 100 Corridor Road, Suite 200, Ponte Vedra Beach, FL 32082.

15. Upon information and belief, Defendant EA Sports is corporation organized under the laws of the state of Delaware with its principal office located at 209 Redwood Shores Parkway, Redwood City, California 94065.

16. TBG is informed and believes, and on that basis alleges, that Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to TBG for the wrongs alleged herein. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, are unknown to TBG at this time.  Accordingly, TBG sues Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities after they are ascertained.

17. The Court has subject matter jurisdiction over this action, and venue is proper in San Mateo County, because Defendant EA Sports maintains its principal place of business in Redwood City, California.

18. The Court has general personal jurisdiction over Defendant EA Sports because it maintains its principal place of business in Redwood City, California and the exercise of jurisdiction over Defendant EA Sports is consistent with the Constitutions of California and the United States of America.

## FACTUAL BACKGROUND

### TBG and NIL Licensing

19.     TBG is a leader in the collegiate group licensing space, using its industry experience and relationships to facilitate co-branding opportunities for student-athletes and their schools.

20.     Co-branding is the combining of the name, image, likeness, and other intellectual property rights owned by a particular athlete, aggregated with the branding rights from another entity, such as the school for which that athlete competes.

21.     For example, when a fan wants to purchase the jersey of their favorite college quarterback ("QB1"), the fan is purchasing an item that needs to be licensed from at least two sources: (1) QB1, for the use of his NIL; and (2) QB1's university, for the use of its logo and related IP.  TBG steps into this deal by grouping the rights and marketing them together to companies—such as jersey manufacturers—in order to create an efficient and effective way to create co-branded products, services, events and the like.

22.     It is in this industry (among others) that TBG has invested significant time, energy and money, building a sterling reputation and substantial goodwill, and in the process creating a brand for itself.

23.     Beginning as early as 2017, TBG believed that college athletics was likely to undergo significant change with respect to NIL programs across the country to allow college athletes to benefit from the marketing of their own name, image and likeness (a practice that was largely prohibited until 2021).

24.     Specifically, at that time, TBG believed the prohibition on athletes marketing their own NIL was likely going to change or be eliminated, so it began developing a strategy to market its professional sports group licensing experience to college athletic departments.

25.     TBG invested significant time, effort, and money into this belief and strategy, even before the rules surrounding NIL were changed, going so far as to develop co-branded programs with one particular university's alumni in two different sports so that the foundations for future

VERIFIED COMPLAINT

157725142v12

1    work with current student-athletes would be in place when the NIL restrictions were lifted by the
2    NCAA.

3        26.    When the NIL rules did eventually change in 2021, college athletes were permitted
4    to capitalize on their NIL while still in school, and TBG quickly became a leader in the new
5    industry of collegiate group licensing.

6                    **TBG's Agreements with Schools and Student-Athletes**

7        27.    To capitalize on co-branding opportunities for its student-athlete clients, TBG
8    enters into Collaboration Agreements with colleges and universities to manage the schools' Group
9    Licensing Programs – which it defines as "those licensing or sponsorship programs in which a
10   collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more Athletes
11   from any one specific sport or six (6) or more Athletes from multiple sports in combination with
12   University trademarks."

13       28.    TBG typically defines Athlete Attributes to mean "the Athlete's name, nickname,
14   initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image,
15   likeness, jersey number, statistics, data, biographical information or any other identifiable feature
16   in Collegiate Group Licensing Programs of any kind."

17       29.    As used herein, "Partner Schools" refers to those colleges and universities with
18   whom TBG has entered into Collaboration Agreements to manage the schools' Group Licensing
19   Programs.

20       30.    Pursuant to these Collaboration Agreements, TBG obtains the right to work with
21   its Partner Schools' licensees and sponsors to explore and develop co-branded opportunities for
22   student-athletes and to manage the schools' Group Licensing Programs.

23       31.    In connection with the Collaboration Agreements, TBG separately contracts with
24   individual student-athletes at these Partner Schools, entering into Group Licensing Authorization
25   and Assignment Agreements ("GLAs"), through which a participating student-athlete grants and
26   assigns to TBG the right to use and to grant to licensees and sponsors the right to use the student-
27   athlete's NIL for co-branded opportunities with the student-athlete's school and sports team in
28   group licensing programs.

VERIFIED COMPLAINT
157725142v12

32.     Presently, 65 of TBG's Partner Schools have NCAA football programs, 54 of which are Division I schools.  TBG likewise has active GLAs with 3,725 current-roster[2] football players at these Partner Schools, including players residing in California.

33.     As used herein, "Client Athletes" refers to those 3,725 student-athlete football players with whom TBG has entered into GLAs for the right to use and market the players' NIL in connection with their respective schools' Group Licensing Programs.

34.     TBG's Collaboration Agreements and GLAs may differ slightly between parties, but the material provisions relevant to this action are substantially the same across all of those contract.

35.     Each GLA provides for the assignment of the Client Athlete's NIL rights in connection with their school's Group Licensing Program, stating as follows:

> The undersigned, **an Athlete at [Partner School], hereby grants and assigns to TBG** and its licensing affiliates during the term only of this Agreement, **the worldwide right to use <u>and to grant to licensees and sponsors</u> the right to use all or any combination of [Client Athlete's] name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature (collectively known as "Athlete Attributes")** in Collegiate Group Licensing Programs that also include the use of [Partner School's] intellectual property. "Collegiate Group Licensing Programs" are defined as those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more current [Partner School] Athletes from one sport or six (6) or more from multiple sports, either in combination with University trademarks and logos or separately as a group.
>
> (emphasis added).

36.     Attached as **<u>Exhibit 1</u>** is a true and correct copy of TBG's GLA template that TBG uses with its Client Athletes.[3]  The template GLA of Exhibit 1 is substantially similar to all of TBG's executed GLAs in all material aspects.

---

[2] This number does not include incoming 2023 freshmen, a number of whom TBG has entered into GLAs with or with whom TBG is in final discussions.

[3] TBG will provide a list of all Client Athletes with whom TBG has entered into GLAs upon request and once a confidential protective order is entered.

7

VERIFIED COMPLAINT

157725142v12

37.     TBG's GLAs further clarify that, "[t]he focus of the Collegiate Group Licensing Programs will be <u>co-branded licensing opportunities involving groups of Athletes' NIL along with [the Partner School's] IP</u>."

38.     In combination, TBG's Collaboration Agreements with the Partner Schools and GLAs with the schools' student-athletes allow TBG to pursue group NIL opportunities for Client Athletes, knowing that they can use the schools' logos and other IP to do so; in other words, while TBG must collaborate with its Partner Schools to use their IP while pursuing opportunities for the student-athletes, TBG's clients in doing so are the student-athletes—not the schools.

39.     In fact, TBG receives no compensation or royalties from the Partner Schools. Pursuant to its agreements, Client Athletes assign to TBG the right to use and to grant to others the right to use the Client Athletes' NIL in Group Licensing deals, and TBG contracts directly with sponsors and licensees for the use of its Partner Schools' and Client Athletes' NIL.  TBG then distributes the royalty revenues received from the sponsor or licensee to the participating Client Athletes.  Typically, TBG retains a percentage commission of the Client Athlete's share of royalty revenue received, including royalties from video game, trading card, merchandise, and apparel sponsorships, and distributes the balance to the participating Client Athletes.

40.     All of TBG's Collaboration Agreements contain provisions designating TBG as either the exclusive or preferred contractor for the Partner Schools' Group Licensing Programs.

41.     The following is a representative exclusivity provision from TBG's Collaboration Agreement with one Partner School in the Big Ten Conference:

> 6. EXCLUSIVITY. During the Term of this Agreement, [University] recognizes TBG and [University's] exclusive agent to develop, implement and manage the Group Licensing Program among its current Athletes. During such time, [University] shall not engaged any other third party, without the express written consent of TBG, to develop, implement or manage any similar program involving a group of any size of current or former [University] Athletes.

42.     Attached as **Exhibit 2** is a true and correct copy of a Collaboration Agreement entered into between TBG and a Partner School, pursuant to which TBG is the exclusive manager

of the Group Licensing Program. The Collaboration Agreement attached as Exhibit 2 is substantially the same as TBG's other Collaboration Agreements which grant TBG exclusivity.

43. Certain other of TBG's Collaboration Agreements include Preferred Provider provisions, which state that the Partner School "shall consider TBG as its preferred provider of a Group Licensing Program for Athletes, and shall not, without TBG's written consent, contract with any other party to develop, implement or manage any substantially similar group licensing program for groups of any size of Athletes."

44. Attached as **Exhibit 3** is a true and correct copy of a Collaboration Agreement entered into between TBG and a Partner School, pursuant to which TBG is the preferred provider for the Group Licensing Program. The Collaboration Agreement attached as Exhibit 3 is substantially the same as TBG's other preferred provider agreements.

45. Pursuant to TBG's Collaboration Agreements, a third-party cannot use the Partner School's trademarks, logos or other IP in combination with the NIL or other Athlete Attributes of three or more of a Partner Schools' student-athletes from any one specific sport or six or more student-athletes from multiple sports (i.e. Group Licensing) without TBG's authorization or consent.

46. Note that while the Collaboration Agreements establish TBG as the exclusive or preferred agent for Group Licensing Programs, neither the Collaboration Agreements nor the GLAs prohibit or prevent the Partner Schools' student-athletes from individually marketing or licensing their NIL, so long as such NIL use does not implicate the Group Licensing Program.

47. As an example, consistent with the Collaboration Agreement and the GLA, a student-athlete from a Partner School could individually contract with an athletic apparel company for the use of the athlete's NIL in an advertising campaign depicting only that individual (e.g. Michael Jordan's "Air Jordan" campaign with Nike). In this example involving an individual athlete, Group Licensing Rights are not implicated.

48. Conversely, Group Licensing Rights *would* be implicated if three or more members of a Partner School's basketball team contracted with an athletic apparel company for the use of

their NIL in an advertising campaign depicting the teammates with their school uniform and branding.

49.     In fact, the GLAs include express language making clear that TBG's representation applies only to Group Licensing Rights.  Each GLA includes the following:

> Please note that this Agreement does NOT limit an Athlete's right to grant the use of his/her individual Athlete Attributes or individual NIL for publicity, advertising, or other commercial purposes, except that such individual grants will not preclude the undersigned also from being covered by the Collegiate Group Licensing Programs granted by TBG. This Agreement also does not limit the Athlete's right to join with other Athletes to grant the group use of their NIL for publicity, advertising or other commercial purposes IF any such other group NIL grant does not involve any use or co-branding of any kind of [Partner School's] own IP or property (such as trademarks, logos, jerseys, names, nicknames, etc.)

50.     As evidenced by this language, TBG's mission is not to limit the commercial opportunities for its Client Athletes, but rather to expand those opportunities and leverage TBG's expansive experience in Group Licensing, such that its Client Athletes receive fair compensation for the use of their NIL in connection with the co-branding of their school.

51.     Based on the reported compensation offered to student-athletes by EA for their participation in the Game, EA's strategy is contrary to TBG's mission and certainly contrary to the interests of TBG's Client Athletes; EA's strategy is, in fact, contrary to the interests of college football student–athletes, generally.

### History of EA Sports Game

52.     Before NCAA rules allowed student-athletes to profit off of NIL, beginning in 1998, EA Sports produced and sold its NCAA-branded video game featuring various college football teams that allowed users to control digital avatars of college football players in simulated matches.[4]

---

[4] Gia Silahian, *EA Sports: It's in the Federal Legislation*, 45 Hastings COMM. & ENT. L.J. 75 (2023).

VERIFIED COMPLAINT

157725142v12

53.    EA Sports first released the game in 1998, under the title "*NCAA Football 98*," and thereafter released a new version of *NCAA Football* each year until 2013 (the 1998-2013 version of the game is collectively referred to herein as "*NCAA Football*").

54.    *NCAA Football* included a unique digital avatar for each college football player represented in the game.  The digital avatars did not identify the players by name, but they did possess the same identifying attributes, including their playing position and uniform number.[5]

55.    Consistent with NCAA rules at the time, EA Sports did not compensate the players for use of their NIL in *NCAA Football*.[6]

56.    The *NCAA Football* franchise was a consistent top-seller for EA Sports, generating tens of millions in unit sales between 2005-2014.[7]

57.    Despite its massive popularity, following a number of legal challenges regarding compensation for student-athletes, EA Sports stopped producing NCAA Football in 2013.

58.    After its discontinuation and in recent years, a college football video game was one of the most-requested games by fans to EA Sports.[8]

**EA's Announced Return of *EA Sports College Football***

59.    On February 2, 2021, EA Sports announced that it was bringing back the Game, to be relaunched as *EA Sports College Football*.

60.    In its February 2, 2021 press release, EA Sports Executive Vice President and General Manager, Cam Weber, touted that "[w]e've heard from the millions of passionate fans requesting the return of college football video games," and we are "beyond thrilled to say we are back in development."

61.    EA Sports also announced that it would be partnering with Collegiate Licensing Committee ("CLC"), a collegiate trademark licensing company, to develop the Game.  In its

---

[5] *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1271 (9th Cir. 2013).

[6] *See id.*

[77] EA Sports Press Release, *Electronic Arts & CLC to Bring Back College Football Video Games*, https://ir.ea.com/press-releases/press-release-details/2021/Electronic-Arts--CLC-to-Bring-Back-College-Football-Video-Games/default.aspx (February 2, 2021).

[8] *Id.*

VERIFIED COMPLAINT

157725142v12

February 2, 2021 announcement, EA revealed that it had reached a deal with CLC that includes licenses for nearly 100 Football Bowl Subdivision ("FBS")[9] schools' intellectual property – such as logos, stadiums, mascots, and fight songs.[10]

62.    CLC's Chief Executive Officer, Cory Moss, shared in EA Sports' excitement, stating that he was excited to bring back "one of the most popular collegiate licensed products in our history."

63.    EA Sports' February 2021 announcement came amid uncertainty regarding NCAA rules relating to student-athlete NIL rights, and at the time, EA Sports reported that the Game would not include student-athlete NIL but noted that EA Sports was watching developments with NIL closely.

64.    Following the Supreme Court's decision in *Alston*, EA Sports released the following statement:

> We are watching the recent developments regarding student-athlete name, image and likeness very closely. It's still very early stages at this point, and we plan to explore the possibility of including players in EA SPORTS College Football. For now, our development team is focused on working with our partners at CLC to ensure the game authentically showcases the great sport of college football and the more than 100 institutions signed on to be featured in our game.[11]

65.    Aware of the publicity surrounding EA Sports' announcement about the Game, and its related statements regarding the use of student-athlete NILs within the same, TBG reached out to EA Sports early-on to ensure it was aware of and honored TBG's rights with respect to group licensing management for its Partner Schools.

66.    In fact, as early as 2021, TBG's representatives were in regular communication with EA about TBG's Collaboration Agreements with Partner Schools, with TBG regularly

---

[9] NCAA Division I Football Bowl Subdivision is the highest level of college football and generally consists of the largest schools in the NCAA.  Presently, there are 133 schools in the FBS.

[10] Mike Hume and Rick Maese, *EA Sports revives college football franchise as courts mull NCAA's stance on amateurism*, https://www.washingtonpost.com/video-games/2021/02/02/ea-sports-college-football/ (February 2, 2021).

[11] Gia Silahian, *EA Sports: It's in the Federal Legislation*, 45 Hastings COMM. & ENT. L.J. 75 (2023).

157725142v12

reporting to EA about new partnerships formed and discussing possible opportunities for Group Licensing, including participation of EA's Partner Schools and Client Athletes in the Game.

67.     Over the next year, TBG communicated with EA about its re-release of the Game, the possible use of student-athlete NIL in the Game, and specifically about TBG's exclusive rights with respect to its Partner Schools' Group Licensing Programs.

68.     On April 15, 2022, Wesley Haynes, President and Founder of TBG, emailed Paul Cairns, Chief Business Officer for EA to follow up from one of their recent conversations.  In his April 15, 2022 email, Mr. Haynes provided Mr. Cairns with six sample Collaboration Agreements for FBS Partner Schools to ensure that EA was aware of and understood TBG's rights.  TBG is now aware that EA intends to include all six of those Partner Schools in the Game.

69.     On May 12, 2022, Mr. Haynes spoke with Mr. Cairns again about the continued development of the Game and TBG's rights with respect to Group Licensing Programs.

70.     During the May 12, 2022 call, Mr. Haynes discussed TBG's exclusive agreements and asked whether EA planned to include TBG's Partner Schools in the Game.  Mr. Cairns informed Mr. Haynes that "rest assured," EA would put all of TBG's Partner Schools and Sponsored-Players in the Game and would enter into direct agreements with TBG at all schools where TBG has rights.  Mr. Cairns also stated that EA "100% plans to work with [TBG]."

71.     Between May 2022 and May 2023, representatives of TBG and EA kept in touch regarding EA's relaunch of the Game and TBG's growing list of Partner Schools for whom it is the exclusive or preferred manager of Group Licensing Programs.

72.     On May 17, 2023, Sean O'Brien, an Executive Vice President of EA, emailed Mr. Haynes, *et al.*, reporting that EA had contracted with OneTeam Partners ("OneTeam") to "facilitate the opportunity for college athletes to opt in and be included in our CFB video game[.]"

VERIFIED COMPLAINT

73. That same day, EA Sports made a public announcement regarding its deal with OneTeam, which noted that the partnership will include the "chance for all eligible FBS players to opt in to have their likenesses in EA Sports College Football."[12]

### TBG'S Formal Notice to EA

74. Given TBG's previous communications with EA and Mr. Cairns' assurances, it came as a shock to hear that EA was partnering with OneTeam to incorporate the NIL of student-athletes into the Game.[13]

75. TBG took prompt action to assert its rights to EA, sending correspondence, through counsel, to Mr. Cairns on May 18, 2023. In the May 18, 2023 correspondence, counsel for TBG not only reiterated that it has exclusive Group Licensing Rights for many of the schools to be featured in the Game, but also expressed concerns about the reported compensation to be paid to student-athletes. A true and accurate copy of TBG's May 18, 2023 correspondence is attached hereto as **Exhibit 4**.

76. Thereafter, TBG learned that EA was communicating directly with certain of its Partner Schools and telling the schools that contracting directly with EA (or an EA affiliate) to participate in the Game would not implicate any group rights and would therefore not be a violation of TBG's rights.

77. For example, on May 24, 2023, a representative from a Partner School, a member of the Big Ten Conference, emailed EA employees, Deanne Mollema and Josh Gregory, asking whether opting in to the Game would create a conflict with the school's corporate sponsors. In that email, the school representative informed EA that "We are currently a BrandR exclusive school." Mr. Gregory responded to the Partner School, advising that each student-athlete would individually contract with EA, and thus group rights would not be implicated. A true and accurate

---

[12] *See* May 18, 2023 *EA Sports to feature players' NIL in CFB video game*, https://www.sportsbusinessjournal.com/Daily/Closing-Bell/2023/05/17/ea-sports-college-football-video-game-nil.aspx.

[13] Lorenzo Reyes, *It's in the game!  EA Sports College Football video game will allow FBS players to opt in*, https://www.usatoday.com/story/sports/ncaaf/2023/05/17/ea-sports-college-football-video-game-will-allow-fbs-players-to-opt-in/70227313007/ (May 17, 2023).

157725142v12

copy of the May 24, 2023 email correspondence between EA and TBG's Partner School is attached hereto as **Exhibit 5**.[14]

78.     On May 30, 2023, EA Sports, through Senior Counsel, Betsy Contro, sent correspondence to TBG's counsel, confirming that "EA plans to provide eligible college football athletes the opportunity to opt-in individually and license their likeness rights directly to EA for inclusions in the Game."  A true and accurate copy of Ms. Contro's May 30, 2023 email is attached hereto as **Exhibit 6**.

79.     Also in her May 30, 2023 email, Ms. Contro further stated that its aim is "to allow individual athletes an inclusive and equitable opportunity to decide whether or not they would like their name and likeness to be included in the Game and to license those (unencumbered) rights directly from eligible student athletes, independently and unrelated to any potential licensing by EA of other intellectual property rights (e.g., division, conference, school, group, etc.)."

80.     Despite the clear implication of TBG's Group Licensing rights, Ms. Contro dismissed TBG's contractual relationships, stating, "[t]o be clear, this has nothing to do with the group rights with student athletes that BrandR claims to have."

81.     On May 31, 2023, TBG heard from certain of its Partner Schools that EA was pressuring schools who had not yet opted in to the Game to approve their participation in the Game by June 30, 2023.

82.     TBG learned of EA's June 30 deadline from representatives of certain of its Partner Schools who asked TBG how they should proceed.  TBG has heard from a number of Partner Schools that the schools do not want to miss out on the opportunity for its student-athletes to participate in the Game, but that they do not want to breach their contractual obligations to TBG.

83.     On June 1, 2023, TBG's counsel responded and sent EA Sports a second letter, clearly explaining that if EA Sports intends to use the NIL of student-athletes in connection with Partner Schools' name, branding, logos, or other IP in the Game, and the Game involves more than

---

[14] To protect the confidentiality and privacy of its Partner Schools, TBG has redacted Exhibit 5.  TBG will provide an unredacted copy of the email upon request and once a confidential protective order is entered.

157725142v12

three individual athletes, then the Game implicates group rights.  A true and accurate copy of TBG's June 1, 2023 letter is attached hereto as **Exhibit 7**.

84.    Also in its June 1, 2023 letter, TBG's counsel notified EA that TBG's Collaboration Agreements and GLAs required that EA recognize TBG as its clients' exclusive representative to the extent EA Sports wishes to include TBG's Partner Schools and Client Athletes in the Game.

85.    On June 5, 2023, Ms. Contro emailed counsel for TBG and asked for a list of the student-athletes represented by TBG.  Counsel for TBG responded on June 7, 2023, identifying the following Partner Schools for whom TBG is the exclusive or preferred partner for their respective Group Licensing Programs:

| | | |
|---|---|---|
| Appalachian State University | University of Louisville* | Oregon State University |
| Arizona State University | Marshall University | University of Pittsburgh |
| University of Arkansas | University of Maryland | Purdue University |
| Auburn University | University of Miami* | Rutgers, The State University of New Jersey (Rutgers University) |
| Baylor University | University of Michigan | Southern Methodist University |
| Boston College | Michigan State University | Syracuse University |
| Brigham Young University | Middle Tennessee State University | The University of Texas at Arlington |
| Campbell University | Mississippi State University | The University of Texas at Austin |
| University of Cincinnati | University of Missouri | Texas Christian University* |
| University of Colorado Boulder | Murray State University | The University of Texas at El Paso |
| Colorado State University | North Carolina Central University | The University of Texas Permian Basin |
| University of Connecticut | North Carolina State University | The University of Texas at San Antonio |
| University of Dayton | University of Nebraska-Lincoln | Towson University |
| University of Florida | The University of North Carolina at Chapel Hill | Troy University |
| Georgia Institute of Technology | University of North Texas | The University of Utah |
| Gonzaga University | Northwestern University | University of Virginia |
| University of Hawai'i at Manoa | Ohio University | University of Wyoming |
| University of Houston | The Ohio State University | Villanova University |

157725142v12

| Kansas State University | Oklahoma State University | Wake Forest University |
|---|---|---|
| Liberty University | Old Dominion University | West Virginia University |
| Louisiana Tech University | The University of Mississippi (Ole Miss) | William Marsh Rice University (Rice University) |
| University of Louisiana at Lafayette | Oral Roberts University | |
| *Schools for whom TBG's exclusivity rights are limited to the football program. | | |

86.     Also in its June 7, 2023 response, TBG provided EA with the following explanation of how its Group Licensing rights are implicated by the use of TBG's Partner Schools and Student Athletes in the Game:

> Given the nature of the EA Sports College Football Game, we think this list is sufficient to provide EA with a general understanding of TBG's representation.  As we explained previously, we presume that the Game will require the use of NIL from three or more football players from a given school, which necessarily implicates TBG's Group Licensing Rights for its partner schools.  TBG has entered into Student-Athlete Group Licensing Authorization & Assignment Agreements with almost all of the football players from these schools, authorizing TBG to act as the student-athletes' exclusive agent with respect to their respective school's Group Licensing Program.

