KEKER, VAN NEST & PETERS LLP
R. JAMES SLAUGHTER - #192813
rslaughter@keker.com
R. ADAM LAURIDSEN - # 243780
alauridsen@keker.com
CANDICE MAI KHANH NGUYEN - # 329881
cnguyen@keker.com
LUIS G. HOYOS - # 313019
lhoyos@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant ELECTRONIC ARTS INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BRANDR GROUP, LLC<br><br>                  Plaintiff,<br><br>   v.<br><br>ELECTRONIC ARTS INC., and DOES 1<br>through 10, inclusive,<br><br>                  Defendants. | Case No. 4:23-cv-02994-HSG<br><br>**DEFENDANT ELECTRONIC ARTS INC.'S OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>[Removed from San Mateo Superior Court, Case No. 23-CIV-2715]<br><br>Date Removed:  June 20, 2023 |

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   FACTS .................................................................................................................. 3

    A.   EA and its college football games. ............................................................ 3

    B.   BrandR's purported licensing programs. ................................................... 5

        1.   Student GLA Template. ................................................................. 5

        2.   MSU and Marshall agreements. ................................................... 7

        3.   BrandR's negotiations with EA. ................................................... 8

III.  LEGAL STANDARD .......................................................................................... 9

IV.   ARGUMENT ....................................................................................................... 9

    A.   BrandR has failed to show that it is likely to suffer irreparable harm. ..................... 9

        1.   BrandR does not face an immediate threatened injury. ............................. 9

        2.   Any harm BrandR suffers can be compensated by damages. .................. 10

        3.   BrandR lacks evidence that it will be driven out of business absent an injunction. ........................................................ 11

        4.   BrandR's alleged non-monetary harms are too speculative and conclusory. ........................................................ 13

    B.   BrandR is not likely to succeed on its tortious interference claim. ...................... 14

        1.   EA cannot interfere with contracts that have not been identified. ............ 14

        2.   EA does not interfere with the terms of BrandR's Student GLA Template. ........................................................ 16

        3.   EA does not interfere with the terms of the MSU and Marshall agreements. ........................................................ 17

    C.   The law and facts do not clearly favor BrandR on its right of publicity claims. ........................................................ 18

        1.   BrandR's claims are not ripe. ...................................................... 18

        2.   BrandR lacks standing. ................................................................ 19

    D.   The law and facts do not clearly favor BrandR on its UCL claim. ..................... 20

        1.   Damages are an adequate remedy at law for BrandR's claims. ............... 20

        2.   No unlawful conduct. ................................................................... 21

| | | | |
|---|---|---|---|
| | 3. | No fraudulent conduct. | 21 |
| | 4. | No unfair conduct. | 22 |
| E. | | The balance of equities tips in EA's favor | 24 |
| F. | | An injunction would harm the public interest | 25 |
| V. | CONCLUSION | | 25 |

## I.      INTRODUCTION

The BrandR Group ("BrandR") presents itself as an indispensable party for licensing student-athletes' names, images and likenesses ("NILs") and schools' trademarks in Electronic Arts Inc.'s ("EA") college football video game.  This is false.  After the Supreme Court's *NCAA v. Alston*[1] decision, student-athletes are now free to license their NIL to EA (or anyone else), and Collegiate Licensing Company ("CLC") is the exclusive licensing agency for more than 700 schools, responsible for licensing school names, trademarks, and logos ("Marks and Indicia").  EA can contract with individual student-athletes to license their NILs, and with CLC to license school Marks and Indicia.  EA can do both without interfering with BrandR's rights.

In its request for a temporary restraining order ("TRO"), BrandR manufactures urgency and dramatically overstates its contractual relationships with student-athletes and schools.  In short, not only does BrandR fail to sufficiently plead its claims, it also falls far short of the demanding standard required to obtain a TRO under Ninth Circuit precedent and the factors in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

***First,*** there is no exigency.  There is no "immediate threatened injury" and thus no need for injunctive relief.  BrandR (and the world) has known about EA's plans for a new college football game—including its use of schools' Marks and Indicia—for over two years.  The game is still a year away from release.  The student-athletes that BrandR seeks to enjoin EA from soliciting have not yet been contacted and not one has signed a license agreement with EA.  And the June 30 "deadline" that BrandR claims EA has set does not exist; nothing precludes any school or student-athlete from participating in the game after June 30.

***Second,*** there is no irreparable harm.  BrandR concedes that its claims are all about money, *i.e.*, "damages resulting from lost royalties" and "financial losses," *see* Dkt. No. 7-4 ("Compl.") ¶¶ 136, 150, 164, 172, and thus that any harm can be remedied through money damages.  That is the end of the story in a request for preliminary injunctive relief.  *See Goldie's Bookstore, Inc. v. Superior Ct.*, 739 F.2d 466, 471 (9th Cir. 1984).

***Third,*** BrandR has not established a likelihood of success on the merits.  None of

---

[1] 141 S.Ct. 2141, 2151-52 (2021).

DEFENDANT ELECTRONIC ARTS INC.'S OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION
Case No. 4:23-cv-02994-HSG

BrandR's claims clearly favor BrandR.  *First*, BrandR's tortious interference with contract claim fails because it does not identify a single, signed contract with a single student-athlete—a necessary predicate to a contract interference claim.  EA cannot have interfered with a contract that BrandR has not identified.  And even the unsigned template agreement BrandR attaches to its papers provides that student-athletes retain the right to individually license their NILs.  That's just what EA intends to do: license student-athletes' NILs individually.  *Second*, BrandR's agreements with schools do not actually grant BrandR the right to license school Marks and Indicia— licensees like EA would have to work with the school's "third-party licensing agency" (CLC) to do that.  *Third*, BrandR's right of publicity claims fail because EA hasn't used any student-athlete's NIL and BrandR hasn't established that it has the standing to bring a right of publicity claim on behalf of any student-athlete.  *Finally*, BrandR's ancillary UCL and declaratory relief claims depend on, and fall with, their interference and publicity claims.

At its core, BrandR's attempt to force its way into negotiations with EA conflates two types of limited agreements—the "collaboration" agreements with schools and an unsigned template group license agreement with student-athletes—to suggest that, together, those agreements give it exclusive rights that appear in *neither* agreement.  In fact, the rights landscape is not so complicated.

CLC is the exclusive licensing agent for schools.  Nothing in BrandR's agreements with schools—of which there are only two before the Court—changes this.  BrandR's agreements with Michigan State University ("MSU") and Marshall University ("Marshall") do not grant BrandR the right to license school Marks and Indicia or rights to any student-athlete NILs.  *See* Dkt. No. 7-1 ("Haynes Decl."), Ex. A ("MSU Agreement") ¶ 2(a); Haynes Decl., Ex. B ("Marshall Agreement") ¶ 2(a) ("Duties").  They are merely "Collaboration Agreements" under which BrandR agrees that it will try to develop group licensing programs for those schools, and those schools agree that they will not contract with any other third-party entity to create "similar" or "substantially similar" programs.  MSU Agreement ¶ 6 ("Exclusivity"); Marshall Agreement ¶ 6 ("Preferred Provider").  None of these terms implicate EA, which is not attempting to develop a group licensing program for these schools or enter into any group license with student-athletes.

