KEKER, VAN NEST & PETERS LLP
R. JAMES SLAUGHTER - #192813
rslaughter@keker.com
R. ADAM LAURIDSEN - # 243780
alauridsen@keker.com
CANDICE MAI KHANH NGUYEN - # 329881
cnguyen@keker.com
LUIS G. HOYOS - # 313019
lhoyos@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant ELECTRONIC ARTS INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BRANDR GROUP, LLC<br><br>    Plaintiff,<br><br>    v.<br><br>ELECTRONIC ARTS INC., and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No. 4:23-cv-02994-HSG<br><br>**DECLARATION OF CORY Z. MOSS IN SUPPORT OF DEFENDANT ELECTRONIC ARTS INC.'S OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>[Removed from San Mateo Superior Court, Case No. 23-CIV-2715]<br><br>Date Removed: June 20, 2023 |

I, Cory Z. Moss, declare as follows:

1. I am not a party to this action and am over the age of 18 years. Unless otherwise stated, I have personal knowledge of the information set forth in this declaration, each of which is true.

2. I am the President of Collegiate Licensing Company, LLC ("CLC"). CLC is the largest and oldest collegiate licensing company in the United States and currently provides its services to more than 700 colleges and universities, athletic conferences, bowl games, the Heisman Trophy, and the NCAA (collectively, "Clients").

3. CLC is the exclusive trademark product licensing agent for its Clients and licenses the names, trademarks, service marks, logos, colors and other identifying indicia (the "Marks and Indicia") of its Clients to licensees who desire to produce, distribute and sell consumer products incorporating the Marks and Indicia.

4. CLC, on its Clients' behalf, negotiates and executes agreements with licensees through which licensees may be granted the rights to use the Marks and Indicia of multiple Clients on certain types of consumer products within a single license agreement. CLC processes licensing applications from licensees to its Clients, who have the sole discretion of whether to approve or deny such applications.

5. CLC does not represent any student-athletes and does not license rights to the names, images or likeness ("NILs") of any student-athletes, either through individual agreements with student-athletes or through agreements with schools.

6. In 2020, Paul Cairns and Sean O'Brien from Electronic Arts Inc. ("EA") reached out to me to discuss licensing the various Marks and Indicia of FBS and FCS schools for use in a new college football game. Mr. O'Brien told me that EA was in the early stages of planning the new college football game and that it was interested in licensing the Marks and Indicia of FBS and FCS schools. I know that the development process for a sophisticated sports game like the ones EA publishes can take years, so I was not surprised that Mr. O'Brien was reaching out well in advance of the new college football game's potential release, which I understand will take place in or around the summer of 2024. In February 2021, EA and CLC announced that EA

would be releasing a new college football game, utilizing schools' Marks and Indicia licensed from CLC, as with prior *NCAA Football* games.

7. After the discussion with Mr. O'Brien, CLC began the process of communicating with FBS schools about whether they would like to opt into a CLC-EA license for the use of their Marks and Indicia in the new college football game. The process of rendering realistic game-elements (such as jerseys, stadiums, and fight songs) using the Marks and Indicia licensed from CLC is a complicated and time-consuming process, so I was not surprised that EA was starting the process early.

8. Because the process of rendering those game elements can be so time-consuming, to ensure adequate lead-time for effective game development, EA and CLC encouraged schools to notify CLC by June 30 of this year if they had any interest in participating in the new college football game so that EA could begin development work. To be clear, EA never communicated the June 30 date as a deadline by which schools had to approve participation in the game. CLC encouraged its Clients to indicate their interest (or lack thereof) by June 30 so that CLC and EA could get a sense for the overall interest in a college game. It has always been anticipated that schools could opt-in (or opt out) after that date.

9. I have read paragraph 31 of the June 22, 2023 declaration of Wesley Haynes, where he says "based upon reports to TBG by multiple Partner Schools, EA is pressuring schools who have not yet opted into the Game to approve their participation in the Game by June 30, 2023." CLC has not pressured any school to participate in the new college football game and has not set any deadlines by which schools have to opt-in to the licensing program for the game. CLC merely set June 30 as a target date for its Clients to respond. Clients may still opt in (or out, if they so choose) after June 30, 2023. Additionally, whether Clients opt-in before or after June 30, 2023 has no relevance to whether student-athletes' NILs are included in the game. Similarly, no rights that EA obtains from CLC for any school's Marks and Indicia are contingent upon EA also receiving NIL rights from any student-athletes.

10. To the best of my knowledge, the only offers made with respect to the new college football game are those made by EA to schools, which CLC communicated to its Clients. Also, to

the best of my knowledge, no offers have been extended yet to any student-athletes.

11. I have read the agreement between the Brandr Group ("Brandr") and Michigan State University ("MSU") attached to Mr. Haynes declaration. I note that the exclusivity granted to the Brandr Group merely provides that MSU will not "engage any other third party… to develop, implement or manage" a "Group Licensing Program among its current Athletes." I note further that the agreement purports to define Group Licensing Program as a "program[] in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more Athletes from any one specific sport or six (6) or more Athletes from multiple sports *in combination* with University trademarks" (emphasis added). In other words, MSU agrees that it will not hire a competitor to Brandr to market a bundled combination of multiple students' NIL rights together with MSU's Marks and Indicia. To the best of my knowledge, MSU has not violated this provision. The agreement between Brandr and MSU does not prohibit MSU from granting its Marks and Indicia to a product, such as a video game, that involves multiple student-athletes, so long as MSU didn't hire a third party to obtain rights for use in the video game on MSU's behalf.

12. CLC does not represent student-athletes and does not purport to bundle the NIL rights of student-athletes together with the Marks and Indicia of schools. Instead, CLC represents schools and licenses their Marks and Indicia. To the extent that EA or some other entity wishes to license the NILs of student-athletes, EA would have to license those rights from the student-athletes themselves, not through CLC.

13. Nothing in the Brandr/MSU agreement prevents CLC from continuing its current licensing practices. To the contrary, BrandR acknowledges in the agreement that CLC ("MSU's third-party licensing agency" referenced therein) remains MSU's agent with respect to using MSU's official marks and logos.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on June 26, 2023 in San Diego, California.

*/s/ Cory Z. Moss*
Cory Z. Moss