UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BRANDR GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ELECTRONIC ARTS INC.,<br><br>Defendant. | Case No. 23-cv-02994-HSG<br><br>**ORDER DENYING APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>Re: Dkt. No. 7 |

Pending before the Court is Plaintiff The Brandr Group, LLC's application for a temporary restraining order. The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the reasons detailed below, the Court **DENIES** the application.

**I.   BACKGROUND**

On June 20, 2023, Defendant Electronic Arts Inc. removed this action from San Mateo Superior Court. Dkt. No. 1. In the complaint, Plaintiff alleges that Defendant is interfering with its contractual relationship with certain colleges and their student athletes by soliciting them to participate in Defendant's upcoming *EA Sports College Football* video game. Dkt. No. 1-1, Ex. 1 ("Compl."). Plaintiff states that it has become a leader in the "collegiate group licensing" industry since 2021 when the National Collegiate Athletic Association ("NCAA") permitted student athletes to be compensated for the use of their own name, image, and likeness ("NIL"). *Id.* at ¶¶ 2–3, 23–26; *see also Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2160–2166 (2021); *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1057–79 (9th Cir. 2015). As relevant here, Plaintiff further contends that it has entered into exclusive "Group Rights Licensing Agreements" with multiple colleges and their football players "to facilitate co-branding

1  experiences" for them. *See, e.g.*, Compl. at ¶¶ 8, 19–20, 27–48. Under these agreements, Plaintiff urges that entities such as Defendant must negotiate directly with or otherwise obtain consent from Plaintiff to use the NIL of three or more student athletes from one specific sport or six or more student athletes from multiple sports in combination with a school's intellectual property (*e.g.*, the school's brand, logos, stadiums, mascots, or fight songs). *See id.* at ¶¶ 27–48, 61, 86, 91, 141–42, 155–56, 176. Plaintiff does not consent to the licensing of its clients' IP or NIL, and suggests that Defendant is misleading schools and students about their contractual obligations. *See id.* at ¶¶ 81–82, 89, 92–93, 95, 130, 149, 163. Plaintiff further alleges that it has heard from its partner schools that Defendant is "pressuring" schools who have not yet opted into the video game to do so by June 30, 2023. *See id.* at ¶¶ 92, 81–82, 120.

Based on these facts, Plaintiff brings causes of action for (1) tortious interference with contract; (2) violation of California's statutory right of publicity, California Civil Code § 3344; (3) violation of the common law right of publicity; (4) violation of California's Unfair Competition Law ("UCL"), Business and Professions Code §§ 17200, *et seq.*; and (5) declaratory relief. *Id.* at ¶¶ 125–179.

On June 22, 2023, Plaintiff filed an application for a temporary restraining order ("TRO"). Dkt. No. 7. Plaintiff argues that such emergency relief is necessary at the outset of this litigation because Defendant has imposed an artificial deadline of June 30, 2023, for schools to enter into agreements to participate in the upcoming video game. *See id.* at 1, 8, 19. Doing so, Plaintiff asserts, wrongfully cuts Plaintiff out of the negotiation process and threatens to drive it out of business entirely. *Id.* at 19–22. Plaintiff accordingly seeks to enjoin Defendant from (1) directly or indirectly soliciting Plaintiff's (as yet unidentified) clients for their participation in the video game; (2) directly or indirectly interfering with Plaintiff's contractual rights under its Collaboration Agreements and Group Licensing Authorization and Assignment Agreements; and (3) directly or indirectly using, appropriating, or incorporating the NIL of Plaintiff's clients without Plaintiff's express authorization and consent. *Id.* at 1–2. Defendant opposes the requested issuance of a TRO. *See* Dkt. No. 16.

