Christopher D. Beatty (SBN 266466)
chris.beatty@katten.com
Ashley T. Brines (SBN 322988)
ashley.brines@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: 310.788.4400
Facsimile: 310.788.4471

Richard L. Farley (admitted *pro hac vice*)
Richard.farley@katten.com
Lindsey L. Smith (admitted *pro hac vice*)
lindsey.smith@katten.com
Kelsey R. Panizzolo (admitted *pro hac vice*)
Kelsey.panizzolo@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
500 S. Tryon Street, Suite 2900
Charlotte, NC 28202-4213
Telephone: 704.344.3178

Attorneys for Plaintiff
The BrandR Group, LLC

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| The BrandR Group, LLC,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>Electronic Arts, Inc., and DOES 1 through 10, inclusive,<br><br>　　　　　Defendants, | Case No. 4:23-cv-02994-HSG<br><br>Honorable Haywood S. Gilliam<br><br>**PLAINTIFF THE BRANDR GROUP, LLC'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STAY DISCOVERY**<br><br>Date: October 19, 2023<br>Time: 2:00 p.m.<br>Place: Courtroom 2 – 4th Floor<br><br>State Court Action Filed: June 16, 2023<br>Date of Removal: June 20, 2023 |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................... 1

II. FACTUAL AND PROCEDURAL BACKGROUND ..................................... 2

    A. TBG's Group Rights Licensing Agreements ....................................... 2

    B. EA Sports and the Game ........................................................................ 5

    C. Procedural History .................................................................................. 6

III. EA'S MOTION TO DISMISS SHOULD BE DENIED AS MOOT ............... 7

IV. EA'S MOTION TO STAY SHOULD BE DENIED ..................................... 8

    A. Legal Standard ........................................................................................ 8

    B. Argument ................................................................................................. 9

V. CONCLUSION ....................................................................................................... 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. AllianceOne, Inc.*,
    No. 08-CV-0248 JAH (LSP), 2008 WL 11336721 (S.D. Cal. Oct. 22, 2008) ........................8, 9

*Blanco v. Am. Home Mortg. Serv. Inc.*,
    No. CIV. 09–578 WBS DAD, 2009 WL 2171071 (E.D. Cal. July 20, 2009) ..........................7

*Cepeda v. Federal Nat. Mortg. Ass'n*,
    No. 5:13–cv–00388–PSG, 2013 WL 1346676 (N.D. Cal. Apr. 2, 2013) .................................7

*Gray v. First Winthrop Corp.*,
    133 F.R.D. 39 (N.D. Cal. 1990) .............................................................................................8

*In re Nexus 6p Products Liability Litigation*,
    No. 17-cv-02185-BLF, 2017 WL 3581188 (N.D. Cal. Aug. 18, 2017) ..................................8

*Lacey v. Maricopa County*,
    693 F.3d 896 (9th Cir. 2012) .................................................................................................7

*Little v. City of Seattle*,
    863 F.2d 681 (9th Cir. 1988) .................................................................................................8

*Novelposter v. Javitch Canfield Group*,
    No. 13-cv-05186-WHO, 2014 WL 12618174 (N.D. Cal. May 23, 2014) ..............................8

*Onuoha v. Facebook, Inc.*,
    No. 5:16-CV-06440-EJD, 2017 WL 11681325 (N.D. Cal. Apr. 7, 2017) ..............................8

*Pac. Lumber Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
    PA, 220 F.R.D. 349 (N.D. Cal. 2003) ....................................................................................9

*Price v. Synapse Grp., Inc.*,
    No. 16-CV-01524-BAS-BLM, 2016 WL 9344094 (S.D. Cal. Sept. 6, 2016) ........................7

*Saddozai v. Davis*,
    No. 18-05558 BLF (PR), 2020 WL 1955666 (N.D. Cal. Apr. 23, 2020) ............................7, 9

