1

**KATTEN MUCHIN ROSENMAN LLP**

2

Richard L. Farley (admitted *pro hac vice*)
Richard.farley@katten.com

3

Lindsey L. Smith (admitted *pro hac vice*)
lindsey.smith@katten.com

4

Kelsey R. Panizzolo (admitted *pro hac vice*)
Kelsey.panizzolo@katten.com

5

500 S. Tryon Street, Suite 2900
Charlotte, NC 28202-4213

6

Telephone: 704.344.3178

7

Christopher D. Beatty (SBN 266466)
chris.beatty@katten.com

8

Ashley T. Brines (SBN 322988)
ashley.brines@katten.com

9

2029 Century Park East, Suite 2600
Los Angeles, CA 90067

10

Telephone: 310.788.4400
Facsimile: 310.788.4471

11

12

Attorneys for Plaintiff
The BrandR Group, LLC

13

**UNITED STATES DISTRICT COURT**

14

**NORTHERN DISTRICT OF CALIFORNIA**

15

**OAKLAND DIVISION**

16

17

The BrandR Group, LLC,

18

                    Plaintiff,

19

          v.

20

Electronic Arts Inc., and DOES 1 through 10, inclusive,

21

                    Defendants,

22

23

24

25

26

27

28

Case No. 4:23-cv-02994-HSG

Honorable Haywood S. Gilliam, Jr.

**PLAINTIFF THE BRANDR GROUP, LLC'S OPPOSITION TO DEFENDANT ELECTRONIC ARTS INC.'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Date: October 19, 2023
Time: 2:00 p.m.
Place: Courtroom 2 – 4th Floor

State Court Action Filed: June 16, 2023
Date of Removal: June 20, 2023

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

**Katten**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF ISSUES TO BE DECIDED ................................................. 2

III.  FACTUAL BACKGROUND ............................................................................. 3

      A.    TBG's collegiate group licensing strategy ........................................... 3

      B.    TBG's Collaboration Agreements with Partner Schools ..................... 3

      C.    TBG's GLAs with Client-Athletes ....................................................... 5

      D.    The *EA Sports College Football* video game ..................................... 7

      E.    EA's interference with TBG's Agreements .......................................... 8

      F.    EA's compensation to student-athletes ................................................ 8

IV.   LEGAL STANDARDS ....................................................................................... 9

V.    ARGUMENT ...................................................................................................... 9

      A.    The Amended Complaint establishes EA's tortious interference with
            TBG's Agreements. ................................................................................ 9

            1.    EA cannot overcome the plain language of TBG's Agreements. ...... 10

                  a)    EA's Game is a Group Licensing Program. ........................... 11

                  b)    The Amended Complaint establishes EA's interference
                        with TBG's Collaboration Agreements. .................................. 14

                  c)    The Amended Complaint establishes EA's tortious
                        interference with TBG's GLAs. ............................................. 15

            2.    Alternatively, TBG's Agreements are ambiguous, and extrinsic
                  evidence is necessary to determine the parties' intent. .................... 17

      B.    The Amended Complaint establishes EA's intentional interference
            with TBG's prospective economic advantage ...................................... 18

      C.    The Amended Complaint establishes TBG's right of publicity claims ........ 19

            1.    TBG's right of publicity claims are ripe ........................................... 20

            2.    TBG has standing to bring its right of publicity claims. ................. 20

            3.    California law applies to TBG's right of publicity claims. .............. 21

      D.    The Amended Complaint establishes EA's violation of the UCL. .............. 22

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

1.     TBG's allegations establish EA's unlawful and unfair conduct. ....... 22

2.     TBG demonstrates an inadequate remedy at law. ............................ 23

E.     TBG pled a valid claim for declaratory judgment........................................ 25

F.     Alternatively, dismissal should be without prejudice. ................................ 25

VI.     CONCLUSION.......................................................................................................... 25

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andino v. Apple, Inc.*,
　No. 20-CV-01628-JAM-AC, 2021 WL 1549667 (E.D. Cal. Apr. 20,
　2021) ...............................................................................................................................24

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ..........................................................................................................9

*Atlanta Cancer Care, P.C. v. Amgen, Inc.*,
　359 F. App'x 714 (9th Cir. 2009) ....................................................................................18

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ..........................................................................................................9

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,
　28 F. Supp. 3d 1006 (C.D. Cal. 2013) .............................................................................22

*Brooks v. Thomson Reuters Corp.*,
　No. 21-CV-01418-EMC, 2021 WL 3621837 (N.D. Cal. Aug. 16,
　2021) ...............................................................................................................................24

*Cairns v. Franklin Mint Co.*,
　24 F. Supp. 2d 1013 (C.D. Cal. 1998) .......................................................................21, 22

*Clapper v. Amnesty Int'l USA*,
　568 U.S. 398, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013) ..............................................20

*Del Amo v. Baccash*,
　No. CV 07-663 PSG, 2008 WL 2780978 (C.D. Cal. July 15, 2008) ................................21

*Eminence Cap., LLC v. Aspeon, Inc.*,
　316 F.3d 1048 (9th Cir. 2003) .........................................................................................25

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
　37 F. Supp. 3d 1126 (N.D. Cal. 2014) .............................................................................22

*Ixchel Pharma, LLC v. Biogen, Inc.*,
　9 Cal. 5th 1130 (2020) ......................................................................................................9

*Johnson v. Trumpet Behav. Health, LLC*,
　No. 3:21-CV-03221-WHO, 2022 WL 74163 (N.D. Cal. Jan. 7, 2022) ...........................24

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT
Case No. 4:23-cv-02994-HSG

*Kellman v. Spokeo, Inc.*,
    599 F. Supp. 3d 877, 887 (N.D. Cal. 2022), *motion to certify appeal
    denied*, No. 3:21-CV-08976-WHO, 2022 WL 2965399 (N.D. Cal. July
    8, 2022) ...........................................................................................................9

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134, 63 P.3d 937 (2003) ...........................................................18, 19

*Loc. TV, LLC v. Super. Ct.*,
    3 Cal. App. 5th 1 (2016) ......................................................................................20

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ..............................................................................9

*Moore v. Wells Fargo Bank, N.A.*,
    39 Cal. App. 5th 280, 251 Cal. Rptr. 3d 779 (2019).............................................18

*Nacarino v. Chobani, LLC*,
    No. 20-cv-7437-EMC, 2022 WL 344966 (N.D. Cal. Feb. 4, 2022) ......................24

*Nat'l City Police Officers' Ass'n v. City of Nat'l City*,
    87 Cal. App. 4th 1274, 105 Cal. Rptr. 2d 237 (2001)..........................................10

*Nicolosi Distrib., Inc. v. BMW N. Am., LLC*,
    No. C 10-3256 SI, 2011 WL 479993 (N.D. Cal. Feb. 7, 2011) ...................................19

*Rader Co. v. Stone*,
    178 Cal. App. 3d 10, 223 Cal. Rptr. 806 (Ct. App. 1986) ...........................................19

*Securimetrics, Inc. v. Hartford Cas. Ins. Co.*,
    No. C 0500917CW, 2005 WL 1712008 (N.D. Cal. July 21, 2005)............................10

*Smith v. State Farm Mut. Auto. Ins. Co.*,
    93 Cal. App. 4th 700 (2001) ...............................................................................23

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) .........................................................................23, 24

*Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*,
    971 F.2d 401 (9th Cir. 1992) ...............................................................................10

*Thomas v. Anchorage Equal Rts. Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) ..............................................................................20

*Timed Out, LLC v. Youabian, Inc.*,
    229 Cal. App. 4th 1001 (2014) ............................................................................21

*Upper Deck Authenticated, Ltd. v. CPG Direct*,
    971 F. Supp. 1337 (S.D. Cal. 1997).....................................................................21

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1 310.788.4400 tel   +1 310.788.4471 fax

**Katten**

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

*Upper Deck Co. v. Flores*,
    569 F. Supp. 3d 1050 (S.D. Cal. 2021)........................................................21

*Upper Deck Co. v. Panini Am., Inc.*,
    469 F. Supp. 3d 963 (2020) ........................................................20

*Upper Deck Co. v. Panini Am., Inc.*,
    533 F. Supp. 3d 956 (S.D. Cal. 2021)........................................................21

*Wolf v. Super. Ct.*,
    114 Cal. App. 4th 1343, 8 Cal. Rptr. 3d 649 (2004)....................................17

*Yeomans v. World Fin. Grp. Ins. Agency, Inc.*,
    No. 19-CV-00792-EMC, 2022 WL 844152 (N.D. Cal. Mar. 22, 2022).....................25

*Zeiger v. WellPet LLC*,
    No. 3:17-CV-04056-WHO, 2021 WL 756109 (N.D. Cal. Feb. 26,
    2021) ........................................................23, 24