87.     A true and accurate copy of TBG's June 7, 2023 email is attached hereto as **Exhibit 8**.

88.     To date, EA has not responded to TBG's June 7, 2023 email. Counsel for TBG followed up with Ms. Contro by email on June 12, 2023, requesting an opportunity to discuss TBG's rights and EA's plans, but EA has not responded.

89.     However, notwithstanding TBG's communications, EA Sports has informed (and continues to inform) TBG's Partner Schools that Partner Schools negotiating and contracting directly with EA Sports, and Client Athletes contracting directly with EA (or an EA affiliate) will not interfere with TBG's exclusivity rights.

90.     This assertion *by EA* is patently false.

91.     EA cannot circumvent TBG's or its Partner Schools' and Client Athletes' contractual rights by entering into individual and direct contracts for participation in the Game.

Indeed, TBG has *individual* and *direct* contracts with each of its Client Athletes.  TBG's GLAs with its Client Athletes plainly assign to TBG the right to use and license its Client Athletes' NIL in licensing programs such as EA's Game, where one Client Athlete's NIL will be used in combination with two or more teammates and their school's IP.

92.     Further, EA continues to push TBG's Partner Schools to opt-in to the Game by its arbitrary June 30 deadline or else they will be ineligible from participating.

93.     Despite repeated notices that negotiating directly with Partner Schools or Client Athletes violates TBG's Collaboration Agreements, EA Sports continues to negotiate in direct, knowing, and intentional interference with TBG's contractual rights.

94.     EA's conduct and misrepresentations have disrupted TBG's contractual relationships with its Partner Schools and Client Athletes.

95.     Indeed, certain of TBG's Partner Schools have already opted-in to the Game, violating their exclusive Collaboration Agreements with TBG, while others have expressed confusion as to how they should proceed when they are interested in participating in the Game and offering that opportunity to their student-athletes, but do not want to run afoul of their contractual obligations with TBG.

**EA's Compensation to Student-Athletes and Schools**

96.     EA's announced return of the Game prompted significant media interest, particularly since EA revealed it would use student-athletes' NIL in connection with their respective teams' logos and IP and that EA would compensate student-athletes for their NIL.

97.     In the May 17, 2023 announcement, EA Sports reported that the participating players "will receive compensation for being placed in the game," and that details regarding "how much an athlete will receive and the structure of payments – are still being finalized."[15]

98.     That same day, EA reportedly told ESPN that the goal is to be "as inclusive and equitable as possible[,]" while OneTeam's website referenced that if "the influence of individual

---

[15] *Id.*

sales couldn't be figured out" that revenue would be divided equally among athletes included in each licensing program.[16]

99.     Since then, numerous articles have been published regarding the reported compensation EA is offering to student-athletes for their participation in the Game.  Reportedly, EA plans to offer a flat, one-time payment of $500 to each player for the use of their NIL in the Game, and no payment for royalties on actual sales of the Game.[17]

100.     TBG has also heard from its Partner Schools that EA is offering to pay participating schools some percentage of income received from the Game, with the total compensation pool available to schools being 10% of the Game's revenue, with guaranteed payments ranging from $10,400 to $104,900 depending on variables such as the football program's prominence, recent national ranking, etc.

101.     EA's proposed compensation to players for participation in the Game is far below market value.

102.     Indeed this reported amount is far less than EA paid players in settlement of the seminal NIL case, *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1056 (9th Cir. 2015), where former University of California, Los Angeles basketball player, Ed O'Bannon, sued EA, *et al.*, after recognizing himself as a digital avatar in EA's *NCAA Basketball 2009* video game. O'Bannon joined with other former NCAA basketball and football players to form the class of student-athletes, with whom EA eventually settled for a total of $60 million.  Individual players received varying amounts in the settlement, but reports indicate that players received on average about $1,600 each after payment of expenses and legal fees.[18]

---

[16] Mike McDaniel, *EA Sports Reaches Agreement to Have FBS Players in College Football Game*, https://www.si.com/college/2023/05/17/ea-sports-reaches-agreement-real-fbs-players-college-football-game-nil (May 17, 2023).

[17] James Batchelor, *College football players urged to boycott EA Sports game over low pay*, https://www.gamesindustry.biz/college-football-players-urged-to-boycott-ea-sports-game-over-low-pay (June 8, 2023).

[18] Stephen Totilo, *EA Sports reaches deal to pay college football athletes*, https://www.axios.com/2023/05/18/ea-sports-college-football-deal (May 18, 2023).

157725142v12

103.   As another example, EA Sports is reportedly paying some National Football League players $28,000 each to appear in EA's annual release of its *Madden* video game.[19]

104.   Not only is the reported $500 per player insufficient to compensate the Client Athletes for the use of their NIL in the Game, but TBG recently learned that the potential cost to players is even higher.  EA is reportedly seeking exclusive rights to use participating schools' trademarks and related indicia for any current or future simulation game play within college football—not just the Game—and non-exclusive rights for non-simulation games.  Thus, not only would players' compensation for the use of their NIL in the Game be capped at $500, but they would be precluded from earning additional compensation off of their NIL in other simulation games such as arcade and video game opportunities.

105.   This is exactly why it is critical that these student-athletes have the benefit of TBG's representation in negotiating with corporate giants like EA.

**The Client Athletes and TBG will be Irreparably Harmed if EA is not Enjoined**

106.   EA has made clear its intent to violate not only TBG's contractual relationships, but also the Client Athletes' right to contract for fair representation in negotiating Group Licensing sponsorships and licensing deals.

107.   TBG's Client Athletes have made clear their intent and desire to be represented by TBG in sponsorship and licensing opportunities involving Group Licensing Programs, specifically those involving video games.

108.   TBG's GLAs state that "[t]he focus of the Collegiate Group Licensing Programs will be <u>co-branded opportunities involving groups of Athletes' NIL along with [the Partner School's] IP</u>[,]" and that the Client Athletes "shall receive 70% (Seventy Percent) of the royalties from third-party licensees in the video game [category.]"

109.   Unlike professional athletes, collegiate student-athletes do not yet have an organized union to represent them in Group Licensing Programs.

---

[19] Franca Quarneti, *EA Sports' College Football Return Marred by Potential Boycott Over Poor Compensation*, https://www.benzinga.com/general/gaming/23/06/32786383/ea-sports-college-football-return-marred-by-potential-boycott-over-poor-compensation (June 8, 2023).

VERIFIED COMPLAINT

157725142v12

110.    For instance, players in the National Football League ("NFL") are represented by the NFL Players Association ("NFLPA"), and the NFLPA negotiates with EA for the licensing of players' NIL rights to be included in the annual *Madden* video game.

111.    TBG's Client Athletes do not have a union, but they are not without representation. They have TBG, whom they engaged to leverage its industry expertise and substantial market share of FBS Partner Schools and Client Athletes to negotiate fair compensation for the Client-Athletes participation in Group Licensing Programs such as EA's Game.

112.    TBG is informed and understands that EA intends to include most—if not all—of its Partner Schools and Client Athletes in the Game.  This, of course, makes sense given that TBG's Partner Schools include 35 of the 65 teams in Power Five conferences[20], six of the 14 programs appearing in the College Football Playoffs since 2014, nine teams ranked in the Associated Press Top 25 at the end of the 2022-2023 college football season, and programs accounting for seven of the 16 Bowl Championship Series ("BCS") championships during the 1998-2013 BCS era.

113.    Further, at least 54 of TBG's Partner Schools were featured in past iterations of the Game before it was discontinued.

114.    Because of these relationships, TBG is well-positioned to influence the amount of compensation to be paid by EA to not only its Client Athletes, but to all other student-athletes who may wish to participate in the Game.

115.    EA's attempt to exclude TBG from discussions regarding the use of Client Athletes' NIL in the Game amounts to anticompetitive conduct that is contrary to the public interest and public policy of California.

116.    As collegiate NIL rights have evolved over the past several years, California has particularly championed the rights of student-athletes to be fairly compensated for the use of their NIL.  California was the first state in the country to create a legal right for college athletes to be compensated for the commercial use of their NIL.  California's Fair Pay to Play Act was groundbreaking legislation in the area of student-athletes NIL rights, and importantly authorizes

[20] The "Power Five" conferences include the Atlantic Coast Conference, Big Ten Conference, Big 12 Conference, Pac-12 Conference, and Southeastern Conference.

VERIFIED COMPLAINT

157725142v12

college athletes to hire agents and other representatives to assist them in negotiating and securing commercial opportunities.[21]

117.   EA seeks to reverse that evolution, denying not only TBG's Client Athletes the right to their desired representation, but also denying all participating student-athletes fair compensation for the use of their NIL in the Game.

118.   Again, EA's conduct goes beyond its failure to offer fair compensation for the Client Athletes' NIL in *this* Game, as EA is reportedly seeking to obtain exclusivity rights for the use of Client Athletes' NIL in *other* simulation video games, compounding the unfairness of EA's offer.

119.   EA's interference with TBG's exclusive Collaboration Agreements has caused and will continue to cause TBG immeasurable and irreparable harm.

120.   EA's false and deceptive assurances to TBG's Partner Schools that contracting directly with EA will not violate the Collaboration Agreements with TBG, as well as EA's artificial deadline for the schools to opt-in to the Game by June 30, 2023 places TBG's Partner Schools in the unenviable position of either breaching their contracts with TBG or potentially losing the opportunity for themselves and their athletes to participate in the Game.

121.   Similarly, EA's tactics are misleading and deceptive to TBG's Client Athletes, the vast majority of who are not represented by attorneys or player's agents and who may unwittingly opt-in to EA's game, not knowing that they are breaching their GLAs with TBG and that they are also likely giving up other NIL sponsorship and licensing opportunities.

122.   EA's tactics will also cause irreparable harm to TBG's Client Athletes, and to every student-athlete who opts-in to their scheme for unfair compensation, because they are being deprived of the opportunity to have their own representative negotiate on their behalfes for fair compensation for the use of their NIL.  That is the fundamental purpose of TBG's Collaboration Agreements, and that is what is being circumvented by EA's program and its misleading tactics.

---

[21] *See* Cal. Educ. Code § 67456; Michael McCann, *What's Next After California Signs Game Changer Fair Pay to Play Act into Law?*, https://www.si.com/college/2019/09/30/fair-pay-to-play-act-law-ncaa-california-pac-12 (September 30, 2019).

VERIFIED COMPLAINT

157725142v12

123.     TBG's own financial damage is also likely impossible to calculate, leading further to its irreparable harm.   Pursuant to the GLAs and Collaboration Agreements, TBG's compensation is based on a percentage of the revenue that it is able to obtain for its Client Athletes for the use of the NIL in Group Licensing arrangements.

124.     If given the opportunity to represent its Client Athletes in fair negotiations with EA and in compliance with its contractual rights and its Partner Schools' and Client Athlete;' contractual obligations, TBG is confident that it would successfully obtain fair compensation to for Client Athletes (and ultimately to every student athlete that opts in to EA's new Game), even after subtracting TBG's commission for its representation. Absent the opportunity to do so, however, it is exceedingly difficult to calculate TBG's damages—or the damages suffered by student athletes themselves by opting in to EA's unfair compensation scheme.

**FIRST CLAIM FOR RELIEF**
**(Tortious Interference with Contract)**
**(By TBG Against Defendants)**

125.     TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

126.     TBG has valid and binding Collaboration Agreements with 65 Partner Schools and GLAs with 3,725 Client Athletes.

127.     EA Sports is aware of TBG's Collaboration Agreements and GLAs, both through notices from TBG directly as well as through correspondence with some of TBG's Partner Schools.

128.     EA Sports is in possession of certain of TBG's Collaboration Agreements and is informed of every Partner School with whom TBG is the exclusive or preferred partner for the schools' Group Licensing Program.

129.     Specifically, EA Sports is aware that the use of TBG's Client Athletes' NIL in the Game implicates TBG's exclusive Group Licensing Rights with its Client Athletes and Partner Schools and that it is a violation of TBG's contractual rights for EA to facilitate the use of the Client Athletes' NIL or the Partner Schools' IP without TBG's involvement or consent.

130.    TBG does not consent to any agreement between EA (or any other third-party) and its Partner Schools and Client Athletes for the use of their respective IP and NIL in the Game.

131.    By requiring TBG's Partner Schools and Client Athletes to negotiate directly with EA or an EA affiliate for their participation in the Game, EA is preventing TBG and its Partner Schools and Client Athletes from performing their contractual obligations under the Collaboration Agreements and GLAs.

132.    Because of EA's interference and direct communications with TBG's Partner Schools, certain of the Partner Schools have already either contracted directly with EA or agreed to contract directly with EA for the use of their IP and their participation in the Game, in direct violation of their contractual obligations to TBG.

133.    EA ultimately intends to engage most—if not all—of TBG's Partner Schools and Client Athletes to participate in the Game.

134.    EA Sports intended to disrupt the performance of TBG, its Partner Schools, and Client Athletes of their contractual obligations under the respective Collaboration Agreements and GLAs.  Further, EA Sports knew the disruption of the performance by the parties of their obligations under the respective Collaboration Agreements and GLAs was substantially certain to occur.

135.    As a result of EA's interference with TBG's contractual relationships with its Partner Schools and Client Athletes, TBG has been harmed by the deprivation of its contractual right to represent its Client Athletes in negotiations with EA for fair compensation for the use of the Client Athletes' NIL in the Game.

136.    Also as a result of EA's interference with TBG's contractual relationships with its Partner Schools and Client Athletes, TBG has suffered and will continue to suffer damages resulting from lost royalties owed to TBG under the GLAs, in an amount to be determined at trial. Disgorgement is also appropriate.

137.    EA Sports' conduct was a substantial factor in causing TBG's harm.

138.    Further, preliminary and permanent injunctive relief is appropriate to restrain EA Sports from engaging in interference.

VERIFIED COMPLAINT

157725142v12

139.   Because EA Sports has acted with oppression, fraud or malice, punitive damages are appropriate to punish EA Sports and make an example of EA Sports.

**SECOND CLAIM FOR RELIEF**
**(Violation of Right of Publicity; CA. Civ. Code § 3344)**
**(By TBG Against Defendants)**

140.   TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

141.   Pursuant to the express terms of the GLAs between TBG and its Client Athletes, each Client Athlete assigned to TBG the right to use their NIL in Collegiate Group Licensing Programs.

142.   Accordingly, TBG owns the right to use the Client Athletes' NIL in Collegiate Group Licensing Programs, and no third-party can use the Client Athletes' NIL in Group Licensing deals without TBG's authorization and consent.

143.   In its public reports to the media and private communications with TBG's Partner Schools, EA communicated a clear intent to use the NIL of most—if not all—of TBG's Client Athletes in its Game.

144.   EA has knowingly engaged certain of TBG's Partner Schools to participate in the Game and has announced its intention to include the Partner Schools' brand, logos, and other IP in the Game.

145.   EA has likewise announced its intention to appropriate and use the Client Athletes' NIL for its own commercial gain, in knowing violation of TBG's Group Licensing Rights, without TBG's consent, and in knowing violation of Cal. Civ. Code § 3344.

146.   EA's knowing appropriation of the Client Athletes' NIL is for the purpose of soliciting sales of EA's *NCAA College Football* video game.

147.   Based on the past performance of EA's *NCAA College Football* game and reported projections, EA expects to sell millions of units of its Game, generating hundreds of millions of dollars in revenue from the sale of the Game, featuring TBG's Partner Schools' IP and Client Athletes' NIL.

157725142v12

148.     EA's Game will include the NIL of at least three student-athletes from the Partner Schools represented in the Game, and thus, EA's use of the Client Athletes' NIL in the Game constitutes Group Licensing, as defined by TBG's Collaboration Agreements and GLAs, for which TBG owns the exclusive rights.

149.     TBG does not consent to EA's use of its Client Athletes' NIL in the Game.

150.     As a direct and proximate result of EA's violation of TBG's right of publicity, TBG has suffered and will continue to suffer damages resulting from lost royalties owed to TBG under the GLAs, in an amount to be determined at trial.  Disgorgement is also appropriate.

151.     As a further direct and proximate result of the wrongful conduct set forth above, TBG has been injured by the loss of the right to control the commercial exploitation of its Client Athletes' NIL.

152.     Further, preliminary and permanent injunctive relief is appropriate to restrain EA Sports from engaging in interference and violating TBG's right of publicity.

153.     Because EA Sports has acted with oppression, fraud or malice, punitive damages are appropriate to punish EA Sports and make an example of EA Sports.

**THIRD CLAIM FOR RELIEF**
**(Violation of Common Law Right of Publicity / Misappropriation of Likeness)**
**(By TBG Against Defendants)**

154.     TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

155.     Pursuant to the express terms of the GLAs between TBG and its Client Athletes, each Client Athlete assigned to TBG the right to use their NIL in Collegiate Group Licensing Programs.

156.     Accordingly, TBG owns the right to use the Client Athletes' NIL in Collegiate Group Licensing Programs, and no third-party can use the Client Athletes' NIL in Group Licensing deals without TBG's authorization and consent.

157725142v12

157.     In its public reports to the media and private communications with TBG's Partner Schools, EA communicated a clear intent to use the NIL of most—if not all—of TBG's Client Athletes in its Game.

158.     EA has knowingly engaged certain of TBG's Partner Schools to participate in the Game and has announced its intention to include the Partner Schools' brand, logos, and other IP in the Game.

159.     EA has likewise announced its intention to appropriate and use the Client Athletes' NIL for its own commercial gain, in violation of TBG's Group Licensing Rights, without TBG's consent, and in knowing violation of its right of publicity.

160.     EA's knowing appropriation of the Client Athletes' NIL is for its own commercial gain and for the purpose of soliciting sales of EA's NCAA College Football video game.

161.     Based on the past performance of EA's NCAA College Football game and reported projections, EA expects to sell millions of units of its Game, generating hundreds of millions of dollars in revenue from the sale of the Game, featuring TBG's Partner Schools' IP and Client Athletes' NIL.

162.     EA's Game will include the NIL of at least three student-athletes from the Partner Schools represented in the Game, and thus, EA's use of the Client Athletes' NIL in the Game constitutes Group Licensing, as defined by TBG's Collaboration Agreements and GLAs, for which TBG owns the exclusive rights.

163.     TBG does not consent to EA's use of its Client Athletes' NIL in the Game.

164.     As a direct and proximate result of EA's violation of TBG's right of publicity, TBG has suffered and will continue to suffer damages resulting from lost royalties owed to TBG under the GLAs, in an amount to be determined at trial.  Disgorgement is also appropriate.

165.     As a further direct and proximate result of the wrongful conduct set forth above, TBG has been injured by the loss of the right to control the commercial exploitation of its Client Athletes' NIL.

166.     Further, preliminary and permanent injunctive relief is appropriate to restrain EA Sports from engaging in interference and violating TBG's right of publicity.

157725142v12

167.    Because EA Sports has acted with oppression, fraud or malice, punitive damages are appropriate to punish EA Sports and make an example of EA Sports.

**FOURTH CLAIM FOR RELIEF**
**(Violation of California Business and Professions Code § 17200, et seq.)**
**(By TBG Against Defendants)**

168.    TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

169.    California Business and Professions Code § 17200, et seq. (the "Unfair Competition Law" or "UCL") prohibits unlawful, unfair and fraudulent business acts and practices.

170.    By negotiating directly with TBG's Partner Schools—in direct violation of TBG's exclusivity agreements—EA Sports is tortiously and unlawfully interfering with TBG's contractual and business relationships and violating TBG's NIL rights.  Further, EA Sports is fraudulently misrepresenting the scope and nature of TBG's rights in communications with athletes, schools, and the public.

171.    EA Sports' interference is unlawful, fraudulent, and/or unfair competition in violation of the UCL.

172.    As a direct and proximate result of EA Sports' unfair, fraudulent and illegal business practices, TBG is suffering and will continue to suffer financial losses if and when EA Sports reaches any agreements with TBG's Partner Schools, without TBG's involvement and in direct violation of EA Sports' exclusivity agreements.

173.    Pursuant to the UCL, TBG is also entitled to injunctive relief to protect athletes, schools, and the public from EA's unfair, illegal, and fraudulent practices.

**FIFTH CLAIM FOR RELIEF**
**(Declaratory Relief)**
**(By TBG against Defendants)**

174.    TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

175.    TBG owns the exclusive right to negotiate under the Group Licensing Rights with its Client Athletes and Partner Schools.

28
VERIFIED COMPLAINT

157725142v12

176.    To the extent EA Sports wishes to include TBG's Partner Schools and Sponsored Students in the Game, TBG's Collaboration Agreements and GLAs require that EA recognize TBG as its clients' exclusive agent.

177.    By negotiating directly with TBG's Partner Schools, EA Sports is in direct violation of TBG's exclusivity agreements.

178.    As a result of the foregoing, there is an actual and present controversy between TBG and EA Sports.

179.    Accordingly, TBG desires a judicial declaration that TBG has exclusive rights to negotiate under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes and to provide EA Sports what it needs to lawfully make the Game.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff TBG prays that the Court enter Judgment as follows:

1.  That EA be preliminarily and permanently enjoined from the following:

    a.  Directly or indirectly soliciting TBG's Partner Schools or Client Athletes for their participation in the Game;

    b.  Directly or indirectly from interfering with TBG's contractual rights granted to TBG under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes; and

    c.  Directly or indirectly using, appropriating, or incorporating the NIL of TBG's Client Athletes in the Game without the express authorization and consent of TBG.