The landscape with respect to student-athlete rights is also clear.  Following the Supreme Court's *Alston* decision and the NCAA's resulting changes to NIL regulations, student-athletes can license their own NIL rights.  Student-athletes are free—as EA has proposed—to decide individually whether they want to directly license their individual rights, including for use in video games.  Nothing BrandR has put before the Court limits student-athletes' freedom.  In fact, BrandR's unsigned student-athlete template expressly confirms that student-athletes retain the right to enter into individual NIL agreements, like the ones EA has proposed.  Compl., Ex. 1 ("Student GLA Template") ¶ 11 ("[T]HIS AGREEMENT DOES NOT RESTRICT OR PREVENT ANY OF MY EXISTING OR FUTURE, INDIVIDUAL NIL AGREEMENTS.").

Following the change of NCAA's amateurism rules, EA explored various ways to license student-athletes' NILs for use in the game.  As part of that process, EA met with BrandR representatives.  Ultimately, EA decided against working with BrandR and instead entered into an agreement with OneTeam Partners ("OneTeam"), who will facilitate individual license agreements between EA and student-athletes.  EA strongly believes that this approach is the fairest system because it allows each student-athlete to decide whether to license EA their NIL rights and provides equitable and transparent compensation for those rights.  BrandR is apparently disappointed that EA did not decide to do business together.  But BrandR's disappointment does not amount to a meritorious lawsuit and certainly does not justify the extreme remedy of a temporary restraining order.  The fact is, this is fundamentally a garden variety commercial contract case for which preliminary injunctive relief is not appropriate.  The Court should deny BrandR's application.

## II.  FACTS

### A.  EA and its college football games.

EA is one of the world's leading digital interactive entertainment companies.  Declaration of Sean O'Brien ("O'Brien Decl.") ¶ 3.  EA develops, publishes, and distributes games, content, and services for video game consoles, personal computers, and mobile devices.  *Id*.  In 1997, EA created and sold the first game using the *NCAA Football* title, which featured college football teams depicted with their actual trademarks, college stadiums, logos, mascots, and other

intellectual property. *Id.* ¶¶ 4-5. EA licensed the schools' Marks and Indicia from the CLC, the schools' exclusive licensing agent. *Id.* ¶¶ 5, 16. Because of NCAA rules limiting compensation to individual college student-athletes, *NCAA Football* did not feature actual players; rather, it used nameless generic player avatars. *Id.* ¶ 5. *NCAA Football* was discontinued in 2013. *Id.* ¶ 4.

On February 2, 2021, responding to fan demand, EA announced a renewed partnership with CLC to license schools' Marks and Indicia for a new college football game. *Id.* ¶ 6; *see also id.*, Ex. A; Declaration of Cory Z. Moss ("Moss Decl.") ¶ 6. EA currently expects to release the new game in the summer of 2024. O'Brien Decl. ¶ 6; Moss Decl. ¶ 6. Incorporating the elements licensed from the schools into the game is a time-consuming process. O'Brien Decl. ¶ 15; Moss Decl. ¶ 8. EA's game designers spend months ensuring that the jerseys, fields, stadiums, fight songs and other elements of the college football experience utilizing Marks and Indicia are rendered as realistically as technically possible. O'Brien Decl. ¶ 15. To ensure adequate lead-time for realistic game development, EA and CLC have encouraged schools to indicate by June 30, 2023, whether they wish to join the CLC license and be included in the new college football game. *Id.*; Moss Decl. ¶ 8. The June 30 date is not a deadline for inclusion in the game. Schools will still be able to opt-in or out after June 30. O'Brien Decl. ¶ 15; Moss Decl. ¶ 8. Whether a school opts in by June 30 will have no effect on whether any student-athlete from that school is also included in the game.

EA originally planned for the new college football game to use generic player avatars with randomly generated names, numbers, and attributes. O'Brien Decl. ¶ 6. In June 2021, following the Supreme Court's decision in *Alston*, the NCAA acknowledged student-athletes' rights to receive compensation for use of their NILs. As a result, student-athletes are now free to license their NIL rights. With this change, EA began considering ways to license student-athletes' NILs for use in its new college football game. O'Brien Decl. ¶ 6. Nearly two years later, EA announced a partnership with OneTeam to facilitate student-athlete licensing. *Id.* ¶ 11. OneTeam will provide a service by which student-athletes will be able to individually license their NIL rights to EA for use in the new game. *Id.* EA is not licensing student-athlete NIL rights from OneTeam; rather, OneTeam is providing a service to facilitate the licensing process between EA

and student-athletes.  Declaration of Malaika Underwood ("Underwood Decl.") ¶ 2.  Through this individual licensing arrangement, EA will compensate student-athletes directly for use of their NIL rights.  O'Brien Decl. ¶ 12.

EA has not yet solicited or entered into an agreement with any student-athletes for use of their NILs in the new college football game.  *Id.* ¶ 13.  EA's new college football game will be based on the 2024 college football season and will be released in the summer of 2024.  *Id.* Schools typically do not begin to set their rosters for the fall football season until the prior spring. *Id.*  Thus, it is unlikely that EA will be in a position to determine which student-athletes would be eligible for inclusion in the game until 2024.  *Id.*

**B.     BrandR's purported licensing programs.**

BrandR's motion rests on the assertion that it is the exclusive avenue through which any licensee (such as EA) must license either student-athlete NILs or school Marks and Indicia for a product that includes elements of both.  For that to be true, BrandR must establish that it (1) owns the exclusive rights to license student-athlete NILs, both individually and as a group of any size, (2) owns the exclusive right to license school Marks and Indicia, ***and*** (3) obtained agreement from both student-athletes and schools that one would not license rights without the other.  But BrandR can't establish any of those points.  Far from the broad exclusive rights BrandR purports to wield, the contracts in evidence make clear that (1) student-athletes who sign the template agreement (EA and the Court still do not know which student-athletes have signed an agreement) at all times retain the right to individually license their NILs; (2) schools do not grant BrandR the right to license or use school Marks and Indicia at all and, instead, at most allow BrandR to discuss with CLC whether to license school Marks and Indicia (subject to further school approval); and (3) the student-athletes and schools are free at all times to license their rights separate from one another.  BrandR simply does not have the rights it purports to possess.

**1.     Student GLA Template.**

BrandR's purported Student GLA Template does not grant BrandR exclusive rights to student-athletes' NILs.  It is an unsigned draft contract through which students-athletes can grant

BrandR the non-exclusive right to license the use of their "Athlete Attributes"[2] in "Collegiate Group Licensing Programs" defined as "programs in which a collegiate licensee or colellegiate sponsor uses [the NILs] of three or more current XX Athletes from one sport or six or more from multiple sports, ***in combination with*** University trademarks and logos."  Student GLA Template ¶ 3 (emphasis added).[3]  This grant of rights is narrowly limited in several material ways.

Most importantly, the Student GLA Template explicitly does not grant BrandR exclusive rights to student-athletes' NILs.  Rather, student-athletes expressly retain the right to license their individual NILs.  *Id.* ¶ 4 ("[T]his Agreement does NOT limit an Athlete's right to grant the use of his/her individual Athlete Attributes or ***individual*** NIL for publicity, advertising, or other commercial purposes, except that such individual grants will not preclude the undersigned also from being covered by the Collegiate Group Licensing Programs" (emphasis added)); *id.* ¶ 11 ("[T]HIS AGREEMENT DOES <u>NOT</u> RESTRICT OR PREVENT ANY OF MY EXISTING OR FUTURE, INDIVIDUAL NIL AGREEMENTS."). In other words, student-athletes retain the right to enter into individual license agreements at all times.