//

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 65, a temporary restraining order may enjoin conduct pending a hearing on a preliminary injunction. *See* Fed. R. Civ. P. 65(b). The standard for issuing a temporary restraining order and issuing a preliminary injunction are substantially identical. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839, n.7 (9th Cir. 2001). A plaintiff seeking preliminary relief must establish: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. A court must find that "a certain threshold showing" is made on each of the four required elements. *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011). Under the Ninth Circuit's sliding scale approach, a preliminary injunction may issue if there are "serious questions going to the merits" if "a hardship balance [also] tips sharply towards the [movant]," and "so long as the [movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## III. DISCUSSION

Plaintiff asserts that it meets all four requirements for a TRO because Defendant "brazenly violated [its] rights" by encouraging schools to enter into agreements with Defendant by June 30, 2023, to participate in the video game, and "threatening that they will be excluded from the highly anticipated game if they do not comply" by then. *See* Dkt. No. 7 at 1. The Court finds that Plaintiff has not established that such an "extraordinary remedy" is warranted in this case.

### A. Irreparable Harm

As an initial matter, Plaintiff has not shown that it is likely to suffer any immediate or irreparable harm absent a TRO. A TRO is intended to preserve the status quo and prevent irreparable harm until a hearing can be held on a preliminary injunction. *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) ("[A] TRO should be restricted to . . .

3

1   preserving the status quo and preventing irreparable harm just so long as is necessary to hold a
2   hearing and no longer." (quotation omitted)); *see also* Fed. R. Civ P. 65(b).  But Plaintiff has not
3   shown the immediacy of any alleged harm if the Court does not grant it interim relief.  *See*
4   *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("[A] plaintiff must
5   demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.").

6         In its application, Plaintiff contends that absent a TRO, Defendant will continue to
7   interfere with its contractual agreements with colleges and student athletes.  Specifically, Plaintiff
8   states that Defendant has given schools an "artificial June 30 deadline" to sign an agreement to
9   participate in the video game.  *See* Dkt. No. 7 at 1, 18–19.  Thus, Plaintiff reasons, more schools
10  may enter into agreements with Defendant given this time pressure and the risk of missing an
11  opportunity to participate in the video game.  *Id.*  Plaintiff further suggests that after this June 30
12  date, Defendant "will turn its focus to signing [its] Client Athletes." *Id.* at 19.  Plaintiff offers
13  little support for these suppositions.  In a declaration, the President of The Brandr Group simply
14  states that he learned of this June 30 deadline "based upon reports to [Plaintiff] by multiple Partner
15  Schools . . . ." Dkt. No. 7-1 ("Haynes Decl.") at ¶ 31.

16        However, in its opposition, Defendant clarifies that the June 30 date is not a deadline at all.
17  *See* Dkt. No. 16-3 ("Moss Decl.") at ¶ 8; Dkt. No. 16-1 ("O'Brien Decl.") at ¶ 15.  Instead, it is "a
18  target date" for schools to indicate their interest in being a part of the game to allow game
19  designers ample time to render the schools' intellectual property—such as the stadiums and
20  jerseys—as realistically as possible.  *See id.*  Schools may still opt in or opt out after this June 30
21  date.  *Id.*  And even if this date puts some pressure on schools, the game itself is intended to be
22  based on the 2024 football season, and Defendant does not anticipate releasing the game until
23  summer 2024.  *See* O'Brien Decl. at ¶¶ 6, 13.  Moreover, Plaintiff's theory of liability turns on
24  Defendant soliciting both colleges *and* students for the video game.  But Defendant has not
25  reached out to any student athletes to participate in the game yet.  *See id.* at ¶ 13.  Because schools
26  generally do not set their rosters until spring, Defendant anticipates that it likely will not identify
27  eligible students until 2024.  *Id.*  Given this runway, Plaintiff has not demonstrated the threat of
28  any immediate harm.