*Tradebay, LLC v. eBay, Inc.*,
    278 F.R.D. 597 (D. Nev. 2011) .............................................................................................8

**Rules**

Fed. R. Civ. Pro. 12(b)(6) ..............................................................................................................8

Fed. R. Civ. Pro. 15(a)(1)(B) .....................................................................................................1, 7

Fed. R. Civ. Pro. 26(c) ...................................................................................................................8

Fed. R. Civ. Pro. 33......................................................................................................................8

## I. INTRODUCTION

EA's Motion to Dismiss and Motion to Stay Discovery is a brazen attempt to steamroll TBG's contractual rights while EA continues to move forward with the development of its popular *NCAA Football* video game[1] to the detriment of TBG and the thousands of student-athletes it represents. Despite its blatant mischaracterization of TBG's Group Licensing Rights[2], EA is well-aware of the Group Licensing process and the intentions of the parties to TBG's contractual Agreements.[3] EA has a long history of recognizing and respecting Group Licensing Rights in the professional sports context, including its *Madden* video game, for which EA contracts with the National Football League ("NFL") Players Association ("NFLPA") for a group license to use NFL players' NIL[4] in the game. EA recognizes and complies with the NFLPA's group licensing rights in connection with the *Madden* game, yet it ignores and pretends that TBG's nearly identical rights under its Agreements do not prohibit the same conduct in connection with the Game. EA cannot feigns ignorance of TBG's Agreements in order to deny student-athletes their desired representation and to pad its own pockets by paying student-athletes an amount far below fair market value for the use of their NIL in the Game.

TBG is confident that the plain language of its Agreements and intentions of the parties to those Agreements support the enforcement of TBG's Group Licensing Rights against EA. Because of EA's attempts to confuse the Court as to the nature of TBG's Group Licensing Rights, pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, TBG files an Amended Complaint

---

[1] On February 2, 2021, EA Sports announced that it was bringing back its popular *NCAA College Football* video game in 2024, to be relaunched as EA Sports College Football. (Amended Compl. ¶ 84.)

[2] Pursuant to its Group Licensing Agreements with FCS and FBS colleges and universities and football players for those schools, TBG has been engaged to act as the exclusive or preferred agent for student-athletes to secure third-party sponsorships and licensing opportunities for Group Licensing Programs – defined as licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes (as defined below) of three (3) or more current athletes from one sport or six (6) or more from multiple sports in combination with school trademarks, logos, and other IP. (Amended Compl. ¶ 8.)

[3] As used herein, "Agreements" refers collectively to the Group Rights Collaboration Agreements between TBG and its Partner Schools (as defined herein) and the Student-Athlete Group Licensing Authorization & Assignment between TBG and Client Athletes (as defined herein).

[4] "NIL" refers to the athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature.

concurrently herewith, to clear up the misconceptions raised by EA about TBG's Agreements. As stated herein, TBG's Amended Complaint renders EA's Motion to Dismiss moot, and EA's Motion to Stay Discovery should be denied so as to avoid further delay to the detriment of TBG and thousands of student-athletes.

For the reasons detailed herein, this Court should dismiss EA's Motion to Dismiss as moot and deny EA's Motion to Stay Discovery.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   TBG's Group Rights Licensing Agreements

Plaintiff TBG is a brand management, marketing, and licensing agency and a leader in the collegiate group licensing industry. Specifically, TBG uses its industry experience and relationships to facilitate co-branding[5] opportunities for student-athletes and their schools. Employing strategic Group Rights Collaboration Agreements ("Collaboration Agreements") entered into between TBG and Partner Schools in combination with Student-Athlete Group Licensing Authorization and Assignment agreements ("GLAs") entered into between TBG and student-athletes, TBG establishes exclusive Group Licensing Rights through which it licenses student-athletes' NIL to third-parties in connection with Group Licensing Programs (as defined herein). As further discussed in its Amended Complaint, TBG holds exclusive or preferred Group Licensing Rights for dozens of FCS and FBS colleges and universities and thousands of football players for these schools. Amended Compl. ¶ 8.