**Statutes**

Cal. Bus. & Prof. Code § 17200 ........................................................22

Cal. Civ. Code § 1060 ........................................................25

Cal. Civ. Code § 1636 ........................................................10

Cal. Civ. Code § 1641 ........................................................10

Cal. Civ. Code § 3344........................................................2, 20, 21, 22

Cal. Civ. Code § 3422 ........................................................25

Cal. Educ. Code § 67456 ........................................................23

**Rules**

Fed. R. Civ. Proc. 8........................................................10

Fed. R. Civ. Proc. Rule 12(b)(1)........................................................9

Fed. R. Civ. Proc. 12(b)(6) ........................................................9

Fed. R. Civ. Proc. 12(c) ........................................................25

**Other Authorities**

Meghan Durham, *DI board approves clarifications for interim NIL policy*,
    https://www.ncaa.org/news/2022/10/26/media-center-di-board-
    approves-clarifications-for-interim-nil-policy.aspx (October 26, 2022). ...................13

Merriam-Webster, https://www.merriam-webster.com/dictionary/program.
(last accessed Sept. 15, 2023) ................................................................5, 11

*NCAA Division I; Institutional Involvement in a Student-Athlete's Name,*
*Image and Likeness Activities* (October 26, 2022) ......................................13

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1 310.788.4400 tel   +1 310.788.4471 fax

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT
Case No. 4:23-cv-02994-HSG

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

In defense of the well-pleaded claims set forth in The BrandR Group, LLC's ("TBG") Amended Complaint against Electronic Arts Inc. ("EA"), EA continues its attempt to confuse the Court and misrepresent TBG's contractual agreements with TBG's Partner Schools[1] and Client Athletes.[2] EA promotes an illogical interpretation of TBG's Agreements[3] that is neither supported by the plain language of those Agreements nor the intentions of the parties thereto.  EA's motivation—which it has not disputed—is clear: to cut TBG out of negotiations for the use of student-athletes' names, images, and likenesses ("NIL") in its *EA Sports College Football* video game (the "Game") in order to avoid paying student-athletes fair market value for their NIL. However, the Amended Complaint makes clear that the intent of the parties and the purpose of these Agreements was to cover precisely the sort of "opportunities" presented by the Game, and EA cannot circumvent that intent by using individual licenses to obtain the athletes' NIL rights.

EA attempts to discredit TBG's established group licensing business, through which collegiate student-athletes grant TBG the right to license and use their NIL in commercial opportunities that use both the NIL of a group of student-athletes and their respective school's logos, trademarks, or other intellectual property ("IP").  To execute this group licensing strategy, TBG contracts with Partner Schools to manage the Group Licensing Programs ("GLPs"), as defined herein, for the Schools, and TBG separately contracts with Client Athletes for the right to

---

[1] As used herein, "Partner Schools" refers to those 66 colleges and universities identified in TBG's Amended Complaint, and with whom TBG has entered into exclusive or preferred Group Rights Collaboration Agreements ("Collaboration Agreements"), plus any additional schools with whom TBG enters into exclusive or preferred Collaboration Agreements following the filing of the Amended Complaint.

[2] As used herein, "Client Athletes" refers to those 3,725 student-athletes who have entered into Group Licensing Authorization & Assignment agreements ("GLAs") with TBG.

[3] Collectively, TBG's Collaboration Agreements and GLAs are referred to herein as the "Agreements".

license the Athletes' NIL for use in these Programs.  It is critical to TBG's business model that TBG contract with both the Partner Schools and the Client Athletes, as each of these contractual relationships has a distinct and important function.  While Client Athletes' GLAs grant TBG the right to use the Athletes' NIL, it is the Partner Schools' Collaboration Agreements that make TBG's rights exclusive or preferred.  TBG's Collaboration Agreements are the linchpin of TBG's group licensing strategy, granting TBG the necessary support of Partner Schools for TBG to facilitate GLPs for its Client Athletes and ensuring that no third-party can use the Partner Schools' IP and the Client Athletes' NIL in a GLP without TBG's consent.

As more fully discussed herein, the *EA Sports College Football* Game is plainly a GLP as defined by the parties to TBG's Agreements.  Through its gather-individual-license strategy, EA attempts to fashion a *parallel* GLP outside the terms of TBG's Agreements, even though the Game facially falls within the definition of a GLP.  Because TBG holds the exclusive or preferred rights to manage GLPs for its Partner Schools, it thus holds the rights to license the use of its Client Athletes' NIL in the Game, and EA has plainly interfered with those rights.  EA's Motion necessarily fails because TBG pleaded sufficient facts to support each of its claims against EA, and the Agreements are facially consistent with TBG's construction.  For the reasons stated herein, EA's Motion to Dismiss Plaintiff's Amended Complaint should be denied.

## II.   STATEMENT OF ISSUES TO BE DECIDED

At issue before the Court is whether, drawing all reasonable inferences in TBG's favor, the Amended Complaint sets forth sufficient facts to support TBG's request for relief on its claims for (i) tortious interference with contract, (ii) intentional interference with prospective economic advantage, (iii) violation of right of publicity under Cal. Civ. Code § 3344, (iv) violation of common law right of publicity and misappropriation of likeness, (v) violation of California UCL, and (vi) declaratory judgment.  If the Court allows EA's Motion, the Court must also determine

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

whether to grant leave to amend or whether TBG's action should be dismissed without prejudice.

## III.     FACTUAL BACKGROUND

### A.     TBG's collegiate group licensing strategy

TBG is an established sports marketing agency and industry leader in collegiate group licensing, using its experience and relationships to facilitate commercial opportunities that use both the Client Athletes' NIL and the IP of TBG's Partner Schools.   Since 2014, TBG has represented professional athletes in negotiations with third-party licensees and sponsors for commercial uses featuring both the athletes' NIL and the IP of the athletes' former collegiate teams.  Dkt. 7-1 ("Haynes Decl.") ¶¶ 2, 5.  When the NCAA NIL rules changed in 2021, TBG was prepared to market its professional sports group licensing experience to collegiate athletes and athletic departments, quickly becoming a leader in the new industry of collegiate group licensing. *Id*. ¶¶ 4, 6.  As of the start of the 2023 NCAA football season, TBG has entered into Collaboration Agreements with 66 Partner Schools and GLAs with 3,725 Client Athletes.   Dkt. 31 ("Am. Compl.") ¶¶ 35, 47.

### B.     TBG's Collaboration Agreements with Partner Schools

In building its collegiate group licensing business, TBG recognized that it needed the schools' support to facilitate GLPs, both to ensure that student-athletes are informed of group licensing opportunities and to act as a liaison between TBG, student-athletes, and potential third-party licensees and sponsors.  For this reason, TBG and each of its Partner Schools entered into Collaboration Agreements, pursuant to which the Partner Schools agreed not to work with any third-party for the management of a GLP without TBG's consent.  *Id*. ¶ 40.  As defined by TBG's Agreements and as used herein, "Group Licensing Programs" are "those licensing or sponsorship

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

programs in which a *collegiate licensee or collegiate sponsor uses* the Athlete Attributes[4] . . . of three (3) or more current athletes from one sport or six (6) or more from multiple sports in combination with school trademarks, logos, and other IP." *Id.* ¶ 8 (emphasis added).

All of TBG's Collaboration Agreements contain provisions designating TBG as either the exclusive or preferred provider for the Partner Schools' GLPs, meaning that at a minimum, the Partner Schools agree not to engage any third-party to develop, implement, or manage their respective GLP, or effectuate any end result(s) which in aggregate includes the NIL of three or more student-athletes co-branded with school IP, without TBG's consent. *Id.* ¶ 40. The exclusivity provision in each of TBG's Collaboration Agreements is substantially similar to the provision in Exhibit 1 to the Amended Complaint, which provides that the School recognizes TBG as its "exclusive agent to develop, implement and manage the [GLP] among its current Athletes[,]" and that the School "shall not engage any other third party, without the express written consent of TBG, to develop, implement or manage any similar program involving a group of any size of current or former [School] Athletes." *Id.* ¶ 41, Ex. 1. Certain other of TBG's Collaboration Agreements include preferred provider provisions, which state that the Partner School "shall consider TBG as its preferred provider of a [GLP] for Athletes, and shall not, without TBG's written consent, contract with any other party to develop, implement or manage any substantially similar group licensing program for groups of any size of Athletes." *Id.* ¶ 43, Ex. 2.