2.  That TBG is entitled to recover damages in an amount in excess of $25,000, to be determined at trial;

3.  That TBG is entitled to recover punitive damages pursuant to California Civil Code § 3294;

4.  That TBG recover costs and attorneys' fees;

VERIFIED COMPLAINT

5.  For a judicial declaration that TBG has exclusive rights to negotiate under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes and to provide EA Sports what it needs to lawfully make the Game; and

6.  For such other relief as the Court deems just and proper.


                                        KATTEN MUCHIN ROSENMAN LLP


                                        By:  */s/ Christopher D. Beatty*

                                               Christopher D. Beatty (SBN 266466)
                                               chris.beatty@katten.com
                                               Ashley T. Brines (SBN 322988)
                                               ashley.brines@katten.com
                                               2029 Century Park East, Suite 2600
                                               Los Angeles, CA 90067
                                               Telephone: 310.788.4400
                                               Facsimile: 310.788.4471

                                               Richard L. Farley (*pro hac vice* forthcoming)
                                               Richard.farley@katten.com
                                               Lindsey L. Smith (*pro hac vice* forthcoming)
                                               lindsey.smith@katten.com
                                               Kelsey R. Panizzolo (*pro hac vice*
                                               forthcoming)
                                               Kelsey.panizzolo@katten.com
                                               500 S. Tryon Street, Suite 2900
                                               Charlotte, NC 28202-4213
                                               Telephone: 704.344.3178
                                               Facsimile: 704.444.2050


                                               ATTORNEYS FOR THE BRANDR GROUP,
                                               LLC

30

VERIFIED COMPLAINT

157725142v12

1

2

**JURY DEMAND**

3     Plaintiff TBG hereby demands a trial by jury.

4

5                          KATTEN MUCHIN ROSENMAN LLP

6

7                By:  */s/ Christopher D. Beatty*

8                    Christopher D. Beatty (SBN 266466)
                   chris.beatty@katten.com

9                    Ashley T. Brines (SBN 322988)
                   ashley.brines@katten.com

10                  2029 Century Park East, Suite 2600
                 Los Angeles, CA 90067

11                  Telephone: 310.788.4400
                 Facsimile: 310.788.4471

12                  Richard L. Farley (*pro hac vice* forthcoming)

13                  Richard.farley@katten.com
                 Lindsey L. Smith (*pro hac vice* forthcoming)

14                  lindsey.smith@katten.com
                 Kelsey R. Panizzolo (*pro hac vice*

15                  forthcoming)
                 Kelsey.panizzolo@katten.com

16                  500 S. Tryon Street, Suite 2900
                 Charlotte, NC 28202-4213

17                  Telephone: 704.344.3178
                 Facsimile: 704.444.2050

18

19                  ATTORNEYS FOR THE BRANDR GROUP,
                 LLC

20

21

22

23

24

25

26

27

28

VERIFIED COMPLAINT

157725142v12

1

**VERIFICATION**

2

3       I, the undersigned, certify and declare that I have read the foregoing **VERIFIED**

4   **COMPLAINT** and know its contents.  The statement following the box checked is applicable.

5       I am the President and Founder of The BrandR Group, LLC, a North Carolina limited

6   liability company, a party to this action, and am authorized to make this verification for and on its

7   behalf, and I make this verification for that reason.  I am informed and believe and on that ground

8   allege that the matters stated in the document described above are true.

9       I declare under penalty of perjury under the laws of the State of California that the

10  foregoing is true and correct and that this declaration was executed this 15th day of June, 2023 in

11  Ponte Vedra Beach, Florida.

12
                                        _Wesley Haynes_
13                                       _____
                                        Wesley Haynes
14                                       President and Founder
                                        The BrandR Group, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



**CURRENT STUDENT-ATHLETE GROUP LICENSING AUTHORIZATION & ASSIGNMENT ("Agreement")**

1.      XXXX University ("XX"), through its Athletic Department, desires to make available a third-party, voluntary Group Licensing Program to its current student-athletes ("Athletes") in light of recent changes in federal and state law and NCAA rules governing an Athlete's "name, image and likeness" ("NIL").  The Group Licensing Program, as defined below, is intended to celebrate the connection between XX and XX Athletes and also to provide both an opportunity and a mechanism for those Athletes to benefit from licensing their NIL in accordance with NCAA rules and State law and in conjunction with the University's official trademarks and logos. The Brandr Group, LLC ("TBG") will work on behalf of current XX Athletes to create and manage this Collegiate Group Licensing Program.

2.      As background information regarding TBG, the company currently works on behalf of many former college athletes to develop business combining group player rights with colleges' intellectual property ("IP"), and TBG also represents groups of players through the NFLPA, NBPA and MLBPA.  In addition, TBG has created a collegiate group rights program for retired NBA players and has done projects for the US Women's National Soccer Team, helping them launch more comprehensive college-based IP programs.

3.      The undersigned, an Athlete enrolled at XX, hereby grants and assigns to TBG and its licensing affiliates during the term only of this Agreement, the worldwide right to use and to grant to licensees and sponsors the right to use all or any combination of the undersigned's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature (collectively known as "Athlete Attributes") in Collegiate Group Licensing Programs of any kind.  "Collegiate Group Licensing Programs" are defined as those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more current XX Athletes from one sport or six (6) or more from multiple sports, in combination with University trademarks and logos.

4.      Please note that this Agreement does NOT limit an Athlete's right to grant the use of his/her individual Athlete Attributes or individual NIL for publicity, advertising, or other commercial purposes, except that such individual grants will not preclude the undersigned also from being covered by the Collegiate Group Licensing Programs granted by TBG.  This Agreement also does not limit the Athlete's right to join with other Athletes to grant the group use of their NIL for publicity, advertising or other commercial purposes IF any such other group NIL grant does not involve any use or co-branding of any kind of XX's own IP or property (such as trademarks, logos, jerseys, names, nicknames, etc.)

5.      The focus of the Collegiate Group Licensing Programs will be co-branded licensing opportunities involving groups of Athletes' NIL along with XX's IP.  Royalties for such opportunities will be allocated as follows: for Collegiate Group Licensing Programs the Athletes shall receive 80% (Eighty Percent) of the royalties from third-party licensees and sponsors for use of the group NIL or Athlete Attributes in connection with this Collegiate Group Licensing Program, except in the categories of video games, trading cards and Fanatics where Athletes shall receive 70% (Seventy Percent) to accommodate additional costs.  TBG shall retain 20% (Twenty Percent) and 30% (Thirty Percent) of such royalties respectively.  Revenues derived from the programs shall be apportioned and distributed on a pro rata basis based upon the usage of each individual

Athlete on licensed products or promotions.  If it is not possible to identify individual usage, then revenue will be divided equally among the Athletes included in each licensing program.  All royalty payments, together with a detailed report to XX, will be made within thirty (30) days of the last day of each calendar quarter.  Any royalties paid by licensees after the close of royalty reporting for a particular quarter will be paid out to the Athletes in the following quarter's payment disbursements.

6.      In consideration for this authorization and assignment of such rights set forth herein, TBG agrees to (A) use its best efforts to maximize revenues from Collegiate Group Licensing Programs for XX Athletes; (B) act in good faith and in the best interests of the XX Athletes; and (C) abide by applicable federal and state law, along with NCAA and XX rules and policies, including but not limited to the NAME OF STATE LAW, the NCAA's Interim NIL Policy, and XX's Student Athlete NIL Policy. TBG makes no representation regarding individual or other group licensing programs or matters other than those expressed herein. This Agreement shall be construed under STATE law without reference to its conflict of laws principles.

7.      The undersigned Athlete hereby authorizes TBG to receive payment of the assigned monies directly from any licensees or sponsors on behalf of the Athlete prior to making the earned royalty percentage payments to the Athlete as noted herein above.  Barring a breach by TBG, this Agreement shall expire automatically one year after the conclusion of the Athlete's collegiate athletic eligibility.  No new Collegiate Group Licensing Programs will be introduced after the end of the Athlete's collegiate athletic eligibility and such ongoing use of school IP is subject to XX's consent.  The undersigned may opt out of this Agreement on the anniversary of date of its execution, providing written notice of termination has been made to TBG at <grouprights@tbgusa.com> at least 15 days prior to that anniversary date.  Use of Athlete Attributes in Collegiate Group Licensing Programs executed before a player provides a notice of termination will be allowed to continue until the expiration of those specific Programs.

8.  I UNDERSTAND THAT SIGNING THIS AGREEMENT AND PARTICIPATING IN THIS GROUP LICENSING PROGRAM ARE PURELY VOLUNTARY.

9.  IF I CHOOSE TO SIGN THIS AGREEMENT, THEN DURING THE TERM OF THIS AGREEMENT TBG SHALL REPRESENT MY GROUP NIL RIGHTS ONLY IN ANY CO-BRANDED LICENSING THAT ALSO INCLUDES THE UNIVERSITY'S IP.

10.  I AGREE THAT I AM FREE TO CONSULT WITH OR HIRE MY OWN PERSONAL AGENT OR ATTORNEY REGARDLESS OF WHETHER I SIGN THIS AGREEMENT, AND THAT I MAY SEEK ADDITIONAL INFORMATION AT ANY TIME FROM MY OWN AGENT OR ATTORNEY AND FROM TBG.

11.  I RECOGNIZE THAT THIS AGREEMENT DOES NOT RESTRICT OR PREVENT ANY OF MY EXISTING OR FUTURE, INDIVIDUAL NIL AGREEMENTS.

12.  I ACKNOWLEDGE THAT THIS AGREEMENT DOES NOT RESTRICT ANY OF MY EXISTING GROUP NIL AGREEMENTS NOR ANY SUCH FUTURE NIL AGREEMENTS THAT DO NOT ALSO INCLUDE THE UNIVERSITY'S CO-BRANDED IP.

2

13.  I UNDERSTAND THAT A THIRD PARTY, TBG, IS CREATING THIS OPPORTUNITY AND MECHANISM FOR ME TO FURTHER EXERCISE MY NIL RIGHTS, AND THAT THE UNIVERSITY IS NOT PAYING COMPENSATION NOR CAUSING COMPENSATION TO BE PAID TO ME.

14.  I AGREE THAT MY NIL LICENSING SHALL BE COMMENSURATE WITH THE VALUE OF MY NIL AND SHALL BE PAID BY THIRD PARTY LICENSEES THROUGH TBG TO ME.

15.  I CONFIRM THAT NO COMPENSATION SHALL BE PAID OR ACCEPTED IN VIOLATION OF THE LAW OR NCAA OR UNIVERSITY RULES, AND THAT IN PARTICULAR, NO COMPENSATION SHALL BE PAID TO ME AS A REWARD OR INDUCEMENT FOR ANY ATHLETIC PARTICIPATION OR PERFORMANCE OR FOR MY ENROLLMENT OR CONTINUED ENROLLMENT AT THE UNIVERSITY.


Dated: _____
        ("Effective Date")

THE BRANDR GROUP, LLC:

_____
Signature

Len Stachitas
Name

Chief Administrative Officer
Title

_____
Athlete's Signature

_____
First Name

_____
Last Name

Email Address: _____

Phone:  _____

Sport: _____

Position: _____

Uniform #: _____

Are you an international student here on a visa?_____

3

# EXHIBIT 2



Michigan State University Athletics Department and The Brandr Group, LLC
Group Rights Collaboration Agreement

This is a Collaboration Agreement between the Michigan State University Athletics Department ("MSU") and The Brandr Group, LLC ("TBG") with an effective date of the _23rd_ of August 2021.

WHEREAS, on June 21, 2021, in the case of <u>National Collegiate Athletic Association ("NCAA") v. Alston, et al.,</u> the U.S. Supreme Court held, among other things, that current university student-athletes have certain rights not previously recognized by the NCAA; and

WHEREAS, the NCAA adopted a new Name, Image and Likeness ("NIL") Interim Policy effective July 1, 2021 ("Interim Policy"); and

WHEREAS, the State of Michigan on December 1, 2020 passed an NIL statute, House Bill 5217, pertaining to student-athletes at certain postsecondary educational institutions in the State; and

WHEREAS, MSU has revised its "Student-Athlete NIL Compensation Policy"; and

WHEREAS, MSU wishes to ensure that its student-athletes are able to benefit from their NIL to the fullest extent possible consistent with all applicable federal and state laws, as well as the Interim Policy, the MSU Policy and the rules of the Big Ten Conference ("Big 10"); and

WHEREAS, MSU intends to make available a Group Licensing Program for its current student-athletes in conjunction with the University's official marks, logos or other intellectual property; and

WHEREAS, TBG is experienced in managing Group Licensing Programs, including for such entities as the National Football League Players Association, the National Basketball Players Association, and the U.S. Women's National Soccer Team, among others.

NOW THEREFORE, MSU and TBG agree to work in collaboration to make available a Group Licensing Program for current MSU student-athletes ("Athletes") under the following terms and conditions:

1. DEFINITIONS
   (a) "<u>Athlete Attributes</u>" mean the Athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature in Collegiate Group Licensing Programs of any kind.

   (b) "<u>Group Licensing Program</u>" means those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more

1

Athletes from any one specific sport or six (6) or more Athletes from multiple sports in combination with University trademarks.

2. DUTIES

(a) <u>MSU</u> will support the Group Licensing Program among its Athletes, including by:

    (i)    distributing information about the Program;

    (ii)    encouraging and facilitating the voluntary execution by any interested Athletes of the attached GROUP LICENSING AUTHORIZATION & ASSIGNMENT ("GLA Agreement");

    (iii)    making Athletes' contact information available to TBG;

    (iv)    supporting the Group Licensing Program among the University's sponsors as appropriate; and

    (v)    via MSU's third-party licensing agency and University licensing staff, make MSU official marks, logos, verbiage, or designs (including identifiable aspects of MSU uniforms) available for use in the Program at market rates for co-branded products.

(b) <u>TBG</u> will create, activate and manage the Group Licensing Program on behalf of current MSU Student-Athletes, including by:

    (i)    creating Group Licensing Program educational materials to be distributed to Athletes;

    (ii)    securing sponsors and licensees to support the Group Licensing Program and its participants;

    (iii)    confirming that no sponsor or licensee in the Group Licensing Program is owned or operated under the authority of MSU;

    (iv)    coordinating with MSU rights holders to avoid any sponsorship or licensing conflicts;

    (v)    receiving funds from sponsors and licensees;

    (vi)    distributing sponsor and licensee funds to participating Athletes; and

    (vii)    reporting on the results of the Program on a quarterly basis to MSU.

3. TERM. This Agreement shall commence on the effective date and expire on July 31, 2024, unless terminated sooner or renewed. During the initial or any subsequent Term, either party may terminate this agreement for any or no reason with ninety (90) days written notice to the other party. Renewal consideration will begin no later than six (6) months prior to the expiration date. Upon expiration or termination of the Agreement, TBG will be entitled to its percentage of royalty payments on deals it consummated for a period of two (2) years. The Agreement will renew automatically for periods of three (3) additional years unless a notice of termination is provided at least sixty (60) days prior to an expiration of any Term.

4. INDEMNIFICATION. Each party shall defend, indemnify, and hold harmless the other party and/or its directors, officers, trustees, employees, agents, or other representatives from and

against any claims, suits, demands, hearings, actions, damages, losses, or expenses, made by a third party relating to an alleged act, error, or omission of the other party in its proceedings or in its handling of its obligations hereunder; provided, however, that an indemnifying party shall not be required to defend or indemnify the other party to the extent that the latter caused, was involved in, or contributed to such act, error or omission.  Each party shall promptly notify the other of any such actual or threatened claim, suit, demand, hearing, or proceeding.

5. ROYALTIES. It is understood that TBG will pay the Athletes Seventy Percent (70%) of the athletes' royalty revenue received in the video game, trading card and Fanatics categories and Eighty Percent (80%) of the athletes' royalty revenue received in all other categories.  MSU shall have no authority to compensate or cause compensation to be directed to a Student-Athlete or to the family of a Student-Athlete.

6. EXCLUSIVITY.  During the Term of this Agreement, MSU recognizes TBG as MSU's exclusive agent to develop, implement and manage the Group Licensing Program among its current Athletes.  During such time, MSU shall not engage any other third party, without the express written consent of TBG, to develop, implement or manage any similar program involving a group of any size of current or former MSU Athletes.

7.   MISCELLANEOUS.   This agreement shall be governed by the laws of the State of Michigan without regard to its conflict of laws principles.  In their respective performance of this Agreement, the parties agree to comply with all applicable federal and state laws and regulations, as amended, as well as all applicable rules and policies, as amended, of the NCAA, the Big 10, and MSU.

MICHIGAN STATE
ATHLETICS DEPARTMENT

_____

Bill Beekman

Director of Athletics

THE BRANDR GROUP, LLC

_____

Wesley Haynes

CEO & President

# **EXHIBIT 3**



Marshall University Athletics Department and The Brandr Group, LLC
Group Rights Collaboration Agreement

This is a Collaboration Agreement between Marshall University on behalf of its Athletics Department ("MU") and The Brandr Group, LLC ("TBG") with an effective date of the 18th of August 2022.

WHEREAS, on June 21, 2021, in the case of <u>National Collegiate Athletic Association ("NCAA") v. Alston, et al.,</u> the U.S. Supreme Court held, among other things, that current university student-athletes have certain rights not previously recognized by the NCAA; and

WHEREAS, the NCAA adopted a new Name, Image and Likeness ("NIL") Interim Policy effective July 1, 2021 ("Interim Policy"); and

WHEREAS, MU has published its "Student-Athlete NIL Compensation Policy"; and

WHEREAS, MU wishes to ensure that its student-athletes are able to benefit from their NIL to the fullest extent possible consistent with all applicable federal and state laws, as well as the Interim Policy, the MU Policy, WV Uniform Athlete Agents Act "Athlete Agent Act" and the rules of the Sun Belt Conference ("SBC"); and

WHEREAS, MU intends to make available a Group Licensing Program for its current student-athletes in conjunction with the University's official marks, logos or other intellectual property; and

WHEREAS, TBG is experienced in managing Group Licensing Programs, including for such entities as the National Football League Players Association, the National Basketball Players Association, and the U.S. Women's National Soccer Team, among others.

NOW THEREFORE, MU and TBG agree to work in collaboration to make available a Group Licensing Program for current MU student-athletes ("Athletes") under the following terms and conditions:

1. DEFINITIONS
    (a) "<u>Athlete Attributes</u>" mean the Athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature in Collegiate Group Licensing Programs of any kind.
    (b) "Athlete" is a person who meets the definition of a student athlete according to NCAA regulations.

1

(c) "Group Licensing Program" means those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more Athletes from any one specific sport or six (6) or more Athletes from multiple sports in combination with University trademarks.

(d) "MU Marks and Indicia" means MU's name, its trademarks, service marks, logos, symbols, college colors, and other licensed indicia

2. DUTIES

(a) MU will support the Group Licensing Program among its Athletes, including by:

    (i)    distributing information about the Program;

    (ii)    facilitating the voluntary execution by any interested Athletes of the attached GROUP LICENSING AUTHORIZATION & ASSIGNMENT ("GLA Agreement");

    (iii)    organizing educational sessions for Athletes to learn about the Program from TBG;

    (iv)    making Athletes' contact information available to TBG for purposes of facilitating signing of the GLA, provided that, this information may only be used by TBG for the purpose of contacting Athletes. This information will remain the property of MU and may not be sold or used for any other purposes not expressly stated in this Agreement;

    (v)    "connecting TBG with MU's third-party trademark licensing agency and University licensing staff, so that TBG can discuss opportunities to secure from such entity(-ies) the right to use MU Marks and Indicia in connection with the Group Licensing Program, provided that MU reserves the right to review and approve each proposed use of MU Marks and Indicia and will have sole discretion to determine involvement by the appropriate rights holder (e.g., trademark licensing agency and/or multi-media rights holder).

    (vi)    providing information regarding the Group Licensing Program among the University's sponsors as appropriate; and

    (vii)    via MU's third-party licensing agency, Multi Media Rights holder and University licensing staff, make MU official marks, logos, verbiage, or designs (including identifiable aspects of MU uniforms) available for use in the Program at market rates for co-branded products. Provided that, MU will review and approve at its sole discretion.

(b) TBG will create, activate and manage the Group Licensing Program on behalf of current MU Student-Athletes, including by:

    (i)    creating Group Licensing Program educational materials to be distributed to Athletes;

2

(ii)     registering as an Athlete Agent through the West Virginia Secretary of State as required by the Athletes Agent Act.

(iii)    conducting Group Licensing Program educational sessions for Athletes;

(iv)     securing sponsors and licensees to support the Group Licensing Program and its participants;

(v)      confirming that no sponsor or licensee in the Group Licensing Program is owned or operated under the authority of MU;

(vi)     coordinating with MU rights holders to avoid any sponsorship or licensing conflicts;

(vii)    ensuring that all sponsors and licensees that plan to produce products as part of the Group Licensing Program apply and become licensed as WVU licensees through the Collegiate Licensing Company;

(viii)   receiving funds from sponsors and licensees;

(ix)     distributing sponsor and licensee funds to participating Athletes; and

(x)      reporting on the results of the Program on a quarterly basis to MU.

(xi)     reporting to MU within seventy-two (72) hours after entering into a contract with a MU Student-Athlete or before the next scheduled athletic event in which the Student-Athlete may participate, whichever occurs first; and

(xii)    retaining records as required by the Athletes Agents Act.

3.  TERM.  This Agreement shall commence on the effective date and expire on July 1, 2027, unless terminated sooner or renewed. During the initial or any subsequent Term, either party may terminate this agreement for any or no reason with ninety (90) days written notice to the other party after two years have elapsed since the effective date. Renewal consideration will begin no later than six (6) months prior to the percentage of royalty payments on deals it consummated for a period of two (2) years. The Agreement may be modified or renewed upon the mutual written agreement of the parties.

4.  RESPONSIBILITY FOR OWN ACTS.  Each party shall be responsible for its own acts or omissions and for any and all claims, liabilities, injuries, suits, demands and expenses of all kinds which may result or arise out of any alleged malfeasance or neglect caused or alleged to have been caused by that party or its employees or representatives in the performance or omission of any act or responsibility of that party under this Agreement.

5. ROYALTIES. It is understood that TBG will pay the Athletes Seventy Percent (70%) of the athletes' royalty revenue received. MU shall have no authority to compensate or cause compensation to be directed to an Athlete or to the family of an Athlete. Royalties to MU shall be in accordance with the co-branded royalty rate identified by MU that apply to this program.

6.  PREFERRED PROVIDER.  To the extent permitted by law, during the Term, the Department shall consider TBG as its preferred provider of a Group Licensing Program for

3

Athletes, and shall not, without TBG's written consent, contract with any other party to develop, implement or manage any substantially similar group licensing program for groups of any size of Athletes.

7. MISCELLANEOUS.  This agreement shall be governed by the laws of the State of West Virginia without regard to its conflict of laws principles.  In their respective performance of this Agreement, the parties agree to comply with all applicable federal and state laws and regulations, as amended, as well as all applicable rules and policies, as amended, of the NCAA, the Sun Belt Conference and MU.