Student-athletes even retain the right to license their NIL rights in a group, if the grant of group-NIL rights "***does not involve any use or co-branding of any kind of [the University's] own IP or property (such as trademarks, logos, jerseys, names, nicknames, etc.*)."  *Id.* ¶ 4; *see also id.* ¶ 12 ("THIS AGREEMENT DOES NOT RESTRICT ANY OF MY EXISTING GROUP NIL AGREEMENTS NOR ANY SUCH FUTURE NIL AGREEMENTS *THAT DO NOT ALSO INCLUDE THE UNIVERSITY'S CO-BRANDED IP*." (emphasis added)).

BrandR implies that the fact multiple student-athletes may decide—on an individual basis—to opt into EA's college football game strips those student-athletes of their freedom to

---

[2] The Student GLA Template defines "Athlete Attributes" as all or any combination of the [athlete's] name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature."  Student GLA Template ¶ 3.

[3] *See also* Student GLA Template ¶ 9 ("[D]uring the term of this Agreement, [BrandR] shall represent my <u>group</u> only in *any co-branded licensing that also includes the University's IP*." (emphasis added)); *id.* ¶ 5 ("The focus of the Collegiate Group Licensing Programs will be ***co-branded opportunities*** involving groups of Athletes' NIL ***along with [the University's] IP***." (emphases added)).

DEFENDANT ELECTRONIC ARTS INC.'S OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION
Case No. 4:23-cv-02994-HSG

contract and instead grants exclusive rights to BrandR to decide whether and on what terms those students may be included in EA's games.  Again, nothing in the agreements before the Court grants BrandR those rights.  The unsigned student-athlete authorization form BrandR submitted shows only a narrow, non-exclusive grant for BrandR to attempt to develop a group licensing program that bundles together the rights of numerous student-athletes and school trademarks and indicia into a single license.  *Id*. ¶ 9 ("DURING THE TERM OF THIS AGREEMENT [BrandR] SHALL REPRESENT MY GROUP NIL RIGHTS ONLY IN ANY CO-BRANDED LICENSING THAT ALSO INCLUDES THE UNIVERSITY'S IP.").  Because EA seeks to contract with student-athletes individually and to obtain school intellectual property in a separate license, BrandR's purported agreements with students are not implicated.

## 2.  MSU and Marshall agreements.

BrandR's "Group Rights Collaboration Agreement[s]" with MSU and Marshall do not grant BrandR the rights to any student-athlete's NIL nor do they grant BrandR the rights to use or license school Marks and Indicia.  For instance, the Marshall Agreement merely obligates Marshall to (1) "distribute information about the [Group Licensing] Program" in order to "facilitate" student-athlete's voluntary decisions to enter into agreements with BrandR, and (2) "connect[] [BrandR] with [Marshall's] third-party trademark licensing agency"—*i.e.* CLC— "and University licensing staff, so that [BrandR] can discuss opportunities to secure from such entities the right to use [Marshall] Marks and Indicia in connection with the Group Licensing Program, provided that [Marshall] reserves the right to review and approve each proposed use of [Marshall] Marks and Indicia[.]"  Marshall Agreement ¶¶ 2(a)(i)-(vii).  In other words, Marshall licenses nothing to BrandR and agrees only to introduce BrandR to student-athletes and its school licensing agent, CLC.[4]

Furthermore, nothing in the MSU and Marshall agreements requires the schools to involve BrandR when they license their Marks and Indicia independently from any student-athletes'

---

[4] Nor does the MSU Agreement grant BrandR a license to MSU's Marks and Indicia.  There is no language granting BrandR a license or rights to any MSU property.  At most, MSU has agreed to make its Marks and Indicia "available for use in the Program" through MSU's "third-party licensing agency" (CLC)—subject to coordination with CLC to avoid, inter alia, licensing conflicts such as CLC's license with EA.  MSU Agreement ¶¶ 2(a)(v); 2(b)(iv).

NILs.  The MSU and Marshall agreements both define "Group Licensing Programs" as "**_licensing or sponsorship programs_** in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes[5] of three (3) or more Athletes from any one specific sport or six (6) or more Athletes from multiple sports **_in combination with University trademarks_**."[6]  MSU Agreement ¶ 1(b) (emphases added); Marshall Agreement ¶ 1(c).  In short, a license to schools' Marks and Indicia on their own does not fall within BrandR's definition of a "Group Licensing Program."

Although BrandR makes much of its "Exclusivity" and "Preferred Provider" terms with MSU and Marshall respectively, the only effect of those terms is to limit the schools from contracting with other third-parties to create a group licensing program that bundles the rights of multiple student-athletes with schools' Marks and Indicia.  MSU Agreement ¶ 6 ("MSU recognizes [BrandR] as MSU's exclusive agent to develop, implement, and manage the Group Licensing Program among its current athletes.");  Marshall Agreement ¶ 6 (Marshall "shall not, without [BrandR's] written consent, contract with any other party to develop, implement or manage any substantially similar group licensing program for groups of any size of Athletes.").  Again, nothing in those terms prevents the schools from licensing their Marks and Indicia separate and apart from any student-athletes' NIL rights.

In fact, CLC—not BrandR—is the schools' exclusive licensing agent for the type of Marks and Indicia license EA plans to use for its new college football game.  Moss Decl. ¶ 3.  By baselessly trying to force itself into the licensing process between EA and schools for Marks and Indicia, it is BrandR that is interfering with CLC's exclusive rights.

### 3.     BrandR's negotiations with EA.

BrandR contacted EA in 2022 regarding its desire to enter a business relationship with EA for the new college football game.  Haynes Decl., Ex. C; O'Brien Decl. ¶ 16.  Throughout the parties' discussions, it was entirely unclear what (if any) student-athlete NIL rights BrandR

---

[5] The MSU and Marshall agreements define "Athlete Attributes" identically to that in the Student GLA template.  *Compare* MSU Agreement ¶ 1(a) and Marshall Agreement ¶ 1(a) *with* Student GLA Template ¶ 3.

[6] BrandR misquotes the definition of its "Group Licensing Program" by appending "or separately as a group" to the end of the definition.  *See* Appl. at 3; Haynes Decl. ¶ 9.

actually had or the nature of such rights; BrandR never disclosed a list of student-athletes it had

contracts with, or provided EA with a single signed agreement with any student-athlete.  O'Brien

Decl. ¶¶ 16-17; Cairn Decl. ¶ 3.  When a representative for BrandR reached out to EA in May

2023, Haynes Decl., Ex. D, EA explained that it was not pursuing group licensing strategy for

student-athletes' NILs, and instead had decided to enter into individual licenses with each

student-athlete.  Haynes Decl., Ex. F; O'Brien Decl. ¶ 18.  When EA told BrandR that it did not

wish to participate in BrandR's Group Licensing Program, BrandR's reaction quickly devolved

into threats.  At no point has BrandR identified any student-athletes with whom it has allegedly

contracted, or any of the executed contracts.  *Id.* ¶¶ 16-17; Cairn Decl. ¶ 3.

## III.   LEGAL STANDARD

A TRO is an "extraordinary remedy never awarded as of right."  *Garcia v. Google, Inc.*,

786 F.3d 733, 740 (9th Cir. 2015) (en banc).  BrandR bears "the heavy burden" of demonstrating:

(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the

absence of preliminary relief, (3) the balance of equities tip in their favor, and (4) an injunction is

in the public interest.  *Blankenship v. Newsom*, 477 F. Supp. 3d 1098, 1103 (N.D. Cal. 2020)

(quoting *Winter*, 555 U.S. at 20 (2008)).