1    Even putting aside such immediacy problems, Plaintiff has not demonstrated any
2    likelihood of irreparable harm either.  Mere financial injury "will not constitute irreparable harm if
3    adequate compensatory relief will be available in the course of litigation." *Goldie's Bookstore,*
4    *Inc. v. Superior Court*, 739 F.2d 466, 471 (9th Cir. 1984) (concluding that plaintiff's harm would
5    be easily calculable in damages); *see Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility
6    that adequate compensatory or other corrective relief will be available at a later date, in the
7    ordinary course of litigation, weighs heavily against a claim of irreparable harm.").  For these
8    reasons, preliminary injunctions are rarely issued for breach of contract claims.  *See Telephia Inc.*
9    *v. Cuppy*, No. C 04-03508 SI, 2005 WL 588441, at *3 (N.D. Cal. Mar. 11, 2005) ("[A] claim for
10   breach of contract can be compensated by money damages, and does not warrant the issuance of a
11   preliminary injunction."); *ConWest Res., Inc. v. Playtime Novelties, Inc.*, No. C 06-5304 SBA,
12   2006 WL 3346226, at *8 (N.D. Cal. Nov. 17, 2006) ("[A] preliminary injunction will not issue
13   based on a breach of contract claim.").

14   Here, the Court finds that Plaintiff's alleged injuries are monetarily compensable and
15   otherwise speculative.  Although Plaintiff asserts that Defendant is interfering with its contractual
16   rights with certain schools and student athletes, it provides little explanation as to why—even if
17   true—any resulting harm is irreparable.  Dkt. No. 7 at 18–22.

18   At the outset, Plaintiff appears to suggest that a TRO or preliminary injunction is
19   appropriate any time there is an alleged breach of contract or tortious interference claim.  *See id.* at
20   19 (arguing that injunctions are appropriate to "restrain[] continued interference").  As noted
21   above, however, courts generally find such claims to be compensable by monetary damages such
22   that preliminary injunctions are unwarranted.  *See, e.g.*, *Telephia*, 2005 WL 588441, at *3;
23   *ConWest*, 2006 WL 3346226, at *8.  Plaintiff makes no effort to explain why alleged harms
24   stemming from tortious interference are inherently irreparable.  Instead, Plaintiff cites a decades-
25   old case from the California Supreme Court, *Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 34 (Cal.
26   1941).  The case is inapposite.

27   In *Imperial Ice*, the California Supreme Court addressed a dispute between competing ice
28   companies.  S.L. Coker entered into a covenant not to compete with the plaintiff, agreeing that he

1    would not sell ice in Santa Monica.  *Id.* at 34–35.  Despite this agreement, a third-party

2    company—owned by Messrs. Rossier and Matheson—supplied Mr. Coker with ice, who then sold

3    it in Santa Monica.  *Id.*  The plaintiff sought an injunction to prevent Mr. Coker from violating his

4    agreement and to prevent Messrs. Rossier and Matheson from inducing Mr. Coker to violate his

5    agreement.  *Id.*  The case did not involve a request for a TRO or preliminary injunction at all.

6    Rather, the court simply recognized a common law tortious interference claim.  *Id.* at 38–39 ("In

7    California . . . an action will lie for unjustifiably inducing a breach of contract.").  The court

8    explained that "[c]ontractual stability is generally accepted as of greater importance than

9    competitive freedom."  *Id.* at 36.

10   Plaintiff urges that the Ninth Circuit in *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180,

11   1187 (9th Cir. 2022), recognized that preliminary injunctions are appropriate to prevent continuing

12   contractual interference.  *See* Dkt. No. 7 at 19.  But as explained in more detail below, the Ninth

13   Circuit did not adopt a uniform rule that preliminary injunctions are always appropriate when the

14   plaintiff brings such claims.  Rather, the Court engaged in a detailed analysis of the four *Winter*

15   factors—including irreparable harm—to determine whether a preliminary injunction was

16   appropriate.  *See hiQ Labs*, 31 F.4th at  1188–1202.

17   Plaintiff also asserts that because this case arises from the "unauthorized" use of student

18   athletes' NILs, "irreparable harm is established."  *See* Dkt. No. 7 at 20.  But Plaintiff fails to show

19   that any such categorical rule exists.  The only authority Plaintiff cites is a single non-binding

20   district court case regarding the intellectual property rights of the estate of Christopher Wallace,

21   professionally known as Notorious B.I.G.  *See Notorious B.I.G. LLC v. Yes. Snowboards*, No.