Specifically, as of this date, TBG has entered into Collaboration Agreements with 65 colleges or universities having NCAA football programs ("Partner Schools"), and GLAs with 3,725 related student-athletes ("Client Athletes"). *Id.* ¶ 47. The Collaboration Agreements include a grant of rights to TBG from the schools to manage the Group Licensing Programs. Haynes Decl. ¶ 7.[6] Pursuant to those agreements, Group Licensing Programs are defined as "those licensing or

---

[5]   As used herein, co-branding is the combining of the name, image, likeness, and other intellectual property rights owned by a particular athlete, aggregated with the branding rights from another entity, such as the school for which that athlete competes.

[6]   Citations to the Haynes Declaration herein refer to Docket No. 7-1, filed in support of TBG's *Ex Parte* Application for Temporary Restraining Order (filed on June 22, 2023).

sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes [e.g., an athlete's name, image, likeness, voice, etc.] of three (3) or more current athletes from one sport or six (6) or more from multiple sports, either in combination with school trademarks and logos or separately as a group." *Id.* ¶ 9.

The specific language in TBG's Collaboration Agreements may vary slightly between schools, but each of TBG's Collaboration Agreements includes a provision requiring that at a minimum, no third party can implement or use a Group Licensing Program without TBG's written consent. *Id.* ¶ 10; *see e.g.*, Ex. B at 4. Most of TBG's Collaboration Agreements provide that the Partner School grants to TBG the "exclusive" right to develop, implement, and manage the school's Group Licensing Program with the school's students, as follows[7]:

> 6. EXCLUSIVITY. During the Term of this Agreement, [University] recognizes TBG and [University's] exclusive agent to develop, implement and manage the Group Licensing Program among its current Athletes. During such time, [University] shall not engaged any other third party, without the express written consent of TBG, to develop, implement or manage any similar program involving a group of any size of current or former [University] Athletes. *Id.* ¶ 10; *see e.g.*, Ex. A.

Certain other of TBG's Collaboration Agreements include Preferred Provider provisions, which instead state that the school "shall consider TBG as its preferred provider of a Group Licensing Program for Athletes, and shall not, <u>without TBG's written consent</u>, contract with any other party to develop, implement or manage any substantially similar group licensing program for groups of any size of Athletes." [8] (emphasis added). Whether designated as the exclusive or preferred provider for a respective Partner School, under every Collaboration Agreement, no third-party can use a Partner School's IP in connection with Group Licensing without TBG's written consent.

In conjunction with the Collaboration Agreements entered into between TBG and its Partner Schools, TBG separately enters into a GLA with each student-athlete who wishes to

---

[7]   A list of TBG's Partner Schools is set forth in ¶ 7 of Haynes Decl.; and a sample exclusive Collaboration Agreement is attached as Exhibit A-1 to the same.

[8]   A sample exclusive Collaboration Agreement is attached as Exhibit B to the Haynes Decl.

3

PLAINTIFF THE BRANDR GROUP, LLC'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STAY

participate in their school's Group Licensing Program. Haynes Decl. ¶ 14; *see e.g.*, Ex. B. Pursuant to the GLA, a Client Athlete grants and assigns to TBG the exclusive right to use and grant the right to use the athlete's NIL in Group Licensing Programs, as follows:

> The undersigned, an Athlete at [Partner School], hereby grants and assigns to TBG and its licensing affiliates during the term only of this Agreement, the worldwide right to use and to grant to licenses and sponsors the right to use all or any combination of [Sponsored Athlete's] name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature (collectively known as "Athlete Attributes") in Collegiate Group Licensing Programs that also include the use of [Partner School's] intellectual property. "Collegiate Group Licensing Programs" are defined as those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more current [Partner School] Athletes from one sport or six (6) or more from multiple sports, either in combination with University trademarks and logos or separately as a group. *Id.* ¶ 14.