Under TBG's Collaboration Agreements, Partner Schools agree, *inter alia*, to make the Partner School's "official marks, logos, verbiage, or designs (including identifiable aspects of [Partner School] uniforms) available for use in the Program at market rates for co-branded

---

[4] TBG's Agreements typically define Athlete Attributes as, "the Athlete's name, nickname, initials, autograph/signature, facsimile, voice, caricature, photograph, portrait, picture, image, likeness, jersey number, statistics, data, biographical information or any other identifiable feature in Collegiate Group Licensing Programs of any kind." Am. Compl. ¶ 34.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT
Case No. 4:23-cv-02994-HSG

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

products[,]" through the School's "third-party licensing agency and University licensing staff[.]" *Id.*, Ex. 1, § 2(a). "Co-branded" is not defined, but under its ordinary meaning refers only to the concurrent use or featuring of multiple brands—as in a video game with athletes' NIL and schools' logos—and not the bundling of brands in a single license (which as discussed below, is impossible). [5] By partnering with schools, TBG can ensure that student-athletes are informed of their peers' and teammates' NIL activities; this also ensures that student-athletes do not deliberately or inadvertently violate the terms of the GLAs by licensing their NIL for a use constituting a GLP without TBG's knowledge or consent.

TBG does not own the right to license the Partner Schools' IP, nor does TBG represent the Partner Schools in negotiating with third-party licensees or sponsors for the use of the Schools' IP in GLPs.[6] *Id.* ¶ 36. Accordingly, it is impossible under the Collaboration Agreements to bundle athletes' NIL rights and Partner Schools' IP into a single license. However, under the Collaboration Agreements, Partner Schools agree not to facilitate GLPs without TBG or, at a minimum, without TBG's consent—meaning Partner Schools cannot allow their IP to be used in a GLP without TBG's consent. *See id.* Ex. 1, ¶ 6; Ex. 2, ¶ 6.

## C. TBG's GLAs with Client-Athletes

Separate from the Collaboration Agreements entered into between TBG and Partner Schools, TBG entered into GLAs with individual student-athletes at these Partner Schools. Under each GLA, the Athlete "**grants and assigns to TBG** and its licensing affiliates during the term only of this Agreement, **the worldwide right to use <u>and to grant to licensees and sponsors</u> the

---

[5] "Co-brand" is defined as "to **market** or **issue** (something, such as a credit card) in conjunction with another company so that the product **bears the name of both**[.]" "*Co-brand*," Merriam-Webster, https://www.merriam-webster.com/dictionary/co-brand. (last accessed Sep. 17, 2023).

[6] TBG receives no compensation or royalties from the Partner Schools because TBG's role is to represent the student-athletes' Group Licensing Rights. Am. Compl. ¶ 53.

**right to use [Athlete Attributes]** in Collegiate Group Licensing Programs of any kind."[7]  *Id.* Ex. 3, ¶ 3 (emphasis added).

TBG's GLAs further clarify the parties' intentions and interpretation of what constitutes a "Group Licensing Program" under the Agreement, stating that:

> The focus of the Collegiate Group Licensing Programs will be <u>co-branded licensing opportunities involving groups of Athletes' NIL along with [the Partner School's] IP</u>.   Royalties for such opportunities will be allocated as follows: for Collegiate Group Licensing Programs the Athletes shall receive 80% (Eighty Percent) of the royalties from third-party licensees and sponsors for use of the group NIL or Athlete Attributes in connection with this Collegiate Group Licensing Program, except in the categories of **video games**, trading cards and Fanatics where Athletes shall receive 70% (Seventy Percent) to accommodate additional costs.

*Id.* Ex. 3, ¶ 5 (emphasis added).  Notably, video games are explicitly identified as a likely use of Client Athlete NIL in a GLP.  *Id.* ¶ 52.  Thus, under the GLAs, Client Athletes assigned to TBG the right to use and to grant to others the right to use the Client Athletes' NIL in GLPs, and TBG contracts directly with sponsors and licensees for the use of its Client Athletes' NIL.  *Id.* Ex. 3. The scope of TBG's Group Licensing Rights[8] are plainly defined, with each GLA including the following:

> Please note that this Agreement does NOT limit an Athlete's right to grant the use of his/her individual Athlete Attributes or individual NIL for publicity, advertising, or other commercial purposes, except that such individual grants will not preclude the undersigned also from being covered by the Collegiate Group Licensing Programs granted by TBG. This Agreement also does not limit the Athlete's right to join with other Athletes to grant the group use of their NIL for publicity, advertising or other commercial purposes **IF any such other group NIL grant does not involve any use or co-branding**

---

[7] "'Collegiate Group Licensing Programs' are defined as those licensing or sponsorship programs in which a collegiate licensee or collegiate sponsor uses the Athlete Attributes of three (3) or more current [Partner School] Athletes from one sport or six (6) or more from multiple sports, either in combination with University trademarks and logos."  Am. Compl. Ex. 3, ¶ 3.

[8] As used herein, "Group Licensing Rights" refers to the rights granted to TBG by the Partner Schools under the Collaboration Agreements and by TBG's Client Athletes in the GLAs.

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

1

2

**of any kind of [Partner School's] own IP or property (such as
trademarks, logos, jerseys, names, nicknames, etc.)[.]**

3

*Id.* Ex. 3, ¶ 4 (emphasis added).  The GLAs make clear that, consistent with its obligations to TBG,

4

a Client Athlete retains the right to contract with third-parties for the use of their NIL in licensing

5

programs, *so long as* those programs do not constitute a GLP.  *Id*. ¶ 55.

6

   D.   **The *EA Sports College Football* video game**

7

      On February 21, 2021, EA Sports announced that it was bringing back its popular *NCAA*

8

*Football* video game, to be relaunched as *EA Sports' College Football*.  *Id.* ¶ 85.  The previous

9

iteration of EA's *NCAA Football* game was produced and released annually by EA from 1998 until

10

it was discontinued in 2013 following a number of legal challenges regarding compensation for

11

student-athletes.  *Id.* ¶ 83.  As part of EA's February 21, 2021 announcement, EA revealed that it

12

would partner with Collegiate Licensing Company ("CLC"), a collegiate trademark licensing

13

company, to license the IP of nearly 100 Football Bowl Subdivision ("FBS") schools for the use

14

of the schools' logos, stadiums, mascots, and other IP in the Game.  *Id.* ¶ 87.  EA later announced

15

that it was also exploring the possibility of including student-athletes' NIL in the Game.  *Id.* ¶ 90.

16

      Following these announcements from EA, in 2021, TBG reached out to EA to ensure that

17

EA had notice of TBG's rights with respect to GLPs involving its Partner Schools and Client

18

Athletes.  *Id.* ¶¶ 91, 94.  Between May 2022 and May 2023, representatives of TBG and EA kept

19

in touch regarding EA's relaunch of the Game and TBG's growing list of Partner Schools for

20

whom it is the exclusive or preferred manager of GLPs.  *Id.* ¶ 97.  On May 17, 2023, Sean O'Brien,

21

Executive Vice President of EA, notified Wesley Haynes, President of TBG, that EA did not intend

22

to license TBG's Client Athletes' NIL through TBG, and instead that EA contracted with

23

OneTeam Partners ("OneTeam") to "facilitate the opportunity for college athletes to opt in and be

24

included in our CFB video game[.]"  *Id.* ¶ 98.  That same day, EA Sports publicly announced its

25

deal with OneTeam, reporting that the partnership will give all FBS players the opportunity "to

26

27

28

7

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

have their likenesses in EA Sports College Football." *Id.* ¶ 99.

## E.    EA's interference with TBG's Agreements

In the May 17, 2023 communications with TBG and its public announcement, EA made clear its concrete plans to interfere with TBG's Agreements by developing a GLP with TBG's Partner Schools and using TBG's Client Athletes' NIL in the Game without TBG's consent.  Since then, EA has moved forward with the development of its Game, negotiating directly with TBG's Partner Schools and misinforming Partner Schools that EA's use of their student-athletes' NIL in the Game does not violate the Partner Schools' exclusive or preferred Collaboration Agreements with TBG.  *See, e.g., id.* ¶ 103.  EA continues to move forward with its development of the Game, requesting Partner Schools to commit to having their IP featured in the Game and to assist in providing initial information relating to the Partner Schools' current roster of players for their NCAA football teams, to begin developing the student-athletes' digital avatars for use in the Game. *Id.* ¶ 108.  TBG is informed and understands that certain of its Partner Schools have already opted in to have their IP featured in the Game and agreed to coordinate with EA in facilitating the use of their student-athletes' NIL in the Game.  *Id.* ¶ 124.