8. ASSIGNMENT. This Agreement may not be assigned without the mutual consent of the parties.

9.  NO PARTNERSHIP OR JOINT VENTURE. Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture.


MARSHALL UNIVERSITY
ATHLETICS DEPARTMENT

_____

Christian Spears

Director of Athletics


THE BRANDR GROUP, LLC


_Wesley Haynes_
_____

Wesley Haynes

CEO & President


4

# EXHIBIT 4



**Katten**

**550 S. Tryon Street**
**Suite 2900**
**Charlotte, NC  28202-4213**
**+1.704.444.2000 tel**
**katten.com**

**Lindsey L. Smith**
lindsey.smith@katten.com
+1.704.344.3178 direct

May 18, 2023

*Via Certified Mail and Email*
Mr. Jake Schatz
Chief Legal Officer
Electronic Arts Inc.
209 Redwood Shores Parkway
Redwood City, CA  94065
jschatz@ea.com

Re:    **LEGAL HOLD NOTICE – Retaining and Preserving All Documents and Electronically Stored Information about EA Sports College Football Game Agreement and Negotiations with OneTeam Partners**

Dear Mr. Schatz:

We represent The BrandR Group ("TBG") and are writing regarding Electronic Arts Inc. ("EA Sports") and its purported agreement with OneTeam Partners ("OTP").  We understand that EA Sports issued a May 17 statement indicating, among other things, that, "*We're excited to have an agreement in place with OneTeam Partners that will enable us to include the names and likenesses of eligible collegiate football athletes at NCAA Division 1 Football Subdivision schools who opt-in to being featured in EA Sports College Football.*"

As you know, TBG is involved in ongoing litigation with OTP, wherein TBG has asserted claims based, in part, on disputes involving OTP's college-related negotiations and any contracts with EA Sports.  While we hope that EA Sports can remain a non-party to that litigation, you nevertheless are hereby notified of your obligation to identify and preserve all documents[1] that might possibly be subject to discovery as part of the ongoing lawsuit between TBG and OTP.  Such materials include but are not limited to documents relating to the agreement with OTP noted in your statement and all the negotiations leading to that agreement.

By our estimate, TBG represents the group rights of about 50-60% of the collegiate student athletes eligible to participate in the EA Sports College Football Game.  Most of those student athlete

---

[1] For purposes of this Legal Hold Notice, the term "documents" is defined to include all emails, documents, communications, information, reports, or records, whether in paper or electronic form, in your possession or control.  Further, this Legal Hold Notice relates to all documents within the possession or control of EA Sports or its employees, including documents stored on your electronic business network, computer desktops, in your business or home office space, or on individual employees' personal communication devices.

KATTEN MUCHIN ROSENMAN LLP
CENTURY CITY   CHARLOTTE   CHICAGO   DALLAS   LOS ANGELES
NEW YORK   ORANGE COUNTY   SHANGHAI   WASHINGTON, DC
A limited liability partnership including professional corporations
LONDON: KATTEN MUCHIN ROSENMAN UK LLP

**Katten**

May 18, 2023
Page 2

contracts grant TBG exclusivity with respect to such group rights.  You are, of course, aware of such exclusivity since TBG has provided EA Sports with multiple examples of such contracts in connection with its past business dealings.  Therefore, we request that you immediately provide us with the details of the compensation to be paid to the student athletes represented by TBG, as well as a copy of the "agreement in place" between EA Sports and OTP as referenced above.  From the press reports and statements we have seen so far, the proposed compensation to the student athletes appears to fall far below fair market value.  The team at TBG sincerely hopes that such early press reporting is inaccurate, as TBG intends to protect and advance the rights and interests of the student athletes under contract with TBG, as well as the group rights granted by those student athletes to TBG.

In addition, we understand that EA Sports also has been provided with samples of TBG's Collaboration Agreements with about 70-80 Division 1 universities.  In many of those agreements, the colleges granted TBG exclusivity or preferred contractor status to manage those schools' NIL programs, including the schools' IP when paired with student athletes' NIL in group rights programs.  We intend to enforce all of TBG's contractual rights in this regard as well.  We hope to receive EA Sports' full cooperation as we do so.

Finally, many of TBG's partner schools already have expressed concerns that the arrangement and compensation planned by EA Sports and OTP will primarily serve the interests of those two entities.  At least some of those colleges are also concerned that the compensation that the schools will receive will be unfair and unreasonable in light of the below market value to be paid to the student athletes.

As we continue to look into the announced agreement between EA Sports and OTP, we look forward to speaking with you about the impact to TBG's existing contractual rights and relationships.  In particular, we look forward to hearing from you as to how EA Sports intends to implement its agreement with OTP without violating TBG's exclusivity rights with respect to those student athletes and universities referenced above.  Please contact me at your earliest convenience to discuss this point.

In addition, we appreciate your cooperation in preserving the documents identified above, and we ask that you provide us with a copy of your contract with OTP, including all exhibits, addendums, and amendments thereto.  Kindly provide this to me at your earliest convenience and by no later than May 25, 2023.

We look forward to speaking with you soon.

# Katten

May 18, 2023
Page 3


Sincerely,

Lindsey L. Smith

Lindsey L. Smith

Cc:    Mr. Paul Cairns, pcairns@ea.com, *via email*

       Richard Farley, richard.farley@katten.com, *via email*

# EXHIBIT 5

REDACTED

████████████████████████████████████████

**From:** Gregory, Josh <jogregory@ea.com>
**Sent:** Wednesday, May 24, 2023 1:31 PM
**To:** ███████████████████████████ Mollema, Deanne <dmollema@ea.com>
**Subject:** RE: EA Sports News

<span style="color:red">Non-██ Email</span>

Hi ████,

Thanks for reaching out about this! The Compass NIL App will be used, but the college football video game license is a standalone offer, is not part of OneTeam's group license, and will not be bundled with anything else.

One Team will be facilitating this offer on behalf of EA Sports through the Compass NIL App. However, the individual license agreement will be directly with EA Sports, not as a part of OneTeam's group license. By opting into the EA Sports agreement, your student-athlete individually grants NIL rights to EA Sports for our college football video game and not any other OneTeam opportunity.

Thanks,

Josh

**From:** ████████████████████████ >
**Sent:** Tuesday, May 23, 2023 3:02 PM
**To:** Mollema, Deanne <dmollema@ea.com>; Gregory, Josh <jogregory@ea.com>
**Subject:** FW: EA Sports News

Deanne and Josh,

It might be too early to have answers to the questions below but wanted to forward this along from my boss.

I think his concern is if our student athletes opt in to one-team, they will automatically be opted in to deals via Learfield which could conflict with our current corporate sponsors.

We are currently a BrandR exclusive school.

Let me know if you have any feedback?


Thank you,



---

**From:** 
**Sent:** Monday, May 22, 2023 10:56 AM
**To:**
**Cc:**
**Subject:** EA Sports News


■■■,

Can you please reach out to EA Sports and ask if players will be able to opt in only for the EA Sports offer through Compass or if opting in through One Team/Compass App will opt players in for all One Team offers?  Some student athletes already have deals in certain categories, and we need to educate them on how this upcoming EA opt in with effect those agreements.

Thanks,



# **EXHIBIT 6**

| | |
|---|---|
| **From:** | Contro, Betsy |
| **To:** | Smith, Lindsey L. |
| **Subject:** | Correspondence from EA re the BrandR Group |
| **Date:** | Tuesday, May 30, 2023 6:23:34 PM |
| **Attachments:** | image001.png |

*EXTERNAL EMAIL – EXERCISE CAUTION*

Dear Ms. Smith,

I am writing on behalf of Electronic Arts Inc. ("EA"). We received your letter to EA dated May 18, 2023, on behalf of your client, The BrandR Group ("BrandR"), regarding the EA Sports College Football game (the "Game").

As we've indicated to BrandR previously, EA is not involved in BrandR's dispute with OneTeam Partners and has no interest in getting drawn into any such dispute. EA, however, will comply with any legal obligations it may have with respect to such proceedings.

As publicized on May 17, EA plans to provide eligible college football athletes the opportunity to opt-in individually and license their likeness rights directly to EA for inclusion in the Game. The aim is to allow individual athletes an inclusive and equitable opportunity to decide whether or not they would like their name and likeness to be included in the Game and to license those (unencumbered) rights directly from eligible student athletes, independently and unrelated to any potential licensing by EA of other intellectual property rights (e.g., division, conference, school, group, etc.). To be clear, this has nothing to do with the group rights with student athletes that BrandR claims to have. Additionally, media contacted us about statements BrandR has made to schools regarding the Game. We ask that you advise your client to refrain from making any false statements about EA or the Game, including suggesting that EA is currently working with BrandR or has any plans to engage BrandR to negotiate on its behalf with schools or student athletes.

Nothing in this response is intended or be construed to constitute an express or implied waiver of any rights or remedies that EA may have in connection with this matter, and all rights are reserved.
Regards,

Betsy Contro
Senior Counsel, Litigation
Electronic Arts Inc.
Email: bcontro@ea.com



NOTICE TO RECIPIENT: THIS E-MAIL IS MEANT SOLELY FOR THE INTENDED RECIPIENT OF THE TRANSMISSION, AND MAY BE A COMMUNICATION PRIVILEGED BY LAW. IF YOU RECEIVED THIS E-MAIL IN ERROR, ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND PLEASE DELETE THIS MESSAGE FROM YOUR SYSTEM.

# EXHIBIT 7



**Katten**

**550 S. Tryon Street**
**Suite 2900**
**Charlotte, NC  28202-4213**
**+1.704.444.2000 tel**
**katten.com**

**LINDSEY L. SMITH**
lindsey.smith@katten.com
+1.704.344.3178 direct

June 1, 2023

*Via Certified Mail and Email*
Ms. Betsy Contro
Senior Counsel
Electronic Arts Inc.
209 Redwood Shores Parkway
Redwood City, CA  94065
bcontro@ea.com

**Re:    EA Sports College Football Game (the "Game") Agreement and Negotiations with OneTeam Partners**

Dear Ms. Contro:

We appreciate your response to our May 18, 2023 letter.  Unfortunately, your comments make clear that either EA does not understand TBG's exclusive group licensing rights, or EA plans to intentionally violate those rights.

You claim in your May 31, 2023 email that the Game "has nothing do with" TBG's exclusive group licensing agreements between it and the dozens of schools and thousands of student-athletes TBG represents.  You seem to suggest that because EA is contracting separately with the individual student-athletes and their schools, that the Game does not affect "group" rights.  To be clear, if EA plans to use the names, images, and likenesses of student-athletes in connection with the students' school name, branding, logos, or other intellectual property, and it involves more than three individual athletes, then the Game necessarily implicates group rights.  EA cannot circumvent TBG's exclusive agreements by entering into what it considers "individual" or "independent" deals with the student-athletes and schools.  We suspect you may understand this concept given your current agreements with the NFLPA and NBPA.

Under TBG's agreements, "Group Licensing Programs" are defined as "those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes[1] of three (3) or more current Athletes from any one specific sport or six (6) or more Athletes from multiple sports in combination with University trademarks."  By definition, the Game constitutes a Group Licensing Program, for which TBG's contractual agreements require that EA recognize TBG as its clients' exclusive agent.  Thus, to the extent EA seeks to include

---

[1]  "Athlete Attributes" include all or any combination of the designated athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature.

KATTEN MUCHIN ROSENMAN LLP
CENTURY CITY    CHARLOTTE    CHICAGO    DALLAS    LOS ANGELES
NEW YORK    ORANGE COUNTY    SHANGHAI    WASHINGTON, DC
A limited liability partnership including professional corporations
LONDON: KATTEN MUCHIN ROSENMAN UK LLP

**Katten**

June 1, 2023
Page 2

TBG-represented student-athletes and schools in its Game, EA must work with TBG to negotiate the student-athlete terms.

We have heard from certain of TBG's partner schools that EA does in fact intend to use TBG-sponsored student-athletes and schools in the Game, and that EA is informing TBG's partners that this will not interfere with TBG's exclusivity rights.  Based on the explanation in your email, this statement is false.  We also understand that EA is telling schools and universities that they must opt in to the Game by June 30, 2023, or else they will be ineligible from participating.  Given the urgency EA has created with this supposed deadline, TBG is accelerating its review of next steps and available remedies.  TBG will not hesitate to take appropriate action against EA to protect its contractual rights and the interests of the schools and athletes TBG represents.

Moreover, contrary to assertions made by EA and OTP, TBG has not made any public statements regarding the Game.  TBG has voiced concerns to its clients about student-athletes not having a voice or representation regarding the financial compensation for joining the Game, which we understand may be well below market value based on comparable video games and arrangements with athletes from other leagues and sports.  TBG's concerns are based on media reports and statements made directly by EA to TBG.

I invite you to contact me should you wish to discuss a possible resolution between our clients.  In the meantime, TBG reserves all rights and continues to assess its next steps.

Sincerely,

*Lindsey L. Smith*

Lindsey L. Smith

Cc:   Mr. Jake Schatz, jschatz@ea.com, *via email*
       Mr. Paul Cairns, pcairns@ea.com, *via email*

# **EXHIBIT 8**

| | |
|---|---|
| **From:** | Smith, Lindsey L. |
| **To:** | "Contro, Betsy" |
| **Cc:** | Schatz, Jake; Cairns, Paul; Farley, Richard L. |
| **Subject:** | RE: Correspondence from EA re the BrandR Group |
| **Date:** | Wednesday, June 7, 2023 6:45:14 PM |
| **Attachments:** | image001.png |

Ms. Contro,

In response to your request, please see below for a list of the current NCAA schools with whom TBG has contracted to act as the exclusive agent with respect to each school's Group Licensing Program.  I believe you are already in possession of certain of TBG's collaboration agreements, and that exclusivity language is representative of TBG's agreements with all of these schools.  Given the nature of the EA Sports College Football Game, we think this list is sufficient to provide EA with a general understanding of TBG's representation.  As we explained previously, we presume that the Game will require the use of NIL from three or more football players from a given school, which necessarily implicates TBG's Group Licensing Rights for its partner schools.  TBG has entered into Student-Athlete Group Licensing Authorization & Assignment Agreements with almost all of the football players from these schools, authorizing TBG to act as the student-athletes' exclusive agent with respect to their respective school's Group Licensing Program.

We hope that this invites a discussion regarding TBG's representation and the participation of its represented schools and student-athletes in the Game.  We reserve all rights and look forward to your response.

| Current TBG-Exclusive Schools | | | |
|---|---|---|---|
| Appalachian State | Kansas State | North Texas | Towson |
| Arizona State | Liberty | Northwestern | Troy |
| Arkansas | Louisiana Tech | Ohio State | UConn |
| Auburn | Louisiana- Lafayette | Ohio University | UNC |
| Baylor | Louisville* | Oklahoma State | UT Arlington |
| Boston College | Marshall | Old Dominion | Utah |
| BYU | Maryland | Ole Miss | UTEP |
| Campbell | Miami* | Oral Roberts | UTPB |
| Cincinnati | Michigan | Oregon State | UTSA |
| Colorado | Michigan State | Pittsburgh | Villanova |
| Colorado State | Middle Tennessee State | Purdue | Virginia |
| Dayton | Mississippi State | Rice | Wake Forest |
| Florida | Missouri | Rutgers | West Virginia |
| Georgia Tech | Murray State | SMU | Wyoming |
| Gonzaga | NC Central | Syracuse | |
| Hawaii | NC State | TCU* | |
| Houston | Nebraska | Texas | |
| *Schools for whom TBG's exclusivity rights are limited to the football program. | | | |

Thank you,

**Lindsey L. Smith**
Partner

**Katten**

Katten Muchin Rosenman LLP
550 S. Tryon Street, Suite 2900 | Charlotte, NC 28202-4213
direct +1.704.344.3178
lindsey.smith@katten.com | katten.com

**From:** Contro, Betsy <bcontro@ea.com>
**Sent:** Monday, June 5, 2023 7:23 PM
**To:** Smith, Lindsey L. <lindsey.smith@katten.com>
**Cc:** Schatz, Jake <JSchatz@ea.com>; Cairns, Paul <pcairns@ea.com>; Farley, Richard L. <richard.farley@katten.com>

**Subject:** RE: Correspondence from EA re the BrandR Group

*EXTERNAL EMAIL – EXERCISE CAUTION*

Dear Ms. Smith,

Your June 1 letter says that your client The BrandR Group ("TBG") is the "exclusive agent" for its clients and that "EA must work with TBG to negotiate the student-athlete terms."  Please identify the student-athletes that TBG claims to represent as their exclusive agent for these purposes, and the scope of such exclusivity.

Regards,
Betsy Contro

**From:** Smith, Lindsey L. <lindsey.smith@katten.com>
**Sent:** Thursday, June 1, 2023 2:55 PM
**To:** Contro, Betsy <bcontro@ea.com>
**Cc:** Schatz, Jake <jschatz@ea.com>; Cairns, Paul <pcairns@ea.com>; Farley, Richard L. <richard.farley@katten.com>
**Subject:** RE: Correspondence from EA re the BrandR Group

Ms. Contro,
Please see the attached correspondence regarding this matter.

Thank you,

**Lindsey L. Smith**
Partner

**Katten**

Katten Muchin Rosenman LLP
550 S. Tryon Street, Suite 2900 | Charlotte, NC 28202-4213
direct +1.704.344.3178
lindsey.smith@katten.com | katten.com

**From:** Contro, Betsy <bcontro@ea.com>
**Sent:** Tuesday, May 30, 2023 6:23 PM
**To:** Smith, Lindsey L. <lindsey.smith@katten.com>
**Subject:** Correspondence from EA re the BrandR Group

*EXTERNAL EMAIL – EXERCISE CAUTION*

Dear Ms. Smith,

I am writing on behalf of Electronic Arts Inc. ("EA").  We received your letter to EA dated May 18, 2023, on behalf of your client, The BrandR Group ("BrandR"), regarding the EA Sports College Football game (the "Game").

As we've indicated to BrandR previously, EA is not involved in BrandR's dispute with OneTeam Partners and has no interest in getting drawn into any such dispute.  EA, however, will comply with any legal obligations it may have with respect to such proceedings.

As publicized on May 17, EA plans to provide eligible college football athletes the opportunity to opt-in individually and license their likeness rights directly to EA for inclusion in the Game.  The aim is to allow individual athletes an inclusive and equitable opportunity to decide whether or not they would like their name and likeness to be included in the Game and to license those (unencumbered) rights directly from eligible student athletes, independently and unrelated to any potential licensing by EA of other intellectual property rights (e.g., division, conference, school, group, etc.). To be clear, this has nothing to do with the group rights with student athletes that BrandR claims to have.

Additionally, media contacted us about statements BrandR has made to schools regarding the Game. We ask that you advise your client to refrain from making any false statements about EA or the Game, including suggesting that EA is currently working with BrandR or has any plans to engage BrandR to negotiate on its behalf with schools or student

athletes.

Nothing in this response is intended or be construed to constitute an express or implied waiver of any rights or remedies that EA may have in connection with this matter, and all rights are reserved.

Regards,

Betsy Contro
Senior Counsel, Litigation
Electronic Arts Inc.
Email: bcontro@ea.com



NOTICE TO RECIPIENT: THIS E-MAIL IS MEANT SOLELY FOR THE INTENDED RECIPIENT OF THE TRANSMISSION, AND MAY BE A COMMUNICATION PRIVILEGED BY LAW. IF YOU RECEIVED THIS E-MAIL IN ERROR, ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND PLEASE DELETE THIS MESSAGE FROM YOUR SYSTEM.

```
============================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive
use of the individual or entity to whom it is addressed and may contain information that is
proprietary, privileged, confidential and/or exempt from disclosure under applicable law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the original
message without making any copies.
============================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
============================================================
```

Christopher D. Beatty (SBN 266466)
chris.beatty@katten.com
Ashley T. Brines (SBN 322988)
ashley.brines@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: 310.788.4400
Facsimile: 310.788.4471

Richard L. Farley (*pro hac vice* forthcoming)
Richard.farley@katten.com
Lindsey L. Smith (*pro hac vice* forthcoming)
lindsey.smith@katten.com
Kelsey R. Panizzolo (*pro hac vice* forthcoming)
Kelsey.panizzolo@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
500 S. Tryon Street, Suite 2900
Charlotte, NC 28202-4213
Telephone: 704.344.3178

Attorneys for Plaintiff
The BrandR Group, LLC

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON          6/16/2023
By          /s/ Jennifer Torres
                 Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN MATEO

| | |
|---|---|
| THE BRANDR GROUP, LLC | Case No. 23-CIV-02715 |
| Plaintiff, | **VERIFIED COMPLAINT** for: |
| vs. | 1. **Tortious Interference with Contract** |
| ELECTRONIC ARTS, INC., and DOES 1 through 10, inclusive, | 2. **Violation of California Civil Code § 3344** |
| Defendants. | 3. **Violation of Right of Publicity/Misappropriation of Likeness** |
| | 4. **Violation of California Business and Professions Code § 17200, *et seq.*; and** |
| | 5. **Declaratory Relief** |

VERIFIED COMPLAINT

157725142v12

Plaintiff The BrandR Group, LLC ("TBG"), by and through its attorneys Katten Muchin Rosenman LLP, for its complaint in this action against Defendant Electronic Arts, Inc. ("EA Sports" or "EA"), alleges as follows:

**NATURE OF THE CASE**

1.      This dispute involves the rights of collegiate student-athletes to receive fair compensation for the commercial use of their "name, image, and likeness" ("NIL") and the protection of the contractual rights of those engaged to advocate for those rights.

2.      For more than 100 years, National Collegiate Athletic Association ("NCAA") rules limited the financial benefits student-athletes could accept for the use of their NIL.  That rule changed in the wake of the seminal Ninth Circuit rulings in *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1272 (9th Cir. 2013) and *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), and the Supreme Court's decision in *NCAA v. Alston*, 141 S. Ct. 2141 (2021), which ultimately divested the NCAA of its long-standing justification for prohibiting collegiate athletes from commercializing their NIL and prompted the NCAA to suspend its previous restrictions and allow student-athletes to profit from the use of their NIL.

3.      With the removal of previous barriers to paying student-athletes for their NIL has come a frenzy of marketing and advertising opportunities for young student-athletes arising from their participation in collegiate sports.

4.      This has proven especially true for those student-athletes participating in collegiate football and basketball programs.  Indeed, it is hard to overstate the popularity of these collegiate sports in the United States, which contributes to the vast array of opportunities that are now available to collegiate football and basketball players with the use of their NIL.

5.      One such opportunity is the return of the *EA Sports College Football* video game ("EA College Football" or the "Game").  Originally released in the 1990s, in 2013-2014, EA announced that it was discontinuing its popular football video game amid an onslaught of NIL

litigation in 2013-2014.  The discontinuance of the Game was significant given that it reportedly generated anywhere between $80 million to $125 million per year in sales revenue.[1]

6.      EA now plans to bring back its popular Game, but this time, EA intends to use student-athletes' NIL and schools' intellectual property ("IP") to create a more realistic college football experience for users – one that includes realistic-looking avatars of the players and the actual branding, logos, and even fight songs from the players' schools.  The Game presents an exciting opportunity for young college football players to participate in what has historically been a tremendously popular and successful video game; more importantly, it presents an opportunity for these young athletes to be fairly compensated for helping to make that Game so successful.