## IV.   ARGUMENT

### A.   BrandR has failed to show that it is likely to suffer irreparable harm.

#### 1.   BrandR does not face an immediate threatened injury.

The Court should deny BrandR's TRO application because it cannot establish an

"immediate threatened injury."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th

Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish

standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to

preliminary injunctive relief.").  BrandR complains that EA is on the verge of signing contracts

with student-athletes and schools to participate in its new college football game in violation of

BrandR's Group Licensing Program agreements.  But the game is not scheduled to release for

another year, *see* Appl. at 18; O'Brien Decl. ¶ 13, and neither EA nor OneTeam has contacted a

single student-athlete about licensing their NIL rights, *id.* ¶ 13; Underwood Decl. ¶ 3.  Nothing is

9

1    immediate.

2          BrandR argues that harm is immediate by pointing to an "arbitrary June 30 deadline" by

3    when it claims schools must sign contracts with EA or risk being excluded from the new college

4    football game.  Appl. at 1, 9; *see also* Haynes Decl. ¶ 31.  That is false.  As EA and CLC explain,

5    June 30 is merely a target date for when schools are encouraged to confirm that they wish to be

6    included in the game.  O'Brien Decl. ¶ 15; Moss Decl. ¶ 8.  By getting schools to indicate their

7    interest by June 30, EA seeks to give their game designers enough lead time to render the

8    schools' Marks and Indicia as realistically as possible.  *See* O'Brien Decl. ¶ 15; Moss Decl. ¶ 8.

9    Schools may participate in the game even if they opt into the group trademark license *after* June

10   30.  *Id*.  And schools may also opt out of the game after June 30.  *Id*.

11              **2.      Any harm BrandR suffers can be compensated by damages.**

12         BrandR's application should also be denied because any harm it may suffer (though there

13   is no evidence of any) could be compensated by damages.  *See Int'l Medcom, Inc. v. S.E. Int'l,*

14   *Inc.*, No. 15-CV-03839-HSG, 2015 WL 7753267, at *5 (N.D. Cal. Dec. 2, 2015) ("[M]ere

15   financial injury 'will not constitute irreparable harm if adequate compensatory relief will be

16   available in the course of litigation.'" (quoting *Goldie's Bookstore*, 739 F.2d at 471)).  In other

17   words, BrandR cannot establish that "if [it] is ultimately successful, compensatory damages and

18   injunctive relief would be inadequate."  *Id*.  To the contrary, BrandR's complaint concedes that

19   the Court can redress each of its claimed injuries through monetary damages:

20   ●  **Claim 1 (tortious interference with contract):** BrandR "has suffered and will continue

21       to suffer damages resulting from lost royalties."  *Id.* ¶ 136.

22   ●  **Claims 2 and 3 (right of publicity):** BrandR "has suffered and will continue to suffer

23       damages resulting from lost royalties."  *Id.* ¶ 150; *see also id.* ¶ 164 (same).

24   ●  **Claim 4 (UCL claim):** BrandR "is suffering and will continue to suffer financial

25       losses[.]"  *Id.* ¶ 172.

26   ●  **Claim 5 (declaratory relief):** "EA Sports is in direct *violation* of [BrandR's] exclusivity

27       *agreements*."  *Id.* ¶ 177 (emphases added).

28         Each of these claims invokes the violation of agreements or "contractual rights" that cause

1   "financial losses" or "lost royalties," which are fundamentally economic and capable of being

2   redressed through monetary relief.[7]  *See Telephia Inc. v. Cuppy*, 2005 WL 588441, at *3 (N.D.

3   Cal. Mar. 11, 2005) ("[A] claim for breach of contract can be compensated by money damages,

4   and does not warrant the issuance of a preliminary injunction."); *Amylin Pharms., Inc. v. Eli Lilly*

5   *and Co.*, 456 F. App'x 676, 678 (9th Cir. 2011) ("[L]ost profits due to lost sales generally

6   constitutes the type of harm that is fully compensable through money damages and therefore does

7   not support injunctive relief.").

8         BrandR claims that it will be "irreparably harmed by the lost opportunity to negotiate fair

9   compensation" for the student-athletes' NILs.  Appl. at 20.  But this is not BrandR's

10  "opportunity" to lose.  BrandR does not offer any evidence that it has a single valid contract with

11  any student-athlete.  Regardless, any injury to "fair compensation" could be cured through

12  monetary damages, particularly since BrandR repeatedly argues that the "market value" of such

13  rights is readily determinable.  *See, e.g., id.* at 1 ("EA seeks to secure [BrandR's] represented

14  student-athletes' participation in the game for far less than market value"); *id.* at 13 ("EA is

15  contracting for the use of Client Athletes' NIL in its Game at a flat rate that . . . is far below fair

16  market value.").

17        Similarly, BrandR's contention that EA's conduct threatens to "diminish, if not

18  completely destroy, [BrandR's] exclusive group license," *id.* at 21, does not support a finding of

19  irreparable harm.  Again, BrandR's argument implies there is a market value for the rights at

20  issue such that any injury could be addressed by monetary damages.  *See Ojmar US, LLC v. Sec.*

21  *People, Inc.*, No. 16-CV-04948-HSG, 2017 WL 2903143, at *3 (N.D. Cal. July 7, 2017) ("[L]oss

22  of prospective business opportunities is generally an economic harm that can be valued and

23  compensated upon later success at trial.").  These injuries are not irreparable.

24              **3.    BrandR lacks evidence that it will be driven out of business absent an
                        injunction.**

25

26        BrandR asserts, without objective support, that it will be "driven out of business" if EA is

27  ─────────────────────

28  [7] There is no difference between a tortious interference claim and a contract claim for purposes of
    this analysis.  *See Freecyclesunnyvale v. Freecycle Network, Inc.*, 2006 WL 870688, at *7 (N.D.
    Cal. Apr. 4, 2006) ("In causes of action for tortious interference with business relations in
    California, damages must be plead." (citation omitted)).

not compelled to take licenses from it.  Appl. at 21.  This is hyperbole, unsupported by any evidence, and belied by BrandR's assertion that it is a "leader in the collegiate group space" with an extensive work portfolio and clients including "many former college athletes," "groups of players through the NFLPA, NBPA and MLBPA," "retired NBA players," and "the US Women's National Soccer Team."  *See supra* Section I; *see also* Student GLA Template ¶ 2; MSU Agreement at 1.  Similarly, BrandR's unsupported complaints about EA's "free reign" to solicit "other prospective licensees and sponsors" or in a "NCAA-branded basketball game" amount to nothing but hypothetical harm.  The reality is that EA's separate licenses with the schools and student-athletes do not impact BrandR's ability to enter into Group Licensing Programs with the same student-athletes and schools for other ventures.[8]  What is actually at issue here is the loss of a *single* opportunity for BrandR to license the NILs of student-athletes and Marks and Indicia of schools together for a *single* unreleased video game.  And, indeed, even under BrandR's purported group license agreement with student-athletes, compensation for the video game would come in the form of royalties from the sales of the game.  The game is not going to be released until the summer of 2024.  Royalty payments, by definition, would not come until later.  BrandR cannot claim hypothetical royalties that at the earliest would not be paid for more than a year from now could be the cause of it going out of business today.