22   LACV1901946JAKKSX, 2022 WL 2784808, at *9 (C.D. Cal. June 3, 2022).  In that case, the

23   court analyzed all the *Winter* factors to determine whether a preliminary injunction was

24   appropriate.  *See id.* at *3–10.  The plaintiff had licensed the exclusive right to manufacture and

25   sell various products with Wallace's NIL, such as apparel and posters.  *Id.* at *1–2.  The pro se

26   defendant was a professional photographer who sold his own posters, prints, and NFTs with

27   Wallace's NIL without a license.  *Id.*  The plaintiff argued that defendant's sales diminished the

28   value of its exclusive rights and its business, which it had built over the course of twenty years.

*Id.* The court explained that such injuries were financial and thus not irreparable. *Id.* *9. However, the court concluded that the plaintiff had provided sufficient evidence that it had carefully curated "Wallace's legacy and the reputation of the Wallace brand" over the years, and this brand was put at risk due to the defendant's conduct. *See id.* The court did not detail how the defendant's conduct would have harmed the Wallace legacy and brand, or by extension the plaintiff's rights, if not enjoined. *Id.* at *9–10.

But even if the Court found this reasoning persuasive, such concerns are not implicated here. There is simply no evidence in the record that the value of the students' NILs would be diminished by their use in the game. To the contrary, Plaintiff devotes substantial space in the complaint to explaining the popularity of Defendant's video games and the desire of athletes and schools to participate in them. *See, e.g.*, Compl. at ¶ 6 ("The Game presents an exciting opportunity for young college football players to participate in what has historically been a tremendously popular and successful video game . . . ."); *id.* at ¶ 82 ("[S]chools do not want to miss out on the opportunity for its student-athletes to participate in the Game."). Plaintiff had also previously engaged in discussions with Defendant about the game. *See id.* at ¶¶ 10–11, 65–71.

Moreover, unlike the plaintiff in *Notorious B.I.G.*, Plaintiff has not established that it actually has an exclusive right to either the schools' IP or the students' NILs. As Defendant explains, and Plaintiff's application does not contest, the Collegiate Licensing Company ("CLC") is the exclusive licensing agency for over 700 schools. *See* Dkt. No. 7-3 ("Moss Decl.") at ¶¶ 2–3. As such, CLC negotiates and executes agreements to license its schools' IP. *Id.* at ¶ 4. Plaintiff's agreement with schools (entitled the "Group Rights Collaboration Agreement") does not grant Plaintiff the right to use or license any of the schools' IP. *See* Dkt. No. 7-4, Ex. 2 at 40–42. Rather, Plaintiff and the schools simply "agree to work in collaboration to make available a Group Licensing Program . . . ." *Id.* at 40. And as part of this program, the schools through their "third-party licensing agency" will also make their IP "available for use in the Program at market rates for co-branded products." *Id.* at 41. The sample student agreement that Plaintiff provides (entitled "Current Student-Athlete Group Licensing Authorization & Assignment") also explicitly states that "this agreement does <u>not</u> restrict or prevent any of [a student's] existing or future, individual

NIL agreements." *See* Dkt. No. 7-4, Ex. 1 at 37 (emphasis in original).[1]  Nor does it "restrict any of [a student's] existing group NIL agreements nor any future NIL agreements that do not also include the university's co-branded IP." *Id.*

What appears to be at stake here, then, is simply the possible monetary benefit that Plaintiff could receive from creating co-branding licensing opportunities that package a school's IP and students' NIL rights together.  Plaintiff attempts to couch the loss of this co-branding opportunity as irreparable harm.  But this too falls short.