Together, TBG's Collaboration Agreements and GLAs allow TBG to pursue group NIL opportunities for its Client Athletes, knowing that they can use their respective school's logos and other IP to do so. Haynes Decl. ¶ 15. Unlike many of its Client Athletes, TBG is well-positioned to negotiate with corporate sponsors and licensees – such as EA – in order to ensure that Client Athletes receive fair value for the use of their NIL.

While the Collaboration Agreements and GLAs do not set forth an exhaustive list of what constitutes a Group Licensing Program, most of these agreements do specifically identify video games as such a program. For instance, most of TBG's GLAs provide that Client Athletes "shall receive 70% of royalties from "third-party licensees in the video game, trading card and Fanatics[9] categories" and 80% of royalties "from all other third-party licensees and sponsors for use of the group NIL or Athlete Attributes in connection with this Collegiate Group Licensing Program." Haynes Decl. ¶ 16, Ex. B. TBG typically retains 30% and 20%, respectively, of royalties from these programs. TBG's Collaboration Agreements similarly identify video games as an example of a Group Licensing Program. Haynes Decl. ¶ 16, Ex. B. Note that while the Partner Schools are

---

[9] As used in the agreements, "Fanatics" refers to an online retailer of official sports apparel.

also compensated for the use of their IP in Group Licensing Programs, TBG's clients are its Client Athletes—not the Partner Schools.

### B.  EA Sports and the Game

On February 2, 2021, EA Sports announced that it was bringing back the Game, to be relaunched as *EA SPORTS College Football*. Haynes Decl. ¶ 19. Thereafter, representatives of TBG and EA communicated regularly regarding TBG's Group Licensing Rights and EA's use of student-athletes' NIL in the Game. Haynes Decl. ¶ 22. Despite its knowledge of TBG's Group Licensing Rights, on May 17, 2023, EA Sports informed TBG that EA was partnering with OneTeam Partners ("OneTeam") to secure the necessary licensing rights for the use of student-athletes' NIL in the Game. *Id.* ¶ 24.

Thereafter, EA Sports communicated to TBG's Partner Schools that Partner Schools do not need to honor the exclusivity provisions in their Collaboration Agreements, and that it is not a violation of TBG's Group Licensing Rights for EA to contract directly with Client Athletes for the use of their NIL in the Game. *Id.* ¶ 89. This assertion by EA is patently false. EA cannot circumvent the contractual rights of TBG, its Partner Schools, and Client Athletes by entering into individual and direct contracts for participation in the Game.

Pursuant to TBG's GLAs, Client Athletes assign to TBG the right to use and license their NIL in Group Licensing Programs such as EA's Game, where one Client Athlete's NIL will be used in combination with two or more teammates and their school's IP. Amended Compl. ¶¶ 54-57. These GLAs work in combination with the rights granted to TBG in the Collaboration Agreements, through which Partner Schools agree to support the Group Licensing Program among its student-athletes and sponsors and to recognize TBG as the exclusive or preferred manager of Group Licensing Programs.

EA is aware of and understand TBG's Group Licensing Rights, but EA nevertheless continues to negotiate in direct, knowing, and intentional interference with TBG's contractual rights. Haynes Decl. ¶ 45. EA's conduct and misrepresentations have disrupted TBG's contractual relationships with its Partner Schools and Client Athletes. *Id.* ¶ 40. Certain of TBG's Partner

Schools have already opted-in to the Game, violating their exclusive Collaboration Agreements with TBG, while others have expressed confusion as to how they should proceed when they are interested in participating in the Game and offering that opportunity to their student-athletes, but do not want to run afoul of their contractual obligations with TBG. *Id.* ¶ 44.