## F.    EA's compensation to student-athletes

EA's motivation for violating TBG's Group Licensing Rights is clear: to deprive the Client-Athletes of their desired representation in order to avoid paying fair market value for the use of the Client-Athletes' NIL in the Game.  EA does not dispute reports that it plans to pay a flat, one-time payment of $500 to each player for the use of their NIL in the Game, and no payment for royalties on actual sales of the Game.  *Id.* ¶ 128.  Moreover, EA reportedly intends to obtain exclusive rights to use participating schools' IP for any current or future simulation game play within college football—not just the Game—and non-exclusive rights for non-simulation games. *Id.* ¶ 133.  Thus, the harm to TBG and its Client Athletes extends far beyond the Game.  It is for

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

this reason that it is critical the Court allow TBG's action to proceed.

## IV.    LEGAL STANDARDS

To defeat a motion to dismiss, a plaintiff must only allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and that would "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a Rule 12(b)(6) motion, "the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff." *Kellman v. Spokeo, Inc.*, 599 F. Supp. 3d 877, 887 (N.D. Cal. 2022).[9]  If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## V.    ARGUMENT

### A.    The Amended Complaint establishes EA's tortious interference with TBG's Agreements.

EA's challenge to the validity of TBG's tortious interference claim[10] rests on the sole assertion that EA is not interfering with TBG's 66 Collaboration Agreements with the Partner Schools and the 3,725 GLAs with Client Athletes by engaging in a licensing program to produce a college football video game that involves (and banks on) the use of the Athletes' NIL and Schools' IP together, so long as EA uses separate, Athlete-by-Athlete $500 licensing contracts to

---

[9] Likewise, to resolve a facial challenge to a complaint under Rule 12(b)(1), "the court assumes that the allegations in the complaint are true and draws all reasonable inference in favor of the party opposing dismissal."  *Kellman v. Spokeo, Inc.*, 599 F. Supp. 3d 877, 887 (N.D. Cal. 2022).

[10] To establish a claim for tortious interference with contract, a plaintiff must establish "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship[10]; and (5) resulting damage."  *Ixchel Pharma, LLC v. Biogen, Inc.,* 9 Cal. 5th 1130, 1141 (2020).

**Katten**

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

do so.  EA's argument is contrary to the plain language of the Agreements and clear intentions of the parties.  Alternatively, EA establishes that the terms of the Agreements are at least ambiguous, and thus dismissal is not proper where, as here, extrinsic evidence is needed to ascertain the parties' intentions.[11]

### 1.  EA cannot overcome the plain language of TBG's Agreements.

EA's interpretation of TBG's Agreements is wholly unsupported by the plain language of the Agreements and California law,[12] which requires that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  Cal. Civ. Code § 1641.  An interpretation of a contract "which renders part of the instrument to be surplusage should be avoided."  *Nat'l City Police Officers' Ass'n v. City of Nat'l City*, 87 Cal. App. 4th 1274, 1279, 105 Cal. Rptr. 2d 237, 239 (2001).  Under California law, "[a] contract must be so interpreted as to give effect to the *mutual intention of the parties* as it existed at the time of contracting, *so far as the same is ascertainable and lawful*."  Cal. Civ. Code § 1636 (emphasis added).  Here, EA's interpretation of TBG's Agreements ignores the mutual intention of the parties and would render meaningless the most material and important provisions of TBG's Agreements—provisions requiring that TBG's Partner Schools only permit the use of their IP in GLPs managed by TBG, and that TBG's Client Athletes license the use of their NIL in GLPs —

---

[11] EA's suggestion that the sample agreements attached to the Amended Complaint are insufficient to establish the existence of TBG's Agreements is without merit.  To satisfy Fed. R. Civ. Proc. Rule 8, "a plaintiff may set forth the contract verbatim in the complaint or plead it, as indicated, by exhibit, or plead it according to its legal effect."  *Securimetrics, Inc. v. Hartford Cas. Ins. Co.*, No. C 0500917CW, 2005 WL 1712008, at *2 (N.D. Cal. July 21, 2005).  TBG pleaded more than is required, attaching representative samples of the Collaboration Agreements and GLAs and establishing that the other Agreements are substantially similar in all material aspects.  *See, e.g.*, Am. Compl. ¶¶ 35-63.

[12] Because TBG's tortious interference and interference with prospective economic advantage claims arise in tort, these claims are not governed by the Agreements' choice of law provisions, and California law applies where EA's tortious conduct occurred.  *See Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (holding that "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision.").

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT
Case No. 4:23-cv-02994-HSG

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

*i.e.,* programs involving the use of multiple Athletes' NIL and Partner School IP—only through TBG.  It would also gut the obvious overarching purpose of the Agreements, which is to govern licensing programs and opportunities, like the Game, involving the use of more than three athletes' NIL and their school's IP.

### a)    EA's Game is a Group Licensing Program.

First, EA's Game is plainly a Group Licensing Program as defined by the parties to TBG's Agreements.  EA's insistence that it does not intend to pursue a GLP is immaterial and based on a willful misreading of the Agreements.  EA is not a party to TBG's Agreements, and the parties to the Agreements agreed that a GLP "means those licensing or sponsorship programs in which a *collegiate licensee or collegiate sponsor uses* the Athlete Attributes of three (3) or more Athletes from any one specific sport or six (6) or more Athletes from multiple sports *in combination with* University trademarks."  Am. Compl. ¶ 8 (emphasis added).  EA's organized campaign to collect Client Athletes' NIL rights one-by-one to then combine them in the Game with Partner School IP is, by the plain meaning of the term, a "program."[13]  Thus, **EA's Game—an NIL licensing "opportunity"— is a "licensing program" in which EA, a collegiate licensee, will "use" the Athlete Attributes of three or more Client Athletes from each of the Partner Schools' football teams, in combination with the Partner Schools' IP.**  *Id*. ¶ 119.  This is a GLP as defined by TBG, the Partner Schools, and the Client Athletes under their Agreements.  EA cannot side-step the scope of what constitutes a GLP by signing the Client Athletes at different points in time for the use of their NIL in the Game or utilizing separate licensing contracts for each Client Athlete.[14]

---

[13] "Program" is defined, *inter alia*, to mean "a plan or system under which action may be taken toward a goal."  "*Program,*" Merriam-Webster, https://www.merriam-webster.com/dictionary/program. (last accessed Sept. 15, 2023).

[14] Throughout its Motion to Dismiss, EA attempts to distract the Court by hypothesizing irrelevant scenarios, suggesting an athlete could unknowingly license their NIL for use in a GLP or that a product could suddenly and retroactively turn into a GLP.  These fanciful scenarios are irrelevant to the Court's determination in this

11

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

Under the unambiguous text, and as underscored by the manifest purpose and intent of the Agreements, the Game is a Group Licensing Program. [15] Indeed, if the Game is not, it is hard to imagine what *would* be.

EA tries to suggest the Game is not a GLP by misreading the Agreements. Critically, though, whether a particular product, campaign, or use constitutes a GLP under the Agreements <u>is not determined</u> by the "bundling" [16] or combining of the licensing rights for Partner Schools' IP and the Client Athletes' NIL into a single license, as EA repeatedly suggests.[17] EA seemingly bases its theory on an illogical interpretation of the words, "in combination with[,]" as used in the definition of GLPs. However, the plain language is clear that the "combination" relates to the combined "use[]" of "Athlete Attributes" and "University trademarks." Nowhere in the definition of GLP do the parties contemplate licensing Client Athlete NIL and School IP together in a single license, and in fact, the Agreements make clear that NIL rights and School IP are to be licensed separately.

Indeed, interpreting "co-branding" to require bundled licensing is not only inconsistent with the ordinary meaning of the term, it is impossible under the Agreements. The Collaboration

instance as EA publicly announced its intention to release the Game featuring the NIL of the individual football players in combination with their school's logos, branding, and other IP and has embarked on an organized campaign to collect Athletes' NIL to do so. Again, if this is not a GLP, what is?

[15] The meaning of "program" as used in the definition of GLP is further clarified by the GLAs, which note that "[t]he focus of the Collegiate GLPs will be <u>co-branded licensing opportunities involving groups of Athletes' NIL along with [University's] IP</u>." Am. Compl. Ex. 3, ¶ 4. The Game is a "licensing opportunity" for athletes that "involves" co-branding because separately licensed Partner School IP is also used in the Game.

[16] *See e.g.* MTD p 9 (TBG can "be involved in negotiations only when a school seeks to create a group licensing program that bundles the NILs of a group of student-athletes together with a school's IP into a single license."); MTD p 19 (The GLAs only grant TBG "a non-exclusive license to use student-athlete NIL in a licensing program that bundles several student-athletes' NILs plus their school's IP.").

[17] EA argues that the exclusivity and preferred provider terms in TBG's Collaboration Agreements only serve to "limit the schools from contracting with other third parties to create a Group Licensing Program that bundles the rights of multiple student-athletes with the schools' IP." MTD p 14; *see also* MTD pp 9, 13, 18-19, 21.