7.      Unfortunately, EA Sports is trying to avoid paying collegiate football players a fair price for their participation in the Game, continuing the pre-*O'Bannon* pattern of large corporations taking advantage of young student-athletes and capitalizing on their NIL.  EA Sports is reportedly offering student-athletes a flat fee of just $500 per athlete to participate in a Game which is expected to yield EA Sports significant revenue in year over year sales.  As the contractual representative for student-athletes in Group Rights Programs co-branded with schools' IP, this is what TBG is trying to prevent.

8.      TBG is a brand management, marketing, and licensing business that holds exclusive Group Rights Licensing Agreements with dozens of FCS and FBS colleges and universities and thousands of football players for these schools.  Generally, under these agreements, TBG has been engaged to act as the exclusive agent for student-athletes to secure third-party sponsorships and licensing opportunities for Group Licensing Programs – defined as licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes (as

---

[1] Kristi Dosh, *How much did Schools Make from EA Sports's NCAA Football Previously?*, https://businessofcollegesports.com/name-image-likeness/how-much-did-schools-make-from-ea-sportss-ncaa-football-previously/#:~:text=Industry%20analysts%20back%20then%20told,Sports%20total%20revenue%20per%20year . (May 17, 2023) (reporting that *EA Sports College Football* generated $125 million in annual sales revenue); *but see* Steve Berkowitz, *How EA Sports's NCAA Football video game could make a comeback*, https://www.usatoday.com/story/sports/2019/05/20/how-ea-sportss-ncaa-football-video-game-could-make-comeback/3704876002/ (May 20, 2019) (reporting that EA executive previously testified that *EA Sports College Football* generated $80 million in sales revenue on the sale of roughly 2 million units).

157725142v12

defined below) of three (3) or more current athletes from one sport or six (6) or more from multiple sports in combination with school trademarks, logos, and other IP.

9.     Unlike the student-athletes it represents, TBG is well-positioned to negotiate with corporate sponsors and licensees – such as EA Sports – in order to ensure that its clients receive fair market value for the use of their respective NIL.  TBG is powered by a team of individuals with decades of collective management experience for some of the world's largest brands. TBG and its principals have substantial experience in the group licensing business and have developed significant goodwill among its clients and customers.

10.    Since the announcement that EA was developing a new version of the Game, TBG has paid careful attention to media and industry reports relating to EA's use of players' NIL and schools' IP.  Representatives of TBG promptly notified EA of its exclusive Group Licensing agreements and informed EA that any attempt to secure TBG's collaborating schools' and client student athletes' participation in the Game without the consent or involvement of TBG would be a violation of those agreements.

11.    Although TBG expressly informed EA of its exclusive contractual rights at collaborating schools that are implicated by the TBG-represented student-athletes included in the Game, EA is pressuring and coercing or attempting to coerce TBG's exclusive collaborating universities to opt-in to the Game, agreeing to a structure that will reportedly pay the student-athletes a flat fee that is far below market value and does not include any payments for future royalties.

12.    Given the ever-changing landscape of collegiate NIL rights, there is no bright-line rule for what a third-party must pay for the use of a student-athlete's NIL in certain contexts.  The issue of collegiate NIL rights has dominated sports headlines and been a hotly litigated subject for several years.  Fortunately, while the legislation surrounding student-athlete NIL rights is relatively new and still evolving, the law of contracts is not.

13.    This is a textbook case of tortious interference by EA of TBG's contractual rights *with thousands of student-athletes* and at schools where TBG has exclusive Collaboration Agreements.  TBG files this Complaint to prevent EA Sports from intentionally interfering with

VERIFIED COMPLAINT

its contractual rights, violating its right to publicity, and causing irreparable harm to TBG and the student-athletes it represents at collaborating schools.

**PARTIES, JURISDICTION AND VENUE**

14.     Plaintiff TBG is a limited liability company organized under the laws of the state of North Carolina with a principal place of business at 100 Corridor Road, Suite 200, Ponte Vedra Beach, FL 32082.

15.     Upon information and belief, Defendant EA Sports is corporation organized under the laws of the state of Delaware with its principal office located at 209 Redwood Shores Parkway, Redwood City, California 94065.

16.     TBG is informed and believes, and on that basis alleges, that Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to TBG for the wrongs alleged herein. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, are unknown to TBG at this time.  Accordingly, TBG sues Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities after they are ascertained.

17.     The Court has subject matter jurisdiction over this action, and venue is proper in San Mateo County, because Defendant EA Sports maintains its principal place of business in Redwood City, California.

18.     The Court has general personal jurisdiction over Defendant EA Sports because it maintains its principal place of business in Redwood City, California and the exercise of jurisdiction over Defendant EA Sports is consistent with the Constitutions of California and the United States of America.

VERIFIED COMPLAINT

# **FACTUAL BACKGROUND**

## **TBG and NIL Licensing**

19.     TBG is a leader in the collegiate group licensing space, using its industry experience and relationships to facilitate co-branding opportunities for student-athletes and their schools.

20.     Co-branding is the combining of the name, image, likeness, and other intellectual property rights owned by a particular athlete, aggregated with the branding rights from another entity, such as the school for which that athlete competes.

21.     For example, when a fan wants to purchase the jersey of their favorite college quarterback ("QB1"), the fan is purchasing an item that needs to be licensed from at least two sources: (1) QB1, for the use of his NIL; and (2) QB1's university, for the use of its logo and related IP.  TBG steps into this deal by grouping the rights and marketing them together to companies—such as jersey manufacturers—in order to create an efficient and effective way to create co-branded products, services, events and the like.

22.     It is in this industry (among others) that TBG has invested significant time, energy and money, building a sterling reputation and substantial goodwill, and in the process creating a brand for itself.

23.     Beginning as early as 2017, TBG believed that college athletics was likely to undergo significant change with respect to NIL programs across the country to allow college athletes to benefit from the marketing of their own name, image and likeness (a practice that was largely prohibited until 2021).

24.     Specifically, at that time, TBG believed the prohibition on athletes marketing their own NIL was likely going to change or be eliminated, so it began developing a strategy to market its professional sports group licensing experience to college athletic departments.

25.     TBG invested significant time, effort, and money into this belief and strategy, even before the rules surrounding NIL were changed, going so far as to develop co-branded programs with one particular university's alumni in two different sports so that the foundations for future

work with current student-athletes would be in place when the NIL restrictions were lifted by the NCAA.

26.    When the NIL rules did eventually change in 2021, college athletes were permitted to capitalize on their NIL while still in school, and TBG quickly became a leader in the new industry of collegiate group licensing.

**TBG's Agreements with Schools and Student-Athletes**

27.    To capitalize on co-branding opportunities for its student-athlete clients, TBG enters into Collaboration Agreements with colleges and universities to manage the schools' Group Licensing Programs – which it defines as "those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more Athletes from any one specific sport or six (6) or more Athletes from multiple sports in combination with University trademarks."

28.    TBG typically defines Athlete Attributes to mean "the Athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature in Collegiate Group Licensing Programs of any kind."

29.    As used herein, "Partner Schools" refers to those colleges and universities with whom TBG has entered into Collaboration Agreements to manage the schools' Group Licensing Programs.

30.    Pursuant to these Collaboration Agreements, TBG obtains the right to work with its Partner Schools' licensees and sponsors to explore and develop co-branded opportunities for student-athletes and to manage the schools' Group Licensing Programs.

31.    In connection with the Collaboration Agreements, TBG separately contracts with individual student-athletes at these Partner Schools, entering into Group Licensing Authorization and Assignment Agreements ("GLAs"), through which a participating student-athlete grants and assigns to TBG the right to use and to grant to licensees and sponsors the right to use the student-athlete's NIL for co-branded opportunities with the student-athlete's school and sports team in group licensing programs.

32.     Presently, 65 of TBG's Partner Schools have NCAA football programs, 54 of which are Division I schools.  TBG likewise has active GLAs with 3,725 current-roster[2] football players at these Partner Schools, including players residing in California.

33.     As used herein, "Client Athletes" refers to those 3,725 student-athlete football players with whom TBG has entered into GLAs for the right to use and market the players' NIL in connection with their respective schools' Group Licensing Programs.

34.     TBG's Collaboration Agreements and GLAs may differ slightly between parties, but the material provisions relevant to this action are substantially the same across all of those contract.

35.     Each GLA provides for the assignment of the Client Athlete's NIL rights in connection with their school's Group Licensing Program, stating as follows:

> The undersigned, **an Athlete at [Partner School], hereby grants and assigns to TBG** and its licensing affiliates during the term only of this Agreement, **the worldwide right to use <u>and to grant to licensees and sponsors</u> the right to use all or any combination of [Client Athlete's] name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature (collectively known as "Athlete Attributes")** in Collegiate Group Licensing Programs that also include the use of [Partner School's] intellectual property. "Collegiate Group Licensing Programs" are defined as those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more current [Partner School] Athletes from one sport or six (6) or more from multiple sports, either in combination with University trademarks and logos or separately as a group.
>
> (emphasis added).

36.     Attached as **<u>Exhibit 1</u>** is a true and correct copy of TBG's GLA template that TBG uses with its Client Athletes.[3]  The template GLA of Exhibit 1 is substantially similar to all of TBG's executed GLAs in all material aspects.

---

[2] This number does not include incoming 2023 freshmen, a number of whom TBG has entered into GLAs with or with whom TBG is in final discussions.

[3] TBG will provide a list of all Client Athletes with whom TBG has entered into GLAs upon request and once a confidential protective order is entered.

157725142v12

37.     TBG's GLAs further clarify that, "[t]he focus of the Collegiate Group Licensing Programs will be <u>co-branded licensing opportunities involving groups of Athletes' NIL along with [the Partner School's] IP</u>."

38.     In combination, TBG's Collaboration Agreements with the Partner Schools and GLAs with the schools' student-athletes allow TBG to pursue group NIL opportunities for Client Athletes, knowing that they can use the schools' logos and other IP to do so; in other words, while TBG must collaborate with its Partner Schools to use their IP while pursuing opportunities for the student-athletes, TBG's clients in doing so are the student-athletes—not the schools.

39.     In fact, TBG receives no compensation or royalties from the Partner Schools. Pursuant to its agreements, Client Athletes assign to TBG the right to use and to grant to others the right to use the Client Athletes' NIL in Group Licensing deals, and TBG contracts directly with sponsors and licensees for the use of its Partner Schools' and Client Athletes' NIL.  TBG then distributes the royalty revenues received from the sponsor or licensee to the participating Client Athletes.  Typically, TBG retains a percentage commission of the Client Athlete's share of royalty revenue received, including royalties from video game, trading card, merchandise, and apparel sponsorships, and distributes the balance to the participating Client Athletes.

40.     All of TBG's Collaboration Agreements contain provisions designating TBG as either the exclusive or preferred contractor for the Partner Schools' Group Licensing Programs.

41.     The following is a representative exclusivity provision from TBG's Collaboration Agreement with one Partner School in the Big Ten Conference:

> 6. EXCLUSIVITY. During the Term of this Agreement, [University] recognizes TBG and [University's] exclusive agent to develop, implement and manage the Group Licensing Program among its current Athletes. During such time, [University] shall not engaged any other third party, without the express written consent of TBG, to develop, implement or manage any similar program involving a group of any size of current or former [University] Athletes.

42.     Attached as **Exhibit 2** is a true and correct copy of a Collaboration Agreement entered into between TBG and a Partner School, pursuant to which TBG is the exclusive manager

157725142v12

of the Group Licensing Program.  The Collaboration Agreement attached as Exhibit 2 is substantially the same as TBG's other Collaboration Agreements which grant TBG exclusivity.

43.    Certain other of TBG's Collaboration Agreements include Preferred Provider provisions, which state that the Partner School "shall consider TBG as its preferred provider of a Group Licensing Program for Athletes, and shall not, without TBG's written consent, contract with any other party to develop, implement or manage any substantially similar group licensing program for groups of any size of Athletes."

44.    Attached as **Exhibit 3** is a true and correct copy of a Collaboration Agreement entered into between TBG and a Partner School, pursuant to which TBG is the preferred provider for the Group Licensing Program.  The Collaboration Agreement attached as Exhibit 3 is substantially the same as TBG's other preferred provider agreements.

45.    Pursuant to TBG's Collaboration Agreements, a third-party cannot use the Partner School's trademarks, logos or other IP in combination with the NIL or other Athlete Attributes of three or more of a Partner Schools' student-athletes from any one specific sport or six or more student-athletes from multiple sports (i.e. Group Licensing) without TBG's authorization or consent.

46.    Note that while the Collaboration Agreements establish TBG as the exclusive or preferred agent for Group Licensing Programs, neither the Collaboration Agreements nor the GLAs prohibit or prevent the Partner Schools' student-athletes from individually marketing or licensing their NIL, so long as such NIL use does not implicate the Group Licensing Program.

47.    As an example, consistent with the Collaboration Agreement and the GLA, a student-athlete from a Partner School could individually contract with an athletic apparel company for the use of the athlete's NIL in an advertising campaign depicting only that individual (e.g. Michael Jordan's "Air Jordan" campaign with Nike).  In this example involving an individual athlete, Group Licensing Rights are not implicated.

48.    Conversely, Group Licensing Rights *would* be implicated if three or more members of a Partner School's basketball team contracted with an athletic apparel company for the use of

their NIL in an advertising campaign depicting the teammates with their school uniform and branding.

49.     In fact, the GLAs include express language making clear that TBG's representation applies only to Group Licensing Rights.  Each GLA includes the following:

> Please note that this Agreement does NOT limit an Athlete's right to grant the use of his/her individual Athlete Attributes or individual NIL for publicity, advertising, or other commercial purposes, except that such individual grants will not preclude the undersigned also from being covered by the Collegiate Group Licensing Programs granted by TBG. This Agreement also does not limit the Athlete's right to join with other Athletes to grant the group use of their NIL for publicity, advertising or other commercial purposes IF any such other group NIL grant does not involve any use or co-branding of any kind of [Partner School's] own IP or property (such as trademarks, logos, jerseys, names, nicknames, etc.)

50.     As evidenced by this language, TBG's mission is not to limit the commercial opportunities for its Client Athletes, but rather to expand those opportunities and leverage TBG's expansive experience in Group Licensing, such that its Client Athletes receive fair compensation for the use of their NIL in connection with the co-branding of their school.

51.     Based on the reported compensation offered to student-athletes by EA for their participation in the Game, EA's strategy is contrary to TBG's mission and certainly contrary to the interests of TBG's Client Athletes; EA's strategy is, in fact, contrary to the interests of college football student–athletes, generally.

**History of EA Sports Game**

52.     Before NCAA rules allowed student-athletes to profit off of NIL, beginning in 1998, EA Sports produced and sold its NCAA-branded video game featuring various college football teams that allowed users to control digital avatars of college football players in simulated matches.[4]

---

[4] Gia Silahian, *EA Sports: It's in the Federal Legislation*, 45 Hastings COMM. & ENT. L.J. 75 (2023).

VERIFIED COMPLAINT

53.     EA Sports first released the game in 1998, under the title "*NCAA Football 98*," and thereafter released a new version of *NCAA Football* each year until 2013 (the 1998-2013 version of the game is collectively referred to herein as "*NCAA Football*").

54.     *NCAA Football* included a unique digital avatar for each college football player represented in the game.  The digital avatars did not identify the players by name, but they did possess the same identifying attributes, including their playing position and uniform number.[5]

55.     Consistent with NCAA rules at the time, EA Sports did not compensate the players for use of their NIL in *NCAA Football*.[6]

56.     The *NCAA Football* franchise was a consistent top-seller for EA Sports, generating tens of millions in unit sales between 2005-2014.[7]

57.     Despite its massive popularity, following a number of legal challenges regarding compensation for student-athletes, EA Sports stopped producing NCAA Football in 2013.

58.     After its discontinuation and in recent years, a college football video game was one of the most-requested games by fans to EA Sports.[8]

**EA's Announced Return of *EA Sports College Football***

59.     On February 2, 2021, EA Sports announced that it was bringing back the Game, to be relaunched as *EA Sports College Football*.

60.     In its February 2, 2021 press release, EA Sports Executive Vice President and General Manager, Cam Weber, touted that "[w]e've heard from the millions of passionate fans requesting the return of college football video games," and we are "beyond thrilled to say we are back in development."

61.     EA Sports also announced that it would be partnering with Collegiate Licensing Committee ("CLC"), a collegiate trademark licensing company, to develop the Game.  In its

---

[5] *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1271 (9th Cir. 2013).

[6] *See id.*

[7][7] EA Sports Press Release, *Electronic Arts & CLC to Bring Back College Football Video Games*, https://ir.ea.com/press-releases/press-release-details/2021/Electronic-Arts--CLC-to-Bring-Back-College-Football-Video-Games/default.aspx (February 2, 2021).

[8] *Id.*

157725142v12

February 2, 2021 announcement, EA revealed that it had reached a deal with CLC that includes licenses for nearly 100 Football Bowl Subdivision ("FBS")[9] schools' intellectual property – such as logos, stadiums, mascots, and fight songs.[10]

62.     CLC's Chief Executive Officer, Cory Moss, shared in EA Sports' excitement, stating that he was excited to bring back "one of the most popular collegiate licensed products in our history."

63.     EA Sports' February 2021 announcement came amid uncertainty regarding NCAA rules relating to student-athlete NIL rights, and at the time, EA Sports reported that the Game would not include student-athlete NIL but noted that EA Sports was watching developments with NIL closely.

64.     Following the Supreme Court's decision in *Alston*, EA Sports released the following statement:

> We are watching the recent developments regarding student-athlete name, image and likeness very closely. It's still very early stages at this point, and we plan to explore the possibility of including players in EA SPORTS College Football. For now, our development team is focused on working with our partners at CLC to ensure the game authentically showcases the great sport of college football and the more than 100 institutions signed on to be featured in our game.[11]

65.     Aware of the publicity surrounding EA Sports' announcement about the Game, and its related statements regarding the use of student-athlete NILs within the same, TBG reached out to EA Sports early-on to ensure it was aware of and honored TBG's rights with respect to group licensing management for its Partner Schools.

66.     In fact, as early as 2021, TBG's representatives were in regular communication with EA about TBG's Collaboration Agreements with Partner Schools, with TBG regularly

---

[9] NCAA Division I Football Bowl Subdivision is the highest level of college football and generally consists of the largest schools in the NCAA.  Presently, there are 133 schools in the FBS.

[10] Mike Hume and Rick Maese, *EA Sports revives college football franchise as courts mull NCAA's stance on amateurism*, https://www.washingtonpost.com/video-games/2021/02/02/ea-sports-college-football/ (February 2, 2021).

[11] Gia Silahian, *EA Sports: It's in the Federal Legislation*, 45 Hastings COMM. & ENT. L.J. 75 (2023).

reporting to EA about new partnerships formed and discussing possible opportunities for Group Licensing, including participation of EA's Partner Schools and Client Athletes in the Game.

67.     Over the next year, TBG communicated with EA about its re-release of the Game, the possible use of student-athlete NIL in the Game, and specifically about TBG's exclusive rights with respect to its Partner Schools' Group Licensing Programs.

68.     On April 15, 2022, Wesley Haynes, President and Founder of TBG, emailed Paul Cairns, Chief Business Officer for EA to follow up from one of their recent conversations.  In his April 15, 2022 email, Mr. Haynes provided Mr. Cairns with six sample Collaboration Agreements for FBS Partner Schools to ensure that EA was aware of and understood TBG's rights.  TBG is now aware that EA intends to include all six of those Partner Schools in the Game.

69.     On May 12, 2022, Mr. Haynes spoke with Mr. Cairns again about the continued development of the Game and TBG's rights with respect to Group Licensing Programs.

70.     During the May 12, 2022 call, Mr. Haynes discussed TBG's exclusive agreements and asked whether EA planned to include TBG's Partner Schools in the Game.  Mr. Cairns informed Mr. Haynes that "rest assured," EA would put all of TBG's Partner Schools and Sponsored-Players in the Game and would enter into direct agreements with TBG at all schools where TBG has rights.  Mr. Cairns also stated that EA "100% plans to work with [TBG]."

71.     Between May 2022 and May 2023, representatives of TBG and EA kept in touch regarding EA's relaunch of the Game and TBG's growing list of Partner Schools for whom it is the exclusive or preferred manager of Group Licensing Programs.

72.     On May 17, 2023, Sean O'Brien, an Executive Vice President of EA, emailed Mr. Haynes, *et al.*, reporting that EA had contracted with OneTeam Partners ("OneTeam") to "facilitate the opportunity for college athletes to opt in and be included in our CFB video game[.]"

157725142v12

73.     That same day, EA Sports made a public announcement regarding its deal with OneTeam, which noted that the partnership will include the "chance for all eligible FBS players to opt in to have their likenesses in EA Sports College Football."[12]

### TBG'S Formal Notice to EA

74.     Given TBG's previous communications with EA and Mr. Cairns' assurances, it came as a shock to hear that EA was partnering with OneTeam to incorporate the NIL of student-athletes into the Game.[13]

75.     TBG took prompt action to assert its rights to EA, sending correspondence, through counsel, to Mr. Cairns on May 18, 2023.  In the May 18, 2023 correspondence, counsel for TBG not only reiterated that it has exclusive Group Licensing Rights for many of the schools to be featured in the Game, but also expressed concerns about the reported compensation to be paid to student-athletes.  A true and accurate copy of TBG's May 18, 2023 correspondence is attached hereto as **Exhibit 4**.

76.     Thereafter, TBG learned that EA was communicating directly with certain of its Partner Schools and telling the schools that contracting directly with EA (or an EA affiliate) to participate in the Game would not implicate any group rights and would therefore not be a violation of TBG's rights.

77.     For example, on May 24, 2023, a representative from a Partner School, a member of the Big Ten Conference, emailed EA employees, Deanne Mollema and Josh Gregory, asking whether opting in to the Game would create a conflict with the school's corporate sponsors.  In that email, the school representative informed EA that "We are currently a BrandR exclusive school."  Mr. Gregory responded to the Partner School, advising that each student-athlete would individually contract with EA, and thus group rights would not be implicated.  A true and accurate

---

[12] *See* May 18, 2023 *EA Sports to feature players' NIL in CFB video game*, https://www.sportsbusinessjournal.com/Daily/Closing-Bell/2023/05/17/ea-sports-college-football-video-game-nil.aspx.

[13] Lorenzo Reyes, *It's in the game!  EA Sports College Football video game will allow FBS players to opt in*, https://www.usatoday.com/story/sports/ncaaf/2023/05/17/ea-sports-college-football-video-game-will-allow-fbs-players-to-opt-in/70227313007/ (May 17, 2023).