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022), which BrandR cites, is instructive.  In that case, plaintiff hiQ was a data analytics company that scraped publicly-accessible data from LinkedIn profiles to create "people analytics" which it sold to business clients.  *Id.* at 1187.  That was the entirety of its business.  After LinkedIn blocked hiQ from accessing LinkedIn's website and data, hiQ sought injunctive relief, arguing that being blocked from the data would put it out of business by preventing it from fulfilling its existing obligations under *all* of its contracts with third parties.  Affirming the district court's factual findings that hiQ

---

[8] BrandR also cites to *Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33 (1941), but that decision simply creates a tortious interference with contract claim at common law.  *Id.* at 39.  It did not involve a request for injunctive relief and it did not stand for BrandR's proposition that irreparable harm is met where there is an "unjustifiable interference with contractual relations."  Appl. at 19.

"has no viable way to remain in business" and that "hiQ will likely be forced to breach its existing contracts with clients such as eBay, Capital One, and GoDaddy, and to pass up pending deals with prospective clients," the Ninth Circuit concluded that "[t]he harm hiQ faces absent a preliminary injunction is not purely hypothetical. *Id.* at 1189.

This case is entirely different from *hiQ*: EA's licenses with student-athletes (which don't yet exist) and schools will, at most, result in the loss of a *single* potential venture for BrandR that would not pay off for years. And, fundamentally, BrandR has not established that it would have a business relationship with EA but for the conduct it complains about here. Even with the injunction BrandR seeks here, EA could decide not to pursue the licenses that implicate BrandR's purported exclusivity. In other words, unlike in *hiQ*, BrandR has not met its burden in demonstrating that it "has no viable way to remain in business other than" enjoining EA from independently engaging with schools and student-athletes for the new college football game. *Id.*[9]

### 4.  BrandR's alleged non-monetary harms are too speculative and conclusory.

To the extent that BrandR's alleged harms are non-monetary, they are fatally speculative and conclusory, precluding injunctive relief. "Speculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007). "[A] plaintiff who attempts to establish irreparable harm via loss of business reputation and goodwill must proffer evidence of that loss—a district court may not base a finding of reputational harm on platitudes rather than evidence." *Amazing Ins., Inc. v. Dimanno*, 2019 WL 3406941, at *3 (E.D. Cal. July 26, 2019); *see also Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) ("conclusory" affidavits "without sufficient support in facts" do not show "irreparable harm").

***Reputational harm.*** BrandR offers no evidence in support of its supposed reputational harm other than a single sentence from its founder: "Over the years, [BrandR] has developed a strong reputation as a leader in facilitating Collegiate Group Licensing Programs and tremendous

---

[9] *hiQ* is also distinguishable because there the existence of plaintiff's third-party contracts was undisputed, 31 F.4th at 1191, whereas BrandR does not offer *any evidence* of its specific student-athlete contracts. *See infra* Section IV.B.1.

goodwill among the schools and student-athletes with whom it partners." Haynes Decl. ¶ 43. But that is not enough. *Asmoke USA, LLC v. YCY Int'l Logistics, Inc.*, 2023 WL 3768655, at *2 (C.D. Cal. May 1, 2023) ("As the Ninth Circuit has stated, allegations of irreparable reputational harm must be 'grounded in . . . evidence.'" (citing *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013)). BrandR is required to explain in detail exactly what reputational harm it will suffer if EA enters into licenses with the student-athletes and schools.

BrandR likens the case to the facts in *Notorious B.I.G. LLC v. Yes. Snowboards*, where the court credited a declaration from the late Christopher Wallace's mother as to her and his estate's "investment of substantial time and resources over many years in establishing Wallace's public persona." 2022 WL 2784808, at *10 (C.D. Cal. June 3, 2022). But the case is readily distinguishable. There, Wallace's estate sought to enforce its undisputed right of publicity against a defendant who did not contest that it had used Wallace's identity and persona without permission. The defendant's sole defense to the publicity-right claim was that "its use is unlikely to cause damage to the commercial value of Wallace's persona." *Id.* at 6. Here, by contrast, BrandR does not provide any details as to what reputational harm it will suffer if EA enters into separate licenses with the student-athletes and schools.

***Loss of Goodwill.*** BrandR's "loss of goodwill" allegation similarly fails for lack of evidentiary support other than a single self-serving sentence in Mr. Haynes's declaration. *See Giftango, LLC v. Rosenberg*, 925 F. Supp. 2d 1128, 1140 (D. Or. 2013) ("[P]laintiff provides no evidence that the claimed loss of customers or goodwill is real and imminent, and not just speculative or potential.").

## B.  BrandR is not likely to succeed on its tortious interference claim.

### 1.  EA cannot interfere with contracts that have not been identified.

To bring a claim for tortious interference with a contract, BrandR must first establish that it has valid contracts with the student-athletes and schools that it purports to represent. *See Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (Cal. 2020) ("Tortious interference with contractual relations requires (1) the existence of a valid contract between the plaintiff and a third

party").[10]  To satisfy this element as to the student-athletes, BrandR attaches only an *unsigned* Student GLA Template, which as a matter of law is *not* a valid, enforceable contract.  *See Halcyon Syndicate Ltd., LLC v. Graham Beck Enters. (PTY), Ltd.*, 2020 WL 4051865, at *24 (N.D. Cal. July 20, 2020) ("[T]he 2014 Draft Agreement is unsigned and therefore is not an enforceable written contract.").  BrandR has never produced—to the Court or to EA—a single signed, valid contract with a student-athlete.  BrandR's failure to produce such a contract is therefore fatal to its tortious interference claim with respect to BrandR's contractual relations with student-athletes. BrandR cannot fix that fatal error now by belatedly producing copies of contracts because BrandR's allegation is that EA has already interfered with its contracts.  How can EA have interfered with a contract of which it is unaware?  As for BrandR's contracts with schools, BrandR attaches only two such contracts: (1) the MSU Agreement and (2) the Marshall Agreement.  At best, these documents establish only that BrandR has valid contracts with MSU and Marshall.  As a result, BrandR has failed to state a claim for tortious interference with any contract that involves other schools.  (As described below, BrandR is not likely to succeed on its claims that EA interferes with any contracts, including with MSU and Marshall).

To overcome this deficiency, BrandR invites the Court to assume the existence and validity of nearly 4,000 contracts with allegedly "substantially the same provisions" as the unsigned template and the Marshall and MSU contracts.[11]  Compl. ¶¶ 33-34.  But BrandR must allege "facts identifying the particular contracts" at issue.  *Image Online Design, Inc. v. Internet Corp. for Assigned Names and Numbers*, 2013 WL 489899, at *9 (C.D. Cal. Feb. 7, 2013).[12] Otherwise, the Court and EA cannot determine (1) who is subject to these contracts; (2) whether the contracts are valid; (3) which state's law applies to each contract; and (4) whether the student-

---

[10] Tortious interference with contractual relations requires "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *Ixchel Pharma*, 9 Cal. 5th at 1141.

[11] The MSU and Marshall agreements have material differences, including choice of law clauses.

[12] *See also Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 980 (N.D. Cal. 2013) ("DLA offers no specific evidence that a contract exists, that the contract was breached or disrupted, or that DLA suffered damages."), *aff'd*, 609 F. App'x 497 (9th Cir. 2015).

athletes and schools will breach the terms of those contracts if they enter into separate licenses with EA.  The Court cannot establish any of these elements without seeing the contracts BrandR allegedly has with student-athletes and schools and so cannot award BrandR injunctive relief on this claim on that basis alone.