For example, Plaintiff suggests that it will suffer irreparable harm from "the lost opportunity to negotiate fair compensation" for use of its student athletes' NILs in the video game.[2]  *See* Dkt. No. 7 at 20.  More specifically, Plaintiff points out that it "is entitled to a percentage of the Client Athletes' proceeds, specifically from Group Licensing Programs involving video games," and repeatedly asserts that Defendant is not planning to pay a fair market rate for use of students' NILs.  *Id.*; *see also* Compl. at ¶¶ 11, 99, 101.  Plaintiff further alleges that it "is well-positioned to influence the amount of compensation to be paid by [Defendant] to not only its Client Athletes, but to all other student-athletes who may wish to participate in the Game." Compl. at ¶ 114.  However, Plaintiff argues that absent a TRO, Defendant "will have free reign to solicit [Plaintiff's] Partner Schools and Client Athletes for their participation in the Game in direct violation of [Plaintiff's] Group Licensing rights . . . ." Dkt. No. 7 at 19.  Setting aside for now whether Defendant is actually engaged in a "Group Licensing Program," Plaintiff at least argues that it will not be properly compensated if Defendant continues soliciting schools or their student athletes to participate in the video game.

Although Plaintiff has arguably identified potential harm that it will suffer from its exclusion from the game negotiations, this does not constitute *irreparable* harm.  *See Sampson*, 415 U.S. at 90 ("The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are

---

[1] For ease of reference, the Court refers to the PDF pagination for exhibits unless otherwise noted.
[2] To the extent Plaintiff suggests that the Court should consider the financial or reputational harm to student athletes, *see* Dkt. No. 7 at 20, that type of alleged harm to third parties is not relevant to whether *Plaintiff* has shown that it is likely to suffer irreparable injury.

8

not enough."). Any purported damage from the schools' and students' participation in the game, or the undervaluing of their NILs (and Plaintiff's resulting payment), appears entirely compensable. Plaintiff can estimate the fair market value for using the NILs in the game, as well as the amount of money Plaintiff would have been entitled to from the game if it had vigorously represented its clients as it wants to do here.

Lastly, Plaintiff suggests that Defendant's conduct threatens the continuing value of its own contractual rights. *See* Dkt. No. 7 at 19–21. According to Plaintiff, Defendant's negotiations "if left unchecked, threaten[] to diminish, if not completely destroy, [Plaintiff's] exclusive group license for video games for its school partners and their players." *Id.* at 21. Additionally, Plaintiff contends that Defendant's conduct could have "a far-reaching impact" because it could set a precedent for Defendant and other prospective licensees to disregard Plaintiff's contractual rights. *Id.* at 19. In other words, Plaintiff suggests that the alleged interference with one agreement could implicate all its current and future agreements. If such extrapolation were enough on its own, any breach of contract claim could establish irreparable harm for purposes of a TRO or preliminary injunction. The Court is not aware of any case that stands for such a sweeping proposition. Plaintiff also offers no support for its theory that such harm is likely here.

As the Ninth Circuit has cautioned, "[s]peculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007). Plaintiff argues that it may be driven out of business by or lose goodwill because of Defendant's conduct. In a single sentence, Plaintiff concludes that "there is a threat that [Defendant's] misconduct will spill over into [its] other businesses." *See* Dkt. No. 7 at 22. In support of this assertion, Plaintiff cites to the declaration from the President of The Brandr Group who simply says the company has "developed a strong reputation as a leader in facilitating Collegiate Group Licensing Programs . . . ." Haynes Decl. at ¶ 43. Far from demonstrating the likelihood of irreparable harm, Mr. Haynes declaration appears to highlight the strength, breadth, and resilience of Plaintiff's business. The sample student agreement that Plaintiff attaches to the complaint further underscores this, noting that Plaintiff "works on behalf of many former college athletes," "represents groups of players through the NFLPA, NBPA and MLBPA," "created a collegiate

group rights programs for retired NBA players," and "has done projects for the US Women's National Soccer Team." *See* Dkt. No. 7-4, Ex. 1 at 36.

Plaintiff has not provided any support for the idea that Defendant's conduct will affect its ability to enter into other group licensing ventures with its college and student athlete clients or that it will have any effect on other aspects of its business. The Court agrees with Defendant that at most, Plaintiff has identified "the loss of a single opportunity for [Plaintiff] to license the NILs of student-athletes and Marks and Indicia of schools together for a single unreleased video game." Dkt. No. 16 at 12. This does not constitute irreparable harm.