Moreover, EA reportedly plans to pay student-athletes well below market value for the use of their NIL in the Game. Further, based upon information received from one or more of TBG's Partner Schools, by opting-in to EA's Game, participating schools will also grant to EA Sports exclusive rights to use participating schools' trademarks and related indicia in any simulation game play (such as mobile simulation games or arcade games) within college football and non-exclusive rights for non-simulation games. Thus, under EA's current plan, not only will the compensation paid to student-athletes fall well short of fair market value, but these athletes will lose future opportunities to earn additional compensation from their NIL in other arcade and video game opportunities.

### C. Procedural History

TBG initially filed this case on June 16, 2023 in California Superior Court, County of San Mateo. TBG asserts six causes of action: (i) tortious interference with contract; (ii) violation of California's statutory right of publicity; (iii) violation of California's common law right of publicity; (iv) violation of California's Unfair Competition Law ("UCL"); and (v) declaratory relief. TBG also seeks a permanent injunction against EA.

EA filed a Notice of Removal on June 20, 2023. After the case was removed, TBG filed an application for a Temporary Restraining Order, which this Court denied on June 30, 2023. On August 1, 2023, EA filed a Motion to Dismiss TBG's Claims, as well as a Motion to Stay Discovery pending a hearing on EA's Motion to Dismiss. Concurrent with the filing of this Opposition, TBG files its Amended Complaint.

6

PLAINTIFF THE BRANDR GROUP, LLC'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STAY

### III.    EA'S MOTION TO DISMISS SHOULD BE DENIED AS MOOT

With the timely filing of TBG's Amended Complaint, EA's Motion to Dismiss is rendered moot and should be denied. Pursuant to Fed. R. Civ. Proc. 15(a)(1)(B) and within the 21 days following service of EA's Motion to Dismiss, TBG files its Amended Complaint concurrently with the filing of this opposition. *See* Dkt. 31. As such, the original Complaint is no longer operative. *See Lacey v. Maricopa County*, 693 F.3d 896, 927 (9th Cir. 2012) (en banc) ("[T]he general rule is that an amended complaint supersedes the original complaint and renders it without legal effect[.]"); *Cepeda v. Federal Nat. Mortg. Ass'n*, No. 5:13–cv–00388–PSG, 2013 WL 1346676, at * 2 (N.D. Cal. Apr. 2, 2013) ("[W]hen a complaint is properly amended, it supersedes the original complaint. Thus, the complaint which Defendants to seek to dismiss is not operative.").

Given that the Complaint is no longer operative, EA's Motion to Dismiss the Complaint is moot. *Saddozai v. Davis*, No. 18-05558 BLF (PR), 2020 WL 1955666, at *1 (N.D. Cal. Apr. 23, 2020) (where plaintiff was permitted to amend complaint as a matter of course within 21 days and did so, defendant's motion to dismiss the prior complaint was rendered moot and denied as unnecessary; new complaint considered the operative pleading); *Price v. Synapse Grp., Inc.*, No. 16-CV-01524-BAS-BLM, 2016 WL 9344094, at *1 (S.D. Cal. Sept. 6, 2016) (terminating as moot motion to dismiss complaint that was superseded by amended complaint); *Blanco v. Am. Home Mortg. Serv. Inc.*, No. CIV. 09–578 WBS DAD, 2009 WL 2171071 (E.D. Cal. July 20, 2009) (denying as moot defendants' motion to dismiss the original complaint where plaintiffs properly filed an amended complaint).

Because EA's Motion to Dismiss and the arguments made therein are rendered moot by the filing of the Amended Complaint, TBG refrains from substantively addressing EA's arguments in this opposition. TBG expressly reserves its right to respond to and dispute the arguments raised in EA's Motion to Dismiss, and TBG will timely address the merits of EA's assertions should EA move to dismiss the Amended Complaint.