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

Agreements expressly acknowledge the Partner Schools' third-party licensing agency (e.g. CLC) and require that the Partner Schools "make [School IP] available" for use with co-branded products. *See* Am. Compl. Ex. 1, § 2(a)(v), Ex. 2, § 2(a)(v). This language is intentional and contemplates that CLC (or other third-party licensing agency) will license the School IP directly to the third-party sponsor (e.g. EA), just as TBG will license the Athletes' NIL directly to the third-party sponsor. Moreover, if TBG did "bundle" the Schools' IP and Client Athletes' NIL in a single license, this would arguably violate the current NCAA NIL policy, which prohibits "[a]ny individual or entity acting on behalf of the athletics department (e.g., third party rights holders, third party agents) [from] representing enrolled [student-athletes] for NIL deals, including securing and negotiating deals on behalf of the [student-athlete]." NCAA Board Guidance, *Institutional Involvement in a Student-Athlete's Name, Image, and Likeness Activities*, (attached as Appendix A).[18] Thus, any interpretation contemplating a requirement of "co-branded licenses" is decisively belied by the unambiguous text of the Agreements and indisputable facts.

EA understands the intentions of the parties' to TBG's Agreements, as demonstrated by the months of conversations and assurances offered by EA to TBG that it would work with TBG to license the Client Athletes' NIL for use in the Game. *See* Am. Compl. ¶¶ 92-96. EA also has a long history of recognizing similar group licensing agreements involving professional athletes and sports teams. For example, EA's *Madden* video game features the NIL of National Football League ("NFL") players, licensed from the NFL Players' Association ("NFLPA"), in combination with the logos and other IP of the NFL players' respective NFL teams, which is separately licensed from the individual teams. *Id*. ¶ 67. It is for this reason, in part, that TBG modeled its collegiate

---

[18] Meghan Durham, *DI board approves clarifications for interim NIL policy*, https://www.ncaa.org/news/2022/10/26/media-center-di-board-approves-clarifications-for-interim-nil-policy.aspx (October 26, 2022).

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

Group Licensing strategy after the format used by the NFL and the NFLPA. *Id.* ¶ 65. Thus, notwithstanding its sudden turnaround on what the Agreements mean and how EA must navigate them, EA understands that its Game is a GLP under the Agreements.[19]

### b) The Amended Complaint establishes EA's interference with TBG's Collaboration Agreements.

Each of TBG's Collaboration Agreements includes either an exclusivity or preferred provider provision,[20] pursuant to which the Partner Schools have agreed not to engage or contract with any third party to "develop, implement or manage" a GLP without, at a minimum, TBG's consent. *Id.* Ex. 1, ¶ 6, Ex. 2, ¶ 6. These provisions are critical to TBG's group licensing business model, as they protect TBG's investment in its relationships and competitive advantage in serving its Client Athletes. It is the Partner Schools' agreement not to support GLPs through anyone other than TBG without TBG's consent, and the Schools' cooperation under the Collaboration Agreements that provides TBG with the ability to facilitate group licensing for its Client Athletes. This agreement ensures that the Partner Schools will only make their IP available for use in GLPs managed by TBG. Further, the Partner Schools' agreement to "support" the GLP encompasses a duty to provide information regarding School athletics programs, contact information for student-athletes, current rosters, team photographs, statistics, and other information needed for TBG to facilitate the use of an entire team's NIL in a product—*precisely* the information and collaboration that EA is now soliciting from the Partner Schools in order to facilitate the Game. However,

---

[19] EA's understanding of TBG's Agreements is further demonstrated by EA's Chief Business Officer, Paul Cairns's, May 12, 2022 comments assuring TBG that EA would put all of TBG's Partner Schools and Client Athletes in the Game, and would enter into direct agreements with TBG at all schools where TBG has rights. Am. Compl. ¶ 96.

[20] As used herein, "Collaboration Agreements" only refers to those Group Rights Collaboration Agreements under which TBG is designated as the exclusive or preferred provider for the Partner Schools' GLPs. TBG has entered into Group Rights Collaboration Agreements with numerous other FBS Schools that do not include exclusivity or preferred provider provisions, and thus, TBG does not seek to enforce its rights under those agreements in the course of this litigation.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT
Case No. 4:23-cv-02994-HSG

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

because of the exclusivity and preferred provider provisions, the Partner Schools agreed that they will not work with or support any third-party in a similar manner to facilitate a GLP.  In exchange, the Partner Schools are able to provide the benefit of GLPs to their student-athletes.

EA has interfered with the Collaboration Agreements in a number of ways.  First, EA has already contracted with certain of TBG's Partner Schools to have their IP featured in the Game. *Id.* ¶ 124.  EA's solicitation of Partner Schools to make their IP available for use in the Game—a GLP that will be managed by a third-party other than TBG—clearly interferes with the Partner Schools' obligations under the Collaboration Agreements.[21]  In addition, EA's partnership with OneTeam to "facilitate the opportunity" for student-athletes to have their NIL featured in the Game also clearly interferes with TBG's contractual, exclusive right to manage a GLP.  *See id.* ¶¶ 98-99.

> ### c)   The Amended Complaint establishes EA's tortious interference with TBG's GLAs.

EA further defends its solicitation of TBG's Partner Schools and use of Client Athletes' NIL in the Game by misrepresenting the scope of the Client Athletes' assignment under the GLAs, arguing that TBG's Group Licensing Rights do not apply so long as Client Athletes employ separate contracts to license the use of their NIL.  EA's interpretation is without support as this leads to a nonsensical result where TBG's rights under the Agreements can be wholly nullified by simply employing separate license agreements for the use of Client Athletes' NIL to achieve an end result that plainly constitutes a GLP.  For example, EA misconstrues the first sentence in paragraph four of the GLAs, which provides "that this Agreement ***does NOT limit*** an Athlete's right to grant the use of his/her ***individual*** Athlete Attributes or ***individual*** NIL for publicity, advertising, or other commercial purposes, except that such individual grants will not preclude the

---

[21] We also note that the Collaboration Agreements are not limited to TBG's Client Athletes, but rather apply to *all* of the Partner Schools' student-athletes.

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

undersigned also from being covered by [GLPs]." Dkt. 34 ("MTD") p 18.[22]  Even as a standalone provision, this sentence does not support EA's theory.  Nothing in this provision suggests that Client Athletes can license their NIL for use in a GLP so long as they do so via individual or separate *licenses*.  Rather, this provision plainly serves to permit Client Athletes to license the individual *use* of Athlete Attributes, meaning an individual use that is not part of a GLP.

Further, EA's interpretation would render other provisions of the GLAs meaningless, which serve to clarify the scope of the exception.  For example, the second half of paragraph four provides as follows:

> This Agreement also does not limit the Athlete's right to join with other Athletes to grant the group use of their NIL for publicity, advertising or other commercial purposes **IF any such other group NIL grant does not involve any use or co-branding of any kind of [Partner School]'s own IP or property (such as trademarks, logos, jerseys, names, nicknames, etc.)**

Am. Compl. Ex. 3, ¶ 4 (emphasis added).  This provision plainly clarifies the meaning of the sentence cited by EA, establishing that Client Athletes retain the right to license their NIL for commercial uses that involve only their individual NIL or that involve the NIL of other Client Athletes, so long as that use is not a co-branding opportunity like the Game.[23]

EA similarly mischaracterizes other sections of the GLAs, again arguing that TBG's rights apply only when Client Athletes' NIL is "bundled" with Partner School IP in a single license.  *See* MTD p 19.  Paragraph 9 of the GLA provides that TBG shall represent a Client Athlete's "GROUP NIL RIGHTS ONLY IN ANY COBRANDED LICENSING THAT ALSO INCLUDES THE UNIVERSITY'S IP[.]"  As noted, though, co-branded does not mean co-licensed.  Nothing in the

---

[22] Page references to the MTD used herein refer to the ECF page number (e.g. Page 18 of 33).

[23] We also note that paragraph four serves to preserve a Client Athletes' right to be represented by TBG for the use of their NIL in GLPs, even if an Athlete also participates in non-GLP NIL opportunities.  *See* Am. Comp. Ex. 3 ¶ 4 ("except that such individual grants will not preclude the undersigned also from being covered by the Collegiate Group Licensing Programs granted by TBG.").