14
VERIFIED COMPLAINT

157725142v12

copy of the May 24, 2023 email correspondence between EA and TBG's Partner School is attached hereto as **Exhibit 5**.[14]

78.    On May 30, 2023, EA Sports, through Senior Counsel, Betsy Contro, sent correspondence to TBG's counsel, confirming that "EA plans to provide eligible college football athletes the opportunity to opt-in individually and license their likeness rights directly to EA for inclusions in the Game." A true and accurate copy of Ms. Contro's May 30, 2023 email is attached hereto as **Exhibit 6**.

79.    Also in her May 30, 2023 email, Ms. Contro further stated that its aim is "to allow individual athletes an inclusive and equitable opportunity to decide whether or not they would like their name and likeness to be included in the Game and to license those (unencumbered) rights directly from eligible student athletes, independently and unrelated to any potential licensing by EA of other intellectual property rights (e.g., division, conference, school, group, etc.)."

80.    Despite the clear implication of TBG's Group Licensing rights, Ms. Contro dismissed TBG's contractual relationships, stating, "[t]o be clear, this has nothing to do with the group rights with student athletes that BrandR claims to have."

81.    On May 31, 2023, TBG heard from certain of its Partner Schools that EA was pressuring schools who had not yet opted in to the Game to approve their participation in the Game by June 30, 2023.

82.    TBG learned of EA's June 30 deadline from representatives of certain of its Partner Schools who asked TBG how they should proceed. TBG has heard from a number of Partner Schools that the schools do not want to miss out on the opportunity for its student-athletes to participate in the Game, but that they do not want to breach their contractual obligations to TBG.

83.    On June 1, 2023, TBG's counsel responded and sent EA Sports a second letter, clearly explaining that if EA Sports intends to use the NIL of student-athletes in connection with Partner Schools' name, branding, logos, or other IP in the Game, and the Game involves more than

---

[14] To protect the confidentiality and privacy of its Partner Schools, TBG has redacted Exhibit 5. TBG will provide an unredacted copy of the email upon request and once a confidential protective order is entered.

three individual athletes, then the Game implicates group rights.  A true and accurate copy of TBG's June 1, 2023 letter is attached hereto as **Exhibit 7**.

84.     Also in its June 1, 2023 letter, TBG's counsel notified EA that TBG's Collaboration Agreements and GLAs required that EA recognize TBG as its clients' exclusive representative to the extent EA Sports wishes to include TBG's Partner Schools and Client Athletes in the Game.

85.     On June 5, 2023, Ms. Contro emailed counsel for TBG and asked for a list of the student-athletes represented by TBG.  Counsel for TBG responded on June 7, 2023, identifying the following Partner Schools for whom TBG is the exclusive or preferred partner for their respective Group Licensing Programs:

| | | |
|---|---|---|
| Appalachian State University | University of Louisville* | Oregon State University |
| Arizona State University | Marshall University | University of Pittsburgh |
| University of Arkansas | University of Maryland | Purdue University |
| Auburn University | University of Miami* | Rutgers, The State University of New Jersey (Rutgers University) |
| Baylor University | University of Michigan | Southern Methodist University |
| Boston College | Michigan State University | Syracuse University |
| Brigham Young University | Middle Tennessee State University | The University of Texas at Arlington |
| Campbell University | Mississippi State University | The University of Texas at Austin |
| University of Cincinnati | University of Missouri | Texas Christian University* |
| University of Colorado Boulder | Murray State University | The University of Texas at El Paso |
| Colorado State University | North Carolina Central University | The University of Texas Permian Basin |
| University of Connecticut | North Carolina State University | The University of Texas at San Antonio |
| University of Dayton | University of Nebraska-Lincoln | Towson University |
| University of Florida | The University of North Carolina at Chapel Hill | Troy University |
| Georgia Institute of Technology | University of North Texas | The University of Utah |
| Gonzaga University | Northwestern University | University of Virginia |
| University of Hawai'i at Manoa | Ohio University | University of Wyoming |
| University of Houston | The Ohio State University | Villanova University |

| Kansas State University | Oklahoma State University | Wake Forest University |
|---|---|---|
| Liberty University | Old Dominion University | West Virginia University |
| Louisiana Tech University | The University of Mississippi (Ole Miss) | William Marsh Rice University (Rice University) |
| University of Louisiana at Lafayette | Oral Roberts University | |
| *Schools for whom TBG's exclusivity rights are limited to the football program. | | |

86.     Also in its June 7, 2023 response, TBG provided EA with the following explanation of how its Group Licensing rights are implicated by the use of TBG's Partner Schools and Student Athletes in the Game:

> Given the nature of the EA Sports College Football Game, we think this list is sufficient to provide EA with a general understanding of TBG's representation.  As we explained previously, we presume that the Game will require the use of NIL from three or more football players from a given school, which necessarily implicates TBG's Group Licensing Rights for its partner schools.  TBG has entered into Student-Athlete Group Licensing Authorization & Assignment Agreements with almost all of the football players from these schools, authorizing TBG to act as the student-athletes' exclusive agent with respect to their respective school's Group Licensing Program.

87.     A true and accurate copy of TBG's June 7, 2023 email is attached hereto as **Exhibit 8**.

88.     To date, EA has not responded to TBG's June 7, 2023 email. Counsel for TBG followed up with Ms. Contro by email on June 12, 2023, requesting an opportunity to discuss TBG's rights and EA's plans, but EA has not responded.

89.     However, notwithstanding TBG's communications, EA Sports has informed (and continues to inform) TBG's Partner Schools that Partner Schools negotiating and contracting directly with EA Sports, and Client Athletes contracting directly with EA (or an EA affiliate) will not interfere with TBG's exclusivity rights.

90.     This assertion *by EA* is patently false.

91.     EA cannot circumvent TBG's or its Partner Schools' and Client Athletes' contractual rights by entering into individual and direct contracts for participation in the Game.

17

VERIFIED COMPLAINT

Indeed, TBG has *individual* and *direct* contracts with each of its Client Athletes. TBG's GLAs with its Client Athletes plainly assign to TBG the right to use and license its Client Athletes' NIL in licensing programs such as EA's Game, where one Client Athlete's NIL will be used in combination with two or more teammates and their school's IP.

92. Further, EA continues to push TBG's Partner Schools to opt-in to the Game by its arbitrary June 30 deadline or else they will be ineligible from participating.

93. Despite repeated notices that negotiating directly with Partner Schools or Client Athletes violates TBG's Collaboration Agreements, EA Sports continues to negotiate in direct, knowing, and intentional interference with TBG's contractual rights.

94. EA's conduct and misrepresentations have disrupted TBG's contractual relationships with its Partner Schools and Client Athletes.

95. Indeed, certain of TBG's Partner Schools have already opted-in to the Game, violating their exclusive Collaboration Agreements with TBG, while others have expressed confusion as to how they should proceed when they are interested in participating in the Game and offering that opportunity to their student-athletes, but do not want to run afoul of their contractual obligations with TBG.

**EA's Compensation to Student-Athletes and Schools**

96. EA's announced return of the Game prompted significant media interest, particularly since EA revealed it would use student-athletes' NIL in connection with their respective teams' logos and IP and that EA would compensate student-athletes for their NIL.

97. In the May 17, 2023 announcement, EA Sports reported that the participating players "will receive compensation for being placed in the game," and that details regarding "how much an athlete will receive and the structure of payments – are still being finalized."[15]

98. That same day, EA reportedly told ESPN that the goal is to be "as inclusive and equitable as possible[,]" while OneTeam's website referenced that if "the influence of individual

---

[15] *Id.*

sales couldn't be figured out" that revenue would be divided equally among athletes included in each licensing program.[16]

99.     Since then, numerous articles have been published regarding the reported compensation EA is offering to student-athletes for their participation in the Game.  Reportedly, EA plans to offer a flat, one-time payment of $500 to each player for the use of their NIL in the Game, and no payment for royalties on actual sales of the Game.[17]

100.    TBG has also heard from its Partner Schools that EA is offering to pay participating schools some percentage of income received from the Game, with the total compensation pool available to schools being 10% of the Game's revenue, with guaranteed payments ranging from $10,400 to $104,900 depending on variables such as the football program's prominence, recent national ranking, etc.

101.    EA's proposed compensation to players for participation in the Game is far below market value.

102.    Indeed this reported amount is far less than EA paid players in settlement of the seminal NIL case, *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1056 (9th Cir. 2015), where former University of California, Los Angeles basketball player, Ed O'Bannon, sued EA, *et al.*, after recognizing himself as a digital avatar in EA's *NCAA Basketball 2009* video game. O'Bannon joined with other former NCAA basketball and football players to form the class of student-athletes, with whom EA eventually settled for a total of $60 million.  Individual players received varying amounts in the settlement, but reports indicate that players received on average about $1,600 each after payment of expenses and legal fees.[18]

---

[16] Mike McDaniel, *EA Sports Reaches Agreement to Have FBS Players in College Football Game*, https://www.si.com/college/2023/05/17/ea-sports-reaches-agreement-real-fbs-players-college-football-game-nil (May 17, 2023).

[17] James Batchelor, *College football players urged to boycott EA Sports game over low pay*, https://www.gamesindustry.biz/college-football-players-urged-to-boycott-ea-sports-game-over-low-pay (June 8, 2023).

[18] Stephen Totilo, *EA Sports reaches deal to pay college football athletes*, https://www.axios.com/2023/05/18/ea-sports-college-football-deal (May 18, 2023).

157725142v12

103.   As another example, EA Sports is reportedly paying some National Football League players $28,000 each to appear in EA's annual release of its *Madden* video game.[19]

104.   Not only is the reported $500 per player insufficient to compensate the Client Athletes for the use of their NIL in the Game, but TBG recently learned that the potential cost to players is even higher.   EA is reportedly seeking exclusive rights to use participating schools' trademarks and related indicia for any current or future simulation game play within college football—not just the Game—and non-exclusive rights for non-simulation games.   Thus, not only would players' compensation for the use of their NIL in the Game be capped at $500, but they would be precluded from earning additional compensation off of their NIL in other simulation games such as arcade and video game opportunities.

105.   This is exactly why it is critical that these student-athletes have the benefit of TBG's representation in negotiating with corporate giants like EA.

**The Client Athletes and TBG will be Irreparably Harmed if EA is not Enjoined**

106.   EA has made clear its intent to violate not only TBG's contractual relationships, but also the Client Athletes' right to contract for fair representation in negotiating Group Licensing sponsorships and licensing deals.

107.   TBG's Client Athletes have made clear their intent and desire to be represented by TBG in sponsorship and licensing opportunities involving Group Licensing Programs, specifically those involving video games.

108.   TBG's GLAs state that "[t]he focus of the Collegiate Group Licensing Programs will be <u>co-branded opportunities involving groups of Athletes' NIL along with [the Partner School's] IP</u>[,]" and that the Client Athletes "shall receive 70% (Seventy Percent) of the royalties from third-party licensees in the video game [category.]"

109.   Unlike professional athletes, collegiate student-athletes do not yet have an organized union to represent them in Group Licensing Programs.

---

[19] Franca Quarneti, *EA Sports' College Football Return Marred by Potential Boycott Over Poor Compensation*, https://www.benzinga.com/general/gaming/23/06/32786383/ea-sports-college-football-return-marred-by-potential-boycott-over-poor-compensation (June 8, 2023).

157725142v12

110.    For instance, players in the National Football League ("NFL") are represented by the NFL Players Association ("NFLPA"), and the NFLPA negotiates with EA for the licensing of players' NIL rights to be included in the annual *Madden* video game.

111.    TBG's Client Athletes do not have a union, but they are not without representation. They have TBG, whom they engaged to leverage its industry expertise and substantial market share of FBS Partner Schools and Client Athletes to negotiate fair compensation for the Client-Athletes participation in Group Licensing Programs such as EA's Game.

112.    TBG is informed and understands that EA intends to include most—if not all—of its Partner Schools and Client Athletes in the Game.  This, of course, makes sense given that TBG's Partner Schools include 35 of the 65 teams in Power Five conferences[20], six of the 14 programs appearing in the College Football Playoffs since 2014, nine teams ranked in the Associated Press Top 25 at the end of the 2022-2023 college football season, and programs accounting for seven of the 16 Bowl Championship Series ("BCS") championships during the 1998-2013 BCS era.

113.    Further, at least 54 of TBG's Partner Schools were featured in past iterations of the Game before it was discontinued.

114.    Because of these relationships, TBG is well-positioned to influence the amount of compensation to be paid by EA to not only its Client Athletes, but to all other student-athletes who may wish to participate in the Game.

115.    EA's attempt to exclude TBG from discussions regarding the use of Client Athletes' NIL in the Game amounts to anticompetitive conduct that is contrary to the public interest and public policy of California.

116.    As collegiate NIL rights have evolved over the past several years, California has particularly championed the rights of student-athletes to be fairly compensated for the use of their NIL.  California was the first state in the country to create a legal right for college athletes to be compensated for the commercial use of their NIL.  California's Fair Pay to Play Act was groundbreaking legislation in the area of student-athletes NIL rights, and importantly authorizes

---

[20] The "Power Five" conferences include the Atlantic Coast Conference, Big Ten Conference, Big 12 Conference, Pac-12 Conference, and Southeastern Conference.

VERIFIED COMPLAINT

college athletes to hire agents and other representatives to assist them in negotiating and securing commercial opportunities.[21]

117.    EA seeks to reverse that evolution, denying not only TBG's Client Athletes the right to their desired representation, but also denying all participating student-athletes fair compensation for the use of their NIL in the Game.

118.    Again, EA's conduct goes beyond its failure to offer fair compensation for the Client Athletes' NIL in *this* Game, as EA is reportedly seeking to obtain exclusivity rights for the use of Client Athletes' NIL in *other* simulation video games, compounding the unfairness of EA's offer.

119.    EA's interference with TBG's exclusive Collaboration Agreements has caused and will continue to cause TBG immeasurable and irreparable harm.

120.    EA's false and deceptive assurances to TBG's Partner Schools that contracting directly with EA will not violate the Collaboration Agreements with TBG, as well as EA's artificial deadline for the schools to opt-in to the Game by June 30, 2023 places TBG's Partner Schools in the unenviable position of either breaching their contracts with TBG or potentially losing the opportunity for themselves and their athletes to participate in the Game.

121.    Similarly, EA's tactics are misleading and deceptive to TBG's Client Athletes, the vast majority of who are not represented by attorneys or player's agents and who may unwittingly opt-in to EA's game, not knowing that they are breaching their GLAs with TBG and that they are also likely giving up other NIL sponsorship and licensing opportunities.

122.    EA's tactics will also cause irreparable harm to TBG's Client Athletes, and to every student-athlete who opts-in to their scheme for unfair compensation, because they are being deprived of the opportunity to have their own representative negotiate on their behalves for fair compensation for the use of their NIL.  That is the fundamental purpose of TBG's Collaboration Agreements, and that is what is being circumvented by EA's program and its misleading tactics.

---

[21] *See* Cal. Educ. Code § 67456; Michael McCann, *What's Next After California Signs Game Changer Fair Pay to Play Act into Law?*, https://www.si.com/college/2019/09/30/fair-pay-to-play-act-law-ncaa-california-pac-12 (September 30, 2019).

123.     TBG's own financial damage is also likely impossible to calculate, leading further to its irreparable harm.   Pursuant to the GLAs and Collaboration Agreements, TBG's compensation is based on a percentage of the revenue that it is able to obtain for its Client Athletes for the use of the NIL in Group Licensing arrangements.

124.     If given the opportunity to represent its Client Athletes in fair negotiations with EA and in compliance with its contractual rights and its Partner Schools' and Client Athlete;' contractual obligations, TBG is confident that it would successfully obtain fair compensation to for Client Athletes (and ultimately to every student athlete that opts in to EA's new Game), even after subtracting TBG's commission for its representation. Absent the opportunity to do so, however, it is exceedingly difficult to calculate TBG's damages—or the damages suffered by student athletes themselves by opting in to EA's unfair compensation scheme.

**FIRST CLAIM FOR RELIEF**
**(Tortious Interference with Contract)**
**(By TBG Against Defendants)**

125.     TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

126.     TBG has valid and binding Collaboration Agreements with 65 Partner Schools and GLAs with 3,725 Client Athletes.

127.     EA Sports is aware of TBG's Collaboration Agreements and GLAs, both through notices from TBG directly as well as through correspondence with some of TBG's Partner Schools.

128.     EA Sports is in possession of certain of TBG's Collaboration Agreements and is informed of every Partner School with whom TBG is the exclusive or preferred partner for the schools' Group Licensing Program.

129.     Specifically, EA Sports is aware that the use of TBG's Client Athletes' NIL in the Game implicates TBG's exclusive Group Licensing Rights with its Client Athletes and Partner Schools and that it is a violation of TBG's contractual rights for EA to facilitate the use of the Client Athletes' NIL or the Partner Schools' IP without TBG's involvement or consent.

157725142v12

130.    TBG does not consent to any agreement between EA (or any other third-party) and its Partner Schools and Client Athletes for the use of their respective IP and NIL in the Game.

131.    By requiring TBG's Partner Schools and Client Athletes to negotiate directly with EA or an EA affiliate for their participation in the Game, EA is preventing TBG and its Partner Schools and Client Athletes from performing their contractual obligations under the Collaboration Agreements and GLAs.

132.    Because of EA's interference and direct communications with TBG's Partner Schools, certain of the Partner Schools have already either contracted directly with EA or agreed to contract directly with EA for the use of their IP and their participation in the Game, in direct violation of their contractual obligations to TBG.

133.    EA ultimately intends to engage most—if not all—of TBG's Partner Schools and Client Athletes to participate in the Game.

134.    EA Sports intended to disrupt the performance of TBG, its Partner Schools, and Client Athletes of their contractual obligations under the respective Collaboration Agreements and GLAs.  Further, EA Sports knew the disruption of the performance by the parties of their obligations under the respective Collaboration Agreements and GLAs was substantially certain to occur.

135.    As a result of EA's interference with TBG's contractual relationships with its Partner Schools and Client Athletes, TBG has been harmed by the deprivation of its contractual right to represent its Client Athletes in negotiations with EA for fair compensation for the use of the Client Athletes' NIL in the Game.

136.    Also as a result of EA's interference with TBG's contractual relationships with its Partner Schools and Client Athletes, TBG has suffered and will continue to suffer damages resulting from lost royalties owed to TBG under the GLAs, in an amount to be determined at trial. Disgorgement is also appropriate.

137.    EA Sports' conduct was a substantial factor in causing TBG's harm.

138.    Further, preliminary and permanent injunctive relief is appropriate to restrain EA Sports from engaging in interference.

VERIFIED COMPLAINT

157725142v12

139.    Because EA Sports has acted with oppression, fraud or malice, punitive damages are appropriate to punish EA Sports and make an example of EA Sports.

**SECOND CLAIM FOR RELIEF**
**(Violation of Right of Publicity; CA. Civ. Code § 3344)**
**(By TBG Against Defendants)**

140.    TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

141.    Pursuant to the express terms of the GLAs between TBG and its Client Athletes, each Client Athlete assigned to TBG the right to use their NIL in Collegiate Group Licensing Programs.

142.    Accordingly, TBG owns the right to use the Client Athletes' NIL in Collegiate Group Licensing Programs, and no third-party can use the Client Athletes' NIL in Group Licensing deals without TBG's authorization and consent.

143.    In its public reports to the media and private communications with TBG's Partner Schools, EA communicated a clear intent to use the NIL of most—if not all—of TBG's Client Athletes in its Game.

144.    EA has knowingly engaged certain of TBG's Partner Schools to participate in the Game and has announced its intention to include the Partner Schools' brand, logos, and other IP in the Game.

145.    EA has likewise announced its intention to appropriate and use the Client Athletes' NIL for its own commercial gain, in knowing violation of TBG's Group Licensing Rights, without TBG's consent, and in knowing violation of Cal. Civ. Code § 3344.

146.    EA's knowing appropriation of the Client Athletes' NIL is for the purpose of soliciting sales of EA's *NCAA College Football* video game.

147.    Based on the past performance of EA's *NCAA College Football* game and reported projections, EA expects to sell millions of units of its Game, generating hundreds of millions of dollars in revenue from the sale of the Game, featuring TBG's Partner Schools' IP and Client Athletes' NIL.

157725142v12

148.    EA's Game will include the NIL of at least three student-athletes from the Partner Schools represented in the Game, and thus, EA's use of the Client Athletes' NIL in the Game constitutes Group Licensing, as defined by TBG's Collaboration Agreements and GLAs, for which TBG owns the exclusive rights.

149.    TBG does not consent to EA's use of its Client Athletes' NIL in the Game.

150.    As a direct and proximate result of EA's violation of TBG's right of publicity, TBG has suffered and will continue to suffer damages resulting from lost royalties owed to TBG under the GLAs, in an amount to be determined at trial.  Disgorgement is also appropriate.

151.    As a further direct and proximate result of the wrongful conduct set forth above, TBG has been injured by the loss of the right to control the commercial exploitation of its Client Athletes' NIL.

152.    Further, preliminary and permanent injunctive relief is appropriate to restrain EA Sports from engaging in interference and violating TBG's right of publicity.

153.    Because EA Sports has acted with oppression, fraud or malice, punitive damages are appropriate to punish EA Sports and make an example of EA Sports.

## THIRD CLAIM FOR RELIEF
### (Violation of Common Law Right of Publicity / Misappropriation of Likeness)
### (By TBG Against Defendants)

154.    TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

155.    Pursuant to the express terms of the GLAs between TBG and its Client Athletes, each Client Athlete assigned to TBG the right to use their NIL in Collegiate Group Licensing Programs.

156.    Accordingly, TBG owns the right to use the Client Athletes' NIL in Collegiate Group Licensing Programs, and no third-party can use the Client Athletes' NIL in Group Licensing deals without TBG's authorization and consent.

157725142v12

157.    In its public reports to the media and private communications with TBG's Partner Schools, EA communicated a clear intent to use the NIL of most—if not all—of TBG's Client Athletes in its Game.

158.    EA has knowingly engaged certain of TBG's Partner Schools to participate in the Game and has announced its intention to include the Partner Schools' brand, logos, and other IP in the Game.

159.    EA has likewise announced its intention to appropriate and use the Client Athletes' NIL for its own commercial gain, in violation of TBG's Group Licensing Rights, without TBG's consent, and in knowing violation of its right of publicity.

160.    EA's knowing appropriation of the Client Athletes' NIL is for its own commercial gain and for the purpose of soliciting sales of EA's NCAA College Football video game.

161.    Based on the past performance of EA's NCAA College Football game and reported projections, EA expects to sell millions of units of its Game, generating hundreds of millions of dollars in revenue from the sale of the Game, featuring TBG's Partner Schools' IP and Client Athletes' NIL.

162.    EA's Game will include the NIL of at least three student-athletes from the Partner Schools represented in the Game, and thus, EA's use of the Client Athletes' NIL in the Game constitutes Group Licensing, as defined by TBG's Collaboration Agreements and GLAs, for which TBG owns the exclusive rights.