> **2.      EA does not interfere with the terms of BrandR's Student GLA Template.**

Even assuming the student-athletes signed contracts that are "substantially" similar to the Student GLA Template, Compl. ¶¶ 33-34, BrandR's tortious interference claim would *still* fail because, by the template's own terms, student-athletes retain the right to separately license their individual NILs.[13]

Here, EA intends to license the student-athletes' individual NILs directly from the student-athletes.  BrandR's Student GLA Template expressly allows student-athletes to individually license their NIL rights:

> Please note that this Agreement **does NOT limit** an Athlete's right to grant the use of his/her **individual** Athlete Attributes or **individual** NIL for publicity, advertising, or other commercial purposes, except that such individual grants will not preclude the undersigned also from being covered by the Collegiate Group Licensing Programs granted by [BrandR].

Student GLA Template ¶ 4 (emphases added); *see also id.* ¶ 11 ("I RECOGNIZE THAT THIS AGREEMENT DOES NOT RESTRICT OR PREVENT ANY OF MY EXISTING OR FUTURE, INDIVIDUAL NIL AGREEMENTS.").  EA intends to individually license student-athlete NIL. The Court does not need to go any further to dispose of BrandR's interference claim.

BrandR's Student GLA Template covers only "Collegiate Group Licensing Programs," which are "licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more current [] Athletes from one sport or six (6) or more from multiple sports, *in combination with University trademarks and logos*."  *Id.* ¶ 3 (emphasis added); *see also id.* ¶ 5 ("The focus of the Collegiate Group Licensing Programs will be *co-branded licensing opportunities* involving groups of Athletes' NIL *along with [the*

---

[13] BrandR's tortious interference claim is also likely unripe, even if student-athletes have signed the Student GLA Template, because EA has not signed a contract with a single student-athlete and does not intend to do so until several months from now.

*University's] IP*." (emphases added)).  In other words, the Student GLA Template grants student-athlete rights only for use in a BrandR licensing program that bundles several student-athletes' NILs *plus* their school's Marks and Indicia in one agreement.  *See id.* ¶ 6 ("[BrandR] makes no representation regarding individual or group licensing programs or matters other than those expressed herein."); *id.* ¶ 9 (providing that the BrandR shall represent a student-athlete's "group NIL rights only in any co-branded licensing that also includes the University's IP"); *id.* ¶ 12 (providing that the agreement "does not restrict any of [the student-athlete's] existing group NIL agreements nor any such future NIL agreements that do not also include the University's co-branded IP").  EA is not seeking this type of bundled rights for the new college football game.[14]

To avoid this conclusion, BrandR insists that it has exclusive rights over *any use* of student-athletes' NIL in *any scenario* so long as the scenario implicates a group of at least three student-athletes from the same sport and school Marks and Indicia.  That interpretation is unsupported by the plain language of the contracts (or template contracts), as well as nonsensical.  In a scenario where three student-athletes separately contract with a third party licensing use of their NIL, without any awareness as to what the other athlete was doing, and the student-athletes' school separately contracts with the third-party for use of their Marks and Indicia to the same, BrandR's interpretation of their contracts somehow voids all four contracts—despite licensing their rights just how the BrandR "contract" contemplated they may.  Nothing in any agreement before the Court—or the law—allows BrandR to retroactively change four individual contracts into a group license.  The Court should reject BrandR's strained interpretation of these contracts.

### 3.    EA does not interfere with the terms of the MSU and Marshall agreements.

Similarly, BrandR's tortious interference claim as to the MSU and Marshall agreements also fail.  Marshall and MSU have not assigned to BrandR the right to license any Marks and Indicia.  BrandR simply has no rights to license to EA on behalf of schools.  That's because CLC

---

[14] Even if the student-athletes' licenses to EA were (inaccurately) characterized as a group license, those student-athlete rights are not bundled together with schools Marks and Indicia since EA is contracting separately for those rights from CLC.  Student GLA Template ¶ 4 (acknowledging that agreement does not limit student-athletes' rights to enter group grants "IF any such group grant does not involve any use or co-branding of any kind of XX's own IP or property" (emphasis in original)).

DEFENDANT ELECTRONIC ARTS INC.'S OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION
Case No. 4:23-cv-02994-HSG

remains the schools' exclusive licensing agent.  Moss Decl. ¶ 3; O'Brien Decl. ¶ 16.
Fundamentally, the schools' obligations under the collaboration agreements are limited to (1)
making information available to student-athletes regarding BrandR's non-exclusive group
licensing program and (2) facilitating the potential licensing of school Marks and Indicia—
through CLC—in conjunction with a potential student-athlete group license.  The collaboration
agreements don't get BrandR anywhere because EA is not entering into any group license with
student-athletes.  BrandR would need to get CLC and school approval to enter into a license
agreement, and the schools retain the right to separately license their Marks and Indicia
individually or as a group with other schools.

   The "exclusivity" provisions in the collaboration agreements do not change the analysis.
At most, the school agrees that it will not hire a competitor to BrandR to market a bundled
combination of multiple students' NIL rights **together** with the schools Marks and Indicia.  MSU
Agreement ¶ 6 ("MSU shall not engage any other third party, without the express written consent
of [BrandR], to develop, implement or manage any similar program ***involving a group of any size
of current or former MSU Athletes.***" (emphasis added)); Marshall Agreement ¶ 6 (preventing
Marshall from entering into a "contract with any other party to develop, implement or manage
any substantially similar group licensing program ***for groups of any size of athletes***" (emphasis
added)).  But those terms do not prohibit the school from licensing its Marks and Indicia to a
product, such as a video game, that involves multiple student-athletes, so long as the school did
not hire a different third-party to bundle together student-athlete and school rights as a Group
Licensing Program for that product.  Again, BrandR overreaches in its claims of exclusivity.

   Because EA has not entered and does not intend to enter into any license agreement that
bundles MSU's or Marshall's trademarks with their student-athletes' NILs, BrandR's tortious
interference claim fails.

   **C.     The law and facts do not clearly favor BrandR on its right of publicity claims.**

   **1.     BrandR's claims are not ripe.**

   BrandR's right of publicity claims fail on the most basic grounds: BrandR has not alleged
that EA has used any student-athlete's name, image, or likeness in a commercial manner.  As the

Ninth Circuit has observed, courts are empowered to adjudicate only "live cases or controversies," not "to issue advisory opinions [or] to declare rights in hypothetical cases." *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).  "For a case to be ripe, it must present issues that are 'definite and concrete, not hypothetical or abstract.'" *Clark v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018).

EA has not entered into a contract with a single student-athlete for use of their NIL, developed its new college football game using student-athletes' NILs, or released, let alone sold, a single copy of the new college football game (nor will it for at least another year).  *See supra* Section I.  BrandR therefore cannot establish the first element of a common law right of publicity claim: that EA actually used any student-athletes' NILs.  *See Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 409 (2001).  Relatedly, BrandR cannot show (1) that EA engaged in "knowing use" of the student-athletes' NILs or (2) a connection between the alleged use and the commercial purpose—the two remaining elements of a statutory right of publicity claim.  *See Michaels v. Internet Ent. Group, Inc.*, 5 F. Supp. 2d 823, 837 (C.D. Cal. 1998); *see* Cal. Civ. Code § 3344.  The Court should deny BrandR's TRO as to its right of publicity claims on this basis alone.