Plaintiff's own authorities highlight the inadequacy of Plaintiff's irreparable harm showing here. In *hiQ Labs*, the Ninth Circuit upheld a preliminary injunction which prohibited LinkedIn from denying hiQ Labs, a data analytics company, access to publicly available data from LinkedIn member profiles. 31 F.4th at 1184–85. HiQ Labs would scrape this user data—such as name, job title, work history, and skills—to create "people analytics," which it sold to business clients. *Id.* at 1187. LinkedIn sent hiQ Labs a cease-and-desist letter, and hiQ eventually sought a preliminary injunction in federal court to preclude LinkedIn from blocking it from accessing the user data. *Id.* at 1187–88. In evaluating irreparable harm, the Ninth Circuit explained that the "[t]he threat of being driven out of business is sufficient to establish irreparable harm." *Id.* at 1188 (quotation omitted). In finding such harm, the Court credited hiQ Labs' explanation that scraping data from LinkedIn was its entire business, there was no viable alternative to this data, and hiQ Labs would not be able to fulfill its current agreements with its business clients without this data. *Id.* at 1189. The CEO further explained that its financing stalled and employees had left the company given the uncertainty of the business's future in light of the lawsuit. *Id.* Plaintiff, in contrast, has made no effort to explain how it could be driven out of business. Nothing in the record before the Court suggests that its entire business model somehow depends on brokering a deal related to a single video game.

Plaintiff's failure to demonstrate irreparable harm is fatal to its application for a TRO. *See, e.g.*, *Amylin Pharms., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011) ("Because Amylin has failed to carry its burden of showing a likelihood of irreparable harm, we need not

address the remaining factors necessary for injunctive relief.").³

**B.     Likelihood of Success on the Merits**

Even assuming Plaintiff could establish some showing of irreparable harm, it has not shown a likelihood of success on the merits, or serious questions going to the merits, of its claims. All Plaintiff's claims turn on the theory that it has contractual agreements with certain schools and student athletes to manage their "Group Licensing Programs." *See* Dkt. No. 7 at 11–17. Plaintiff further contends that Defendant's video game, which may include both school IP and student NILs, implicates these contractual agreements. Considering the plain language of the sample agreements that Plaintiff provides, Plaintiff appears to overstate the scope of its rights and the reach of these agreements.

*First*, Plaintiff points to a sample collaboration agreement with Michigan State University. Under this agreement the school acknowledges that it "intends to make available a Group Licensing Program for its current student-athletes in conjunction with the University's official marks, logos or other intellectual property." *See* Dkt. No. 7-4, Ex. 2 at 40. As explained above, Plaintiff and the schools therefore "agree to work in collaboration to make available a group Licensing Program . . . ." *Id.* Under the collaboration agreement, the school further:

> recognizes TBG as [the University's] exclusive agent to develop, implement and manage the Group Licensing Program among its current Athletes. During such time, [the University] shall not engage any other third party, without the express written consent of TBG, to develop, implement or manage any similar program involving a group of any size of current or former [University] Athletes.

*Id.* at 42. "Group Licensing Program," in turn, is defined as "those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more current [University] Athletes from one sport or six (6) or more from multiple sports, in combination with University trademarks and logos." *Id.* at 40–41.

*Second*, Plaintiff's sample group licensing agreement with student athletes reads in

---

³ As an unpublished Ninth Circuit decision, *Amylin* is not precedent, but may be considered for its persuasive value. *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

relevant part:

> The undersigned, an Athlete enrolled at [the University], hereby grants and assigns to TBG and its licensing affiliates during the term only of this Agreement, the worldwide right to use and to grant to licensees and sponsors the right to use all or any combination of the undersigned's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature (collectively known as "Athlete Attributes") in *Collegiate Group Licensing Programs* of any kind.