## IV. EA'S MOTION TO STAY SHOULD BE DENIED

### A. Legal Standard

The Federal Rules of Civil Procedure do not provide for an automatic stay of discovery while a motion to dismiss is pending. *See In re Nexus 6p Products Liability Litigation*, No. 17-cv-02185-BLF, 2017 WL 3581188, at *1 (N.D. Cal. Aug. 18, 2017) (citing *Tradebay, LLC v. eBay, Inc.*, 278 F.R.D. 597, 600 (D. Nev. 2011). As this Court has noted, "[h]ad the Federal Rules contemplated that a motion to dismiss under Fed.R.Civ.Pro. 12(b)(6) would stay discovery, the Rules would contain a provision to that effect." *See Gray v. First Winthrop Corp.,* 133 F.R.D. 39, 40 (N.D. Cal. 1990) (further remarking that the notion that a motion to dismiss would stay discovery "is directly at odds with the need for expeditious resolution of litigation."). In *Gray*, this Court used Rule 33 as an example, noting that Rule 33, which provides that interrogatories may be served at the same time as the summons and complaint, "only makes sense if discovery is not to be stayed pending resolution of [motions to dismiss]." *Id.; see also See Novelposter v. Javitch Canfield Group*, No. 13-cv-05186-WHO, 2014 WL 12618174, at *1 (N.D. Cal. May 23, 2014) ("Federal Rules of Civil Procedure do not provide for stays of discovery simply because a motion to dismiss is pending . . . Courts have not looked favorably upon granting stays of discovery in these circumstances.").

While the district court has "wide discretion" to control discovery and determine whether to stay discovery during pendency of a motion to dismiss, these circumstances do not support a stay. *See Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988). Parties seeking a stay of discovery must meet the requirements under Federal Rule of Civil Procedure 26(c) and establish good cause. *Id.* The "moving party must show a particular and specific need for the protective order, as opposed to making stereotyped or conclusory statements." *Adams v. AllianceOne, Inc.*, No. 08-CV-0248 JAH (LSP), 2008 WL 11336721, at *2 (S.D. Cal. Oct. 22, 2008) (internal citations omitted). In determining whether good cause exists, federal courts in California have applied a two-part test: "(1) will the motion dispose of the entire case (or at least the issue at which discovery is aimed)? and (2) can the motion be decided without further discovery?" *Onuoha v.*

8

PLAINTIFF THE BRANDR GROUP, LLC'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STAY

*Facebook, Inc.,* No. 5:16-CV-06440-EJD, 2017 WL 11681325, at *1 (N.D. Cal. Apr. 7, 2017). If the Court answers both questions affirmatively, then a protective order may issue, but "if either prong of this test is not established, discovery proceeds." *Pac. Lumber Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, PA, 220 F.R.D. 349, 351 (N.D. Cal. 2003).

### B. Argument

EA's Motion to Stay should be denied because the Motion to Dismiss upon which EA centers its request for a stay has been rendered moot by the Amended Complaint. Moreover, in light of TBG's Amended Complaint and clarification of TBG's Group Licensing Rights set forth therein, EA cannot show good cause to stay discovery, which would further delay TBG's recovery of the relief requested and further delay TBG's Client Athletes the benefit of TBG's representation in connection with the use of their NIL in the Game. Specifically, EA fails to satisfy the good cause standard applied by federal courts in California because (i) the pending Motion to Dismiss will not dispose of the entire case; and (ii) the balance of the equities favors TBG.

#### 1. EA's pending motion will not dispose of the entire case.

EA cannot establish good cause to stay discovery because it cannot show that its pending Motion to Dismiss is likely to dispose of the entire case. As stated herein, EA's Motion to Dismiss is rendered moot by TBG's Amended Complaint, and thus, it must be denied. In requesting a stay of discovery, the moving party has the burden of "showing the immediate and clear possibility the Court will grant the dispositive motion." *Adams*, 2008 WL 11336721 at *2. In analyzing whether the moving party has met this burden, the Court should "take a preliminary peek at the merits of the allegedly dispositive motion to see if on its face there appears to be an immediate and clear possibility that it will be granted." *Id.* Here, even a "preliminary peak" at the merits of EA's Motion to Dismiss is unnecessary, as that Motion is rendered moot by TBG's Amended Complaint

The original Complaint upon which EA bases its Motion to Dismiss is no longer the operative complaint and has been superseded by the Amended Complaint. Therefore, EA's Motion to Dismiss will not dispose of anything as it is rendered moot. *See Saddozai*, 2020 WL 1955666, at *1. For this reason alone, the Court should deny the pending Motion to Stay.