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

Agreements or the plain language meaning of "co-branded" supports EA's position.  Likewise, the language in paragraph 12, providing that the GLA "DOES NOT RESTRICT ANY OF [THE ATHLETE'S] EXISTING GROUP NIL AGREEMENTS NOR ANY SUCH FUTURE NIL AGREEMENTS THAT DO NOT ALSO INCLUDE THE UNIVERSITY'S CO-BRANDED IP[,]" simply makes clear that under the GLA, Client Athletes retain the right to license their NIL with other student-athletes, so long as the use does not constitute a GLP.  EA's interpretation would essentially render meaningless the most material terms of the Agreements.  As EA's interpretation is contrary to the most basic canons of contract interpretation, EA fails to disprove TBG's well-pleaded allegations regarding EA's tortious interference with the Agreements.

### 2. Alternatively, TBG's Agreements are ambiguous, and extrinsic evidence is necessary to determine the parties' intent.

Although the Agreements unambiguously support TBG's position, TBG has at least demonstrated that the disputed language is ambiguous.  Dismissal of TBG's tortious interference claim is not appropriate where extrinsic evidence is needed to determine the intentions of the parties to the Agreements.  "Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning."  *Wolf v. Super. Ct.*, 114 Cal. App. 4th 1343, 1350, 8 Cal. Rptr. 3d 649, 655 (2004) (reversing the trial court's award of summary judgment for defendants for failure to consider extrinsic evidence to ascertain meaning of disputed contract language).  *Id.* at 1351.  Further, "[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible."  *Id.*

Here, at a minimum, TBG's Amended Complaint establishes that TBG's Agreements are *at least* ambiguous as to the terms "Group Licensing Program" and "co-branding," and thus reasonably susceptible of TBG's interpretation.  Indeed, the Amended Complaint pleads sufficient

17

facts to demonstrate that the Partner Schools have historically agreed with TBG's interpretation. *See, e.g.*, Am. Compl. ¶ 103, Ex. 5 (alleging that a representative from one Partner School asked EA about a possible conflict with its obligations to TBG, informing EA that, "We are currently a BrandR exclusive school."); *id.* ¶ 60 (discussing the Wrangler campaign with the University of Texas as an example of a previous Group Licensing Program).  EA *itself* has demonstrated that the Agreements are susceptible to TBG's interpretation.  *See id.* ¶ 96 (alleging that in May 2022, EA assured TBG that it would contract directly with TBG for student-athlete NIL at all schools where TBG has rights); *id.* ¶ 67 (demonstrating EA's history of licensing NFL players' NIL as a group via the NFLPA and separately licensing NFL team IP for use in its *Madden* video game). In all events, therefore, EA is not entitled to dismissal, and extrinsic evidence should be admitted for a jury to consider at trial.  *See Moore v. Wells Fargo Bank, N.A.*, 39 Cal. App. 5th 280, 287, 251 Cal. Rptr. 3d 779, 785 (2019) (reversing award of judgment for defendant where trial court failed to consider extrinsic evidence to determine declaratory judgment cause of action); *Atlanta Cancer Care, P.C. v. Amgen, Inc.*, 359 F. App'x 714, 716 (9th Cir. 2009) (holding that under California law, "courts may not dismiss on the pleadings when one party claims that extrinsic evidence renders the contract ambiguous.").

**B.    The Amended Complaint establishes EA's intentional interference with TBG's prospective economic advantage.**

EA's arguments regarding TBG's claim for intentional interference with prospective economic advantage are without merit.  As set forth above, EA bases its entire argument on a misrepresentation of the plain language and intentions of the parties to TBG's Agreements. Further, under California law, the existence of a contract does not defeat TBG's claim.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 63 P.3d 937 (2003).  California courts have made clear that "the existence of a contract does not mean that a plaintiff's claim must be brought exclusively as one for interference with contract."  *Id.* at 1157.  The distinction between

18

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

the torts of interference with contract and prospective economic advantage is that "a plaintiff must plead that the defendant engaged in an act that is wrongful apart from the interference itself" with prospective economic advantage. *Id.* at 1158. Here, TBG identifies numerous misrepresentations made by EA to its Partner Schools as the independent wrongful acts supporting its claim for interference with prospective economic advantage. *See* Am. Compl. ¶¶ 116, 146, 173.

This Court has previously acknowledged that both claims for tortious interference with contract and intentional interference with prospective advantage can proceed when a valid contract is alleged. *See Nicolosi Distrib., Inc. v. BMW N. Am., LLC*, No. C 10-3256 SI, 2011 WL 479993, *2 (N.D. Cal. Feb. 7, 2011) (denying defendant BMW's motion for judgment on the pleadings where plaintiff alleged BMW knew of its exclusive paint supply agreement with GM but required GM to contract to use BMW's paint, resulting in damages to plaintiff in the form of lost paint sales and non-paint sales that the plaintiff would have made as a vendor to GM.); *see also Rader Co. v. Stone*, 178 Cal. App. 3d 10, 29, 223 Cal. Rptr. 806 (Ct. App. 1986) (holding that plaintiff, a real estate broker, sufficiently pled claim for intentional interference with prospective economic advantage where plaintiff alleged that defendant had knowledge of plaintiff's relationship with property owner and intentionally excluded plaintiff from lease negotiations, resulting in defendant obtaining lease at a lower price than if plaintiff's commission had been fully paid, and that plaintiff was damaged in amount at least equal to the commission).

TBG's allegations against EA are analogous to the plaintiff's claims against BMW in *Nicolosi*. Despite being informed by TBG and TBG's Partner Schools of their obligations under the Collaboration Agreements, EA ignored TBG's rights, seeking to work directly with Partner Schools and directly license the use of the Client Athlete's NIL. Thus, EA's motion to dismiss this claim should be denied.

C.   **The Amended Complaint establishes TBG's right of publicity claims.**

19

TBG's Amended Complaint establishes each of the required elements for its right of publicity claims, and EA's request to dismiss these claims as unripe or based on a lack of standing should be denied.[24]

### 1.   TBG's right of publicity claims are ripe.

In EA's direct communications to TBG, TBG's Partner Schools, and statements to the media, EA articulated a definitive, concrete plan to use Client Athletes' NIL in the Game without TBG's consent.  Am. Compl. ¶¶ 98-99, 103, 105, 135.  Even since the filing of this action, TBG is aware that EA has continued to violate TBG's rights as it proceeds in developing its Game, asking Partner Schools to provide photographs and other information relating to members of the football team to develop the players' digital avatars for use in the Game.  TBG has sufficiently pled its impending injury to move forward with discovery through which additional evidence of EA's conduct will be developed.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147, 185 L. Ed. 2d 264 (2013) (requiring that threatened injury be "certainly impending to constitute injury in fact"); *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (holding that a claim is ripe when the issues presented are "definite and concrete, not hypothetical or abstract").

### 2.   TBG has standing to bring its right of publicity claims.

EA contends that TBG's Agreements with the Client Athletes contain nonexclusive licenses, and that consequently, TBG lacks standing to bring a claim for violation of its right of publicity.  EA's position is without support.  Under the combined rights granted to TBG under the

---

[24] To establish a claim for common law right of publicity (or misappropriation of name or likeness), a plaintiff must show "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Loc. TV, LLC v. Super. Ct.*, 3 Cal. App. 5th 1, 8 (2016). A claim for statutory violation of right of publicity under California Civil Code section 3344, requires the same elements, and also "a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose." *Upper Deck Co. v. Panini Am., Inc.*, 469 F. Supp. 3d 963, 982 (2020).

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel   +1.310.788.4471 fax

Agreements, TBG is the exclusive or preferred manager of GLPs, meaning that no other third-party can use the NIL of Partner Schools' student-athletes' in a GLP without TBG's consent.  Thus, while TBG's right to use Client Athletes' NIL is limited to GLPs, it is nevertheless exclusive for this purpose.  *See Timed Out, LLC v. Youabian, Inc.*, 229 Cal. App. 4th 1001, 1009 (2014) (rejecting defendant's argument that limited assignment of right to sue for misappropriation of models' likenesses was insufficient to grant plaintiff standing to maintain right of publicity claim).

Alternatively, even if TBG's rights to the Client Athletes' NIL are deemed nonexclusive, this does not defeat TBG's standing to assert its right of publicity claims.  *See Upper Deck Co. v. Flores*, 569 F. Supp. 3d 1050, 1068 (S.D. Cal. 2021) (holding that an allegation of a non[]exclusive license is sufficient to support standing); *Del Amo v. Baccash*, No. CV 07-663 PSG (JWJx), 2008 WL 2780978, at *9 (C.D. Cal. July 15, 2008) (holding that models' grant to producer of "perpetual but non[-]exclusive right to use, and license others to use," Artist's NIL was sufficient to assign models' rights of publicity under § 3344); *see also Upper Deck Co. v. Panini Am., Inc.*, 533 F. Supp. 3d 956, 968 (S.D. Cal. 2021) (rejecting standing analysis in *Upper Deck Authenticated, Ltd. v. CPG Direct*, 971 F. Supp. 1337, 1349 (S.D. Cal. 1997) as not based in California law).