163.    TBG does not consent to EA's use of its Client Athletes' NIL in the Game.

164.    As a direct and proximate result of EA's violation of TBG's right of publicity, TBG has suffered and will continue to suffer damages resulting from lost royalties owed to TBG under the GLAs, in an amount to be determined at trial.  Disgorgement is also appropriate.

165.    As a further direct and proximate result of the wrongful conduct set forth above, TBG has been injured by the loss of the right to control the commercial exploitation of its Client Athletes' NIL.

166.    Further, preliminary and permanent injunctive relief is appropriate to restrain EA Sports from engaging in interference and violating TBG's right of publicity.

VERIFIED COMPLAINT

157725142v12

167.    Because EA Sports has acted with oppression, fraud or malice, punitive damages are appropriate to punish EA Sports and make an example of EA Sports.

### FOURTH CLAIM FOR RELIEF
#### (Violation of California Business and Professions Code § 17200, et seq.)
#### (By TBG Against Defendants)

168.    TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

169.    California Business and Professions Code § 17200, et seq. (the "Unfair Competition Law" or "UCL") prohibits unlawful, unfair and fraudulent business acts and practices.

170.    By negotiating directly with TBG's Partner Schools—in direct violation of TBG's exclusivity agreements—EA Sports is tortiously and unlawfully interfering with TBG's contractual and business relationships and violating TBG's NIL rights.  Further, EA Sports is fraudulently misrepresenting the scope and nature of TBG's rights in communications with athletes, schools, and the public.

171.    EA Sports' interference is unlawful, fraudulent, and/or unfair competition in violation of the UCL.

172.    As a direct and proximate result of EA Sports' unfair, fraudulent and illegal business practices, TBG is suffering and will continue to suffer financial losses if and when EA Sports reaches any agreements with TBG's Partner Schools, without TBG's involvement and in direct violation of EA Sports' exclusivity agreements.

173.    Pursuant to the UCL, TBG is also entitled to injunctive relief to protect athletes, schools, and the public from EA's unfair, illegal, and fraudulent practices.

### FIFTH CLAIM FOR RELIEF
#### (Declaratory Relief)
#### (By TBG against Defendants)

174.    TBG repeats and realleges the allegations set forth above and hereafter as if fully set forth herein.

175.    TBG owns the exclusive right to negotiate under the Group Licensing Rights with its Client Athletes and Partner Schools.

157725142v12

176.     To the extent EA Sports wishes to include TBG's Partner Schools and Sponsored Students in the Game, TBG's Collaboration Agreements and GLAs require that EA recognize TBG as its clients' exclusive agent.

177.     By negotiating directly with TBG's Partner Schools, EA Sports is in direct violation of TBG's exclusivity agreements.

178.     As a result of the foregoing, there is an actual and present controversy between TBG and EA Sports.

179.     Accordingly, TBG desires a judicial declaration that TBG has exclusive rights to negotiate under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes and to provide EA Sports what it needs to lawfully make the Game.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff TBG prays that the Court enter Judgment as follows:

1. That EA be preliminarily and permanently enjoined from the following:

    a.  Directly or indirectly soliciting TBG's Partner Schools or Client Athletes for their participation in the Game;

    b.  Directly or indirectly from interfering with TBG's contractual rights granted to TBG under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes; and

    c.  Directly or indirectly using, appropriating, or incorporating the NIL of TBG's Client Athletes in the Game without the express authorization and consent of TBG.

2. That TBG is entitled to recover damages in an amount in excess of $25,000, to be determined at trial;

3. That TBG is entitled to recover punitive damages pursuant to California Civil Code § 3294;

4. That TBG recover costs and attorneys' fees;

5. For a judicial declaration that TBG has exclusive rights to negotiate under its Collaboration Agreements with Partner Schools and GLAs with Client Athletes and to provide EA Sports what it needs to lawfully make the Game; and

6. For such other relief as the Court deems just and proper.

KATTEN MUCHIN ROSENMAN LLP

By: */s/ Christopher D. Beatty*

Christopher D. Beatty (SBN 266466)
chris.beatty@katten.com
Ashley T. Brines (SBN 322988)
ashley.brines@katten.com
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: 310.788.4400
Facsimile: 310.788.4471

Richard L. Farley (*pro hac vice* forthcoming)
Richard.farley@katten.com
Lindsey L. Smith (*pro hac vice* forthcoming)
lindsey.smith@katten.com
Kelsey R. Panizzolo (*pro hac vice* forthcoming)
Kelsey.panizzolo@katten.com
500 S. Tryon Street, Suite 2900
Charlotte, NC 28202-4213
Telephone: 704.344.3178
Facsimile: 704.444.2050

ATTORNEYS FOR THE BRANDR GROUP, LLC

30

VERIFIED COMPLAINT

157725142v12

1

## JURY DEMAND

2

3        Plaintiff TBG hereby demands a trial by jury.

4                                            KATTEN MUCHIN ROSENMAN LLP

5

6                                            By:  */s/ Christopher D. Beatty*

7

8                                                Christopher D. Beatty (SBN 266466)
                                                 chris.beatty@katten.com
9                                                Ashley T. Brines (SBN 322988)
                                                 ashley.brines@katten.com
10                                               2029 Century Park East, Suite 2600
                                                 Los Angeles, CA 90067
11                                               Telephone: 310.788.4400
                                                 Facsimile: 310.788.4471
12
                                                 Richard L. Farley (*pro hac vice* forthcoming)
13                                               Richard.farley@katten.com
                                                 Lindsey L. Smith (*pro hac vice* forthcoming)
14                                               lindsey.smith@katten.com
                                                 Kelsey R. Panizzolo (*pro hac vice*
15                                               forthcoming)
                                                 Kelsey.panizzolo@katten.com
16                                               500 S. Tryon Street, Suite 2900
                                                 Charlotte, NC 28202-4213
17                                               Telephone: 704.344.3178
                                                 Facsimile: 704.444.2050
18

19                                                ATTORNEYS FOR THE BRANDR GROUP,
                                                 LLC
20

21

22

23

24

25

26

27

28

VERIFIED COMPLAINT
157725142v12

**VERIFICATION**

I, the undersigned, certify and declare that I have read the foregoing **VERIFIED COMPLAINT** and know its contents.  The statement following the box checked is applicable.

I am the President and Founder of The BrandR Group, LLC, a North Carolina limited liability company, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.  I am informed and believe and on that ground allege that the matters stated in the document described above are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed this 15th day of June, 2023 in Ponte Vedra Beach, Florida.

_Wesley Haynes_
_____
Wesley Haynes
President and Founder
The BrandR Group, LLC

157725142v11

# EXHIBIT 1



**CURRENT STUDENT-ATHLETE GROUP LICENSING AUTHORIZATION & ASSIGNMENT ("Agreement")**

1.      XXXX University ("XX"), through its Athletic Department, desires to make available a third-party, voluntary Group Licensing Program to its current student-athletes ("Athletes") in light of recent changes in federal and state law and NCAA rules governing an Athlete's "name, image and likeness" ("NIL").  The Group Licensing Program, as defined below, is intended to celebrate the connection between XX and XX Athletes and also to provide both an opportunity and a mechanism for those Athletes to benefit from licensing their NIL in accordance with NCAA rules and State law and in conjunction with the University's official trademarks and logos. The Brandr Group, LLC ("TBG") will work on behalf of current XX Athletes to create and manage this Collegiate Group Licensing Program.

2.      As background information regarding TBG, the company currently works on behalf of many former college athletes to develop business combining group player rights with colleges' intellectual property ("IP"), and TBG also represents groups of players through the NFLPA, NBPA and MLBPA.  In addition, TBG has created a collegiate group rights program for retired NBA players and has done projects for the US Women's National Soccer Team, helping them launch more comprehensive college-based IP programs.

3.      The undersigned, an Athlete enrolled at XX, hereby grants and assigns to TBG and its licensing affiliates during the term only of this Agreement, the worldwide right to use and to grant to licensees and sponsors the right to use all or any combination of the undersigned's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature (collectively known as "Athlete Attributes") in Collegiate Group Licensing Programs of any kind.  <u>"Collegiate Group Licensing Programs" are defined as those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more current XX Athletes from one sport or six (6) or more from multiple sports, in combination with University trademarks and logos.</u>

4.      Please note that this Agreement does NOT limit an Athlete's right to grant the use of his/her individual Athlete Attributes or individual NIL for publicity, advertising, or other commercial purposes, except that such individual grants will not preclude the undersigned also from being covered by the Collegiate Group Licensing Programs granted by TBG.  This Agreement also does not limit the Athlete's right to join with other Athletes to grant the group use of their NIL for publicity, advertising or other commercial purposes IF any such other group NIL grant <u>does not involve any use or co-branding of any kind of XX's own IP or property (such as trademarks, logos, jerseys, names, nicknames, etc.)</u>

5.      The focus of the Collegiate Group Licensing Programs will be <u>co-branded licensing opportunities involving groups of Athletes' NIL along with XX's IP</u>.  Royalties for such opportunities will be allocated as follows: for Collegiate Group Licensing Programs the Athletes shall receive 80% (Eighty Percent) of the royalties from third-party licensees and sponsors for use of the group NIL or Athlete Attributes in connection with this Collegiate Group Licensing Program, except in the categories of video games, trading cards and Fanatics where Athletes shall receive 70% (Seventy Percent) to accommodate additional costs.  TBG shall retain 20% (Twenty Percent) and 30% (Thirty Percent) of such royalties respectively.  Revenues derived from the programs shall be apportioned and distributed on a pro rata basis based upon the usage of each individual

Athlete on licensed products or promotions.  If it is not possible to identify individual usage, then revenue will be divided equally among the Athletes included in each licensing program.  All royalty payments, together with a detailed report to XX, will be made within thirty (30) days of the last day of each calendar quarter.  Any royalties paid by licensees after the close of royalty reporting for a particular quarter will be paid out to the Athletes in the following quarter's payment disbursements.

6.      In consideration for this authorization and assignment of such rights set forth herein, TBG agrees to (A) use its best efforts to maximize revenues from Collegiate Group Licensing Programs for XX Athletes; (B) act in good faith and in the best interests of the XX Athletes; and (C) abide by applicable federal and state law, along with NCAA and XX rules and policies, including but not limited to the NAME OF STATE LAW, the NCAA's Interim NIL Policy, and XX's Student Athlete NIL Policy. TBG makes no representation regarding individual or other group licensing programs or matters other than those expressed herein. This Agreement shall be construed under STATE law without reference to its conflict of laws principles.

7.      The undersigned Athlete hereby authorizes TBG to receive payment of the assigned monies directly from any licensees or sponsors on behalf of the Athlete prior to making the earned royalty percentage payments to the Athlete as noted herein above.  Barring a breach by TBG, this Agreement shall expire automatically one year after the conclusion of the Athlete's collegiate athletic eligibility.  No new Collegiate Group Licensing Programs will be introduced after the end of the Athlete's collegiate athletic eligibility and such ongoing use of school IP is subject to XX's consent.  The undersigned may opt out of this Agreement on the anniversary of date of its execution, providing written notice of termination has been made to TBG at <grouprights@tbgusa.com> at least 15 days prior to that anniversary date.  Use of Athlete Attributes in Collegiate Group Licensing Programs executed before a player provides a notice of termination will be allowed to continue until the expiration of those specific Programs.

8. I UNDERSTAND THAT SIGNING THIS AGREEMENT AND PARTICIPATING IN THIS GROUP LICENSING PROGRAM ARE PURELY VOLUNTARY.

9. IF I CHOOSE TO SIGN THIS AGREEMENT, THEN DURING THE TERM OF THIS AGREEMENT TBG SHALL REPRESENT MY GROUP NIL RIGHTS ONLY IN ANY CO-BRANDED LICENSING THAT ALSO INCLUDES THE UNIVERSITY'S IP.

10. I AGREE THAT I AM FREE TO CONSULT WITH OR HIRE MY OWN PERSONAL AGENT OR ATTORNEY REGARDLESS OF WHETHER I SIGN THIS AGREEMENT, AND THAT I MAY SEEK ADDITIONAL INFORMATION AT ANY TIME FROM MY OWN AGENT OR ATTORNEY AND FROM TBG.

11. I RECOGNIZE THAT THIS AGREEMENT DOES NOT RESTRICT OR PREVENT ANY OF MY EXISTING OR FUTURE, INDIVIDUAL NIL AGREEMENTS.

12. I ACKNOWLEDGE THAT THIS AGREEMENT DOES NOT RESTRICT ANY OF MY EXISTING GROUP NIL AGREEMENTS NOR ANY SUCH FUTURE NIL AGREEMENTS THAT DO NOT ALSO INCLUDE THE UNIVERSITY'S CO-BRANDED IP.

2

13.  I UNDERSTAND THAT A THIRD PARTY, TBG, IS CREATING THIS OPPORTUNITY AND MECHANISM FOR ME TO FURTHER EXERCISE MY NIL RIGHTS, AND THAT THE UNIVERSITY IS NOT PAYING COMPENSATION NOR CAUSING COMPENSATION TO BE PAID TO ME.

14.  I AGREE THAT MY NIL LICENSING SHALL BE COMMENSURATE WITH THE VALUE OF MY NIL AND SHALL BE PAID BY THIRD PARTY LICENSEES THROUGH TBG TO ME.

15.  I CONFIRM THAT NO COMPENSATION SHALL BE PAID OR ACCEPTED IN VIOLATION OF THE LAW OR NCAA OR UNIVERSITY RULES, AND THAT IN PARTICULAR, NO COMPENSATION SHALL BE PAID TO ME AS A REWARD OR INDUCEMENT FOR ANY ATHLETIC PARTICIPATION OR PERFORMANCE OR FOR MY ENROLLMENT OR CONTINUED ENROLLMENT AT THE UNIVERSITY.


Dated: _____
        ("Effective Date")

THE BRANDR GROUP, LLC:

_____
Signature

Len Stachitas
Name

Chief Administrative Officer
Title

_____
Athlete's Signature

_____
First Name

_____
Last Name

Email Address: _____

Phone: _____

Sport: _____

Position: _____

Uniform #: _____

Are you an international student here on a visa?_____

# EXHIBIT 2



the
brandr
group

Michigan State University Athletics Department and The Brandr Group, LLC
Group Rights Collaboration Agreement

This is a Collaboration Agreement between the Michigan State University Athletics Department ("MSU") and The Brandr Group, LLC ("TBG") with an effective date of the _23rd_ of August 2021.

WHEREAS, on June 21, 2021, in the case of <u>National Collegiate Athletic Association ("NCAA") v. Alston, et al.,</u> the U.S. Supreme Court held, among other things, that current university student-athletes have certain rights not previously recognized by the NCAA; and

WHEREAS, the NCAA adopted a new Name, Image and Likeness ("NIL") Interim Policy effective July 1, 2021 ("Interim Policy"); and

WHEREAS, the State of Michigan on December 1, 2020 passed an NIL statute, House Bill 5217, pertaining to student-athletes at certain postsecondary educational institutions in the State; and

WHEREAS, MSU has revised its "Student-Athlete NIL Compensation Policy"; and

WHEREAS, MSU wishes to ensure that its student-athletes are able to benefit from their NIL to the fullest extent possible consistent with all applicable federal and state laws, as well as the Interim Policy, the MSU Policy and the rules of the Big Ten Conference ("Big 10"); and

WHEREAS, MSU intends to make available a Group Licensing Program for its current student-athletes in conjunction with the University's official marks, logos or other intellectual property; and

WHEREAS, TBG is experienced in managing Group Licensing Programs, including for such entities as the National Football League Players Association, the National Basketball Players Association, and the U.S. Women's National Soccer Team, among others.

NOW THEREFORE, MSU and TBG agree to work in collaboration to make available a Group Licensing Program for current MSU student-athletes ("Athletes") under the following terms and conditions:

1. DEFINITIONS
(a) "<u>Athlete Attributes</u>" mean the Athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature in Collegiate Group Licensing Programs of any kind.

(b) "<u>Group Licensing Program</u>" means those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more

Athletes from any one specific sport or six (6) or more Athletes from multiple sports in combination with University trademarks.

2. DUTIES
(a) <u>MSU</u> will support the Group Licensing Program among its Athletes, including by:
   (i)     distributing information about the Program;
   (ii)    encouraging and facilitating the voluntary execution by any interested Athletes of the attached GROUP LICENSING AUTHORIZATION & ASSIGNMENT ("GLA Agreement");
   (iii)   making Athletes' contact information available to TBG;
   (iv)    supporting the Group Licensing Program among the University's sponsors as appropriate; and
   (v)     via MSU's third-party licensing agency and University licensing staff, make MSU official marks, logos, verbiage, or designs (including identifiable aspects of MSU uniforms) available for use in the Program at market rates for co-branded products.

(b) <u>TBG</u> will create, activate and manage the Group Licensing Program on behalf of current MSU Student-Athletes, including by:
   (i)     creating Group Licensing Program educational materials to be distributed to Athletes;
   (ii)    securing sponsors and licensees to support the Group Licensing Program and its participants;
   (iii)   confirming that no sponsor or licensee in the Group Licensing Program is owned or operated under the authority of MSU;
   (iv)    coordinating with MSU rights holders to avoid any sponsorship or licensing conflicts;
   (v)     receiving funds from sponsors and licensees;
   (vi)    distributing sponsor and licensee funds to participating Athletes; and
   (vii)   reporting on the results of the Program on a quarterly basis to MSU.

3. TERM. This Agreement shall commence on the effective date and expire on July 31, 2024, unless terminated sooner or renewed. During the initial or any subsequent Term, either party may terminate this agreement for any or no reason with ninety (90) days written notice to the other party. Renewal consideration will begin no later than six (6) months prior to the expiration date. Upon expiration or termination of the Agreement, TBG will be entitled to its percentage of royalty payments on deals it consummated for a period of two (2) years. The Agreement will renew automatically for periods of three (3) additional years unless a notice of termination is provided at least sixty (60) days prior to an expiration of any Term.

4. INDEMNIFICATION. Each party shall defend, indemnify, and hold harmless the other party and/or its directors, officers, trustees, employees, agents, or other representatives from and

2

against any claims, suits, demands, hearings, actions, damages, losses, or expenses, made by a third party relating to an alleged act, error, or omission of the other party in its proceedings or in its handling of its obligations hereunder; provided, however, that an indemnifying party shall not be required to defend or indemnify the other party to the extent that the latter caused, was involved in, or contributed to such act, error or omission. Each party shall promptly notify the other of any such actual or threatened claim, suit, demand, hearing, or proceeding.

5. ROYALTIES. It is understood that TBG will pay the Athletes Seventy Percent (70%) of the athletes' royalty revenue received in the video game, trading card and Fanatics categories and Eighty Percent (80%) of the athletes' royalty revenue received in all other categories. MSU shall have no authority to compensate or cause compensation to be directed to a Student-Athlete or to the family of a Student-Athlete.

6. EXCLUSIVITY. During the Term of this Agreement, MSU recognizes TBG as MSU's exclusive agent to develop, implement and manage the Group Licensing Program among its current Athletes. During such time, MSU shall not engage any other third party, without the express written consent of TBG, to develop, implement or manage any similar program involving a group of any size of current or former MSU Athletes.

7. MISCELLANEOUS. This agreement shall be governed by the laws of the State of Michigan without regard to its conflict of laws principles. In their respective performance of this Agreement, the parties agree to comply with all applicable federal and state laws and regulations, as amended, as well as all applicable rules and policies, as amended, of the NCAA, the Big 10, and MSU.

MICHIGAN STATE
ATHLETICS DEPARTMENT

_____

Bill Beekman

Director of Athletics

THE BRANDR GROUP, LLC

_____

Wesley Haynes

CEO & President

# **EXHIBIT 3**



Marshall University Athletics Department and The Brandr Group, LLC
Group Rights Collaboration Agreement

This is a Collaboration Agreement between Marshall University on behalf of its Athletics Department ("MU") and The Brandr Group, LLC ("TBG") with an effective date of the 18th of August 2022.

WHEREAS, on June 21, 2021, in the case of <u>National Collegiate Athletic Association ("NCAA") v. Alston, et al.</u>, the U.S. Supreme Court held, among other things, that current university student-athletes have certain rights not previously recognized by the NCAA; and

WHEREAS, the NCAA adopted a new Name, Image and Likeness ("NIL") Interim Policy effective July 1, 2021 ("Interim Policy"); and

WHEREAS, MU has published its "Student-Athlete NIL Compensation Policy"; and

WHEREAS, MU wishes to ensure that its student-athletes are able to benefit from their NIL to the fullest extent possible consistent with all applicable federal and state laws, as well as the Interim Policy, the MU Policy, WV Uniform Athlete Agents Act "Athlete Agent Act" and the rules of the Sun Belt Conference ("SBC"); and

WHEREAS, MU intends to make available a Group Licensing Program for its current student-athletes in conjunction with the University's official marks, logos or other intellectual property; and

WHEREAS, TBG is experienced in managing Group Licensing Programs, including for such entities as the National Football League Players Association, the National Basketball Players Association, and the U.S. Women's National Soccer Team, among others.

NOW THEREFORE, MU and TBG agree to work in collaboration to make available a Group Licensing Program for current MU student-athletes ("Athletes") under the following terms and conditions:

1. DEFINITIONS
    (a) "<u>Athlete Attributes</u>" mean the Athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature in Collegiate Group Licensing Programs of any kind.
    (b) "Athlete" is a person who meets the definition of a student athlete according to NCAA regulations.

1

(c) <u>"Group Licensing Program"</u> means those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more Athletes from any one specific sport or six (6) or more Athletes from multiple sports in combination with University trademarks.

(d) <u>"MU Marks and Indicia"</u> means MU's name, its trademarks, service marks, logos, symbols, college colors, and other licensed indicia

2. DUTIES

(a) <u>MU</u> will support the Group Licensing Program among its Athletes, including by:

    (i)      distributing information about the Program;

    (ii)     facilitating the voluntary execution by any interested Athletes of the attached GROUP LICENSING AUTHORIZATION & ASSIGNMENT ("GLA Agreement");

    (iii)    organizing educational sessions for Athletes to learn about the Program from TBG;

    (iv)    making Athletes' contact information available to TBG for purposes of facilitating signing of the GLA, provided that, this information may only be used by TBG for the purpose of contacting Athletes. This information will remain the property of MU and may not be sold or used for any other purposes not expressly stated in this Agreement;

    (v)     "connecting TBG with MU's third-party trademark licensing agency and University licensing staff, so that TBG can discuss opportunities to secure from such entity(-ies) the right to use MU Marks and Indicia in connection with the Group Licensing Program, provided that MU reserves the right to review and approve each proposed use of MU Marks and Indicia and will have sole discretion to determine involvement by the appropriate rights holder (e.g., trademark licensing agency and/or multi-media rights holder).