## 2. BrandR lacks standing.

Moreover, BrandR lacks standing to assert this claim on behalf of student-athletes—not a single of which has been identified to this Court or EA.  *See* O'Brien Decl. ¶ 16.  When bringing either a common law or statutory right of publicity claim in California, "a plaintiff must first establish that it has standing to pursue said claim." *Fighters Inc., LLC v. Elec. Arts Inc.*, 2009 WL 10699504, at *5 (C.D. Cal. Oct. 30, 2009).  Whether a third party like BrandR has standing to assert a right of publicity claim "depends on the rights granted to the licensee in the license agreement." *Upper Deck Co. v. Panini Am., Inc.* ("*Panini*"), 469 F. Supp. 3d 963, 984 (S.D. Cal. 2020).  As relevant here, the California courts observe that "it is unlikely that a non-exclusive licensee could assert [a right of publicity claim]." *Upper Deck Authenticated, Ltd. v. CPG Direct* ("*CPG Direct*"), 971 F. Supp. 1337, 1349 (S.D. Cal. 1997) (finding plaintiff had no standing to sue for right of publicity claims because it was a nonexclusive licensee); *see also Fighters*, 2009

WL 10699504, at *6-7 (same).  The unsigned template group license agreement between BrandR and student-athletes does not purport to grant BrandR exclusive rights to student-athletes' NILs. *See supra* Section IV.B.2.

BrandR claims that it has standing because the student-athletes assigned their NIL rights. In support of this, BrandR cites its collaboration agreements with **schools**.  Appl. at 14; *see also* Haynes Decl. ¶¶ 6-7 (describing BrandR's GRCAs with 65 colleges or universities).  This is nonsensical, as the collaboration agreements between the schools and BrandR do not assign (exclusively or otherwise) the NIL rights to any student-athlete.  And the authority to which BrandR cites, *Panini*, 469 F. Supp. 3d at 984, is distinguishable.  That case involved an ***exclusive license*** between plaintiff and a single athlete, Michael Jordan, for his NIL, wherein the defendant failed to obtain consent from either Upper Deck or Jordan to use his image in trading cards.  In addition, *Panini* resolved a motion to dismiss, not a TRO.  In contrast, under the terms of BrandR's agreements (*i.e.*, an unsigned Student GLA Template), there is no evidence that student-athletes have assigned their individual NIL rights to BrandR—let alone assigned an exclusive license for those rights.  BrandR therefore lacks standing to assert this claim.  *See Fighters*, 2009 WL 10699504, at *6-7 (denying a preliminary injunction upon finding that plaintiff lacked standing where the record evidence showed that each of the licensors granted a nonexclusive right to NIL, retaining "a right to license his name and likeness to third parties in specific instances").[15]

**D.      The law and facts do not clearly favor BrandR on its UCL claim.**

**1.      Damages are an adequate remedy at law for BrandR's claims.**

As a threshold matter, BrandR's UCL claim fails because BrandR cannot show that it lacks adequate alternative remedies at law.  "[C]ivil causes of action authorized by the UCL . . . must properly be considered equitable, rather than legal, in nature."  *Nationwide Biweekly*

---

[15] BrandR's California state law right of publicity claims separately fail because BrandR purportedly contracts with student-athletes and schools on a nationwide basis.  *See Davis v. Elec. Arts, Inc.*, No. 10-CV-03328-RS, 2017 WL 8948081, at *4 (N.D. Cal. Feb. 2, 2017) ("[I]t is self-evident that plaintiffs suffer injury where the games are sold and/or where they are domiciled" further noting that "[i]t might very well be that a former player living in some state that does not recognize a right of publicity would be entitled to sue in California, under California law, for a misappropriation of his likeness in products sold in California.").

*Admin., Inc. v. Superior Ct. of Alameda Cnty.*, 9 Cal. 5th 279, 326 (Cal. 2020); *see also Williams v. Apple, Inc.*, 2020 WL 6743911, at *9 (N.D. Cal. Nov. 17, 2020) ("[A] federal court cannot grant relief under the UCL . . . if Plaintiffs have an adequate remedy at law.").  Monetary damages are a remedy at law.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Here, monetary damages are an adequate remedy at law for BrandR's claims.  *See supra* Section IV.A.2.  In fact, throughout its papers, BrandR acknowledges that any purported injury suffered can be rectified through damages.  *See infra* Section IV.A; *see also* Appl. at 1 (acknowledging a market price for students' participation in the new college football game), 13 (reference to EA's purported flat rate payment to student-athletes that "is far below fair market value").  Because BrandR has an adequate remedy at law, BrandR cannot establish a likelihood of success on its UCL claim.

### 2.  No unlawful conduct.

Regardless, BrandR's claims fail under each prong of the UCL.  For the reasons stated in Section IV.B, BrandR cannot state a claim for tortious interference—the predicate basis for the "unlawful" prong of the UCL.  The case upon which BrandR relies is therefore inapposite; there, the court found that summary judgment was warranted as to plaintiff's tortious interference with contract claim and, relatedly, its related claim under the UCL.  *Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1017 (C.D. Cal. 2013).[16]

### 3.  No fraudulent conduct.

Nor can BrandR satisfy the second UCL prong sounding in fraud because BrandR fails to meet the heightened pleading standard for such a claim, let alone establish a likelihood of success on the merits.  "UCL . . . claims grounded in fraud are governed by the reasonable consumer test, which requires the plaintiff to show that members of the public are likely to be deceived" by the

---

[16] Further, *Blizzard* is distinguishable on its facts; that case concerned the producer of the online game World of Warcraft ("WoW") and a defendant software company who developed programs to permit players to hack, or cheat, WoW.  28 F. Supp. 3d at 1011.  The Court found that defendant's hacking software "has no other purpose than to engage in game play that is expressly prohibited" by plaintiff's contracts, and that defendant was well aware that the software violated these contracts.  *Id.* at 1016.  In contrast, for the reasons stated above in Section IV.B.2-3, EA's actions do not violate BrandR's contracts with student-athletes or schools, and EA's actions have a separate, legitimate business purpose.

1    defendant's alleged fraudulent statements or omissions.  *Williamson v. McAfee, Inc.*, 2014 WL

2    4220824, at *6 (N.D. Cal. Aug. 22, 2014) (internal quotation marks omitted).  To state a claim

3    under the UCL under the fraud prong, Plaintiffs "must allege 'the who, what, where, and how of

4    the misconduct charged.'  In addition, Plaintiff must plead reasonable reliance on alleged

5    misstatements with particularity by alleging facts "of sufficient specificity," allowing a court to

6    infer that "misrepresentations caused injury to plaintiff[ ] by inducing [him] to pay" for products

7    or services."  *Id.* (cleaned up).

8        Here, citing no evidence, BrandR vaguely argues that EA is engaged in fraudulent conduct

9    by misrepresenting the scope and nature of BrandR's Group Licensing Program to "at least one"

10   school, attempting to induce the school to breach its agreement with BrandR.  *See* Appl. at

11   16.  As such, BrandR has failed to demonstrate that EA has made any actionable statements that

12   rise to the level of a UCL violation under the fraudulent prong.  *See Facebook, Inc. v. BrandTotal*

13   *Ltd.*, 499 F. Supp. 3d 720, 743 (N.D. Cal. 2020) (denying relief as to UCL claim where plaintiff

14   "has shown at most serious issues going to this claim, not a likelihood of success").  Indeed, the

15   sparsity of BrandR's argument under this prong underscores that it has failed to *plead* a UCL

16   claim under this prong—let alone demonstrate likelihood of success.