Dkt. No. 7-4, Ex. 1 at 36 (emphasis added). The agreement defines "Group Licensing Agreement" as it does in the school collaboration agreement. *See id.*

At bottom, the parties dispute the meaning of "Group Licensing Program" and its application to Defendant's licensing efforts for its video game. At least under California law,[4] when interpreting contracts, the overarching goal is to effectuate the parties' intent. Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting."). The plain language governs. Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit."); *see also* Cal. Civ. Code § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible."). However, "[i]f the terms . . . are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." *See id.* at § 1649. Therefore, when interpreting a contract, the Court must first determine whether its language is ambiguous or reasonably susceptible to more than one interpretation.

Plaintiff, for its part, seems to simply assume that Defendant's conduct is covered because it intends to use schools' IP and more than three students' NILs in the same game. *See, e.g.*, Dkt. No. 7 at 12 (noting that the game would "feature whole teams of collegiate football programs"). Critically, it does not explain why provisions about group licensing programs would be implicated by separate license agreements between Defendant and the schools on the one hand and Defendant

---

[4] Plaintiff notes that "[g]enerally, each agreement provides that it is governed by the law of the state where the respective Partner School is located." *See* Dkt. No. 7 at 18.

and individual students on the other. Even if the IP and NILs are used in the same game, the record suggests that such rights are not licensed together, nor are they apparently contingent on each other. Defendant explains that "whether or not a school opts in by June 30 will have no effect on whether any student-athlete from that school is also included in the game." *See* O'Brien Decl. at ¶ 15.

The agreements explicitly define a Group Licensing Program as "*licensing or sponsorship programs* in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more current [University] Athletes from one sport or six (6) or more from multiple sports, *in combination with University trademarks and logos*." *Id.* at 40–41 (emphasis added). Plaintiff's rights are therefore only implicated when licensing or sponsoring programs use both student NILs and school IP. Neither the agreements nor the parties directly explain what constitutes a "licensing or sponsorship program." The surrounding language, however, provides context.

The student agreements, for example, state that "[t]he focus of the Collegiate Group Licensing Programs will be co-branded licensing opportunities involving groups of Athletes' NIL along with [the University's] IP." *See* Dkt. No. 7-4, Ex. 1 at 36. They further provide that Plaintiff shall represent a student athlete's "*group NIL rights* only in any *co-branded licensing* that also includes the University's IP." *Id.* at 37 (emphasis added). Licensing programs therefore appear to require "co-branded licensing opportunities" where the rights of schools and students are licensed together. In keeping with this narrow definition, the student group licensing agreements also explicitly state that "this Agreement does NOT limit an Athlete's right to grant the use of his/her individual Athlete Attributes or individual NIL for publicity, advertising, or other commercial purposes . . . ." *Id.* Nor does it "limit the Athlete's right to join with other Athletes to grant the group use of their NIL for publicity, advertising or other commercial purposes *IF any such other group NIL grant does not involve any use or co-branding* of any kind of [the University's] own IP or property (such as trademarks, logos, jerseys, names, nicknames, etc.)." *Id.* (emphasis added).

Here, even as alleged, Defendant is not obtaining group NIL grants or co-branded licenses. It is explicitly licensing with colleges and students separately. The Court understands that

Plaintiff believes "that there is significant value to athletes when [licensing] negotiations are handled as a group." Dkt. No. 7 at 17–18. But this purported value cannot overcome the plain language of the agreements at issue in this case. There is simply nothing in the record before the Court suggesting that schools and students must coordinate the licensing of their rights together and with the help of Plaintiff. Plaintiff bears the burden of making a "clear showing" that it is entitled to a TRO, but it has failed to establish that such extraordinary relief is warranted here. *See Winter*, 555 U.S. at 20.

## IV. CONCLUSION

Accordingly, the Court **DENIES** the application for temporary restraining order. The Court further **ADVANCES** the telephonic case management conference to August 15, 2023. The parties shall submit a joint case management statement by August 8, 2023.

**IT IS SO ORDERED.**

Dated: 6/30/2023

*/s/ Haywood S. Gilliam, Jr.*
HAYWOOD S. GILLIAM, JR.
United States District Judge

14