**2.    The balance of the equities falls in favor of TBG.**

The balance of equities strongly supports allowing TBG to proceed with discovery without further delay. EA has already delayed TBG's enforcement of its contractual rights at every opportunity—first, by communicating with TBG about the Game as if EA intended to honor TBG's contractual rights (before suddenly announcing its partnership with OneTeam, to the exclusion of TBG); and second, by telling TBG's Partner Schools that they do not have to honor their contractual agreements with TBG. Now, even after TBG filed this lawsuit (which entitles TBG to certain discovery related to EA's blatant violation of TBG's rights, including discovery related to steps EA has taken to contract with TBG's Partner Schools and Client), EA continues to sidestep and avoid providing TBG with discovery it needs and is entitled to in order to pursue its claims. It is imperative that TBG remain able to timely pursue its claims in the coming weeks and months while EA prepares to file its responsive pleading to TBG's Amended Complaint.

Moreover, in its Amended Complaint, TBG further clarifies TBG's binding Agreements and the exclusive Group Licensing Rights granted therein. Based on EA's private communications to TBG, EA's public statements in the media, and reports from representatives of TBG's Partner Schools, TBG also details EA's specific actions and concrete plans to interfere with TBG's Group Licensing Rights. Discovery should not be delayed so as to require EA to immediately produce all evidence of its planned violations of TBG's rights and unauthorized use of Client Athletes' NIL in the Game. TBG has asserted six causes of action against EA, and part of the relief TBG is seeking is injunctive relief to prevent EA from entering into contractual agreements with TBG's Partner Schools and Client Athletes without TBG's involvement. TBG's claims center on whether EA has interfered with or violated TBG's rights with respect to its contracts with its Partner Schools and Client Athletes, and the essence of these contractual relationships relies on TBG's ability to participate in and facilitate NIL opportunities for its Client Athletes in order to provide fair representation in Group Licensing Programs such as EA's Game.

On August 2, 2023, TBG served its First Set of Interrogatories and First Set of Requests for Production of Documents (the "TBG Discovery Requests"). The TBG Discovery Requests are

narrowly tailored and seek discovery of information and documents relevant to TBG's Agreements with its Partner Schools and Client Athletes, and EA's conduct with respect to the same. TBG has reserved discovery requests relating to damages, for example, until a later date in order to limit discovery during amendment of the pleadings. The discovery that TBG has requested is time-sensitive and vital to TBG's claims.

TBG's business depends on its ability to enforce its contracts with its Partner Schools and Client Athletes, many of whom EA purportedly plans to feature in the Game. This Court cannot possibly make a determination about whether EA has induced TBG's Partner Schools and its Client Athletes to violate TBG's rights under its Agreements have been violated without discovery related to EA's communications and negotiations regarding licensure of school IP and student-athlete NIL, or discovery related to the parties' understandings and interpretation of the contracts at issue. On the contrary, EA will not be unduly burdened in timely responding the TBG's Discovery Requests because the discovery is narrowly tailored and focused on the pertinent issues in the case, and EA cannot show good cause for delaying its responses to the same.

## V. CONCLUSION

In conclusion, for the reasons set forth above, this Court should DENY Defendant's Motion to Dismiss and Motion to Stay Discovery in its entirety.

DATED: August 15, 2023

**KATTEN MUCHIN ROSENMAN LLP**

By: /s/ Lindsey L. Smith
Lindsey L. Smith
Attorneys for Plaintiff
The BrandR Group, LLC