### 3.    California law applies to TBG's right of publicity claims.

EA contends that TBG's right of publicity claim fails because TBG "has not alleged facts sufficient to show which state's/states' law(s) apply to those claims."  MTD p 26.  Even if true, EA fails to show any support for why this warrants dismissal.  Further, EA fails to establish that California law does not apply to TBG's right of publicity claims.  The *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1028 (C.D. Cal. 1998) case relied on by EA is distinguishable in that it involved a different California statute governing the post-mortem right of publicity after the property holder's death, and the court merely addressed the living right of publicity statute in dicta, "noting that cases based on publicity rights under § 3344 have typically selected the law of the

property owner's domicile when resolving choice of law questions under California's governmental interests test." *Id.* at 1028.

In addition, TBG's alleged harm relates to a nationwide and international market insofar as the anticipated sales of EA's Game.  Thus, even if TBG is precluded from bringing right of publicity claims in certain of the Client Athletes' home states, EA has not shown why TBG could not bring these claims under California law.  *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126, 1146 (N.D. Cal. 2014) (holding that where alleged harm occurred in national market for licensing rights for NIL in game broadcasts, to "disprove the existence of this market at the pleading stage, the NCAA would have to identify a law or set of laws that precludes student-athletes from asserting publicity rights to game broadcasts in every state").

### D.   The Amended Complaint establishes EA's violation of the UCL.

As discussed more fully above, TBG's Amended Complaint pleads sufficient allegations to establish EA's violation of California's Unfair Competition Law.  The UCL is broad in scope, prohibiting any "unlawful, unfair or fraudulent business act or practice[.]"  Cal. Bus. & Prof. Code § 17200.  Here, TBG alleges sufficient facts to prevail on this claim.

#### 1.   TBG's allegations establish EA's unlawful and unfair conduct.

As set forth above, TBG has pled sufficient facts to establish a right to relief on its tortious interference with contract, intentional interference with prospective advantage, and right of publicity claims, each of which is sufficient on its own to support the unfair prong of the UCL. *See e.g. Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1017 (C.D. Cal. 2013) (holding that "a claim under the UCL unlawful prong may be premised upon the unlawful actions that constitute tortious interference with contractual relations.").

EA's conduct also violates the "unfair" prong of the UCL, which is based on a practice that

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

"offends an established public policy" or that "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001), as modified (Nov. 20, 2001) (internal citations omitted). Here, EA is interfering with TBG's Agreements for the purpose of denying the Client Athletes their desired representation in order to underpay college athletes for the value of their NIL. Such conduct is unquestionably unfair and against California's public policy in favor of athletes' right to adequate compensation for their NIL. *See, e.g.*, Cal. Educ. Code § 67456 (California's "Fair to Play" act, which prohibits a collegiate institution from preventing its student-athletes "from earning compensation as a result of the use of the student's [NIL], or athletic reputation.").

### 2.     TBG demonstrates an inadequate remedy at law.

EA's reliance on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) in challenging TBG's request for equitable relief is misplaced. In *Sonner*, the Ninth Circuit affirmed the district court's dismissal of plaintiff's claim for equitable restitution under the UCL where the plaintiff failed to establish that she lacked an adequate remedy at law. *Id*. at 844. As EA correctly recognizes, *Sonner* specifically did not apply to injunctive relief. *See* MTD p 28, n 13. Although EA contends that other courts applying *Sonner* have found that all forms of equitable relief are barred where a plaintiff has a legal remedy, EA overstates the applicability of *Sonner* here.

Courts in this district have recognized that "[i]njunctive relief was explicitly not at issue in *Sonner*" and that "[m]anifest differences . . . exist between . . . the retrospective equitable remedy of restitution and the prospective equitable remedy of an injunction." *Brooks v. Thomson Reuters Corp.*, No. 21-CV-01418-EMC, 2021 WL 3621837, at *11 (N.D. Cal. Aug. 16, 2021) (noting recent cases recognizing that a damages award may be insufficient to deter a defendant from engaging in an unlawful, unfair, or fraudulent business practice.); *see Zeiger v. WellPet LLC*, No. 3:17-CV-04056-WHO, 2021 WL 756109, at *21 (N.D. Cal. Feb. 26, 2021) (holding that

"[a]ssuming that *Sonner* applies to injunctive relief, [plaintiff] has shown that monetary damages for past harm are an inadequate remedy for . . . future harm"); *see also Andino v. Apple, Inc.*, No. 20-CV-01628-JAM-AC, 2021 WL 1549667, at *5 (E.D. Cal. Apr. 20, 2021) (holding that "*Sonner* does not warrant dismissal of [plaintiff's] request for injunctive relief" because "[m]oney damages are an inadequate remedy for future harm, as they will not prevent [d]efendant from continuing the allegedly deceptive practice"). Accordingly, where TBG alleges ongoing future harm, TBG has sufficiently shown that it lacks an adequate remedy at law to support its UCL claim.

EA's argument fails for the additional reason that the pleading stage is not the appropriate time to address the adequacy of remedies that are pled in the alternative. A number of district courts since *Sonner* have concluded that it has minimal application at the pleading stage. *See Nacarino v. Chobani, LLC*, No. 20-cv-7437-EMC, 2022 WL 344966, at *9–10 (N.D. Cal. Feb. 4, 2022) (discussing that *Sonner* has limited applicability at the pleading stage); *Johnson v. Trumpet Behav. Health, LLC*, No. 3:21-CV-03221-WHO, 2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022) (noting that *Sonner* was decided at a later posture and holding that "if a plaintiff pleads that she lacks an adequate legal remedy, *Sonner* will rarely (if ever) require more this early in the case); *see also Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, No. 19-CV-00792-EMC, 2022 WL 844152, at *8 (N.D. Cal. Mar. 22, 2022) (denying defendant's Rule 12(c) motion as to UCL claim, holding that "Plaintiffs' request for restitution under the UCL as a remedy in the alternative to legal remedies under the labor code is both sufficient and permissible at the pleading stage").

Here, TBG seeks the equitable remedy of permanent injunctive relief to prevent the irreparable harm that will result if EA continues to interfere with TBG's rights. TBG has alleged an inadequate legal remedy in that EA's conduct, if not stopped, threatens the survival of TBG's business as well as future rights for TBG, its Partner Schools, and Client Athletes beyond just the single opportunity presented by the Game. Am. Compl. ¶¶ 133, 144. Moreover, TBG's monetary

damages are extremely difficult to ascertain given that TBG's future compensation under the GLAs depends on TBG's ability to negotiate with EA for future royalty payments for the use of Client Athletes' NIL in the Game, as well as future losses relating to future simulation game play within college football.  *Id.* at 133.  Under California law, a final injunction may be granted to prevent the breach of an obligation existing in favor of a plaintiff where, as here, "it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief."  Cal. Civ. Code § 3422.  Accordingly, EA's request to dismiss TBG's UCL claim should be denied.

### E.    TBG pled a valid claim for declaratory judgment.

EA's use of TBG's Client Athletes' NIL in the Game is a violation of TBG's rights under the Collaboration Agreements with Partner Schools and GLAs with Client Athletes.  EA disputes that it has violated TBG's rights under the Agreements, and thus an actual controversy exists, for which a declaration is needed to determine TBG's rights.  *See* Cal. Civ. Code § 1060.

### F.    Alternatively, dismissal should be without prejudice.

Should the Court determine that the Amended Complaint fails to establish the claims stated therein, TBG should be granted leave to amend.  *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (reversing dismissal, noting that prejudice to opposing party is the touchstone of the inquiry under rule requiring leave to amend to be given freely).  Alternatively, in light of EA's claims that no Client Athlete has yet entered into a licensing agreement with EA and that EA does not plan to release the Game until 2024, *see* Dkt. 16 p 4, if the Court determines that dismissal is appropriate, dismissal should be without prejudice to TBG's ability to re-file its action once additional evidence has been established.

## VI.    CONCLUSION

For the reasons stated herein, TBG respectfully requests that the Court deny EA's Motion to Dismiss TBG's Amended Complaint.