    (vi)    providing information regarding the Group Licensing Program among the University's sponsors as appropriate; and

    (vii)   via MU's third-party licensing agency, Multi Media Rights holder and University licensing staff, make MU official marks, logos, verbiage, or designs (including identifiable aspects of MU uniforms) available for use in the Program at market rates for co-branded products. Provided that, MU will review and approve at its sole discretion.

(b) <u>TBG</u> will create, activate and manage the Group Licensing Program on behalf of current MU Student-Athletes, including by:

    (i)      creating Group Licensing Program educational materials to be distributed to Athletes;

(ii)     registering as an Athlete Agent through the West Virginia Secretary of State as
         required by the Athletes Agent Act.
(iii)    conducting Group Licensing Program educational sessions for Athletes;
(iv)     securing sponsors and licensees to support the Group Licensing Program and its
         participants;
(v)      confirming that no sponsor or licensee in the Group Licensing Program is owned
         or operated under the authority of MU;
(vi)     coordinating with MU rights holders to avoid any sponsorship or licensing
         conflicts;
(vii)    ensuring that all sponsors and licensees that plan to produce products as part of
         the Group Licensing Program apply and become licensed as WVU licensees
         through the Collegiate Licensing Company;
(viii)   receiving funds from sponsors and licensees;
(ix)     distributing sponsor and licensee funds to participating Athletes; and
(x)      reporting on the results of the Program on a quarterly basis to MU.
(xi)     reporting to MU within seventy-two (72) hours after entering into a contract with
         a MU Student-Athlete or before the next scheduled athletic event in which the
         Student-Athlete may participate, whichever occurs first; and
(xii)    retaining records as required by the Athletes Agents Act.

3.   TERM.  This Agreement shall commence on the effective date and expire on July 1,
2027, unless terminated sooner or renewed. During the initial or any subsequent Term, either
party may terminate this agreement for any or no reason with ninety (90) days written notice
to the other party after two years have elapsed since the effective date. Renewal
consideration will begin no later than six (6) months prior to the percentage of royalty
payments on deals it consummated for a period of two (2) years. The Agreement may be
modified or renewed upon the mutual written agreement of the parties.

4.   RESPONSIBILITY FOR OWN ACTS.  Each party shall be responsible for its own acts
or omissions and for any and all claims, liabilities, injuries, suits, demands and expenses of all
kinds which may result or arise out of any alleged malfeasance or neglect caused or alleged to
have been caused by that party or its employees or representatives in the performance or
omission of any act or responsibility of that party under this Agreement.

5. ROYALTIES. It is understood that TBG will pay the Athletes Seventy Percent (70%) of
the athletes' royalty revenue received. MU shall have no authority to compensate or cause
compensation to be directed to an Athlete or to the family of an Athlete. Royalties to MU
shall be in accordance with the co-branded royalty rate identified by MU that apply to this
program.

6. PREFERRED PROVIDER.  To the extent permitted by law, during the Term, the
Department shall consider TBG as its preferred provider of a Group Licensing Program for

3

Athletes, and shall not, without TBG's written consent, contract with any other party to develop, implement or manage any substantially similar group licensing program for groups of any size of Athletes.

7. MISCELLANEOUS.  This agreement shall be governed by the laws of the State of West Virginia without regard to its conflict of laws principles.  In their respective performance of this Agreement, the parties agree to comply with all applicable federal and state laws and regulations, as amended, as well as all applicable rules and policies, as amended, of the NCAA, the Sun Belt Conference and MU.

8. ASSIGNMENT. This Agreement may not be assigned without the mutual consent of the parties.

9. NO PARTNERSHIP OR JOINT VENTURE. Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture.

MARSHALL UNIVERSITY
ATHLETICS DEPARTMENT

_____

Christian Spears

Director of Athletics

THE BRANDR GROUP, LLC

_Wesley Haynes_
_____

Wesley Haynes

CEO & President

4

# EXHIBIT 4



**Katten**

**550 S. Tryon Street**
**Suite 2900**
**Charlotte, NC  28202-4213**
**+1.704.444.2000 tel**
**katten.com**

**LINDSEY L. SMITH**
lindsey.smith@katten.com
+1.704.344.3178 direct

May 18, 2023

*Via Certified Mail and Email*
Mr. Jake Schatz
Chief Legal Officer
Electronic Arts Inc.
209 Redwood Shores Parkway
Redwood City, CA  94065
jschatz@ea.com

Re:     **LEGAL HOLD NOTICE – Retaining and Preserving All Documents and
        Electronically Stored Information about EA Sports College Football Game
        Agreement and Negotiations with OneTeam Partners**

Dear Mr. Schatz:

We represent The BrandR Group ("TBG") and are writing regarding Electronic Arts Inc. ("EA
Sports") and its purported agreement with OneTeam Partners ("OTP").  We understand that EA
Sports issued a May 17 statement indicating, among other things, that, "*We're excited to have an
agreement in place with OneTeam Partners that will enable us to include the names and likenesses
of eligible collegiate football athletes at NCAA Division 1 Football Subdivision schools who opt-
in to being featured in EA Sports College Football.*"

As you know, TBG is involved in ongoing litigation with OTP, wherein TBG has asserted claims
based, in part, on disputes involving OTP's college-related negotiations and any contracts with EA
Sports.  While we hope that EA Sports can remain a non-party to that litigation, you nevertheless
are hereby notified of your obligation to identify and preserve all documents[1] that might possibly
be subject to discovery as part of the ongoing lawsuit between TBG and OTP.  Such materials
include but are not limited to documents relating to the agreement with OTP noted in your
statement and all the negotiations leading to that agreement.

By our estimate, TBG represents the group rights of about 50-60% of the collegiate student athletes
eligible to participate in the EA Sports College Football Game.  Most of those student athlete

[1] For purposes of this Legal Hold Notice, the term "documents" is defined to include all emails, documents,
communications, information, reports, or records, whether in paper or electronic form, in your possession
or control.  Further, this Legal Hold Notice relates to all documents within the possession or control of EA
Sports or its employees, including documents stored on your electronic business network, computer
desktops, in your business or home office space, or on individual employees' personal communication
devices.

KATTEN MUCHIN ROSENMAN LLP

CENTURY CITY     CHARLOTTE     CHICAGO     DALLAS     LOS ANGELES
NEW YORK     ORANGE COUNTY     SHANGHAI     WASHINGTON, DC
A limited liability partnership including professional corporations
LONDON: KATTEN MUCHIN ROSENMAN UK LLP

**Katten**

May 18, 2023
Page 2

contracts grant TBG exclusivity with respect to such group rights.  You are, of course, aware of such exclusivity since TBG has provided EA Sports with multiple examples of such contracts in connection with its past business dealings.  Therefore, we request that you immediately provide us with the details of the compensation to be paid to the student athletes represented by TBG, as well as a copy of the "agreement in place" between EA Sports and OTP as referenced above.  From the press reports and statements we have seen so far, the proposed compensation to the student athletes appears to fall far below fair market value.  The team at TBG sincerely hopes that such early press reporting is inaccurate, as TBG intends to protect and advance the rights and interests of the student athletes under contract with TBG, as well as the group rights granted by those student athletes to TBG.

In addition, we understand that EA Sports also has been provided with samples of TBG's Collaboration Agreements with about 70-80 Division 1 universities.  In many of those agreements, the colleges granted TBG exclusivity or preferred contractor status to manage those schools' NIL programs, including the schools' IP when paired with student athletes' NIL in group rights programs.  We intend to enforce all of TBG's contractual rights in this regard as well.  We hope to receive EA Sports' full cooperation as we do so.

Finally, many of TBG's partner schools already have expressed concerns that the arrangement and compensation planned by EA Sports and OTP will primarily serve the interests of those two entities.  At least some of those colleges are also concerned that the compensation that the schools will receive will be unfair and unreasonable in light of the below market value to be paid to the student athletes.

As we continue to look into the announced agreement between EA Sports and OTP, we look forward to speaking with you about the impact to TBG's existing contractual rights and relationships.  In particular, we look forward to hearing from you as to how EA Sports intends to implement its agreement with OTP without violating TBG's exclusivity rights with respect to those student athletes and universities referenced above.  Please contact me at your earliest convenience to discuss this point.

In addition, we appreciate your cooperation in preserving the documents identified above, and we ask that you provide us with a copy of your contract with OTP, including all exhibits, addendums, and amendments thereto.  Kindly provide this to me at your earliest convenience and by no later than May 25, 2023.

We look forward to speaking with you soon.

**Katten**

May 18, 2023
Page 3


Sincerely,

*Lindsey L. Smith*

Lindsey L. Smith


Cc:     Mr. Paul Cairns, pcairns@ea.com, *via email*

        Richard Farley, richard.farley@katten.com, *via email*

# **EXHIBIT 5**

REDACTED

**From:** Gregory, Josh <jogregory@ea.com>
**Sent:** Wednesday, May 24, 2023 1:31 PM
**To:** ███████████████████████████ Mollema, Deanne <dmollema@ea.com>
**Subject:** RE: EA Sports News

Non-██ Email

Hi ████,

Thanks for reaching out about this! The Compass NIL App will be used, but the college football video game license is a standalone offer, is not part of OneTeam's group license, and will not be bundled with anything else.

One Team will be facilitating this offer on behalf of EA Sports through the Compass NIL App. However, the individual license agreement will be directly with EA Sports, not as a part of OneTeam's group license. By opting into the EA Sports agreement, your student-athlete individually grants NIL rights to EA Sports for our college football video game and not any other OneTeam opportunity.

Thanks,

Josh

**From:** ████████████████████████████ >
**Sent:** Tuesday, May 23, 2023 3:02 PM
**To:** Mollema, Deanne <dmollema@ea.com>; Gregory, Josh <jogregory@ea.com>
**Subject:** FW: EA Sports News

Deanne and Josh,

It might be too early to have answers to the questions below but wanted to forward this along from my boss.

I think his concern is if our student athletes opt in to one-team, they will automatically be opted in to deals via Learfield which could conflict with our current corporate sponsors.

We are currently a BrandR exclusive school.

Let me know if you have any feedback?


Thank you,



---

**From:** 
**Sent:** Monday, May 22, 2023 10:56 AM
**To:**
**Cc:**
**Subject:** EA Sports News


,

Can you please reach out to EA Sports and ask if players will be able to opt in only for the EA Sports offer through Compass or if opting in through One Team/Compass App will opt players in for all One Team offers?  Some student athletes already have deals in certain categories, and we need to educate them on how this upcoming EA opt in with effect those agreements.

Thanks,



# EXHIBIT 6

| | |
|---|---|
| **From:** | Contro, Betsy |
| **To:** | Smith, Lindsey L. |
| **Subject:** | Correspondence from EA re the BrandR Group |
| **Date:** | Tuesday, May 30, 2023 6:23:34 PM |
| **Attachments:** | image001.png |

*EXTERNAL EMAIL – EXERCISE CAUTION*

Dear Ms. Smith,

I am writing on behalf of Electronic Arts Inc. ("EA"). We received your letter to EA dated May 18, 2023, on behalf of your client, The BrandR Group ("BrandR"), regarding the EA Sports College Football game (the "Game").

As we've indicated to BrandR previously, EA is not involved in BrandR's dispute with OneTeam Partners and has no interest in getting drawn into any such dispute. EA, however, will comply with any legal obligations it may have with respect to such proceedings.

As publicized on May 17, EA plans to provide eligible college football athletes the opportunity to opt-in individually and license their likeness rights directly to EA for inclusion in the Game. The aim is to allow individual athletes an inclusive and equitable opportunity to decide whether or not they would like their name and likeness to be included in the Game and to license those (unencumbered) rights directly from eligible student athletes, independently and unrelated to any potential licensing by EA of other intellectual property rights (e.g., division, conference, school, group, etc.). To be clear, this has nothing to do with the group rights with student athletes that BrandR claims to have. Additionally, media contacted us about statements BrandR has made to schools regarding the Game. We ask that you advise your client to refrain from making any false statements about EA or the Game, including suggesting that EA is currently working with BrandR or has any plans to engage BrandR to negotiate on its behalf with schools or student athletes.

Nothing in this response is intended or be construed to constitute an express or implied waiver of any rights or remedies that EA may have in connection with this matter, and all rights are reserved.
Regards,

Betsy Contro
Senior Counsel, Litigation
Electronic Arts Inc.
Email: bcontro@ea.com



NOTICE TO RECIPIENT: THIS E-MAIL IS MEANT SOLELY FOR THE INTENDED RECIPIENT OF THE TRANSMISSION, AND MAY BE A COMMUNICATION PRIVILEGED BY LAW. IF YOU RECEIVED THIS E-MAIL IN ERROR, ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND PLEASE DELETE THIS MESSAGE FROM YOUR SYSTEM.

# **EXHIBIT 7**



**550 S. Tryon Street**
**Suite 2900**
**Charlotte, NC  28202-4213**
**+1.704.444.2000 tel**
**katten.com**

**LINDSEY L. SMITH**
lindsey.smith@katten.com
+1.704.344.3178 direct

June 1, 2023

*Via Certified Mail and Email*
Ms. Betsy Contro
Senior Counsel
Electronic Arts Inc.
209 Redwood Shores Parkway
Redwood City, CA  94065
bcontro@ea.com

Re:   **EA Sports College Football Game (the "Game") Agreement and Negotiations with OneTeam Partners**

Dear Ms. Contro:

We appreciate your response to our May 18, 2023 letter.  Unfortunately, your comments make clear that either EA does not understand TBG's exclusive group licensing rights, or EA plans to intentionally violate those rights.

You claim in your May 31, 2023 email that the Game "has nothing do with" TBG's exclusive group licensing agreements between it and the dozens of schools and thousands of student-athletes TBG represents.  You seem to suggest that because EA is contracting separately with the individual student-athletes and their schools, that the Game does not affect "group" rights.  To be clear, if EA plans to use the names, images, and likenesses of student-athletes in connection with the students' school name, branding, logos, or other intellectual property, and it involves more than three individual athletes, then the Game necessarily implicates group rights.  EA cannot circumvent TBG's exclusive agreements by entering into what it considers "individual" or "independent" deals with the student-athletes and schools.  We suspect you may understand this concept given your current agreements with the NFLPA and NBPA.

Under TBG's agreements, "Group Licensing Programs" are defined as "those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes[1] of three (3) or more current Athletes from any one specific sport or six (6) or more Athletes from multiple sports in combination with University trademarks."  By definition, the Game constitutes a Group Licensing Program, for which TBG's contractual agreements require that EA recognize TBG as its clients' exclusive agent.  Thus, to the extent EA seeks to include

---

[1]  "Athlete Attributes" include all or any combination of the designated athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature.

KATTEN MUCHIN ROSENMAN LLP
CENTURY CITY   CHARLOTTE   CHICAGO   DALLAS   LOS ANGELES
NEW YORK   ORANGE COUNTY   SHANGHAI   WASHINGTON, DC
A limited liability partnership including professional corporations
LONDON: KATTEN MUCHIN ROSENMAN UK LLP

# Katten

June 1, 2023
Page 2


TBG-represented student-athletes and schools in its Game, EA must work with TBG to negotiate the student-athlete terms.

We have heard from certain of TBG's partner schools that EA does in fact intend to use TBG-sponsored student-athletes and schools in the Game, and that EA is informing TBG's partners that this will not interfere with TBG's exclusivity rights.  Based on the explanation in your email, this statement is false.  We also understand that EA is telling schools and universities that they must opt in to the Game by June 30, 2023, or else they will be ineligible from participating.  Given the urgency EA has created with this supposed deadline, TBG is accelerating its review of next steps and available remedies.  TBG will not hesitate to take appropriate action against EA to protect its contractual rights and the interests of the schools and athletes TBG represents.

Moreover, contrary to assertions made by EA and OTP, TBG has not made any public statements regarding the Game.  TBG has voiced concerns to its clients about student-athletes not having a voice or representation regarding the financial compensation for joining the Game, which we understand may be well below market value based on comparable video games and arrangements with athletes from other leagues and sports.  TBG's concerns are based on media reports and statements made directly by EA to TBG.

I invite you to contact me should you wish to discuss a possible resolution between our clients.  In the meantime, TBG reserves all rights and continues to assess its next steps.

Sincerely,

*Lindsey L. Smith*

Lindsey L. Smith


Cc:     Mr. Jake Schatz, jschatz@ea.com, *via email*
        Mr. Paul Cairns, pcairns@ea.com, *via email*

# **EXHIBIT 8**

| | |
|---|---|
| **From:** | Smith, Lindsey L. |
| **To:** | "Contro, Betsy" |
| **Cc:** | Schatz, Jake; Cairns, Paul; Farley, Richard L. |
| **Subject:** | RE: Correspondence from EA re the BrandR Group |
| **Date:** | Wednesday, June 7, 2023 6:45:14 PM |
| **Attachments:** | image001.png |

Ms. Contro,

In response to your request, please see below for a list of the current NCAA schools with whom TBG has contracted to act as the exclusive agent with respect to each school's Group Licensing Program.  I believe you are already in possession of certain of TBG's collaboration agreements, and that exclusivity language is representative of TBG's agreements with all of these schools.  Given the nature of the EA Sports College Football Game, we think this list is sufficient to provide EA with a general understanding of TBG's representation.  As we explained previously, we presume that the Game will require the use of NIL from three or more football players from a given school, which necessarily implicates TBG's Group Licensing Rights for its partner schools.  TBG has entered into Student-Athlete Group Licensing Authorization & Assignment Agreements with almost all of the football players from these schools, authorizing TBG to act as the student-athletes' exclusive agent with respect to their respective school's Group Licensing Program.

We hope that this invites a discussion regarding TBG's representation and the participation of its represented schools and student-athletes in the Game.  We reserve all rights and look forward to your response.

| Current TBG-Exclusive Schools | | | |
|---|---|---|---|
| Appalachian State | Kansas State | North Texas | Towson |
| Arizona State | Liberty | Northwestern | Troy |
| Arkansas | Louisiana Tech | Ohio State | UConn |
| Auburn | Louisiana- Lafayette | Ohio University | UNC |
| Baylor | Louisville* | Oklahoma State | UT Arlington |
| Boston College | Marshall | Old Dominion | Utah |
| BYU | Maryland | Ole Miss | UTEP |
| Campbell | Miami* | Oral Roberts | UTPB |
| Cincinnati | Michigan | Oregon State | UTSA |
| Colorado | Michigan State | Pittsburgh | Villanova |
| Colorado State | Middle Tennessee State | Purdue | Virginia |
| Dayton | Mississippi State | Rice | Wake Forest |
| Florida | Missouri | Rutgers | West Virginia |
| Georgia Tech | Murray State | SMU | Wyoming |
| Gonzaga | NC Central | Syracuse | |
| Hawaii | NC State | TCU* | |
| Houston | Nebraska | Texas | |
| *Schools for whom TBG's exclusivity rights are limited to the football program. | | | |

Thank you,

**Lindsey L. Smith**
Partner

**Katten**

Katten Muchin Rosenman LLP
550 S. Tryon Street, Suite 2900 | Charlotte, NC 28202-4213
direct +1.704.344.3178
lindsey.smith@katten.com | katten.com

---

**From:** Contro, Betsy <bcontro@ea.com>
**Sent:** Monday, June 5, 2023 7:23 PM
**To:** Smith, Lindsey L. <lindsey.smith@katten.com>
**Cc:** Schatz, Jake <JSchatz@ea.com>; Cairns, Paul <pcairns@ea.com>; Farley, Richard L. <richard.farley@katten.com>

**Subject:** RE: Correspondence from EA re the BrandR Group

*EXTERNAL EMAIL – EXERCISE CAUTION*

Dear Ms. Smith,

Your June 1 letter says that your client The BrandR Group ("TBG") is the "exclusive agent" for its clients and that "EA must work with TBG to negotiate the student-athlete terms." Please identify the student-athletes that TBG claims to represent as their exclusive agent for these purposes, and the scope of such exclusivity.

Regards,
Betsy Contro

**From:** Smith, Lindsey L. <lindsey.smith@katten.com>
**Sent:** Thursday, June 1, 2023 2:55 PM
**To:** Contro, Betsy <bcontro@ea.com>
**Cc:** Schatz, Jake <jschatz@ea.com>; Cairns, Paul <pcairns@ea.com>; Farley, Richard L. <richard.farley@katten.com>
**Subject:** RE: Correspondence from EA re the BrandR Group

Ms. Contro,
Please see the attached correspondence regarding this matter.

Thank you,

**Lindsey L. Smith**
Partner

**Katten**

Katten Muchin Rosenman LLP
550 S. Tryon Street, Suite 2900 | Charlotte, NC 28202-4213
direct +1.704.344.3178
lindsey.smith@katten.com | katten.com

---

**From:** Contro, Betsy <bcontro@ea.com>
**Sent:** Tuesday, May 30, 2023 6:23 PM
**To:** Smith, Lindsey L. <lindsey.smith@katten.com>
**Subject:** Correspondence from EA re the BrandR Group

*EXTERNAL EMAIL – EXERCISE CAUTION*

Dear Ms. Smith,

I am writing on behalf of Electronic Arts Inc. ("EA"). We received your letter to EA dated May 18, 2023, on behalf of your client, The BrandR Group ("BrandR"), regarding the EA Sports College Football game (the "Game").

As we've indicated to BrandR previously, EA is not involved in BrandR's dispute with OneTeam Partners and has no interest in getting drawn into any such dispute. EA, however, will comply with any legal obligations it may have with respect to such proceedings.

As publicized on May 17, EA plans to provide eligible college football athletes the opportunity to opt-in individually and license their likeness rights directly to EA for inclusion in the Game. The aim is to allow individual athletes an inclusive and equitable opportunity to decide whether or not they would like their name and likeness to be included in the Game and to license those (unencumbered) rights directly from eligible student athletes, independently and unrelated to any potential licensing by EA of other intellectual property rights (e.g., division, conference, school, group, etc.). To be clear, this has nothing to do with the group rights with student athletes that BrandR claims to have.

Additionally, media contacted us about statements BrandR has made to schools regarding the Game. We ask that you advise your client to refrain from making any false statements about EA or the Game, including suggesting that EA is currently working with BrandR or has any plans to engage BrandR to negotiate on its behalf with schools or student

athletes.

Nothing in this response is intended or be construed to constitute an express or implied waiver of any rights or remedies that EA may have in connection with this matter, and all rights are reserved.

Regards,

Betsy Contro
Senior Counsel, Litigation
Electronic Arts Inc.
Email: bcontro@ea.com



NOTICE TO RECIPIENT: THIS E-MAIL IS MEANT SOLELY FOR THE INTENDED RECIPIENT OF THE TRANSMISSION, AND MAY BE A COMMUNICATION PRIVILEGED BY LAW. IF YOU RECEIVED THIS E-MAIL IN ERROR, ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND PLEASE DELETE THIS MESSAGE FROM YOUR SYSTEM.

```
============================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive
use of the individual or entity to whom it is addressed and may contain information that is
proprietary, privileged, confidential and/or exempt from disclosure under applicable law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the original
message without making any copies.
============================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
============================================================
```