17       Finally, to the extent BrandR seeks to rely on an email between EA and a school, this

18   document does not show that EA induced the school to breach its agreement with BrandR.  *See*

19   Compl. ¶¶ 76-77; Compl., Ex. 5.  Setting aside that BrandR's agreements with schools do not

20   convey to BrandR individual student-athletes' NILs, *see supra* Section IV.C, nowhere in this

21   email correspondence did EA make any factual misrepresentations regarding BrandR's

22   agreement, let alone "induce" the school to breach it.  Instead, EA correctly advised that "the

23   individual license agreement [with student-athletes] will be directly with EA Sports, not as a part

24   of OneTeam's group license.  By opting into the EA Sports agreement, your student-athlete

25   individually grants NIL rights to EA Sports for our college football video game and not any other

26   OneTeam opportunity."  Compl., Ex. 5 at 2.

27           **4.      No unfair conduct.**

28       The last UCL prong that BrandR alleges is that EA's conduct is unfair, arguing that such

conduct undercuts California's public policy in favor of student-athletes' right to compensation for their NILs.  Appl. at 17.  California courts have articulated two tests to determine unfairness under the UCL: the "balancing test" and the "tethering test," leaving the law in this area "in flux." *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 842-43 (N.D. Cal. 2020).  BrandR's claim fails both tests.

First, under the balancing test, courts consider whether an "unfair business practice" is one that "offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."  *Williamson*, 2014 WL 4220824, at *6.  As an initial matter, BrandR provides no legal support for the proposition that student-athletes in this context are "consumers" within the meaning of the UCL.  Regardless, BrandR's theory that EA will underpay student-athletes for their NILs is pure speculation, since EA has yet to contract with any student-athlete for use of their NIL.  *See* O'Brien Decl. ¶ 13.  BrandR therefore falls far short of demonstrating a likelihood of success under this test.

Second, BrandR's claim fails under the tethering test, because it has not alleged "any harm to competition or violation of the 'letter, policy, or spirit of the antitrust laws.'"  *In re Google Assistant*, 457 F. Supp. 3d at 843.  If anything, it's *BrandR* that is engaging in anticompetitive behavior.  Rather than permit student-athletes to license their NILs with EA, or permit schools to license their Marks and Indicia with EA/CLC, BrandR seeks to interject itself into these negotiations for a slice of the student-athletes' and schools' proceeds.  In doing so, BrandR relies on a baselessly broad interpretation of its purported exclusivity rights, extending them well beyond the rights for which they actually contracted.  Relatedly, forcing student-athletes to bundle their NIL rights together with their schools' Marks and Indicia would lead to less, not more, value for individual student-athletes.  *See* O'Brien Decl. ¶ 12.  At bottom, it is BrandR, not EA, that is limiting the ability of individual student-athletes to license their NILs and

DEFENDANT ELECTRONIC ARTS INC.'S OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION
Case No. 4:23-cv-02994-HSG

1  schools to license their Marks and Indicia.[17]

2      **E.      The balance of equities tips in EA's favor.**

3          Here, the equities favor EA or (at best for BrandR) are neutral.  BrandR's asserted

4  hardships are either speculative or insufficient when compared against the potential harm to EA.

5  The balance of equities requires a court to consider "the interests of all parties and weigh the

6  damage to each." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir.

7  2019).  BrandR first asserts that its "thousands" of contracts and its goodwill and reputation will

8  be harmed because if EA succeeds in directly engaging schools and athletes, other third-parties

9  may too.  Appl. at 17.  Not only do BrandR's contracts explicitly permit individual contracts, but

10  this supposed harm is entirely speculative and redressable, if proven, by monetary damages.

11  BrandR is free to continue to negotiate with other third parties, such as sponsors, regarding its

12  Group Licensing Agreements.

13          Second, BrandR asserts that it would be unreasonable to have to sue partner schools and

14  student-athletes for alleged breach, and that doing so would require BrandR to file in different

15  states based on the choice of law provision in its contracts.  But that is a problem of BrandR's

16  own making.  BrandR should not be allowed to foist the consequences of its own business choices

17  and drafting onto EA, a third-party to those contracts.

18          Moreover, BrandR undersells the potential harm to EA.  BrandR seeks an injunction that

19  is overly broad and could be highly disruptive to EA's business.  *See, e.g.*, Dkt. No. 7-3 (asking

20  the Court to enjoin EA from all "direct[] or indirect[] solicit[ation]" of or "direct[] or indirect[]

21  interfer[ence] with" any BrandR Partner School or unidentified BrandR athlete for the game for

22  an unspecified duration).  As discussed, EA has existing partnerships with CLC and OneTeam

23  regarding a school license and individual student-athlete licenses for the game.  BrandR's

24

25  ─────────────
[17] Finally, to the extent BrandR seeks to enjoin EA's negotiations with student-athletes and
schools outside California, the California courts have held that the UCL does not extend

26  extraterritorially.  *See Norwest Mortgage, Inc. v. Superior Ct.,* 72 Cal. App. 4th 214, 222 (1999)
("[The UCL is not] applicable to claims of non-California residents injured by conduct occurring

27  beyond California's borders"); *see also Badella v. Deniro Mktg. LLC,* 2011 WL 5358400, *11
(N.D. Cal. Nov. 4, 2011) ("[T]he Court recognizes that extraterritorial application of the UCL is

28  improper where non-residents of California raise claims based on conduct that allegedly occurred
outside of the state." (citing *Sullivan v. Oracle Corp.,* 547 F.3d 1177, 1187 (9th Cir. 2008)).

injunction could interfere with those agreements and could potentially delay release of the new game, especially given the tight development timeline.

### F.     An injunction would harm the public interest.

BrandR asserts that granting an injunction is in the public interest because EA's actions amount to "anticompetitive conduct."  Appl. at 22.  But if anything, it is BrandR—not EA—that seeks to restrain student-athletes' ability to contract freely.  BrandR's proposed injunction would frustrate student-athletes' ability to make individual choices regarding whether they want to license their NIL rights and be included in EA's game.  *See Robinson v. Thurston,* 248 F. 420, 424 (9th Cir. 1918) ("[Y]ou have this paramount public policy to consider- that you are not lightly to interfere with this freedom of contract." (quotation omitted)).

BrandR's proposed injunction also would raise a host of other legal and factual issues.  For instance, the injunction does not identify any duration.  And it does not offer any guidance on what "interfering with [BrandR's] contractual rights"—the very issue underlying this dispute—or "soliciting" cover.  As just one example, it would enjoin EA from contracting with CLC for schools' Marks and Indicia—going so far as to give BrandR the right to approve EA's use of school Marks and Indicia, even though BrandR cannot point to any agreement that gives them such rights.  "Because injunctive relief must be tailored to remedy the specific harm alleged, an overbroad injunction is an abuse of discretion."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009) (cleaned up).

## V.     CONCLUSION

For the foregoing reasons the Court should DENY BrandR's *ex parte* application for a TRO and preliminary injunction.

Dated:  June 27, 2023

KEKER, VAN NEST & PETERS LLP

By:   */s/ R. James Slaughter*
R. JAMES SLAUGHTER
R. ADAM LAURIDSEN
CANDICE MAI KHANH NGUYEN
LUIS G. HOYOS

Attorneys for Defendant ELECTRONIC ARTS INC.

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTESTATION UNDER CIVIL LOCAL RULE 5-1**

Pursuant to Local Rule 5-1(h)(3), I attest that concurrence in the filing of the document has been obtained from each of the other signatories.


Dated: June 27, 2023                                  */s/ R. James Slaughter*
                                                      R. JAMES SLAUGHTER
                                                      Attorney for Defendant ELECTRONIC ARTS INC.