Katten

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
+1.310.788.4400 tel  +1.310.788.4471 fax

DATED:  September 19, 2023

**KATTEN MUCHIN ROSENMAN LLP**

By:*/s/ Lindsey L. Smith*

Richard L. Farley (admitted *pro hac vice*)
Richard.farley@katten.com
Lindsey L. Smith (admitted *pro hac vice*)
lindsey.smith@katten.com
Kelsey R. Panizzolo (admitted *pro hac vice*)
Kelsey.panizzolo@katten.com
500 S. Tryon Street, Suite 2900
Charlotte, NC 28202-4213
Telephone: 704.344.3178
Facsimile: 704.444.2050

Christopher D. Beatty (SBN 266466)
chris.beatty@katten.com
Ashley T. Brines (SBN 322988)
ashley.brines@katten.com
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: 310.788.4400
Facsimile: 310.788.4471

ATTORNEYS FOR THE BRANDR GROUP, LLC

**APPENDIX A**

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT
Case No. 4:23-cv-02994-HSG



**NCAA Division I**
**Institutional Involvement in a Student-Athlete's Name, Image and Likeness Activities**
**October 26, 2022**

**Background:**

Effective July 1, 2021, the NCAA adopted the Interim Name, Image and Likeness (NIL) Policy allowing NCAA student-athletes the opportunity to benefit from their NIL without jeopardizing their NCAA eligibility.  A November 2021 question-and-answer document clarifies that schools may not use NIL transactions to compensate student-athletes for athletics participation or achievement or as an improper inducement. Further, the Q&A states that schools should not dictate how student-athletes use their compensation (e.g., should not require student-athletes to use compensation for financial aid). Although not under the NCAA's purview, it also raised other potential issues, such as claims for contractual nonperformance, Title IX issues and employment issues to which campus compliance, Title IX and general counsel staff should be consulted. Finally, the Q&A states that institutions should not provide compensation in exchange for the use of a student-athlete's name, image or likeness.

In May 2022, the NCAA Division I Board of Directors released additional guidance related to the NIL interim policy stating that institutional coaches and staff may not organize, facilitate or arrange a meeting between a booster/NIL entity and a prospective student-athlete or communicate directly or indirectly with a prospective student-athlete on behalf of a booster/NIL entity.  However, the guidance did not specifically extend this prohibition to involvement with NIL activities for currently enrolled student-athletes.  Further, a July 2022 Q&A provides more clarification surrounding the prohibition of institutional involvement with boosters, NIL Collectives and prospective student-athletes; however, it does not specifically address institutional involvement with NIL activities for currently enrolled student-athletes.

In order to maintain key principles of fairness and integrity across the NCAA and reinforce rules prohibiting improper institutional involvement and pay-for-play, the NCAA Division I Board of Directors issued the following guidance to clarify the application of existing NCAA legislation and the NIL policy in the current NIL environment, specifically addressing institutional involvement in enrolled student-athletes' NIL activities.

**Applicable Legislation:**

Per NCAA Division I Bylaw 11.1.3, athletics department staff members are prohibited from representing a prospective student-athlete or enrolled student-athlete in marketing their athletics ability or reputation. Further, per Bylaw 12.1.2-(a), a student-athlete may not use athletics skill (directly or indirectly) for pay in any form.  Additionally, per Bylaw 12.5.1.1-(f), institutions may not compensate a student-athlete in exchange for the use of their NIL.  Finally, while Bylaw 16.02.3 generally prohibits an institutional staff member or booster from providing a student-athlete with a special arrangement or benefit, Bylaw 16.3 permits institutions to finance and assist student-athletes with personal development services.

**Disclaimer:**

This document addresses the application of **NCAA Division I Bylaws and the NCAA Interim Policy** to institutional involvement in a **current student-athlete's NIL Activities**.  The guidance in this document is subject to state laws or executive actions with the force of law in effect. Further, institutions should consult legal counsel regarding other issues that may stem from institutional involvement in NIL activities, such as the potential for contractual nonperformance, Title IX and employment related matters.

NCAA Division I: Institutional Involvement in Name, Image and Likeness Activities
October 26, 2022
Page No. 2
_____

**Effective Date:**

The guidance is effective immediately. For violations that occurred prior to the publication date of this document, the Board of Directors directed the NCAA enforcement staff to review the facts of individual cases but to pursue only those actions that clearly are contrary to the published interim policy, including the most severe violations of institutional involvement or pay for play.  Further, the emphasis of this NIL guidance is on institutions involved in student-athletes' NIL activities and is not intended to question the eligibility of enrolled student-athletes.

NCAA Division I: Institutional Involvement in Name, Image and Likeness Activities
October 26, 2022
Page No. 3
_____

### INSTITUTIONAL EDUCATION AND MONITORING

| *Permissible under Interim Policy/NCAA rules* |
| --- |
| • Educational sessions for SAs: Financial literacy, taxes, entrepreneurship, social media, etc.<br>• Educational sessions for NIL entity (e.g., Collectives).<br>• Educational sessions for boosters.<br>• Educational sessions for PSAs.<br>• Required reporting of NIL activity by SAs.<br><br>*No impermissible activities identified at this time; additional circumstances to be considered, as appropriate. |

### INSTITUTIONAL SUPPORT FOR STUDENT-ATHLETE NIL ACTIVITY

| *Permissible under Interim Policy/NCAA Rules* | *Impermissible under Interim Policy/NCAA Rules* |
| --- | --- |
| • Engage NIL entity to inform SAs of NIL opportunities.<br>• Engage NIL entity to administer a marketplace that matches SAs with NIL opportunities without involvement of institution.<br>• Provide information to SAs about opportunities that institution has become aware of (transmit information without further involvement).<br>• Provide SA contact information and other directory information to NIL entity (e.g., Collectives and others seeking to engage SAs).<br>• Provide stock, stored photo/video/graphics to a SA or NIL entity.<br>• Introduce SA to representatives of NIL entity.<br>• Arrange space for NIL entity and SA to meet on campus or in institution's facilities.<br>• Promote SA's NIL activity, provided there is no value or cost to the institution (e.g., retweeting or liking a social media post).<br>• Promote SA's NIL activity on paid platform provided SA or NIL entity is paying going rate for advertisement (e.g., NIL entity pays for advertisement on video board).<br>• Purchase items related to a SA's NIL deal that are de minimis in value and for the same rate available for the general public. | • Communicate with NIL entity regarding specific SA request/demand for compensation (e.g., SA needs X dollars in NIL money) or encouragement for NIL entity to fulfill SA's request.<br>• Proactively assist in the development/creation, execution or implementation of a SA's NIL activity (e.g., develop product, develop promotional materials, ensure SA performance of contractual NIL activities) unless the same benefit is generally available to the institution's students.<br>• Provide services (other than education) to support NIL activity (e.g., graphics designer, tax preparation, contract review, etc.) unless the same benefit is generally available to the institution's students.<br>• Provide access to equipment to support NIL activity (e.g., cameras, graphics software, computers, etc.) unless the same benefit is generally available to the institution's students.<br>• Allow SA to promote their NIL activity while on call for required athletically related activities (e.g., practice, pre- and postgame activities, celebrations on the court, press conferences). |

NCAA Division I: Institutional Involvement in Name, Image and Likeness Activities
October 26, 2022
Page No. 4
_____

### INSTITUTIONAL SUPPORT FOR NIL ENTITY/COLLECTIVE

| *Permissible under Interim Policy/NCAA Rules* | *Impermissible under Interim Policy /NCAA Rules* |
|---|---|
| • Staff member assists NIL entity in raising money for NIL entity (e.g., appearances at fundraisers, donates autographed item).<br>• Provide assets (e.g., tickets, suite) to NIL entity under sponsorship agreement provided access to assets are available to and on the same terms, as other sponsors.<br>• Request donor to provide funds to NIL entity (without directing funds be used for a specific sport or SA).<br>• Provide donor information or facilitate meetings between donors and NIL entity. | • Subscribes to the entity and donates cash to the entity (regardless of whether funds are earmarked for a specific sport or SA).<br>• Provide assets (e.g., tickets, suite) to a donor as an incentive for providing funds to the NIL entity.<br>• Athletics department staff member employed by NIL entity. |

### NEGOTIATING, REVENUE SHARING AND COMPENSATING

| *Impermissible under Interim Policy/NCAA Rules* |
|---|
| • Athletics department staff member (or company owned by staff member) representing enrolled SAs for NIL deals, including securing and negotiating deals on behalf of the SA.<br>• Any individual or entity acting on behalf of the athletics department (e.g., third party rights holders, third party agents) representing enrolled SAs for NIL deals, including securing and negotiating deals on behalf of the SA.<br>• Institution entering into a contract with SA for the sale of product related to SA's NIL.<br>• Conference and SA revenue sharing: Broadcast revenue, NIL revenue.<br>• Staff members who own businesses separate from the institution, providing NIL deal with a SA.<br>• Institutional coach compensating SA to promote coach's camp.<br>• SAs receiving compensation directly or indirectly for promoting an athletics competition in which they participate. |

*** This is a nonexhaustive list of permissible and impermissible institutional involvement in a current student-athlete's NIL activities.**